**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| *IN RE* **FMC CORPORATION SECURITIES LITIGATION** | Case No. 2:23-cv-04398-KNS |
| | |
| **This Document Applies To:** | <u>CLASS ACTION</u> |
| **ALL ACTIONS** | |
| | **JURY TRIAL DEMANDED** |

**AMENDED COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     JURISDICTION AND VENUE .........................................................................12

III.    THE PARTIES AND RELEVANT NON-PARTIES..........................................12

        A.      Lead Plaintiff ..........................................................................................12

        B.      Additional Plaintiff ................................................................................13

        C.      Defendants ...............................................................................................13

                1.      Corporate Defendant FMC ..........................................................13

                2.      Individual Defendants..................................................................13

        D.      Former Employees Reporting Relevant Facts .......................................15

IV.     FACTUAL BACKGROUND.............................................................................20

        A.      FMC's Business Model, Financial Reporting Practices, and Internal
                Processes for Demand Forecasting and Monitoring ...............................20

                1.      FMC's Sales Model ......................................................................20

                2.      FMC's Financial Reporting ..........................................................21

                3.      FMC's Reliance on Debt Subject to Leverage Ratios ..............22

                4.      FMC's Access to Current, Comprehensive Data on Sales,
                        Inventory, and Other Key Metrics to Inform Its Demand Planning
                        and Budgeting Operations.............................................................24

                        a.      Information on Product Demand, Channel Inventories, and
                                Other Key Metrics Is Shared Internally at FMC in Regular
                                Meetings...........................................................................24

                        b.      FMC's "Cutting Edge" Data System Gives Management
                                Real-Time Transparency and Reporting with Respect to
                                FMC's Performance and Product Movements from "End-
                                to-End"..............................................................................25

        B.      FMC's "Pivotal" and "Transformative" Acquisition of the Diamide
                Products...................................................................................................27

        C.      FMC Announces Its Five-Year Plan in 2018, Centered Around Diamide
                Sales ........................................................................................................29

        D.      Leading Up to the Class Period, FMC Touts Its Financial Success and the
                Future Prospects of Its Products Including the Diamides.......................31

E.    During the Class Period, FMC Assures Investors that Demand for Its Products Is Growing, There Are No Significant Channel Inventory Issues, and that Patent Protection for the Diamides Will Preserve Revenues and Fend Off Competitors ................................................................33

    1.    Defendants' Representations Concerning Growth and Product Demand in 2022 ...............................................................33

    2.    Defendants' Representations Concerning Growth and Product Demand in 2023 ...............................................................38

F.    Unbeknownst to Investors, FMC Experienced an Unsustainable Increase in Channel Inventory Levels in 2021 to 2022, Which, Combined with the Entrance of Generic Competitors and Other Factors, Caused Demand to Plummet ................................................................42

    1.    FMC Experienced a Demand "Bubble" and a Large Increase in Channel Inventory Levels in the Distribution Channels During COVID ................................................................42

    2.    Coming Out of COVID, and Despite the Fact that the Channels Were "Saturated" with Products that Had Been Overbought During the Pandemic, Douglas and FMC Continued to "Push" Sales and Increase Sales Targets ................................................................48

    3.    In Addition to Packed Channel Inventories, FMC Faced Other Major Factors that Negatively Impacted Demand and Revenues During the Class Period ................................................................54

        a.    FMC Suffered a Series of Litigation Losses that Threatened the Continued Viability of Its Diamide Patent Portfolio ...............54

        b.    Generic Competition Around the Globe Began Cutting Deeply into FMC's Demand During the Class Period .................57

        c.    In Addition to Saturated Channel Inventories and Encroaching Generics, Other Market Factors Dampened Demand for FMC's Products During the Class Period.................60

    4.    FMC's Demand, Cash Flow, and Revenue Picture Did Not Improve During the Class Period, Despite Defendants' Desperate Measures to Incentivize Sales and Cut Costs ...............................62

    5.    Defendants' Knowledge of Current Inventory and Demand Levels .........68

        a.    FMC's Bottom-Up Demand Planning and Forecasting Processes Provided Company Management with Real-Time Data Regarding the Demand and Inventory Levels for the Company's Products ...........................................................68

        b.    Channel Inventories, Demand, and Other Metrics Were Routinely Discussed During Meetings and Calls at the Regional Level and Company-Wide..............................................73

           c.      Internal FMC Reports and Data Systems Provided Further Insight into Sales, Revenues, Channel Inventories, and Demand ..................................................................................76

V.     THE TRUTH IS GRADUALLY REVEALED........................................................79

    A.    Defendants Slash Guidance As Excess Inventory Leads to Volume Declines.....................................................................................................80

        1.    May 1-2, 2023: Defendants Cut 2Q 2023 Outlook...................80

        2.    July 10, 2023: Defendants Further Cut 2Q 2023 Outlook and Reduce Full-Year 2023 Outlook........................................82

    B.    September 7, 2023: Blue Orca Publishes Report Revealing Misrepresented and Concealed Threats to Demand and Patent Protection for FMC's Diamides ...............................................................................................84

    C.    October 23, 2023: Defendants Again Cut Outlook for 2023 ...............86

    D.    October 30-31, 2023: 3Q Results and Negative FCF Guidance...........88

VI.    POST-CLASS PERIOD EVENTS ......................................................................91

    A.    FMC Further Amends the Fifth Credit Agreement..............................91

    B.    Defendants' Admissions Regarding Channel Inventories ...................91

VII.   DEFENDANTS VIOLATED ITEM 303 OF REGULATION S-K ................................93

VIII.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS ...................................95

    A.    February 8, 2022 4Q 2023 Earnings Press Release and February 9, 2022 4Q 2023 Earnings Call.......................................................................95

    B.    February 25, 2022 2021 Form 10-K ..................................................99

    C.    March 8, 2022 RBC Capital Markets Chemicals and Packaging Conference ........................................................................................101

    D.    May 3, 2022 1Q 2022 Form 10-Q ...................................................102

    E.    May 3, 2022 1Q 2022 Earnings Call ................................................102

    F.    May 4, 2022 Wells Fargo Industrial Conference...............................104

    G.    May 18, 2022 BMO Capital Markets Global Farm to Market Conference.........105

    H.    August 3, 2022 2Q 2022 Form 10-Q ................................................107

    I.    August 3, 2022 2Q 2022 Earnings Call ............................................107

    J.    November 1, 2022 3Q 2022 Earnings Press Release and November 2, 2022 3Q 2022 Earnings Call..............................................................109

K.    November 2, 2022 3Q 2022 Form 10-Q .................................................113

L.    November 8, 2022 Morgan Stanley Global Chemicals, Agriculture and Packaging Conference ................................................................115

M.    February 7, 2023 4Q 2022 Earnings Press Release .............................116

N.    February 8, 2023 4Q 2022 Earnings Call ...........................................120

O.    February 21, 2023 Citi Global Industrial Tech and Mobility Conference..........121

P.    February 24, 2023 2022 Form 10-K ...................................................124

Q.    March 1, 2023 Bank of America Global Agriculture and Materials Conference ................................................................................127

R.    May 1, 2023 1Q 2023 Earnings Press Release and May 2, 2023 1Q 2023 Earnings Call................................................................................128

S.    May 2, 2023 1Q 2023 Form 10-Q ......................................................131

T.    May 9, 2023 Goldman Sachs Industrials & Materials Conference .....................131

U.    May 18, 2023 BMO Capital Markets Global Farm to Market Conference .........134

V.    August 3, 2023 2Q 2023 Earnings Call ..............................................137

IX.    SUMMARY OF SCIENTER ALLEGATIONS ..............................................139

A.    Defendants' Access to Information Reflecting Demand and Inventory Levels Among Other Metrics.................................................................140

B.    Defendants Repeatedly Addressed Demand for FMC's Products, Inventory Levels, and Competition in Response to Analyst and Investor Questions and Professed to Have Knowledge and Insight into These Topics.................................................................................142

C.    Defendants Professed to Have Detailed Knowledge and Insight into Factors Driving Demand, Including Channel Inventory and Competition from Generic Products and Routinely Discussed These Topics in Prepared Remarks and SEC Filings .................................................................146

D.    Diamide Revenues and Revenues from LATAM and Asia Drove Revenues for FMC .................................................................147

E.    Additional Indicia of Scienter .........................................................149

X.    NEITHER THE STATUTORY SAFE HARBOR NOR THE BESPEAKS CAUTION DOCTRINE APPLIES.................................................................153

XI.    LOSS CAUSATION.................................................................154

A.    First Partial Corrective Disclosure: May 1-2, 2023 ...........................154

iv

B. Second Partial Corrective Disclosure: July 10, 2023 ........................................... 159

C. Third Partial Corrective Disclosure: September 7, 2023 ..................................... 162

D. Fourth Partial Corrective Disclosure: October 23, 2023 ..................................... 166

E. Final Partial Corrective Disclosure: October 30-31, 2023 ................................. 170

XII. CLASS ACTION ALLEGATIONS ..................................................................... 177

XIII. THE FRAUD ON THE MARKET PRESUMPTION APPLIES ................................... 179

XIV. CAUSES OF ACTION ................................................................................. 180

XV. PRAYER FOR RELIEF ................................................................................. 184

Court-appointed Lead Plaintiff Ruth Asset Management ("Ruth"), and additional plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma," and together with Ruth, "Plaintiffs"), by and through their undersigned counsel, bring this action individually and on behalf of all others similarly situated who purchased or otherwise acquired FMC Corporation ("FMC" or the "Company") common stock between February 9, 2022, and October 30, 2023, both dates inclusive (the "Class Period"), and were injured thereby (the "Class"). This action is brought against defendants FMC and its former and current executive officers, Mark A. Douglas and Andrew D. Sandifer ("Douglas" and "Sandifer," together, the "Individual Defendants," and with FMC, "Defendants").

Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon, among other things, the ongoing investigation conducted by and through their attorneys. This investigation includes, but is not limited to, reviewing and analyzing: (i) documents that FMC filed with the United States Securities and Exchange Commission (the "SEC"); (ii) securities analyst reports about FMC; (iii) transcripts of FMC investor conference calls and conference appearances; (iv) FMC press releases and publicly available slide presentations; (v) press and media reports, including online news sources; (vi) other public material obtained in connection with Plaintiffs' continuing investigation; and (vii) interviews of former FMC employees ("Former Employees" or "FEs"). Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    FMC is a global agricultural sciences company based in Philadelphia, Pennsylvania, that primarily derives its revenues from developing, commercializing, distributing,

and selling crop protection and enhancement chemicals around the world through its own sales force as well as through independent distributors and partner entities. The gravamen of this case is that Defendants fraudulently misrepresented FMC's actual demand and revenue picture during the Class Period by portraying a sustained, market-leading growth story based on increasing demand, healthy inventories in distribution channels, and impregnable patent protections around FMC's leading product suite, when the truth was starkly worse. In fact, by 2022, FMC's demand and growth were under acute strain around the globe, due to massive post-COVID channel inventory backlogs, the steady encroachment of generic competition for key products, and other mounting headwinds, such as industry consolidation at the distribution and retail levels that shrank FMC's market share. When these material adverse facts began trickling into the market through a string of corrective disclosures between May and October 2023, investors were stunned, and FMC's common stock price plunged, decimating billions of dollars of shareholder value. This lawsuit seeks to recover those fraud-based losses.

2.    FMC's products include crop nutrition and seed treatment products, as well as herbicides, fungicides, and its leading revenue-generator, insecticides. In 2017, FMC acquired two industry-leading diamide agricultural insecticides—Rynaxypyr and Cyazypyr (the "Diamides")—from DuPont for more than $1 billion. The deal, which Defendants hailed as "transformative," was a potential blockbuster for FMC, that Defendants claimed would generate billions in revenue, substantially expand its research and development capabilities, and turn the Company into one of the largest agricultural chemical companies in the world. One year after the DuPont transaction closed, FMC announced a new five-year strategic plan that aggressively forecasted revenue growth based largely on continual demand increases for Rynaxypyr and Cyazypyr.

3.    The Diamides quickly became FMC's flagship products and principal revenue drivers, accounting for at least 35% of the Company's total revenue in each fiscal year from 2019 to 2021. From the beginning of the Class Period through the end of 2022, FMC continued to report purported strong financial results, and it appeared to the market that, unlike most of its competitors, FMC had navigated COVID-era disruptions and emerged in 2022 on a wave of remarkable, sustained revenue growth, underpinned substantially by sales of the Diamides.

4.    Unsurprisingly, FMC's ability to sustain growing sales and demand for all of its products was a key concern of investors. In that regard, quarter after quarter during the Class Period, Defendants characterized the global demand for FMC's products, including the Diamides, as robust and continuing, including by stating that demand was "***very, very strong . . . all over the world***." Leading into 2023, Defendants claimed that the Company was "expecting a pretty robust demand environment," and celebrated FMC's financial results for 1Q 2023 as "***driven by robust volume and strong pricing***."

5.    Because FMC's crop protection products are typically sold through a chain or "channel" whereby the products go from FMC to distributors and/or retailers, and from retailers to farmers and other end-users, it is critical that FMC track demand for its products through the entire distribution channel. Accordingly, FMC and securities analysts covering the Company closely monitor "channel inventories"—that is, the amount of product (i) sold by FMC and warehoused by distributors, (ii) held by retailers, and (iii) held by farmers. Channel inventory is a critical measure upon which FMC and investors rely, as high inventories in the channel may indicate significant shifts, such as slowdowns in demand, that could have materially negative impacts on FMC's revenue.

6.       According to Defendants and a number of FMC Former Employees or FEs, the Company's ability to monitor and measure channel inventory was thorough and robust throughout the Class Period. Among other things, FMC implemented a Systems Applications and Products in Data Processing ("SAP") program—an "end-to-end" business resource planning system that housed comprehensive data on all facets of FMC's overall business—which was fully operational at FMC in all of its global regions by 2020. FEs report that FMC's SAP system in place during the Class Period included up-to-date information concerning sales, forecasting, inventory, invoicing, purchasing, manufacturing, raw goods, supply, and long-term pricing: "***everything that FMC does, it tracks***." Adding to this "end-to-end" real-time sales and inventory data, FMC utilized Electronic Distribution Invoice reports to track sales of FMC products by distributors to retailers, while other regular reports tracked the quantities of FMC products in retailer inventories. FMC relied upon these inventory metrics in support of its demand forecasting as well as operationally, for example, in determining payments of incentives to its retailers and distributors.

7.       During the Class Period, Defendants repeatedly assured investors about their ability to assess channel inventory levels by citing the deep visibility that management maintained globally into FMC's sales and distribution network. For example, when addressing a securities analyst's question concerning FMC's visibility into its channel inventories early in the Class Period, Douglas assured investors that FMC had insight and expertise "***not only in [FMC's] facilities, not only in third-party warehouses, but also at the grower level***," while adding that these capabilities enabled the Company's sales force and financial groups to operate in "lockstep."

8.       Against the backdrop of their representations that FMC had the real-time ability to monitor inventory and demand for all of its products down to the "grower level," Defendants repeatedly represented during the Class Period that FMC's channel inventories were at appropriate,

4

"normal" levels. Thus, Defendants regularly asserted that they were "***not concerned about channel inventories***" and that "inventories are where they should be right now. . . ." Defendant Douglas also downplayed questions about potentially high channel inventories, stating: "***I mean when I think about channel inventories today, frankly, I have very, very few concerns from where I sit at FMC,***" and "***overall, we would say we're happy where inventory levels are in the marketplace***." From these repeated representations, investors understood that FMC's inventory levels did not evidence any material changes in demand, such as overstocked channels that would inhibit FMC's ability to sell more product into its distribution channels and continue to grow its revenues.

9.      While assuring investors that demand for its products remained high and channel inventories stood at normal levels, FMC also touted its ability to perpetuate critical patent protections for its Diamide products. Patent expiry for the vaunted Diamides potentially presented a fundamental threat to FMC's ability to grow its revenues and EBITDA, as the entry of generic competitors upon patent expiration, particularly in the significant Asian and Latin American markets, would result in rapid price decline and loss of market share for the Diamides. Recognizing the significance of these revenue-driving insecticides to investors, Defendants regularly reminded the market that FMC's acquisition of the Diamides included a patent portfolio that Defendants claimed would enable the Company to extend its market dominance well beyond the term of the underlying composition of matter patents, which were set to begin expiring in 2022.

10.     Accordingly, FMC assured investors that it could preclude generic competition for the Diamides by asserting patent protection over the chemical processes used to manufacture them, thereby preventing the rapid price erosion that would inevitably come with generic competition. Even toward the end of the Class Period, on May 9, 2023, Sandifer assured the market that FMC's

Diamide sales revenues were not at risk and would "continue to grow profit dollars" because, in part, there did not exist "a single legal competitor in Rynaxypyr in the world today. . . ."

11.     Thus, according to Defendants' representations throughout the Class Period, FMC held a market position of tremendous strength: the Company had emerged from the COVID pandemic's disruptions with demand and revenues that were continuously growing; its carefully monitored channels held normal inventory levels of FMC products around the globe, a critical indication of continuing demand; and the market share of its flagship Diamides was protected by a stout patent estate that would forestall price erosion and competitive losses to generic products for several years, at least.

12.     In response to Defendants' representations, investors drove FMC's stock price to new heights. Fueled by Defendants' impressive growth story, FMC's stock price achieved a string of record highs during the Class Period, soaring above $125 per share for several months, and exceeding $135 per share on numerous trading days.

13.     The story behind the scenes, however, was far different. Hidden from investors, and contrary to Defendants' public statements during the Class Period, FMC's business was nosediving. *First*, the substantial increase in demand for FMC's products experienced during the COVID pandemic was not, as Defendants knew, the result of organic growth or a "new normal," but was instead the result of an unsustainable, pandemic-fueled product stocking bubble. As FEs from around the world report, fearing supply-chain disruptions, distributors double-ordered and over-bought FMC products through 2021 and into 2022, hoarding large volumes of excess inventory in a buying spike that was recognized throughout the Company as anomalous and wholly unsustainable. FEs further report that based upon this unique purchasing surge, a downturn in

demand for all of FMC's products "***was going to happen in the foreseeable future. It had to happen and there was no way it couldn't***."

14.     *Second*, as a result of product stockpiling, by 2022 channel inventories were not—as Douglas characterized it—"normal." Instead, as was well known throughout the Company, channels were so stuffed with FMC product that had been pulled forward during the pandemic ordering spree, that it would take months and even years for distributors, retailers, and farmers to destock and resume normal ordering patterns. Accordingly, channel inventory levels did not support any claim that demand remained high or that distributors would continue to purchase FMC products at accelerated rates—let alone that product sales would continuously grow. Rather, as FEs report, channel inventory levels indicated that the demand for FMC's products would be severely depressed during a prolonged destocking period.

15.     As senior FEs from each of FMC's sales regions report, by 2022, the Company's excess inventory problem was "exploding" and the "bubble had burst." But rather than concede what numerous FEs have stated was well known throughout the Company, Defendants pursued a campaign to convince investors that the inflated demand trend for its products was sustainable, and represented a new baseline that would enable the Company to achieve its guided trajectory of year-over-year increases in revenues and Adjusted EBITDA. Among other devices deployed in furtherance of this goal, Defendants relentlessly pushed more product into the marketplace, commanding FMC's sales and distribution employees to meet unattainable targets. FEs decried this strategy as "***crazy***" because "***how on earth are we supposed to be selling that much when the channels were already full***?" To help persuade the Company's customers to take even more FMC product that they did not need, FMC leveraged itself by extending extraordinary credit, offering steep discounts, and providing protracted payment terms, which led the Company to, among other

things, accumulate debt and become saddled with mounting returns of expired unused products from client warehouses. As one FE states, FMC continued to push sales aggressively because "***no one had the gumption to tell the investors that the party was over***."

16.    *Third*, compounding these issues, notwithstanding its public statements to the contrary, FMC's ability to maintain patent exclusivity for the Diamides was quickly eroding by 2022 due to the steady march of generic competitors from China and elsewhere into global markets. Obscuring the threat to its core product franchise, FMC concealed from investors that it had suffered a series of significant legal setbacks that not only resulted in lawful manufacturing of far less expensive generics by competitors, cutting deeply into FMC's Diamide business in certain markets during the Class Period, but, more broadly, signaled an ongoing and escalating risk to the predominant legal strategy that FMC had promoted to investors. Undeterred, FMC continued to trumpet the enforceability of its patent portfolio for the Diamides—even when generics were already being sold lawfully in some of FMC's most profitable regions. Defendants' narrative was in stark contrast to the accounts of its Former Employees, who report that, by this time, "***the Diamide story was over***."

17.    Starting in mid-2023, the truth began to be revealed through a series of disclosures that partially corrected and/or represented a materialization of the risks concealed by Defendants' prior misrepresentations and omissions concerning demand for the Company's products, including competition for the Diamides. Even as portions of the misrepresented and concealed facts were revealed, however, Defendants continued to materially downplay the issues and distort and omit material facts for months thereafter.

18.    On May 1 and 2, 2023, FMC announced "solid" results for 1Q 2023, but that it was lowering its outlook for 2Q 2023 based upon, among other things, reduced demand for its products

in certain markets, and some channel inventory issues. FMC assured investors, however, that the reduced outlook had fully taken into account any channel inventory difficulties, and the Company in fact raised its overall Adjusted EBITDA outlook for 2023. In response to this first partial disclosure of demand issues, the price of FMC common stock declined sharply, losing $7.34 per share in a single day. Media and analyst reports immediately connected the decline to the disclosed issues that drove reduced 2Q 2023 guidance, however, several viewed the reduced outlook as a response to a transient event, accepting Defendants' representation that the noted issues were now fully baked into the forecast for the rest of 2023.

19.    Over the next few months, Defendants continued to partially reveal new, negative information related to the alleged fraud while materially downplaying the issues and misrepresenting and concealing material facts. On July 10, 2023, FMC announced more downward revisions of its expectations for 2Q 2023, representing that (i) it had "experienced unforeseen and unprecedented volume declines in three out of four operating regions" as a result of "channel partners rapidly reducing inventory levels," and (ii) it was cutting its 2Q 2023 Adjusted EBITDA forecast by nearly 50%, and revising downward its full-year revenue and Adjusted EBITDA outlook. This massive reduction came only two months after FMC had raised its full year Adjusted EBITDA outlook, and according to one FE, "*you don't discover in two months that your inventory is full*." Analysts expressed shock at the severity of the guidance cuts, and questioned whether FMC had overstated demand in prior years—and whether the Company's justification for the purportedly recent destocking was accurate. For example, on July 10, 2023 Morgan Stanley raised several pointed questions: "*Why is the destocking taking place given the company is calling out flat underlying grower consumption of FMC's products?*"; "*Does this mean that volume sales in prior years' overstated underlying demand and therefore this is actually an*

*earnings reset. . . ?*"; "*Will the Company have to concede some price in future quarters to move volume. . . ?*" The news of the abrupt reductions in inventory caused the price of FMC common stock to decline a staggering $11.62 per share, or over 11%, on July 10, 2023.

20.     Investor questions about the truthfulness and adequacy of FMC's disclosures only grew when, just two months later, on September 7, 2023, Blue Orca Capital published a detailed report addressing intellectual property protection for the Diamides, claiming that FMC "concealed from investors the deterioration of [its] core business[,] resulting in an inescapable cycle of falling revenues, plummeting cash flows, [and] declining profits." The report further described how FMC had misrepresented the strength of its patent protection for the Diamides and its ability to fend off generic market entrants, writing that FMC "continues to misrepresent to investors that it will not face generic competition for its flagship diamides when in reality, as a result of devastating legal defeats, generics have already launched in key markets of China and India and are on the precipice of launching in Brazil."

21.     In response to this news, the price of FMC common stock declined $6.09 per share, or about 7%, in one day. Notably, while FMC issued a same-day press release stating that it had "always been clear and transparent about its diamide growth strategy," the Company did not identify a single putative material inaccuracy in the Blue Orca report. Media reports and securities analysts linked the decline in the price of FMC common stock to the new information disclosed by Blue Orca on September 7, 2023.

22.     The unspooling of the truth about FMC's purported growth story continued on October 23, 2023, when FMC again cut its revenue and earnings outlook, this time for 3Q and full-year 2023, due to continued channel destocking in all regions. Belatedly acknowledging that significant global destocking trends were expected to persist into 2024 and "not expected to

improve in the near-term," FMC "initiated an immediate restructuring process" for its operations in its key Brazil market and "launched a broader, more comprehensive process to review and adjust our total Company cost structure." As investors processed this new information, which Bloomberg characterized as a "'shocking' guidance cut," the price of FMC common stock plummeted $10.84 per share, or approximately 16.2%, from a close of $66.95 per share on October 20, 2023, to close at $56.11 per share on October 24, 2023.

23.    Finally, on October 30, 2023, the Company announced its results for 3Q 2023. While those results were generally in line with the revised outlook that FMC had provided only a week earlier, Defendants again surprised investors with new information, here pertaining to FMC's cash flow. Specifically, FMC lowered "its full-year free cash flow guidance to a range of negative $860 million to negative $640 million" based on its expected reduction in "second half EBITDA and the impacts to working capital from higher inventory and lower payables." The next day, Sandifer revealed that the "sudden deceleration" in FMC's earnings required it to negotiate temporary debt covenant relief. The news revealed on October 30 and 31, 2023 caused the price of FMC's common stock to decline $4.76 per share, or over 8%, with one securities analyst remarking, "*[t]he issue of inventory reduction in crop chemicals seems like a business problem where the mosaic could have been put together*."

24.    By the end of the Class Period, the correction of Defendants' material misrepresentations and omissions, and/or the materialization of the risks that Defendants' prior misstatements concealed, resulted in the loss of billions of dollars in market capitalization, severely harming investors.

## II.     JURISDICTION AND VENUE

25.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

26.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and under 28 U.S.C. §§ 1331 and 1337, because this is a civil action arising under the laws of the United States.

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. §78aa, as many of the acts and transactions alleged herein, including the preparation and dissemination of materially false or misleading information to the investing public occurred in substantial part in this District. Additionally, Defendant FMC maintains its headquarters and conducts business in this District.

28.     In connection with the acts and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange.

## III.    THE PARTIES AND RELEVANT NON-PARTIES

### A.      Lead Plaintiff

29.     Lead Plaintiff Ruth Asset Management is one of the largest fund companies in Sweden. Ruth's line of business is fund asset management of funds domiciled in Sweden and in Luxembourg. Ruth was founded in 2002 and currently has more than $5 billion in assets under management. As set forth in the certification attached hereto as Exhibit A, Ruth purchased or otherwise acquired FMC common stock on the New York Stock Exchange ("NYSE") at artificially inflated prices during the Class Period and was damaged as a result of the conduct alleged herein.

**B.    Additional Plaintiff**

30.    Additional plaintiff Oklahoma is a public pension fund established in 1980 to administer pension benefits for Oklahoma firefighters. As of June 30, 2023, Oklahoma managed approximately $3.4 billion in total assets on behalf of nearly 27,000 members. As set forth in the certification attached hereto as Exhibit B, Oklahoma purchased or otherwise acquired FMC common stock on the NYSE at artificially inflated prices during the Class Period and was damaged as a result of the conduct alleged herein.

**C.    Defendants**

**1.    Corporate Defendant FMC**

31.    Defendant FMC, a Delaware corporation founded in 1882 and headquartered in Philadelphia, Pennsylvania, is a global agricultural sciences company engaged in the development and commercialization of crop protection solutions. Specifically, FMC develops, markets, and sells insecticides, herbicides, and fungicides, in addition to biologicals, crop nutrition, and seed treatments. At all relevant times, FMC divided its operations into four global regions: North America; Latin America ("LATAM"); Asia-Pacific ("APAC"); and Europe, the Middle East and Africa ("EMEA"). Among FMC's largest revenue generators during the Class Period were the patented diamide insecticides Rynaxypyr (chlorantraniliprole, or "CTPR") and Cyazypyr (cyantraniliprole). During the Class Period, Rynaxypyr and Cyazypyr accounted for 36% to 39% of the Company's total revenues. FMC's common stock trades on the NYSE under the ticker symbol "FMC."

**2.    Individual Defendants**

32.    Defendant Douglas served as FMC's President and Chief Executive Officer ("CEO") from June 2020 until his resignation on June 11, 2024. Douglas also served on FMC's Board of Directors from April 2020 until his resignation. From June 2018 to June 2020, Douglas

served as FMC's President and Chief Operating Officer, and from October 2012 to June 2018, he was President of the Company's Agricultural Solutions segment. During his four-year tenure as CEO, Douglas actively participated in FMC's process for preparing and making public disclosures to the market regarding the Company's financial performance and related matters, including disclosures regarding demand and inventory levels, as well as disclosures discussing the patent protections for its main products, such as its Diamides. In particular, during this time, Douglas was a core participant in preparing, reviewing, and approving: (i) FMC's quarterly earnings calls and Q&A scripts (in which Douglas was regularly a main speaker); (ii) the press releases that FMC published along with each quarterly earnings release (in which Douglas was often quoted); and (iii) the SEC Forms 10-Q and 10-K that FMC filed and published for each fiscal period. Throughout the Class Period, Douglas approved FMC's periodic filings with the SEC, certifying based on his knowledge that the information in each filing "fairly present[ed], in all material respects, the financial condition and results of operations of the Company." Douglas also regularly spoke to investors and securities analysts about FMC's operations and financial performance in conference calls, and at meetings and conferences, after personally participating in the preparation and finalization of his public statements on behalf of FMC.

33.    Defendant Sandifer has served as FMC's Executive Vice President, Chief Financial Officer ("CFO"), and Treasurer since May 2018. As CFO and Treasurer, Sandifer has actively participated in FMC's process for preparing and making public disclosures to the market regarding the Company's financial performance and related matters, including disclosures regarding demand and inventory levels, as well as disclosures discussing the patent protections for its main products, such as its Diamides. In particular, since 2018, and throughout the Class Period, Sandifer was a core participant in the preparation, drafting and review of: (i) FMC's quarterly earnings calls and

Q&A scripts (in which Sandifer was regularly a main speaker); (ii) the press releases that FMC published along with each quarterly earnings release; and (iii) the SEC Forms 10-Q and 10-K that FMC filed and published for each fiscal period. Throughout the Class Period, Sandifer approved and signed FMC's periodic filings with the SEC, certifying based on his knowledge that the information in each filing "fairly present[ed], in all material respects, the financial condition and results of operations of the Company." Sandifer also regularly spoke to investors and securities analysts about FMC's operations and financial performance in conference calls and at meetings and conferences, after personally participating in the preparation and finalization of his public statements on behalf of FMC.

### D.    Former Employees Reporting Relevant Facts

34.    Multiple former FMC employees, or FEs, report relevant facts and circumstances related to the Company's revenues and demand for its products, both actual and as forecasted, in its global sales regions in and around the Class Period. FEs with responsibilities and roles with respect to the facts, circumstances and events alleged herein are described in the remainder of this subsection.[1]

35.    FE-1 worked for FMC from 2019 through mid-2022. From early 2021 through the end of his tenure, FE-1 was a Manager in FMC's Structured Finance group for its LATAM business region, with more than six employees reporting directly to him. In this role, FE-1 was responsible for working with FMC LATAM clients to finance their FMC debt to enable further product sales to those clients, managing issues of client credit, and negotiating structured finance deals with third parties to sell client debt owed to FMC into the market. In 2021 to 2022, FE-1

---

[1]    To preserve anonymity, each FE is referenced with masculine pronouns, regardless of the FE's gender.

reported to William Mills, FMC's CFO Americas, who reported, in turn, directly to FMC's CFO, Defendant Sandifer.

36.     FE-2 worked for FMC for over twenty-five years, through early 2022. For at least fifteen years up through the time of his departure, FE-2 was the head of FMC's business in several countries in Southwest Asia. One of FE-2's primary responsibilities was managing FMC's business in these countries to achieve monthly, quarterly and annual sales targets. The business headed by FE-2 routinely produced approximately $70 million in annual revenues for FMC in the final years of FE-2's tenure. FMC's Southwest Asia business was in FMC's Asia-Pacific or APAC business region, and FE-2 reported to FMC's APAC head.

37.     FE-3 worked for FMC for over four years, through mid-2022, as a member of the Demand Planning team for FMC's Europe, Middle East and Africa or EMEA business. His team's primary responsibilities included analyzing supply chain, sales and demand trends, including inventory, with respect to FMC's products in the EMEA market. To accomplish this, FE-3's team worked closely with FMC counterparts in Marketing, Sales, Finance and corporate leadership. FE-3's team reported to the heads of FMC's European business, Marc Hullebroeck and Sebastian Pons, who, in turn, reported to FMC's CEO, Defendant Douglas.

38.     FE-4 worked for FMC for over twenty years, through mid-2022. From late 2020 through the end of his tenure, FE-4 was involved in FMC's Product Engineering and Precision Agriculture Group, reporting to Group head Sarah Sterling. Sterling reported, in turn, to FMC Executive Vice President and Chief Marketing Officer, Brian Angeli. FE-4's primary responsibilities included expanding the use of mechanical application technologies used with FMC's products by farmers in the U.S. and FMC's other regional markets.

39.    FE-5 worked at FMC from late 2022 through early 2024 in FMC's corporate headquarters in Philadelphia, PA, as a member of the Integrated Accounts team for the North America region, including both the U.S. and Canada. His team's primary responsibilities included handling order management for FMC's North American distributor clients, and the processing and fulfilment of client orders. There were nine account specialists and a manager on FE-5's team. FE-5's team reported to FMC's Director of Revenue Operations Matthew Hancock, who, in turn reported to FMC's North America President, Darren Dillenbeck.

40.    FE-6 worked for FMC for over twelve years, through mid-2022. For more than five years, and through the time of his departure in 2022, FE-6 was a Manager in FMC's Pakistan business operations. FE-6 had various responsibilities, including procurement, product warehousing, and supplying FMC product dealers in Pakistan. FE-6 reported to a Director, Dinesh Diaz, who reported to Sanjeev Kumar, Regional Supervisor and Supply Chain Director.

41.    FE-7 worked at FMC in a manager-level position in the Finance and Supply Chain Group for the Southwest Asia business for over ten years, through early 2022. His primary responsibilities in this role were to monitor and manage the finance-related operations of FMC's business in Southwest Asia. FE-7 had over a dozen people reporting to him in this position, and his reporting managers included Sujit Mukherjee, FMC's Director of Asia Finance, in Singapore. Mukherjee, in turn, reported to FMC's CFO, Defendant Sandifer.

42.    FE-8 worked at FMC for over three years through early 2022 as a member of FMC's Enterprise Governance and Continuous Improvement Group and in Business Process Management, at the corporate headquarters in Philadelphia, PA. His team's primary responsibilities involved implementing an SAP program—an "end-to-end" business resource planning system that houses comprehensive data on all facets of FMC's overall business, from raw

goods to invoicing customers—including product sales, pricing, inventory and forecasting, which was fully operational at FMC in all of its global regions in 2020.

43.    FE-9 worked at FMC as a Regional Business Manager ("RBM") in the Midwest U.S. for over seven years, through mid-2024. His primary responsibilities involved working with FMC sales managers, and distributors, and retailers, to facilitate sales of FMC products from FMC to the distributors, and from the distributors to the retailers (who sold agricultural chemical products to end-users). FE-9 also had responsibilities for communicating to FMC managers about market, sales, and forecasting numbers. Pursuant to FMC's standard structure, along with around a half dozen other RBMs, FE-9 reported to FMC Regional Director Randy Young, who reported to FMC's Director of Sales for North America, who, in turn, reported to FMC's CEO, Defendant Douglas.

44.    FE-10 worked at FMC as a Retail Market Manager ("RMM") in the Midwest U.S. for over twenty years, through early 2024. His main responsibilities involved working with distributors to facilitate their purchases of FMC products, and also working with retailers and other FMC retail personnel to facilitate retailers' purchases of FMC products from distributors. FE-10 reported to RBM, Brian Laverentz. Laverentz reported to Randy Young, who had roughly six RBMs who reported to him. Young reported to FMC's national sales and marketing Director, Julio Negreli.

45.    FE-11 worked at FMC from early 2020 through the first quarter of 2023 as a Retail Sales Manager in the Midwest U.S. FE-11's primary responsibilities were facilitating sales of FMC's products to retail customers from FMC's distribution partners, and dealing with FMC client issues or complaints. When working with retailers, FE-11's objective was to make sure retailers had sufficient supplies of FMC products, including Diamides, for their current or upcoming

season. FE-11 reported to two RBMs, both of whom reported to Manager for the Midwest U.S. region, Randy Young.

46.    FE-12 worked at FMC from 2019 through late 2022 as a Global Research and Development ("R&D") Scientist, first in FMC's R&D Group based in Delaware, and then, starting in 2022, as a member of FMC's Operations Group in Philadelphia, PA. FE-12's primary responsibilities included working on process engineering and related patents for FMC products, including some concerning Diamides products. While in FMC's Operations Group, FE-12 reported to Connie White, the Company's Capital and Disciplined Engineering Director.

47.    FE-13 worked at FMC for over thirty years, through mid-2022. He worked in both the product Development and Regulatory groups of FMC's business in a Southwest Asian country, working the last several years of his tenure as a Manager in the Regulatory Department. FE-13's primary duties involved product registration and distribution. FE-13 reported to FMC's Country head, who, in turn, reported to the Director, or head, of FMC's APAC business.

48.    FE-14 worked at FMC as a National Sales Manager in FMC's Southwest Asia business, for over eight years, through early 2023. His responsibilities involved working with FMC's Country Manager and sales representatives as well as distributors, dealers and farmers, to facilitate sales of FMC products. FE-14 reported to Pramod Thota and the Country Head.

49.    FE-15 worked at FMC as a Market Professional in FMC's U.S. territory from early 2022 through the second quarter of 2023. His primary responsibilities involved moving FMC products to the consumption point through, among other things, interactions with distributors and retailers.

50.    FE-16 worked at FMC as an Analyst in the Financial Planning and Analysis ("FP&A") Group in the Philadelphia, PA corporate headquarters from the second quarter of 2023

through the first quarter of 2024. His primary responsibilities involved financing matters related to the operations of third-party manufacturers or "tollers" used by FMC to make its products.

51.     FE-17 worked at FMC in the area of FP&A within the Treasury Group at corporate headquarters in Philadelphia, PA, for over six years, through the fourth quarter of 2021. FE-17's primary responsibilities involved addressing issues of working capital and material requirements and planning. He reported to corporate VP Robert Blair, who reported to FMC CFO Defendant Sandifer.

52.     FE-18 worked at FMC as a senior scientist in the Company's R&D facility in Stein Haskell, Delaware for over four years, through mid-2023. FE-18's primary responsibilities involved scientific review of FMC's products in connection with regulatory review. He reported to James Styr.

53.     FE-19 worked at FMC for over five years, through mid-2023, as a member of the Finance Team and Demand Team for the EMEA region. His Demand Team's primary responsibilities included managing financial matters in FMC's businesses in Southwest Europe (including France, Spain, Italy, Belgium, the Netherlands and other countries), and working with FMC's Product, Manufacturing, Marketing and sub-regional business leaders to track and fulfil demand for FMC products across the entire EMEA region. His Demand Team included seven subregional EMEA demand planners (e.g., in Africa and Europe).

## IV.    FACTUAL BACKGROUND

### A.    FMC's Business Model, Financial Reporting Practices, and Internal Processes for Demand Forecasting and Monitoring

#### 1.    FMC's Sales Model

54.     FMC earns revenues from the sales of specialized agricultural chemicals, including insecticides, herbicides and fungicides, and its predominant business operations involve the

development, manufacture, distribution, and sale of such products. At all relevant times, FMC maintained its own sales and marketing organizations and accessed the market through a combination of distributors, retailers, and co-ops in all four of its regions. While FMC sold directly to large growers in select countries such as Brazil, FMC mainly sold or consigned its products to authorized distributors, rather than directly to retailers or end-users, such as farmers. The distributors, in turn, sold FMC products to retailers. Retailers then sold the FMC products to farmers and other end-users.

55.    FE-11 confirms that in North America, there were three levels to FMC's sale and marketing business model: (i) FMC, the supplier, sold its products directly to distributors; (ii) distributors sold FMC products to retailers; and (iii) retailers sold FMC products to large growers. Similarly, FE-10 states that FMC's "first customer" was always the distributor, and that FMC only sold its products through authorized distributors. FE-10 explained that even if an RMM went to a retailer and convinced it that FMC's product was needed and would make the retailer more profitable, the distributor still had to write the order to get the FMC product to the retailer.

## 2. FMC's Financial Reporting

56.    At all relevant times, FMC divided its operations into four global regions, North America, LATAM, APAC, and EMEA, and reported the annual revenues attributable to the Company's four product categories (insecticides, herbicides, fungicides and plant health), as well as revenues attributable to the Diamides specifically.

57.    Throughout the Class Period, FMC reported revenues on a quarterly basis, including in its filings with the SEC and earnings releases published at the end of each quarter, and also provided purported forecasts for the upcoming quarter and the remainder of the fiscal year. In addition, FMC provided information on adjusted Earnings Before Interest Tax Depreciation and Amortization ("EBITDA") achieved, typically alongside a quarterly and yearly

EBITDA forecast in its filings with the SEC, as well as in its published earnings releases. The Company defined Adjusted EBITDA as "operating profit excluding corporate special charges (income) and depreciation and amortization expense."

58.     FMC also reported Free Cash Flow ("FCF") on a quarterly and annual basis and provided both quarterly and annual guidance for this metric. FMC defined FCF as a non-GAAP measure that reflected "all cash inflows and outflows excluding those related to financing activities (such as debt repayments, dividends, and share repurchases) and acquisition related investing activities." The Company further explained that FCF was "calculated as all cash from operating activities reduced by spending for capital additions and other investing activities as well as legacy and transformation spending" and highlighted the importance of FCF as an indicator of the Company's financial performance:

> [T]he free cash flow measure is consistent with management's assessment of operating cash flow performance and *we believe it provides a useful basis for investors and securities analysts about the cash generated by routine business operations*, including capital expenditures, in addition to assessing our ability to repay debt, fund acquisitions including cost and equity method investments, and return capital to shareholders through share repurchases and dividend.[2]

### 3.     FMC's Reliance on Debt Subject to Leverage Ratios

59.     At all relevant times, FMC relied, in part, on debt to fund its operations and to that end, entered into credit agreements setting forth the terms of the Company's borrowings.

60.     For example, on May 26, 2021, FMC entered into a Fourth Amended and Restated Credit Agreement (the "Fourth Credit Agreement"). The Fourth Credit Agreement provided for a "$1.5 billion revolving credit facility . . . with an option, subject to certain conditions and limitations, to increase the aggregate amount of the revolving credit commitments to $2.25

---

[2]     Unless otherwise noted herein, all emphasis is added.

billion." As part of the Fourth Credit Agreement, FMC was required to maintain "as of the last day

of each Fiscal Quarter a Leverage Ratio of not more than" 3.75:1.00 until September 30, 2021. For

the fiscal quarter ending December 31, 2021 and thereafter, the maximum Leverage Ratio would

drop to 3.50:1.00. FMC's failure to maintain its Leverage Ratio as required by this covenant would

result in an event of default, authorizing the administrative agent to declare the loans made in

connection to the Credit Agreement due and payable immediately.

61.     The Fourth Credit Agreement defined "Leverage Ratio" as follows:

[T]he ratio of (a) Financial Covenant Debt[3] as of such date <u>minus</u> the aggregate
amount of unrestricted cash and cash equivalents (as each such term is defined in
accordance with GAAP) of the U.S. Borrower and its Subsidiaries as of such date
in excess of $150,000,000 (it being understood and agreed that any proceeds of any
issuance by the U.S. Borrower and its Subsidiaries of unsecured debt securities,
other debt securities or borrowing of term loans, in each case, in connection with
financing an acquisition, investment, refinancing or other transaction (to the extent
such proceeds are held or placed into escrow prior to being applied to consummate
such transaction) shall be deemed to be unrestricted for purposes of this definition)
to; (b) EBITDA for the last four Fiscal Quarters ending on or before such date."

62.     On June 17, 2022, FMC entered into a Fifth Amended and Restated Credit

Agreement (the "Fifth Credit Agreement"). The Fifth Credit Agreement provided for a $2.0 billion

revolving credit facility, and an option, subject to certain conditions and limitations, to increase

the aggregate amount of the revolving credit commitments to $2.75 billion. The Fifth Credit

Agreement left the maximum Leverage Ratio unchanged at 3.50:1.00.

---

[3]     "Financial Covenant Debt" is defined by the Credit Agreement as "[…]Indebtedness of the
type specified in clauses (a), (b), (c), (d), (e), (f), (g) and (h) of the definition of "Indebtedness";
provided however, that (i) in the case of clause (c), such obligation shall be included in this
definition of Financial Covenant Debt only to the extent such obligations are in respect of
unreimbursed drawings under letters of credit, and (ii) that Guaranty Obligation supported by a
Letter of Credit shall not, to the extent so supported be included in this definition of Financial
Covenant Debt." (emphasis in original).

63.    Illustrating the importance of FMC's leverage ratio to its ability to maintain access to debt needed to fund its operations and avoid defaulting on its existing credit facilities, the Company reported its leverage ratio in its quarterly and annual filings with the SEC throughout the Class Period. The Company's leverage ratio was also a topic of frequent analyst questions and commentary during the Class Period, further demonstrating that this metric was critical to the Company's ability to meet its liquidity needs and fund its operations.

### 4.    FMC's Access to Current, Comprehensive Data on Sales, Inventory, and Other Key Metrics to Inform Its Demand Planning and Budgeting Operations

#### a.    Information on Product Demand, Channel Inventories, and Other Key Metrics Is Shared Internally at FMC in Regular Meetings

64.    FMC also maintained all manner of detailed sales, channel inventory and other demand-related metrics, which it used at all levels of the Company, up to the senior management level, to direct and operate its business in and around the Class Period.

65.    At all relevant times, FMC's sales forecasts and budgets which it used to operate its business were based, in part, on a budgeting and demand planning process performed at the country and regional level utilizing comprehensive sales and inventory data, which was then rolled up to the enterprise level for review and approval by FMC's corporate executives in the U.S. Multiple FEs report that there were various regular meetings within FMC in support of such demand planning and budgeting at both the regional and Company-wide level, as discussed in detail below. *See infra* Section IV.F.5. These meetings included monthly Supply and Operations Planning ("S&OP") meetings at the regional level, and at the corporate level on a semi-annual basis. Regional leadership, including the regional presidents and CFOs, attended the regional meetings. The information gathered and discussed at the regional level, including information regarding distribution channels, channel inventories, regional sales performance, updated sales

goals, and customer payment issues, was then communicated up to FMC's C-Suite by regional leadership.

66.　　In addition to these regular demand planning and budgeting meetings, FMC also held other meetings and calls, often involving Defendants Douglas and Sandifer, in which current and forecasted numbers for FMC's business were presented, including numbers pertaining to inventory, sales, and demand. These meetings included quarterly "All Hands" meetings led by Douglas, "Town Hall" meetings where Douglas and Sandifer spoke, monthly "Leadership Calls" including all regional leaders, Global Meeting calls, Annual Sales Meetings attended by FMC's C-Suite, including Douglas, and annual Company meetings where earned revenues, projected revenues, and channel inventories were all discussed. *See infra* Section IV.F.5.

> **b.　　FMC's "Cutting Edge" Data System Gives Management Real-Time Transparency and Reporting with Respect to FMC's Performance and Product Movements from "End-to-End"**

67.　　Also, at all relevant times, FMC utilized a comprehensive data and planning system that allowed immediate access to live numbers and information on FMC's business at every step, from supply and manufacturing to sales and distribution. Specifically, since July 2020, FMC has utilized an SAP enterprise resource planning system, or SAP ERP, that manages and presents Company-wide, end-to-end information about the business. As the Company stated in its 2020 Form 10-K: "In November 2020, we successfully completed the implementation of our new SAP system. We now have a single, modern system across the entire company for the first time in our history."

68.　　The comprehensiveness of FMC's SAP system for capturing and presenting Company data is confirmed by multiple Former Employees. FE-8, who was involved in FMC's SAP ERP implementation process, states that the system is "cutting edge" and provides a competitive advantage as it allows for "instant access to information" from every FMC region.

FE-8 notes that the SAP ERP system, which became operational by July 2020, was a huge worldwide transformation for FMC because prior to its implementation, FMC had multiple different systems in dozens of countries, which are now combined into one overall system.

69.     FE-8 also explains FMC's SAP ERP is "an end-to-end system" which provides access to all manner of business data including up-to-date information concerning sales, forecasting, inventory, invoicing, purchasing, manufacturing, raw goods, supply, and long-term pricing. FE-8 states about the SAP system, that "everything that FMC does, it tracks." FE-8 explains that FMC's system runs a software called SAP S/4HANA, which is supported by artificial intelligence. FE-8 confirms that any data entered into the system, such as uploaded orders, is immediately available in the system. He added that FMC's SAP ERP system handles "everything from one end of the chain to the other."

70.     FE-8 explains that the implementation period for the new SAP ERP system was from 2018 to 2021 in a phased go-live release, and that the system was up and running by July 2020, after which it was fully operational globally. FE-8 confirms that once the SAP system was implemented at FMC, there were no other systems.

71.     FE-6 confirms that FMC used the SAP S/4HANA system to track information on transactions for the Company, and that management at FMC headquarters could access all data related to any region in this SAP system.

72.     Former employees further confirm that, in addition to SAP, FMC management also had access to and regularly utilized a wide variety of other information and reports showing current information on pricing, accounts receivable, customer credit, and inventories, in the operation of the business. *See infra* Section IV.F.5.c. These reports included Electronic Distribution Invoice ("EDI") reports on sales to retailers from distribution, Point of Service ("POS") reports showing

retailer carryover inventories, quarterly reports on late payments from distributors and Product on the Ground ("POG") reports, reflecting the amount of FMC product sold to distributor clients and being stored, and receivables, among other things.

**B.    FMC's "Pivotal" and "Transformative" Acquisition of the Diamide Products**

73.    FMC acquired the Diamides product portfolio in 2017, after which these products became a centerpiece of Company revenues through 2023.

74.    Specifically, on March 31, 2017, FMC announced that it had entered a definitive agreement to acquire a "significant" portion of E.I. du Pont de Nemours and Company's ("DuPont") crop protection business, including DuPont's selective insecticide portfolio and a substantial portion of DuPont's global research and development capabilities (collectively, the "DuPont Transaction"). Through this transaction, FMC acquired the "industry-leading" Diamides Rynaxypyr and Cyazypyr, as well as all underlying intellectual property, such as patents and registrations, four active ingredient manufacturing facilities and ten regional formulation plants to produce the Diamides, in exchange for a $1.2 billion cash payment.

75.    After the DuPont Transaction, FMC's patent portfolio for the Diamides was comprised of: (i) Composition of Matter Patents, which "[p]rotect[ed] [the] proprietary molecular structure of the active ingredient and the molecular structure of certain intermediates"; (ii) Process Patents, which "[p]rotect[ed] the manufacturing processes for the active ingredient and the key intermediates used to make the active ingredient"; (iii) Formulation Patents, which "[p]rotect[ed] product formulations that use[d] the active ingredient"; (iv) Use Patents, which "[p]rotect[ed] how a product containing the active ingredient [was] used"; and (v) Application Patents, which "[p]rotect[ed] the methods or approaches to apply products containing the active ingredient." As a further means of intellectual property protection, FMC explained, "various pesticide laws and regulations around the world offer added protection to the initial active ingredient registrant in the

27

form of data protection and registration timelines that can extend after the composition or process patents have expired."

76.    In its March 31, 2017 press release announcing the DuPont Transaction, FMC told investors that after the deal closed, FMC would "become the fifth largest crop protection chemical company in the world by revenue." The Company also announced that it would sell Rynaxypyr and Cyazypyr across all of its markets, and noted that the acquisition would facilitate a "significant increase in FMC's presence in Asia and Europe." In an investor conference call that day, the Company's then-CEO, Pierre Brondeau celebrated the DuPont Transaction, stating:

> This acquisition will significantly expand our commercial portfolio, including the market-leading insecticide Rynaxypyr and Cyazypyr and indoxacarb . . . *we believe Rynaxypyr is the single-largest IP-protected crop protection molecule on the market today*.
>
> ***
>
> *This is a pivotal transaction for FMC as it transforms the company into a Tier 1, innovation-based crop protection company*, the fifth largest in the world, by revenue, once all the current consolidation is complete. But this transaction is not exciting simply because it increases our size. *We are equally excited that we're acquiring a portfolio of market-leading products* and a work-class R&D organization. Together, *the performance of our Ag Solutions business will be transformed in both the near and long term*.

77.    During the question-and-answer portion of the March 31, 2017 conference call, Citigroup analyst Daniel William Jester inquired as to the patent protection for Rynaxypyr and Cyazypyr. In response, Douglas stated:

> *I'll give you some information on the patent estate for the molecules we're acquiring; and the first thing I would say here is that I've never seen a patent estate around molecules that Dupont have here. It's very extensive and long lived.* The basic patents for Rynaxypyr expire in August 2022, and the basic patents for Cyazypyr run through January 2024. *Now on top of that, there are all sorts of other patents related to those molecules that run longer and there are data protection activities around those patent dates. So we have a long runway in front of us in terms of patent protection.*

28

78.     Securities analysts reacted favorably to the announcement of the Dupont

Transaction. For example, in an April 2, 2017 report, Susquehanna lauded the transaction:

> ***Transformative acquisition . . . The acquisition of ~50% of DD's crop chemical business increases FMC's ag sales by 65%.*** More importantly by acquiring a basic discovery capability and pipeline of 15 early-stage projects from DD FMC now becomes one of five CPC producers with the ability to develop new chemistries.

***

> ***FMC noted that Rynaxypyr is the single largest IP-protected CPC molecule on the market today. The basic patent for [Rynaxypyr] expires [in] August 2022, and Cyazypyr runs through January 2024, but there are other patents around these molecules that run longer, meaning that FMC has a 'long runway' for patent protection.***

### C.     FMC Announces Its Five-Year Plan in 2018, Centered Around Diamide Sales

79.     The year after the DuPont Transaction closed, FMC announced a new five-year

strategic plan. In a press release dated December 3, 2018, FMC outlined new five-year targets for

the Company, including: (i) a revenue Compound Annual Growth Rate ("CAGR") of 5-7%; (ii)

EBITDA CAGR of 7-9%; (iii) cash return to shareholders of up to $4.5 billion over 5 years; and

(iv) a doubling of free cash flow conversion, growing from 35% to approximately 70%. The

Company also announced that by 2023, it expected revenue to be between $5.5 and $6.0 billion,

EBITDA to be between $1.5 and $1.7 billion, and FCF to be between 65% and 75% of the

Company's net income. As part of the 5-year growth plan, the Company explained to investors

that it was targeting a gross debt/EBITDA ratio of between 2.2X to 2.5X.

80.     At the Company's December 3, 2018 Investor Day presentation, Sandifer presented

a slideshow explaining the Company's path to its lofty goals. Sandifer explained that the growth

described in the 5-year plan was "fundamentally driven by organic growth." Sandifer also stressed

FMC's deep understanding of the Company's most important regions, hailing the Company's

"country-level focus, where our people can build close relationships with customers and respond

29

more quickly with products tailored to their specific needs. This is a key differentiator for FMC versus our other large crop protection competitors." He noted that such capabilities were especially important "in our top 15 countries, which we expect to drive roughly 70% of our targeted revenue growth, and even more so in Brazil and India, which represent roughly 1/3 of our total growth, and are both countries where we have unique market positions." In selling the Company as a "Compelling Investment Opportunity" FMC's presentation highlighted a "[c]redible but aggressive Sales and EBITDA growth expectation[]."

81.    In support of its ability to execute the plan, the Company celebrated how well connected it was to its sales channels and customers during FMC's December 3, 2018 Investor Day. Douglas detailed how the Company operated "a lean global structure that coordinates closely with our regional teams, a model that reduces bureaucracy, accelerates decision-making and pushes everyone much closer to the customer." Sandifer also highlighted the new SAP S/4HANA system as allowing the Company to "gain scale economies by consolidating transactional activity into hubs." Specifically referring to Brazil, Douglas explained how the mobile CRM system used by the Company was "tied directly to our SAP system, ensuring live, real time accuracy."

82.    In response, Seaport Global wrote on December 4, 2018 that FMC's Investor Day "bolster[ed] our view on strong growth opps[.]"Seaport stated that the Company's targets looked "conservative," noting that "most of the growth through the plan period is expected to come from leveraging current products, including Rynaxypyr and Cyazypyr, which are still in growth mode." The same day, Stephens also published a report noting FMC's five-year plan and lauding the DuPont Transaction as "vault[ing] FMC into the top tier of molecule R&D."

**D.    Leading Up to the Class Period, FMC Touts Its Financial Success and the Future Prospects of Its Products Including the Diamides**

83.    FMC's reported financial results in the years following the DuPont Transaction confirmed that the Company's Diamide business had quickly become one of its primary revenue drivers. Specifically, as shown in the table below, the Diamides accounted for 35% of the Company's revenues in 2019, 39% in 2020, and 38% in 2021.

**Table 1: Percent of Total Revenue (in Millions) Attributable to Diamide Sales**

|  | **2019** | **2020** | **2021** |
|---|---|---|---|
| **Diamide Revenue** | $1,600 | $1,800 | $1,900 |
| **Total Revenue** | $4,609.8 | $4,642.1 | $5,045.2 |
| **Percent of Total Revenue** | 35% | 39% | 38% |

84.    FMC boasted in its 2020 Form 10-K that its Diamide sales had grown significantly since the DuPont Transaction, stating: "Rynaxypyr® and Cyazypyr® actives now represent over $1.8 billion in combined sales, representing approximately 55 percent growth since we acquired these molecules in November 2017."

85.    Leading up to the start of the Class Period, FMC repeatedly emphasized the importance of the Diamides to the Company's business in statements to investors, frequently labeling Rynaxypyr and Cyazypyr as core products. For example, during FMC's August 4, 2021 earnings call for 2Q 2021, Douglas stated: "***Since we launched FMC as a pure-play agricultural science company, diamides have been a core part of our business. Rynaxypyr and Cyazypyr have grown to be almost 40% of FMC sales today***."

86.    Similarly, FMC explained in its response to a Comment Letter from the SEC dated September 23, 2021, that its insecticide product category was the Company's "***largest revenue stream and features two key diamide-class molecules – Rynaxypyr® and Cyazypyr® active***

31

*ingredients*." The Company's response further stressed the importance of the Diamides, explaining "[*t*]*he diamide portfolio represents a critical component of our product offerings*, and accordingly, we provide additional commentary on our strategic initiatives to grow that portfolio within our annual report and on a less frequent basis, in our quarterly presentations including earnings calls."

87.     FMC also reported strong portfolio- and Company-wide financial results—not just Diamide growth, but revenue growth beyond those products, as well—with revenue growth across most of its regions between 2020 and 2021 and an increase of more than $60 million in Adjusted EBITDA, as shown in the table below.

**Table 2: Revenues, Adjusted EBITDA, and FCF at Year End (in Millions)**

|  | **2019** | **2020** | **2021** |
|---|---|---|---|
| **LATAM Revenue** | $1,441.7 | $1,456.5 | $1,633.4 |
| **North America Revenue** | $1,121.1 | $1,032.5 | $1,117.2 |
| **APAC Revenue** | $1,045.2 | $1,106.8 | $1,254.6 |
| **EMEA Revenue** | $1,001.8 | $1,046.3 | $1,040.0 |
| **Insecticide Revenue** | $2773.6 | $2836.8 | $3020.0 |
| **Total Revenue** | $4,609.8 | $4,642.1 | $5,045.2 |
| **Adjusted EBIDTA** | $1,220.5 | $1,250.4 | $1,313.8 |
| **FCF** | $301.8 | $544.1 | $713.3 |

88.     Leading into the Class Period, FMC also routinely reassured investors that while certain patents within its patent portfolio for the Diamides would begin expiring in 2022, there was no expectation of "legitimate" generic product competition before 2026 in its major markets of

Europe, Brazil, India and China, and before 2027 in the U.S. at the earliest. For example, during

FMC's second quarter 2021 earnings call on August 4, 2021, Douglas stated:

> ***Taking into account our patents and regulatory requirements, we do not expect to see sales by a legitimate generic competitor that uses the approved manufacturing process, which would rely on our Rynaxypyr® product data before 2026 in Europe, Brazil, India or in China, and 2027 for the U.S.*** Using that same approach for Cyazypyr® on slide 19, we do not expect to see sales by legitimate generic competitors until 2026 for Brazil, China and India, 2027 for Europe, and 2028 for the U.S. ***It is important to note that process and intermediate patents are critical as it is extremely difficult to produce these compounds without these intermediates***.

> **E.    During the Class Period, FMC Assures Investors that Demand for Its Products Is Growing, There Are No Significant Channel Inventory Issues, and that Patent Protection for the Diamides Will Preserve Revenues and Fend Off Competitors**

89.    During the Class Period, Defendants made a series of materially false or misleading

statements regarding demand for its suite of products, including the Diamides by, among other

things, misrepresenting the state of the Company's channel inventories and the protections

afforded by the Diamide patent portfolio. Defendants' representations did not reveal the material,

adverse facts and circumstances that were actually in play and impacting FMC's sales and demand

situation and performance in regions around the globe. Set forth in this section is an overview of

Defendants' misstatements, which are discussed fully below in Section VIII.

> **1.    Defendants' Representations Concerning Growth and Product Demand in 2022**

90.    From the beginning of the Class Period, and throughout calendar year 2022, FMC

reported purportedly strong financial results, and significant increases in overall revenues,

including revenues attributable to the Diamides. When presenting and discussing these results,

Defendants consistently touted the supposed sustained and growing demand for the Company's

products and assured the market that FMC's channel inventory levels—a key demand indicator on

which industry and investment analysts were acutely focused—were normal (with the exception

of expected seasonal and weather-related fluctuations) and presented no reason for concern. Defendants also represented to investors that the Diamides were shielded by "robust" patent and registration protections that would impede the introduction of competitor products for the remainder of the decade and help to maintain the strong demand for these products.

91.    For example, after the close of trading on February 8, 2022, FMC issued its 4Q and full-year 2021 earnings release, announcing revenues of $5.05 billion, Adjusted EBITDA of $1.324 billion, and FCF of $713 million for 2021. In discussing these results, Douglas stated: "Our financial performance reflects the strength of our synthetic and biological portfolios, a healthy demand environment as well as accelerating price increases. Revenue growth was particularly robust in North America and Latin America." As part of this release the Company also announced its full-year outlook for 2022, anticipating revenue of $5.25 to $5.55 billion and Adjusted EBITDA of $1.32 to $1.48 billion, with the high end of this range approaching the goal that was set as part of the Company's five-year strategic plan, and FCF of $515 to $735 million.

92.    On February 9, 2022, the next day, FMC held its quarterly earnings call. Analysts participating on the call were keenly focused on the demand for the Company's products and asked multiple questions related to these topics. For example, Goldman Sachs analyst Adam L. Samuelson asked Douglas how the Company viewed the sustainability of its earnings, as well as its current channel inventory levels. In response, Douglas claimed that Defendants had no concerns about FMC's demand or inventory levels:

> *[F]rom a volume perspective . . . there's obviously—there's very, very strong demand out there. . . . I think from a market demand perspective, it's very strong all over the world. I mean when I think about channel inventories today, frankly, I have very, very few concerns from where I sit at FMC*.
>
> ***
>
> *Brazil, we have—from FMC's perspective, we got absolutely 0 concern*. From North America and probably the other way around when it comes to channel

34

inventories, I'm more concerned that there is not enough material there. Europe, not really a problem at all. ***So channel inventories, frankly, in our own internal conversations has not really come up in the last quarter. Demand has come up. Demand is very, very strong***.

93.    Investors embraced Defendants' representations about sustained demand and thriving channel inventory conditions supporting revenue growth on February 8 and 9, 2022, and the price of FMC's common stock rose more than $6.00 per share from its closing price on February 8, 2022 to its closing price on February 9, 2022.

94.    Thereafter, throughout 2022, Defendants continued to assure the market that FMC was not facing any demand issues, representing that they had no concerns regarding channel inventory, and continuing to tout the protections against generic competition afforded by the Company's Diamide patent portfolio.

95.    For example, on the Company's May 3, 2022 1Q 2022 earnings call, in response to an analyst question regarding "prebuying" ahead of a potential price increase or due to supply chain fears, Douglas again dismissed any concerns:

Generally speaking, ***we are not concerned about channel inventories***.

*** * * ***

***So we're not seeing anything that we would say is concerning at all***. They seem pretty normal to us. In Latin America, for us, normal. Argentina, Brazil, Mexico, India where we should be at this point of the season, ***demand has been very good for us***. Our growth rates are in line with how we're penetrating the market.

96.    A week later, at the May 10, 2022 Goldman Sachs Industrials & Materials Conference, Sandifer praised the strength of the Diamides' patent portfolio and assured investors that even though certain patents would begin expiring in the near term, the protections afforded by the portfolio as a whole would endure for at least several more years:

[C]redit to the team at DuPont that did the work is a really robust patent portfolio, a combination of patents on the actual composition of matter of the molecules themselves but also on the manufacturing processes and on intermediate materials

35

that are used to make the products and on alternate manufacturing routes and on formulations to where *there really is a broad base of IP that makes it very hard to legally enter these markets for quite some time*.

Now the first of the earliest patent start expiring at the end of this year and into next year. *But the last of the patents really go through the end of the decade*, depending on the country and the particular issue.

97.     Sandifer further represented that the risk of competition was minimal, noting that the competitors currently on the market were illegal, and also touted the growth prospects for the Diamides through the end of the decade:

> Now certainly, there will be new entrants, and some of them will be illegal. There are illegal product on the market right now, right? There's always been. But we are -- at this point, *it's a $2 billion business that makes above company average margins and continuing to grow in the high single digits this year. It's a great franchise that we think is going to be an anchor for the company to continue growing over the next -- rest of the decade*.

98.     Defendants also assured the market that they had a thorough understanding of channel inventory levels and demand for the Company's products. For example, at the BMO Capital Markets Global Farm to Market Conference on May 18, 2022, Douglas was asked: "[H]ow can [you] manage inventories versus the past? In the past, maybe you didn't have as much visibility in -- this is not my words, by the way -- how much visibility you had into your inventory in Brazil. What are you doing different that's now -- where are you different now?"

99.     In response, Douglas trumpeted FMC's ability to track and manage inventory down to the "grower level" and reiterated that the Company was not seeing any issues with inventory in Brazil:

> *We manage inventory not only in our own facilities, not only in third-party warehouses but also at the grower level. So our sales force and our financial groups are actually lockstep in terms of how much product are we selling into the market? How much is actually getting through to the grower? And then importantly, how much is getting used on the ground?* So the system is completely different to what it was 7, 8, 9 years ago in terms of how we manage inventory in Brazil. *And right now, as I said earlier, there are no issues with inventory in Brazil for us*.

36

100.    Moving forward, Defendants continued to tell the same growth story. On November 2, 2022, the Company held its 3Q 2022 earnings call. In his prepared remarks, Douglas claimed that "**demand remains strong for new products based on diamides and other chemistries**, and FMC continues to make significant progress by improving our market access in geographies where we are underrepresented."

101.    Among the analyst questions posed during the November 2, 2022 conference call, Christopher S. Parkinson from Mizuho asked Defendants to comment on growth rates for the Diamides. In response, Douglas stated "[t]his year, year-to-date, we're up in the high mid-single digits. **We would expect that same growth rate next year as we go forward**. **We're getting new registrations, especially for Cyazypyr**. **That market is growing rapidly in many parts of the world, which is good news**."

102.    Another analyst, Kevin William McCarthy of Vertical Research Partners, asked Douglas about inventory levels that could be described as "outlying." In response Douglas reassured investors that while there were "pockets" of higher inventories, these were largely due to weather events, and the Company was unconcerned:

> **Well, I think generally speaking, overall, we would say we're happy where inventory levels are in the marketplace**. There are pockets of higher inventories. We talked about India before. The last few years, with the weather monsoons played out and rice acreage reductions, have not been great. So we're working through inventory there.

> **I would say in the U.S., things are fine. Europe is pretty okay for us**. 1 or 2 pockets in the South because of the dry weather that we had last year. I would say in Latin America, there are parts of Brazilian market where they had a drought last year that you can imagine inventories are high. Inventories are high right now in Brazil because we're in the planting season. **But we're happy with where our inventories are right now.**

103.    In FMC's 3Q 2022 Form 10-Q filed on November 2, 2022, Defendants again assured investors regarding the strength of the Diamide patent portfolio, referencing their

"vigorous[]" efforts to defend FMC's Diamide patents and reassuring investors that the recent rulings the Company received from the China Patent Review Board invalidating two of the Company's patents were outliers and would not "materially adversely impact [the Company's] enforcement of [its] similar patents in other countries."

### 2. Defendants' Representations Concerning Growth and Product Demand in 2023

104.    During the first several months of 2023, it was more of the same, as Defendants repeatedly represented that the demand for the Company's products was sustainable and remained high, that channel inventory levels were normal, and that generic competition posed no legitimate threat with respect to the Diamides. For example, on February 8, 2023, the Company held its 4Q 2023 earnings call. During the call, Vertical Research Partners analyst Kevin William McCarthy asked Douglas to characterize channel inventory levels in the U.S., Brazil, and Argentina. In response, Douglas noted that some channel inventories were elevated, but downplayed the buildup as "normal" and once again attributed the elevated inventory levels to impacts from weather:

> [F]rom a North American perspective, U.S. in particular, I think channel inventories are a little bit elevated right now, *but that's normal*. I would say, as you enter the season, most of retail and distribution is stocked up for a very good year. *When I think of inventory levels for FMC compared to our sales on a percent basis, we're about the same place we were the year before. So I think it's pretty normal*. Brazil and Argentina, a different story. Forget the nonselective that we just talked about. I think because of the conditions that we saw in the south of Brazil and in Argentina, it was very dry in the fourth quarter.
>
> \*\*\*
>
> *So overall, it's pretty much what you would expect*. . . . The vast majority of the growth in Brazil was price, it wasn't volume and that's important to recognize.

105.    During the Citi Global Industrial Tech and Mobility Conference on February 21, 2023, Sandifer continued Defendants' unbroken stream of reassurances that generic competition

posed no meaningful threat, as the Diamides would be patent-protected through the end of the

decade:

> Many of the intermediate steps and the chemicals that are produced there really have no other use than for making Rynaxypyr. We have patents on their composition of matter. We have patents on the process to make several of those as well. We also have patents on formulations on how that product is finally formulated to take to market. ***So we've had this broad set of patent protections.*** We are also provided some protection to the use of our regulatory data and the way registrations are managed in different countries. ***They give us protection that continues well until the end of this decade and, in some cases, a bit longer.***

106.    In discussing the Diamide patents, Sandifer also referenced the Company's

aggressive efforts to enforce the patents so as to further assure investors that FMC was successfully

defending the valuable revenue streams that the Diamides provided:

> And certainly, with -- speaking directly to Rynaxypyr, which has earlier expiration dates, Cyazypyr goes a little bit further. But as you pointed to, P.J., it's not just relying on the patents themselves. And ***obviously, we've been very aggressive in enforcing the patents. We have won cases for infringement in both China and India and continue to aggressively defend our patents***.

107.    Following the Company's presentation, Citigroup analyst Prashant N. Juvekar

asked Sandifer about the channel inventory situation around the world at both the distributor level

and the grower level. In response, Sandifer brushed aside the inventory concerns and again chalked

the backlog up to weather fluctuations, noting that the Company was closely monitoring the

inventory levels:

> [W]e'll start with Latin America because I think you highlighted one of the hot points. There was a drought and very dry conditions in Southern Brazil and Argentina at the beginning of the growing season in October, November. . . . So because of that, ***there is a bit of channel inventory, and something we're very conscious of and managing closely***.
>
> ***In the U.S. market, there is a lot of product in the channel because there should be a lot of product in the channel***. Planning season starts here in another 4 weeks or so. ***You need that product in place***.

***

Europe, generally speaking, pretty good shape. . . . There's a little bit of inventory in the channel, but it's not significant."

108.    When asked again, "is there is some -- in some pockets, there is inventory, but you're not concerned overall for the company?" Sandifer downplayed any widespread channel inventory issues impacting the Company, and emphasized FMC's ability to manage channel inventory issues, stating: "***No. No, I think we're managing. I think we know where the issues are, and we're going to manage it proactively***."

109.    On May 2, 2023, FMC held its 1Q 2023 earnings call to discuss its results for 1Q and its outlook for the remainder of the year. Based upon what Defendants referred to as "lower volumes in select markets," FMC reduced its guidance for 2Q 2023. As a result, during the earnings call, analysts specifically questioned Defendants about FMC's channel inventory levels. For example, UBS analyst Joshua David Spector asked Douglas: "[W]hat gives you confidence that inventory levels aren't at risk to the back half or into next year? And kind of similarly on the diamides [insecticides], where you talk about some partner channel destocking. What's the visibility that, that doesn't bleed into the second half as well?"

110.    In response, Douglas minimized the buildup of inventory as transient, and assured investors that the elevated inventory levels were already accounted for in the Company's revised guidance, stating:

> As the weather patterns improve as we go through the second quarter, ***we should be eating away at some of that inventory***.
>
> ***
>
> On the diamides, what we're telling you in our guidance now is that the partners that are reducing inventories, that's not just an event now that continues through the rest of the year. ***So that's already built into our forward-looking guidance***.

111.    Mizuho analyst Christopher S. Parkinson similarly asked Douglas to speak to the Company's confidence in its volume growth outlook. In response, Douglas reminded investors

that 2022 was purportedly "an absolute record year in terms of total market for crop protection chemicals, driven a lot by volume, not just price." Douglas further stated: *"[A]ll the signs are all good. . . . [O]verall, the volume perspective as we go through the year will improve for FMC*."

112.    At the Goldman Sachs Industrials & Materials Conference on May 9, 2023, Sandifer took the opportunity to tout once again the strength of the Diamide patent portfolio and emphasized that even though the initial composition of matter patents had begun to expire, there were still no legal competitors on the market due to the layers of patent protection for the Diamides:

> *[T]here's not a single legal competitor in Rynaxypyr in the world today that said differently, that isn't buying it from us.* Now there are illegal competitors and have been since before we bought the business. So there's been [illegal] material, particularly in China and India, always. But there are no current legal entrants in either of those markets where a the [sic] initial composition of matter patents have expired. *And that's in part because that's just the beginning of the story around the patent protection*.

113.    During the question-and-answer portion of the conference, Sandifer also faced questions regarding the Company's inventory levels. Specifically, Goldman Sachs analyst Adam L. Samuelson asked where the Company saw "channel inventories . . . in South America and going into the season in the Northern Hemisphere and the key kind of things you're watching to assess the demand later in the year?" In response, Sandifer assured investors that the elevated inventory levels were already factored into the reduced guidance Defendants had announced a week earlier, stating that while "there's a couple of hotspots around the world, . . . *we're pretty comfortable with channel inventory overall around the world*" and reiterated that FMC sees "*demand for crop protection products being very, very healthy despite what may -- where there might be a little bit of channel inventory of different spots*."

114.    As discussed in Sections IV.F and VIII below, Defendants' Class Period statements regarding demand for FMC's products—including statements discussing channel inventories, Diamide patent protections, and expected revenues—failed to disclose material adverse facts that

rendered Defendants' statements incomplete and materially false or misleading in critical respects. The true state of play began to be revealed in mid-2023, when Defendants could no longer maintain the façade that there was a sustainable demand for the Company's products, including its flagship Diamides, that the inventory channels were "normal," and that the Diamide patents were warding off generic competitors. Starting in May 2023, the market came to learn, through a series of partial corrective disclosures, what Defendants had known throughout the Class Period—demand for the FMC's products and the resultant revenues had plunged due to the glut of products amassed around the COVID pandemic, and the entrance of generic competitors in several of the Company's key markets, among other factors.

**F.    Unbeknownst to Investors, FMC Experienced an Unsustainable Increase in Channel Inventory Levels in 2021 to 2022, Which, Combined with the Entrance of Generic Competitors and Other Factors, Caused Demand to Plummet**

115.    As the market would learn only later, throughout the Class Period, FMC was grappling with a massive backlog in channel inventory resulting from, among other things, the stockpiling of product during the COVID pandemic—directly contradicting Defendants' Class Period statements that the inventory levels were "normal" and no cause for concern. This backlog significantly impacted the demand for FMC's products. At the same time, competitors had begun to launch generic products that were eroding Diamide market share in certain of its key markets, further exacerbating the declining demand stemming from the saturated channels, and FMC was facing mounting adverse market conditions due to industry consolidation.

**1.    FMC Experienced a Demand "Bubble" and a Large Increase in Channel Inventory Levels in the Distribution Channels During COVID**

116.    Former Employees from the Company's businesses around the globe uniformly report that due to concerns spurred by the COVID pandemic and other factors, distributors, retailers and end-users over-bought FMC products through 2021, amassing large volumes of

excess inventories in a buying spike that was recognized throughout the Company as obviously unsustainable. This excessive purchasing was a bubble, not a new baseline of underlying demand, and the excess inventory in the distribution channels had to be worked through, often for a year or more, before even normal purchasing of FMC products, including the Diamides, could resume. Thus, the COVID-based purchasing surge had a pronounced detrimental effect on the demand for FMC's products in the market, post-2021. Further, the excessive purchasing of FMC products in the years leading up to the Class Period led to other negative financial impacts for FMC, including price deterioration, product returns, and delinquent or refused payments.

117.  For example, FE-1 reports that FMC's distributors began stocking "huge volumes" of "excess" inventory near the end of COVID restrictions in or around late 2021 to early 2022. He states that, during that time, orders from distributors were excessive. FE-1 states that FMC did not account for future losses from the excess inventory that was pulled forward into its distribution channels in that period, and that excess inventory eventually resulted in lower margins for FMC from reduced sales, price deterioration, and discounts offered to secure new orders. At the end of 2021, during monthly LATAM S&OP meetings in which FE-1 participated, FMC had "many, many" discussions concerning their clients' high inventory levels and reviews of lower profit margins as a result of clients' price renegotiations. In fact, FE-1 states that by mid-2022, FMC's excess inventory issue was "already exploding," causing the Company to begin curtailing costs in response. FE-1 reports that the excess inventory had caused FMC's product pricing to deteriorate by the end of 2021 or early 2022. For example, he states, by the end of 2021, FMC's clients that had purchased large quantities and stockpiled their inventories had so much product that they began negotiating with FMC to return some of their product and to renegotiate the price they had agreed to pay for that product, in exchange for continuing to buy FMC products.

118.    FE-6 states that the issues facing FMC relating to overstuffed supply channels date back to the beginning of the COVID pandemic in 2020. He states that, because of the fear of global supply chain disruptions, direct buyers and distributors overbooked purchases from FMC in order to guarantee they would have sufficient stock on hand. FE-6 adds that because wholesalers and dealers were afraid of disruptions, they were interested in making purchases at this time. FE-6 states that FMC's U.S. headquarters was pushing all regions to get higher numbers during this time, and that in Pakistan, its subregion head pushed for more sales based on instructions from the region and FMC's U.S. headquarters. FE-6 specifies that local management in Pakistan referenced emails being sent from APAC heads Bethwyn Todd and Pramod Thota, as well as Douglas demanding greater sales.

119.    FE-6 states that it became apparent to him during COVID that the downstream channels were becoming overstocked. He states that, for example, during COVID, FMC stockpiled a huge quantity of sold products in its own warehouses and other storage locations, a large portion of which was "booked as sold" but was not delivered to the customers as the customers had no storage space. FE-6 further states that sales managers were booking sales and stockpiling product for delivery in the following season, and that some of these products that had already been booked as sold were not delivered until five or six months later.

120.    Other FEs tell a similar story and corroborate FE-1's and FE-6's accounts regarding the significant backlog of inventory that resulted from overbuying in the years leading up to the Class Period, creating an unsustainable bubble that was bound to burst. These facts are in stark contrast to Defendants' Class Period assurances regarding the inventory channels for FMC's products.

121. For example, FE-6 states that this created a huge "bubble" that drastically increased sales numbers but that this bubble was bound to burst. FE-6 states that everyone at FMC, including the top management in the U.S., was aware that this was a "bubble" caused by the pandemic, and that it was a short-term spike that would not last. FE-6 states that as early as 2020 he had remarked to many people that he expected sales numbers to drop dramatically in 2021 and 2022. FE-6 states that after the worst of the pandemic was over and supply chains were getting back to normal, farmers and distributors were not as concerned with stockpiling inventory. FE-6 believes that FMC's executives were misleading the public about the revenue prospects for the Company.

122. FE-4 similarly states that during COVID, FMC's distributor customers pre-ordered and over-purchased FMC products due to fears of supply chain disruptions. Retailers and farmers also over-purchased during COVID for fear of shortages. FE-4 states that everyone at FMC "always knew that we would hit a wall" eventually as demand declined because of this over-ordering of products. He participated in conversations during the first half of 2022, in which he recalls discussions that "***It was going to happen in the foreseeable future. It had to happen and there was no way it couldn't.***" He explains that if a farm purchased supplies for two years, they knew the farm was going to stop buying products until it worked through that supply. However, FE-4 states that after COVID, FMC never changed or reset the way it forecasted for the coming year, instead, he says, "It was like 'let's establish a new trend of 2 years in the channel and keep doing it.'" FE-4 states that, by the spring of 2022, the drop in demand for FMC was "imminent."

123. FE-17 similarly reports that increasing pre-sales in 2021 caused channel inventory to build up.

124. FE-10 states that the dynamics of COVID definitely changed things, in that customers were buying products two years in advance because of COVID, and distributors and

retailers were also holding onto products. He states it was akin to toilet paper, which people were hoarding during COVID—if farmers did not have crop protection products, they could not farm. FE-10 states that there was a lot of product hoarding in 2021 which was difficult for him as an RMM, and others. Unless product is sold on the retail side, it sits on a shelf. FMC, however, wanted to keep selling product. FE-10 states that he was given sales targets to hit by his RBM in 2021 to 2022, and he would tell them there was no way it would happen, because "[B]arns were full and product had not hit the ground." FE-10 states that they could not ask distributors and retailers to take more product because they had not used or sold what they had on the shelves, and the "barns were full."

125.    FE-5 states that FMC's customers ordered too much product during the pandemic. Because of their concern about supply chains, customers had stocked up on product. FE-5 states that, as a result, after the pandemic, distributors and retailers were not purchasing FMC product and were trying to get rid of their existing stock, and this destocking caused FMC's sales numbers to go down. FE-5 states that it was common knowledge within FMC that the overbuying started in approximately 2020 and lasted until 2022. FE-5 learned about the overbuying as early as his interview process for employment at FMC, when he asked about the pandemic's effect on the supply chain and was told that the customers were ordering as much product as they could purchase.

126.    FE-3 states that overstocked inventories were always a problem for FMC in the 2020-2022 period.

127.    FE-11 reports that when supply chains came to a "screeching halt" during COVID, there was a lot of demand for products that buyers could substitute in lieu of the usual products they purchased, and that FMC's diamide products, and specific brand name products Anthem

Maxx and Authority Supreme, were among those substitute products. FE-11 added that FMC's manufacture of some of its products in the U.S. aided in its ability to continue selling during the pandemic.

128.    FE-18 states that in 2022 and continuing into 2023, he and his colleagues could see that product orders were way down, and channel inventory that was overbought during COVID was stockpiling over a lack of demand. He reports that FMC resisted lowering prices and was sitting on the inventory.

129.    FE-9 states that any high sales numbers being shown by FMC were because customers were double and triple ordering during the pandemic. According to FE-9, the ordering was "unnatural" during the pandemic, and "kicked into high gear" in and around COVID. Usually, retailers ordered FMC products from one or two distributors, but during the pandemic, they were ordering the same product from two to five different distributors, hoping one distributor would be able to deliver product. A farmer, for example, may order from multiple co-ops and the retailer was also ordering from multiple distributor reps. These orders would be recorded as sales, but when the retailer received the necessary product from one distributor, the other duplicate orders would have been cancelled. FE-9 confirms that FMC leadership was aware of the double ordering through multiple avenues. First, double ordering was being reported by sales reps up the chain. FE-9 personally reported the issue to his divisional director, who would report to the leadership team. Second, FE-9 reports that there was a "huge" increase in orders in the SAP system. Third, FMC's account managers would have been in contact with their distributor clients regarding the orders and cancellations, and would have reported this anomaly to their managers. Fourth, reports on product distribution, or EDI reports, would have shown that there was an unusual increase in orders.

      **2.**      **Coming Out of COVID, and Despite the Fact that the Channels Were "Saturated" with Products that Had Been Overbought During the Pandemic, Douglas and FMC Continued to "Push" Sales and Increase Sales Targets**

130.    As global COVID restrictions eased and the supply chains returned to normal, fears regarding the availability of products began to dissipate and the stockpiling and overbuying of products came to an end. However, distributors, retailers, and farmers alike were left with stores of FMC products that would take months, or even years for them sell or use, thereby drastically reducing their need to purchase additional FMC products. Notwithstanding the significant backlog of inventory, Defendants imposed completely impossible and unrealistic sales goals that called for continued year-over-year growth in an attempt to maintain the illusion of organic growth and portray as sustainable the Company's impressive demand and growth story that Defendants were touting to investors throughout the Class Period.

131.    FE-17 explains that FMC used a "push" business model. He states that a push model is the opposite of a "pull model." In a pull model, a company communicates with its customers, takes their orders, and sources products based on the need to fulfill these orders. In a push model like FMC's, the Company sources the products, and then turns to its clients and tries to sell as much as possible, including through a variety of financial incentives.

132.    FE-17 states that, as part of its push model, FMC would do a major distributor initiative of pre-sales in 4Q for the coming year's 1Q and 2Q to make FMC's end of year financials appear better. He recalls that in 2021 in particular, FMC was pushing revenues and delaying expenses as much as possible, but worldwide demand for FMC products was down, causing issues with FMC trying to sell off its large channel inventory. At the time, FE-17 saw nine months to over a year of product sitting in channel inventory that FMC tried to sell off with discounts that lowered company revenues. For instance, FE-17 recalls that in India in 2021 sales were lagging

and FMC could only pre-sell so much product, and that FMC India in 2021 held off paying vendors due to cash issues. Nevertheless, FE-17 states that FMC management, including CFO Sandifer, would not accept submitted budget numbers not meeting desired increasing cash flow expectations, and budgets that were presented were rejected with instructions to resubmit with higher sales numbers. FE-17 states that management's pushback started with CFO Sandifer and went down the chain of command.

133.    FEs from across the other regions of FMC's business echo FE-17's observations regarding FMC's extraordinary attempts to prop up its demand numbers, including by forcing more product into the channels despite the complete lack of customer need. These FEs almost uniformly describe Defendants' extreme efforts to "push" unneeded product into the channels in order to meet top-down sales goals and forecasts that were completely divorced from reality and ignored the massive stockpiles.

134.    For example, FE-3 states that, through his departure in mid-2022, FMC Global Headquarters would revise sales goals and tell them to push more inventory. He adds that all companies want to grow, but FMC's year over year increases to the targets were "pretty high;" his response was, "***how on earth are we supposed to be selling that much when the channels were already full***?" FE-3 states that in 2021 and 2022, all FMC regions had the same problem with unrealistic sales goals, including South America (primarily, Brazil) and North America, and they all had the same issues—they couldn't place product because there already was too much wholesale and retail inventory in the channel. FE-3 recalls that EMEA targets would have to be increased because of shortfalls in other areas. FE-3 reports that during 2021 to 2022 there was a strong sales push by FMC for certain active ingredients, including Rynaxypyr. He recalls wondering how sustainable the practice was of pushing customers to take more product when there

49

already was so much product out there. FE-3 states that it was "crazy" selling the product to customers even though the customers already had sufficient product for the season.

135.    FE-2 states that FMC's sales target numbers, which came down directly from Douglas, were all about "push, push, push." He states that the effort to push product down the pipeline made it obvious that the inventories would become so full that there would be a collapse in pricing and sales at some point. He reports that because of the supply chain fears and resultant buying during COVID, the drop in sales was delayed. FE-2 also states that the Company was aware of looming returns at the time of sale, recalling that there were $35 million in returns in 2021, and that India and Brazil were responsible for a significant amount of these returns.

136.    FE-6 states that despite the already overstuffed channels, in 2021 FMC management in the U.S. and Pakistan continued to demand that sales representatives exceed the previous year's numbers. He states that Sales Managers told the head of FMC's APAC region, Bethwyn Todd, that the 2020 sales numbers could not be achieved again, let alone exceeded, and yet Todd nevertheless continued to push Sales Managers to meet quotas. FE-6 states that each year, FMC management expected the regional managers and country managers to meet or exceed their prior-year sales. He adds that in 2021, FMC management still increased sales targets by 10% or more over the previous year's COVID-inflated sales numbers. He states that it didn't matter that there was no longer a market demand for the products because of oversupply. FE-6 states that many of the purchases made in 2020 were going to be consumed during the 2021 season, putting a damper on demand, which resulted in Sales Managers having to resort to additional channel stuffing in an attempt to increase sales without the end-user actually consuming additional products. FE-6 states that everyone at FMC, including U.S. executives, was aware of these overbooked sales, and states that there were numerous emails back and forth from headquarters in

the U.S. reflecting the problems from overbooking sales and warehousing product that was not delivered. He states that many times his team stated they wanted to stop overbooking sales because it has no impact on sales since the products were simply being stored in the warehouses, and this was non-compliant with the standard process. Still, the team received emails to push sales, and the response from management when met with any pushback was "I don't know how you will manage it but you have to handle it." FE-6 states that many veteran sales staff at FMC Pakistan left to go to competitors or quit out of frustration.

137.    FE-14 similarly states that after COVID, the sales numbers that the sales staff were expected to hit, which came from FMC corporate headquarters in Philadelphia and regional headquarters in Singapore, were not attainable. He states there was a constant increase in sales targets from 2020 to 2022. He states that in order to hit the ever-increasing sales targets, management required sales staff to push product in "bulk quantities" at the distributor level as opposed to the "proper way" of selling products through to the farmers based on their requirements. He adds that while FMC sought to push products that customers did not need, competitors in the market did not adopt the same push approach, and that FMC has lost $50 to $60 million due to the practice of pushing sales. FE-14 reports that in order to hit the unreasonable sales target numbers, sales representatives had to push product downstream, despite knowing that the overall market and the sales channels were saturated and that the target numbers set by FMC could not be met. He states that the emphasis was placed on shipping product to distributors and dealers, and that even though these entities did not need the product, sales representatives incentivized them to accept the product by offering deals "with no cash needed." This meant that a distributor could accept the product and pay for it at some later date. In addition, sales representatives were forced to grant discounts and lower prices to try to move additional quantities, according to FE-14.

138.    FE-14 states that the directives to push product were most obvious in December of each year, when management wanted end of year numbers to look better. Based on his discussions with Country managers, he reports that these directives came from higher level management in Singapore and in the U.S., including Douglas.

139.    FE-14 states that, from his discussions with other employees and other managers in the course of performing his responsibilities for FMC, he understood that Douglas and Sandifer knew that the practice of pushing product into the channels to hit sales numbers was having a negative effect on business, and that FMC's U.S. management knew that FMC Pakistan lost approximately 50% of its business in and after 2022.

140.    FE-2 states that during monthly Leadership Calls in which he participated until early 2022, business leaders from various countries made it clear that sales channels for FMC's products were already clogged, and that FMC management on the calls would direct that other regions would have to press hard to cover for underperforming regions.

141.    FE-7 states that FMC expected increased revenues even after COVID, in the face of high channel inventory, increasing product competition at lower prices, and increasing credit extensions and discounts to customers. He states that despite a product demand decline, management pushed for higher revenues, and that after 2019, bonus compensation at FMC was based exclusively on sales revenues and EBIT. FE-7 states that he and other managers of FMC Asia countries advised FMC's global leaders that they could not push any more, but were told, "there is no option." FE-7 states that these unreasonable revenue demands from upper management led to an over-extending of credit to customers and a non-compliance finding at FMC that resulted in Finance Directors being pushed to resign in Pakistan, India, and elsewhere in Asia.

142.    FE-7 states that FMC's "push sales" business model exerted pressure on every region, but a very clear example was in India where the business model caused a negative $22 million revenue result for 1Q 2022 in India. FE-7 reports that the sales drop in 2021 to 2022 in India, China and Australia was due to channel inventory and pushed stock. He also notes that FMC Pakistan had excessive channel inventory in 2022, and the prolonged de-stocking of inventory led to product expiring on FMC and distributors' warehouse floors, which meant that FMC had to take the expired product back. FE-7 states this is all in the FMC SAP system for review. He states that every year sales were dropping because the channel was full of products, stating by 2023, "the bubble burst."

143.    FE-4 states that in the final years of his tenure, which ended in mid-2022, FMC management made a big push to "shove products into the channel" to meet quarterly expectations. FE-4 states that these directives came down from executive leadership, and that Douglas was "running the ship" at the time and his direct reports would communicate this pressure down the chain to push product. He states that around this time, channel inventories for FMC's products including Diamides, herbicides, fungicides, were very high, with some inventories "stacked to the ceiling."

144.    FE-11 also states that, in 2022, retailers had too much FMC product. Sales had grown in the prior years but had leveled off at that point. He states that, by February or March 2022, retailers really "started putting the brakes on buying," and as early as mid-2022 but no later than October 2022, retailers expressed to FE-11 and other FMC representatives that 2022 "was a dryer year" and they had leftover inventory to go through, so they "needed to pump the brakes" on buying FMC product. FE-11 states that this caused a "scare" at FMC. He states that distribution was full of inventory and retail did not want to take it. By late 2022, a lot of veteran FMC

employees "on the floor" discussed how there was no way that FMC's growth rate was sustainable. FE-11 states that no company wants to grow at 20% per year because it is unsustainable in the long term. According to FE-11, the expectation was that distributors were now going to be left with lots of inventory sitting in their warehouse for 2023, followed by a "huge lull" from the end of 2023 into 2024.

145.    FE-15 states that, by late 2022, based on his visits to distributor and retail warehouses, both the distributor and retail channels were packed full, with pallets of inventory stacked six high, which was much higher than usual.

> **3.    In Addition to Packed Channel Inventories, FMC Faced Other Major Factors that Negatively Impacted Demand and Revenues During the Class Period**

146.    Demand for FMC's products in and after 2022 was also depressed by a steadily increasing encroachment of generic competition for FMC's products, including its flagship Diamides, the extensive consolidation in the distribution market in North America, and pre-buying ahead of an anticipated price increase in at least EMEA.

> **a.    FMC Suffered a Series of Litigation Losses that Threatened the Continued Viability of Its Diamide Patent Portfolio**

147.    By the second half of 2022, FMC's ability to maintain patent exclusivity for the Diamides in critical markets was quickly eroding through a series of significant legal setbacks that, while hailing its putative victories, the Company did not disclose to investors. These losses not only resulted in lawful manufacturing of generics by competitors, but, more broadly, signaled an ongoing and escalating threat to the predominant legal strategy for protecting the Diamides that FMC had promoted and continued to promote to investors.

148.    For example, on September 12, 2022, the China National Intellectual Property Administration, the primary intellectual property regulator of the People's Republic of China,

ruled that FMC's process patent for an intermediate chemical used in the production of Rynaxypyr and its synthesis process was invalid.

149.    Then, only weeks later, FMC suffered a stinging legal setback in its patent litigation in India against Natco Pharma, ("Natco") a large and well capitalized generic competitor who sought to manufacture a Rynaxypyr, or CTPR, generic. Although FMC had initially obtained a temporary injunction against Natco in 2021, which FMC publicly touted, on September 19, 2022, the Delhi High Court ruled against FMC, vacating the prior injunction that prohibited Natco from launching a generic competitor. Despite routinely putting the solidity of the Diamides' patent estate in play in their public statements during the Class Period, Defendants misled investors regarding this significant litigation loss.

150.    Critically, the court in India rejected FMC's assertions regarding process patents, the central element of FMC's intellectual property litigation in international markets. Specifically, the court found that "Plaintiffs [FMC] have thus been unable to discharge the burden of proving that the Natco process is equivalent to the suit patent process and ***prima facie no case of infringement is made out***."

151.    In the wake of its victory, on September 24, 2022, Natco announced the rollout of generic competitor, Natgen, in the Indian market. On December 5, 2022, the High Court of Delhi denied FMC's appeal of the September decision, thereby seemingly clearing the way for Natco's generic version of Rynaxypyr product to launch in the Indian market.

152.    FMC's litigation strategy was riddled with setbacks in other cases as well. During the same period that FMC was litigating against Natco, it was also seeking to prevent GSP Crop Science, another generic competitor, from marketing its competing generic product in India. Here too, FMC floundered.

153.     Specifically, on November 14, 2022, the Delhi High Court again ruled against FMC, rebuking its legal arguments, and establishing a path for lawful generic competition. The court's ruling was harshly critical of FMC, stating: "This court is convinced that this is nothing but an attempt by the Plaintiffs to extend their monopoly beyond the life of IN'332 under the garb of the slight differences and usage of broad terminologies in the suit patent. The non-assertion of the suit patent prior to the expiry of IN'332 supports the conclusion the intention is to merely extend the monopoly on CTPR, in some way or the other."

154.     The court further found that FMC had engaged in improper conduct, and was "guilty of suppressing material facts and misleading the court and also the patent office," and "clearly points towards an attempt for evergreening CTPR . . . even though, the product patent for the same has expired and therefore, has fallen into public domain."

155.     FMC's legal stumbles were not limited to Asia. In August 2022, a Chinese competitor, Rainbow Agro ("Rainbow"), filed suit in Brazil, the largest market in FMC's LATAM region. Rainbow sought to compel Brazilian regulators to consider a registration application for Rainbow's generic competitor to Rynaxypyr. In order to enter the Brazilian market, Rainbow needed regulatory review by three Brazilian agencies (Institute of Environmental and Renewable Natural Resources, Health Regulatory Agency, and Ministry of Agriculture and Livestock).

156.     On September 16, 2022, the Brazilian court sided with Rainbow and ordered the three regulatory bodies to conduct the required assessments within 30 days. This ruling provided a short-term regulatory path for Rainbow to launch its generic Rynaxypyr competitor in the Brazilian market. While continuing to tout the revenue and demand protection that the Diamide patents provided, Defendants disclosed none of these critical legal setbacks.

   **b.    Generic Competition Around the Globe Began Cutting Deeply
           into FMC's Demand During the Class Period**

157.    In contrast to Defendants' representations, FEs from several of FMC's key markets report a rising influx of generic versions of FMC's flagship Diamides as early as 2021 or 2022. These FEs state that the availability of these generic products, which were significantly cheaper than the Diamides, made it increasingly difficult to sell FMC's products and cut directly into the Company's business.

158.    FE-1 states that, by late 2021 to early 2022, the marketing departments of FMC's distributors blamed reduced FMC product orders on not only high inventories but also FMC's products coming off patents.

159.    FE-7 states that by 2022 there were already generic insecticide competitors to some of FMC's products, and recalls specifically that Pakistan, India, and Europe had generic competition, and that FMC's China business had been reduced by as much as 50% by generics.

160.    FE-3 states that by 2022, there was an increase in generic herbicides, as FMC patents were expiring. He recalls that FMC had already started to enter agreements with competitors regarding Rynaxypyr in certain regions, or in liquid or solid form. FE-3 states that the generics made conversations between FMC sales people and customers more challenging because there were more suppliers from which customers could choose.

161.    FE-10 states that in around 2022, generic diamide offerings suddenly came into play in the U.S. FMC RMMs had thought with the acquisition of the Diamides that they had a good opportunity going forward. Then suddenly generics for Diamides came on the market, like Steward/Indoxacarb. FE-10 states that his counterparts in the U.S. south in 2022 reported that a product named Shen-Z [sic] was showing up, which ended up being a Rynaxypyr generic. The RMMs were confused because they thought they had the market to themselves for a while after

acquiring the Diamides, that is, patent protection on Rynaxypyr until 2027 or 2029. FE-10 received a call from his FMC counterpart in Oklahoma that one of his retailers was selling Shen-Z [sic] and he had no idea what it was—the generic was being sold for $5-6/acre, while FMC was selling its product for about $10-12/acre. He states that FMC could not compete at that rate; the difference was too much to make up through discounting by FMC. FE-10 got other similar heated phone calls from his counterparts in 2022. He states that retailers were also reaching out to him because they could not sell FMC product when the competitor was selling so much cheaper. FE-10 spoke to RBMs about the competition to try and see how FMC could bridge the gap, but received no help. If there was a problem with the product, FMC normally had service agreements (complaint policies) to make retailers' life easier, and that added value to FMC products. FMC's good service was worth an extra $1-2, but they could not cover a gap of $5-6 with service or discounts. There was no response from RBMs, because they didn't have the money to narrow the gap.

162.    FE-12 states that he worked on developing lower cost methods to manufacture existing products, primarily Rynaxypyr and Cyazypyr. He explains that FMC wanted to find cheaper ways to produce their "blockbuster molecules" because they were concerned about cheaper generic versions being sold by competitors in India and China. He explains that FMC was specifically facing competition from India- and China-based manufacturers of generic Rynaxypyr, due to the pending expirations of FMC's Rynaxypyr patents and registrations in various foreign markets.

163.    FE-12 describes two kinds of patents: composition of matter patents and process patents. Composition of matter patents are a "straightforward" patent of a molecule, the key ingredient that no one else can use. Process patents are a patent on the process to make the molecule in a specific way. He states that if there is truly only one way to make a molecule, a process patent

is a "very strong" patent. But FE-12 adds that process patents are a grey zone and that the strength of a process patent depends on the country. He explains that patent protection varies by country, some have "robust" patent protection and others do not. According to FE-12, any claim that FMC has a strong patent portfolio all over the world is "overstated." FE-12 recalls conversations with colleagues who informed him that FMC was concerned about the pending expirations of Rynaxypyr and Cyazypyr in various foreign jurisdictions, and that FMC was concerned with competition from illegally manufactured products in foreign countries.

164.    FE-4 recalls discussions at FMC regarding concerns over process patents by no later than early 2022. He states that the active ingredients in FMC's products were off-patent, however the process patents were still in effect. He notes that FMC was "banking a lot on the protection of the process patents." He states, "It's kind of a long shot."

165.    FE-9 states that the patent issues were "another problem" along with FMC products being overpriced and lacking new chemistry. He states said there has been a lot of generic competition in the last six years or so and that a lot of customers went to generic suppliers. For example, FE-9 states that when the generic version of FMC's Hero product became available, "the market was obliterated and we lost a lot of market share." FMC's decision was to not react at all.

166.    FE-2 states that by 2023, competing generic products were already being sold in many countries. In particular, he notes that the sale of generics in China spreads from there, as once a product is able to be registered as a generic in another country, the same can be done legally in some other places, such as Pakistan. FE-2 reports that in approximately 2019 or 2020, there were companies in Pakistan that were beginning to test generic alternatives to FMC's Diamides, and that in 2021, he personally participated in fighting these attempts at registration. FE-2 specified that the registration applications had only provided research data for one crop for one season, while

registration required more data, and because of this, the registrations were rejected for six months. However, FE-2 states, by 2Q 2022, the appropriate trials were completed, the test data was submitted and generic competitor products were registered. Generic diamide sales in the Pakistan market followed soon thereafter—FE-2 knows this because he saw the products selling in the marketplace in Pakistan. He states that by no later than 1Q 2023 generic competition to FMC's Diamide products had launched in Pakistan and generic competitors were "on the shelves" for sale. He notes that this meant, while the Diamides FMC had acquired from DuPont were a "gem" for FMC in 2019 and 2020, for FMC, "the Diamides story was over."

167.    FE-13 also states that by 2022 other companies in Pakistan were underway with the registration process for generic products to compete with the Diamides and that generic versions of the products were already being produced and marketed in China and sold in other countries and markets in the APAC region.

168.    FE-14 similarly states that by around 2023, the Pakistan diamide market became "open" and generic competitors to FMC's diamide products were being sold that were approximately one half the price of FMC's products. FE-14 states that other countries were suffering the same issues as Pakistan. He states that he knows that FMC India was facing competition from generics even before Pakistan confronted this problem.

### c.    In Addition to Saturated Channel Inventories and Encroaching Generics, Other Market Factors Dampened Demand for FMC's Products During the Class Period

169.    FE-19 states that an additional factor that contributed to FMC's inventory backlog in 2022 was an anticipated significant price increase, which FMC communicated to customers was planned for December 2022. He states that customers pre-bought product in order to avoid the price increase. This pre-purchasing of product had an impact on demand in 2023, such that FMC was below its objectives in 1Q, as well as 2Q and 3Q. FE-19 estimated it was a $1.2 billion drop.

170.    As FE-10 describes, prior to 2022, industry consolidation took place among the distributors to which FMC sold in North America, which further eroded FMC's sales. He states that this was followed by consolidation among many of the North American retailers in 2022 and after, many of which were bought by the major distributors. He states that several national distributors started getting into the retail space, after having bought up and consolidated entities in the distribution space, including Nutrien (a Canadian company), Helena, Simplot and Wilber Ellis. He states that the consolidation of retailers was throughout the North American region and negatively affected sales in all regions.

171.    FE-10 reports that in connection with this consolidation, the consolidated national distributors regularly favored products from specific manufacturers, including products the distributors themselves sold, instead of FMC products. There were a lot of generic products that distributors put their name on and sold as their own, and, he states, the distributors had a vested interest in pushing those products to retail. He also notes that there were economic reasons for the consolidated distributors to push FMC's competitors' products. For example, unlike FMC, some competitor companies sold not only herbicides and pesticides but also included many other related products that could be "bundled," such as seed products, and therefore they could provide various discounts to the distributors. FMC was strictly a crop protection manufacturer whereas Corteva, Syngenta and Bayer had not only crop protection offerings but also seed offerings, in addition to an ability to provide financing.

172.    FE-10 states that it was a "big old ball of wax that got rolled up" and made certain products more attractive to the distributors and the retailers when deciding to push one product vs. another to end-users. He states that after the distributor consolidation in approximately 2021, and certainly by the time of the retailer consolidation in 2022, there was a "pecking order" and some

"favoritism" with what brands and products the large national distributors would push or incentivize retailers to buy. This was largely due to financial incentives including product bundling that FMC could not match. For example, Helena favored Syngenta, a Chinese Manufacturer over FMC, and Nutrien seemed to favor BASF, a German manufacturing company when it came to other segments. FE-10 states that competing with these national distributors was "an uphill battle" because the distributors favored certain non-FMC brands and products and FMC was forced to fight for the remaining smaller segments of the market. This is why FE-10 was not excited to see national distributors start buying up independent retailers because before they were bought by distributors, retailers had no vested interest in pushing particular products or brands to farmers. They did not have their name on the product.

    **4.**    **FMC's Demand, Cash Flow, and Revenue Picture Did Not Improve During the Class Period, Despite Defendants' Desperate Measures to Incentivize Sales and Cut Costs**

173.    The significant adverse factors that impacted demand for FMC's products and its resulting revenues continued throughout the Class Period without relief, generating myriad negative financial consequences, and FMC struggled to stem the tide—all while concealing this reality from investors.

174.    FE-10 states that, in this post-COVID era, the distributors simply were not taking on as much FMC product as they had before. He states, however, that "***no one had the gumption to tell the investors that the party was over***."

175.    FE-1 states that by mid-2022, the excess inventory issue was "exploding," causing the Company to begin curtailing costs. He states that excess inventory had caused FMC's product pricing to deteriorate by the end of 2021 or early 2022. FE-1 reports that FMC's clients' excess inventory at the end of 2021 was discussed at S&OP meetings because FMC was worried about its cash flow.

176.    As a result, in November 2021, FE-1 began negotiating with Rabobank to securitize some of FMC's clients' sales order debt in exchange for $500mm from Rabobank, as a means to increase FMC's cash flow. FE-1 reports that at that time there was "huge, huge pressure" to increase cash flows from the financial side of the Company.

177.    FE-17 states that he participated in discussions with Sandifer and VP Director Patrick Day in 2020 to 2021 regarding FMC's efforts to increase cash flow. For example, he participated in discussions that included Sandifer in 2020 that addressed the selling off of certain railcar assets, and that the railcar sales were made as an alternative to factoring. He states that FMC sold off its alkaline mineral mining business, and later in 2021, sold railcar assets to raise needed cash for the Company, which brought in fifty to one-hundred million dollars in cash.

178.    FE-1 also recalls that almost on a weekly basis, he received pressure from the commercial sales team to increase client credit limits in order to increase sales. He states that FMC's poor cash flow at that time was due to escalating bad debt and non-performing sales. He explains that FMC's customers were not selling their inventories and were not paying their debts to FMC. FE-1 worked in the S&OP and Finance Groups in 2022 to give client credit limit increases due to the "huge" pressure to meet FMC's sales projections. Even when there was no more room for clients to take on more debt, FMC still pushed them to take on more. FMC tracked resellers' inventory and sales so closely that the Company would know if a reseller had not sold all of its inventory. FE-1 reports that even in those circumstances in which a reseller had lots of inventory, FMC pushed new sales and increases to credit limits for those resellers. FMC's pressure on resellers to take on more product led to price deterioration and margin cuts that needed "a lot of clean up" in 2023.

179.    FE-1 explains that, in order to "overdraft" a client that had reached their credit limit, an FMC employee would need to approve it. FE-1 was also responsible for recommending credit limit increases. In this regard, he would email the LATAM CFO for a credit limit increase approval, and if the increase needed was above a certain number, the LATAM CFO would forward that email to Sandifer. Sandifer's email response would be shared with FE-1. He reports that a client's inventory level was not taken into account to authorize a credit limit increase, but rather margin deterioration and the ability of the Company to sell products at a certain price. Thus, FE-1 observed that increases to client credit limits would be authorized even though clients had unsold FMC "products on the ground."

180.    FE-6 reports that, in 2022, in addition to slowing sales, many of the presales and deliveries of FMC's products that were made during COVID, including Diamides, were of products that had expiration dates, which led to returns and adverse impacts on FMC's revenues. Specifically, he states that many of the products sold in the surge of 2020 had expiration dates of 2022, and customers were demanding the products be replaced with fresh stock. He reports that FMC was forced to accept returns for many customers and warehouses and had to dispose of these products. FMC then had to give credit to customers or restock the warehouses. He states that this cut even deeper into FMC's net revenues. Indeed, FE-6 states that this was occurring "everywhere" throughout FMC's territories. He states that this issue obviously affected net revenues, as the returns had to be deducted from previously claimed sales revenues. He adds that all of these returns and disposals also would have been captured on the Company's "Sales Return System" database, and that the Accounts Receivable Department also would have to have records of these transactions, as there would be a decrease in the Accounts Receivables from the customers making returns.

181.    FE-19 states that FMC was "pushing, pushing, pushing" at the ends of each quarter and entering 2023 they were already "raising red flags" and warning before 1Q that FMC was not going to make its EMEA forecast. He states that "all signals were red" and there were "red flags everywhere." There were comments from multiple countries. He states that the red flags included: (i) the countries were reporting too much inventories in the channel; (ii) FMC's price increases were too high; and (iii) customers were moving to competitor products. He states this message was given to the VP, whose response was to increase prices to offset the decrease in volume. FE-19's Demand Team told the VP that FMC was not making its numbers in its area of responsibility. He notes that in 1Q the CEO and CFO were saying that FMC was still making its numbers and was still on track, yet three months later there was a huge drop. FE-19 states that the Demand Team manager's boss, European Market Manager Olivier Ryckeboer, was fired in mid-April 2023. According to FE-19, Ryckeboer was not aligned with what Europe and the U.S. were doing and was pushing back on the strategy of raising prices and how Europe was managed. In early May 2023, FE-19 states that his Demand Team's subsequent manager had a huge argument with the EMEA VP because the manager was telling the EMEA VP that FMC would not make its 2Q numbers.

182.    FE-19 states that the issues seen in Europe were also seen in the U.S. He states that there was not sufficient demand. He understood from colleagues that FMC was extending credit to customers in Brazil and India in order to sell more product. There were a lot of issues in Brazil because customers had one-year payment terms and could not pay FMC back, but FMC continued to sell product to the customers. FE-19 said that in Europe payment terms are imposed by law, for instance in France the terms are set at 60 days. He said that in the Ukraine, Turkey and Africa credit payment terms were extended by FMC to make deals.

65

183.    FE-19, a member of the Demand Team in EMEA, states that he could not understand how at the end of 1Q 2023 FMC announced it was on track despite the sales shortfalls, and then by May 2023 the sales dropped by $1 billion. He states, "You don't discover in two months that your inventory is full."

184.    FE-9, an RBM in the U.S., states that especially during 2023, he would get reports in meetings with Randy Young and other U.S. RBMs in which it was stated that FMC was growing 14%, while its competitors like BASF were growing at 5-6%. FE-9, the other RBMs and Randy Young would all agree "there is absolutely no way"—FE-9 knew the numbers being reported were inaccurate because they knew there were large amounts of carryover inventory in the channel because the product was not being used and FMC was not making new sales. FE-9 states that the number of acres planted doesn't change much, so FMC sales reps were not going to sell products for a demand that was not there. FMC wanted to say they had great sales numbers, but they did not. They knew how many acres are planted and what inventory is sitting out there. There were definitely good years when FMC grew, but not like they were reporting in 2023.

185.    FE-5 states that, by 2023, FMC was not meeting its numbers. For example, Latin America was struggling. Other regions would have to make up for the regions which were not doing well, so FE-5's team was hearing that they were "not meeting the numbers" and that they had to "suck it up" to make up for other regions' lower sales. He states that in reaction to the over-purchasing issue, FMC became nervous about its finances. FE-5 reports that FMC began "tightening the belt" in 2023, and that examples of this were FMC imposing cost controls and a hiring freeze.

186.    FE-6 states that he knows that this issue of oversupply in the channels was occurring in various FMC regions, not just Pakistan. He states that many Sales Managers asked

customers to agree to "purchase products on paper" even though delivery would be made six months or later down the road. FE-6 states that those sales should not have been "booked" until the product was delivered, however, the sales were booked in earlier quarters in order to meet quotas, and this pre-booking of sales only served to exacerbate the already over-aggressive sales numbers. FE-6 states that everyone in FMC, up to the top management in Philadelphia, was aware that supply channels were overstuffed and sales had been pre-booked in earlier quarters.

187.    FE-2 states that, post-COVID, customers were provided very favorable pricing and credit terms in order to get them to continue to accept product, but eventually the opportunities to provide credit to many customers began to dry up and it was even harder to make sales. He reports that the Company resorted to accepting items such as tractors to cover for customer's credit.

188.    FE-7 also reports that FMC was aggressively extending credit to its customers. He states that the FMC Sales Team would do a computerized request for manager level approval in the FMC SAP system for the credit extensions. FE-7 states that FMC extended other customer incentives, including cash incentives and product discounts and payment extensions. He recalls FMC Pakistan and India were doing as much as six-month payment extensions for customers.

189.    In addition, FE-4 states that, by the end of his tenure in mid-2022, he saw signs that FMC was experiencing financial issues, including that FMC cut its advertising budget, and began layoffs.

190.    FE-10 states that he and many others at FMC received an email in the fall of 2023 stating that if they did not take voluntary separation they would be involuntarily let go. He believes that around 218 voluntary separations and another 20 involuntary separations were executed. FE-9 also reports FMC's offer of early retirement in 2023.

191.    FE-9 further reports that in 2023, FMC began to stress cost cutting efforts. He recalled having to cancel an in-person team meeting in the fall of 2023 because the cost was no longer approved. FE-9 notes that the cost-cutting measures were discussed at Town Hall Meetings with the entire company.

192.    FE-18 reports that in 2022-23, while FMC was putting out favorable information and numbers, they were cutting budgets and not allowing purchasing of product within the Company for as long as two years.

193.    FE-16 explains that FMC had its own manufacturing facilities but also contracted with third-party manufacturers, or tollers. These tollers were paid labor and storage fees, and FMC would be responsible for formulas, raw materials, and packaging. FE-16 states that, as of May 2023, there was a steady decrease in production orders for the tollers. He states that he looked at approximately a dozen tollers, and their usage by FMC fell by 75% from prior levels by December 2023.

194.    FE-15 also reports that FMC's manufacturing process was different from its competitors in the agricultural chemical industry in that FMC had a relatively small capital asset allocation for manufacturing because it relied on third-party manufacturers. He also states that by February 2023, FMC imposed "expense containment," which meant expenses were cut amounting to an approximately 40% reduction in cost center expenses.

                5.    **Defendants' Knowledge of Current Inventory and Demand Levels**

                        a.    **FMC's Bottom-Up Demand Planning and Forecasting Processes Provided Company Management with Real-Time Data Regarding the Demand and Inventory Levels for the Company's Products**

195.    Multiple FEs detail FMC's demand planning and forecasting processes and explained the detailed information that flowed from the regional level up to U.S. management

reflecting current and historical demand, channel inventories, revenues, margins, pricing, and operating expenses, among other things.

196.    For example, FE-1 was privy to FMC's demand planning processes for both the LATAM region (including Brazil) and for the Company as a whole, including as a regular participant in FMC's S&OP meetings. He reports that these S&OP meetings were a core part of FMC's demand planning for the sales and marketing of its products.

197.    According to FE-1, through at least mid-2022, regional, LATAM S&OP meetings occurred monthly, while FMC-wide S&OP meetings occurred twice per year. Participants in these regional and Company-wide S&OP meetings regularly discussed distribution channels, sales, demand and inventories. Specific topics routinely discussed, he reports, included FMC sales projections, channel inventories and ordering materials for manufacturing. He notes that FMC's finance side would factor in sales projections and inventory amounts when addressing potential increases to client credit limits at these S&OP meetings.

198.    FE-1 states that FMC's senior executives in the region attended the monthly LATAM S&OP meetings, including LATAM President Ronaldo Pereira and LATAM CFO William Mills, as did operations staff, demand planners, and commercial directors for the region. FE-1 confirms that Mills was responsible for reporting regional channel inventory issues up to the FMC "C-Suite" and that reporting from LATAM leadership to the C-Suite also included regional sales performance, updated sales goals, and customer payment issues such as delinquencies or "past dues." Coming out of these S&OP meetings, FE-1 states that the LATAM Director of Marketing also reported any channel inventory issues up to FMC's Global Marketing Director.

199.    FE-19 similarly reports that, through mid-2023 in FMC's EMEA region, there were monthly S&OP Meetings in which twenty to thirty people participated, including the VP for

Europe, finance mangers, demand managers, and supply chain managers, as well as himself, as a member of the Demand Team. FE-19 also confirms that there were monthly Executive Sales and Operations Planning ("ESOP") Meetings involving FMC's CEO Douglas and all FMC VPs, worldwide.

200.    FE-19's team was responsible for building the EMEA Demand Forecast in connection with these meetings, based on information provided by the EMEA sub-regions. For example, FE-19 states that sub-regions including Central Europe, Middle East, Africa, France, Italy, Spain, the UK, Germany, and Turkey would report to managers regarding the demand within their regions, and if volume was dropping, they had to provide an explanation, such as too much inventory in the channels, pricing was too high, or weather conditions.

201.    FE-19 states that the EMEA Demand Forecast his team developed was included in a presentation to FMC's U.S. management regarding FMC's demand and budget. In these presentations to U.S. management, FE-19 reports that each FMC regional leader presented on their region, and that EMEA's presentation was managed by the VP, Financial Director for Europe and the Europe Marketing and Strategy Director. FE-19 states that the regional presentation covered the EMEA budget and objectives, and not just demand, and addressed metrics including financials, revenue, margins, pricing, operating expenses, head counts and the inventory on FMC's books. FE-19 reports that additional information regarding inventory in the distribution channels was very often shared by the sub-region Directors for purposes of these presentations.

202.    With respect to FMC's budget process, FE-19 states that the first budget presentation for the coming year was made in September and included actual figures. The budget always reflected figures for the current year and included current sales numbers compared to the previous year. Because the budget process started in August, the team had actual data up until that

point, leaving 3-4 months to forecast in the current year. FE-19 reports that the VP of Europe made the EMEA budget presentation to the FMC CEO (Douglas) and CFO (Sandifer).

203.    FE-3 similarly reports that, through mid-2022 in FMC's EMEA region, demand planning was a "bottom-up" process based on inputs from FMC's businesses in Europe, Africa and the Middle East. According to FE-3 monthly EMEA Demand Planning Meetings were attended by personnel from the Sales, Finance, Planning and Supply groups, and participants beyond himself, as a member of the Demand Team, included FMC's European/EMEA Head, European managers in Finance and Business in general, sub-region leads, Supply Chain managers, sub-region Finance managers and sub-region Demand Planners. In connection with the demand planning process, FE-3 reports that there were also Supply Planning Meetings during which participants would examine gaps in supply, and technical meetings regarding customers during which delays and decreased volumes would be discussed. FE-3 reports that after the monthly EMEA Demand Planning Meeting, the European Head then met with FMC's CEO, Defendant Douglas.

204.    FE-3 states that his Demand Planning Team prepared reports for the Demand Planning Meetings that contained all input from the sub-regions to the product level as well as from the various constituent country units, and which were housed in the Demand Plan file. The Demand Planning numbers included statistical considerations with sales numbers and examined country deviations and sales histories. FE-3's team prepared PowerPoint slide decks for the monthly EMEA Demand Planning Meetings based upon his team's input and the demand planning reports.

205.    The demand planning numbers were not a sales budget or forecast. FE-3 explains that the Demand Planning numbers were country-based performance analyses, whereas sales

projections were market-based numbers considering various factors to estimate how much product the customers would take in a period of time.

206.    Multiple FEs also report that, although FMC's demand plans from its business regions around the globe included all manner of information about sales demand conditions, inventories in the distribution channels, supply issues, payment rates and other factors, upon receiving these plans, FMC management at U.S. headquarters would often mandate sales budgets and quotas that were far higher than what the "bottom up" demand forecasts stated was feasible.

207.    For example, FE-2, the head of FMC's Southwest Asia business through early 2022, reports that he developed a forecast for the region for 2021, but FMC came back with numbers that were 20-50% higher. FE-2 states that he had by that time developed a 38% market share of the agricultural chemicals market for FMC in the region—meanwhile there are only a few other territories that even have double-digit market share. FE-2 explained that there was very little room for him to expand his market share in his territories, and most of his end-users were already "saturated" with product by 2021. Therefore, FE-2 states, the numbers that FMC management was demanding were completely unreasonable. FE-2 states that the target numbers came down directly from FMC CEO Douglas. FE-2 states that other FMC Regional Managers spoke up about the unreasonable sales goals and resisted management's efforts to get them to raise forecasts were forced to resign from their positions, including a General Manager in the Philippines and Bob Trogele, a Regional Manager.

208.    FE-19 similarly states that his Demand Team provided a 2023 EMEA forecast to European management that was reasonable based on his team's work. FMC U.S. responded that the EMEA budget should be more aggressive, and provided a revised forecast that, according to FE-19, was unreasonable.

209.    FE-3 states that that FMC leadership pushback on submitted demand numbers was mainly around the fact that the numbers were not meeting targets. Ultimately, he states, the budget targets came from Global Headquarters who set the targets and told those under them to "figure out how to do it." He states that demand planning was a "futile exercise" because when they would submit their demand planning numbers FMC leadership would not accept the submitted numbers, and instead would tell them, "these are your numbers;" the leadership would tell them to add $20 million to their expected targets which had been submitted. FE-3 said that disagreement with FMC leadership regarding the numbers was a "hollow exercise" because leadership would not listen. FE-3 states that there were unrealistic sales goals set by Company leadership, and that these were "top-down" numbers.

### b.    Channel Inventories, Demand, and Other Metrics Were Routinely Discussed During Meetings and Calls at the Regional Level and Company-Wide

210.    Multiple FEs recount the myriad meetings and calls where issues including channel inventories, demand, sales forecasts, revenues and other information were regularly discussed at the regional level and Company-wide, including meetings where Defendants Sandifer and Douglas were presented with information and spoke on these and related issues.

211.    For example, FE-4 reports that, through mid-2022, he participated in "All Hands" meetings at FMC corporate headquarters in Philadelphia, that occurred approximately one month after the end of each quarter, and were led by CEO Douglas. According to FE-4, the entire FMC executive team, including all functional leaders, would generally be present at these meetings. FE-4 states that Douglas would open the meetings with remarks, and then executive team members would give presentations on various topics, including the Company's quarterly performance, inventory levels, sustainability, and a "look forward" that involved issues such as inventory levels and market dynamics. FE-4 also states that these All-Hands meetings would include a breakdown

of the performance metrics of each region, including North America, APAC, EMEA, and LATAM, in which each region would be assessed on how they performed based on the goals established in the prior quarter.

212.    FE-2 states that, as the head of FMC's Southwest Asia business in at least 2019-2022 he participated in monthly "Leadership Calls" for APAC. He reports that these calls were run by FMC's APAC corporate heads, specifically Bethwyn Todd and later Pramod Thota, and that all the other top managers for FMC's businesses in the hemisphere participated monthly. FE-2 states that during these meetings, the sales performance of the various countries was a main topic, the sales numbers that had been achieved in the territories were displayed, and sales goals and performance-related factors were always discussed. FE-2 states that the sales numbers that the countries and region were supposed to achieve "came from the top," or "from Douglas." FE-2 confirms that FMC's executives in charge of APAC on the Leadership Calls were communicating the directives of CEO Douglas.

213.    FE-2 states that, in addition to the APAC Leadership Calls, he would participate in calls with country managers every month, and that the APAC country managers would meet face to face quarterly, sometimes in Singapore.

214.    FE-6 similarly states that there were regular conference calls and "Teams" conferences during which APAC Country Managers discussed the issues they were facing, and that Country Managers would frequently talk with each other regarding the oversupply problems in their territories. FE-6 states that these calls and Teams conferences consisted of the representatives from the APAC region.

215.    FE-9 likewise reports that Leadership Calls were regularly scheduled and held among U.S. management heads, including U.S. Divisional Leaders, VP and the President.

216.    FE-3 also reports regular calls and communications at the management level between FMC's regions to ensure that sales goals were met across all global regions. He states that the content of the exchanges among regions was always driven by FMC Global. FE-3 was aware of this because when sales dropped in one region, the shortfall had to be made up by other regions, and EMEA targets would have to be increased because of shortfalls in other areas.

217.    FE-16 reports that he participated in FMC "Town Hall" meetings at which CEO Douglas and CFO Sandifer spoke, and that through those meetings, he was aware of inventory problems in Brazil. FE-9 similarly states that during FMC Town Hall meetings held by management, the Company touted how much its business was growing "which made no sense," and also blamed North America for not selling enough. FE-9 states that he "laughed about the numbers the Company put out" in the meetings, and "no one" in his position "believed anything they said in the Town Hall meetings because they were not accurate numbers at all." FE-18 likewise states that, through mid-2023, FMC had quarterly Town Hall Meetings, calls to announce information and company financial numbers that would be made public, which included global reporting. FE-18 states that the R&D staff would laugh at the positive spin FMC was putting out to the public when internally resources were being cut and layoffs occurring.

218.    FE-11 states that during 2020-2023, FMC's sales team would have an Annual Sales Meeting, either virtually or in-person, which was attended by members of FMC's C-Suite, including CEO Douglas.

219.    FE-7 reports that, through the time of his departure in early 2022, FMC had annual Company meetings wherein slides were presented showing revenues, projected revenues, and channel inventories. In particular, the slides presented contained "Financials Overview" for each country, that reflected Sales and EBITDA numbers for the Month To Date, Quarter To Date and

Year To Date, measured against the FMC budget and forecast for the given country. FE-7 also confirms that slides presented at these meetings contained cash flow information for FMC's businesses at the country level. Sales Managers would put out FMC present positions and outlooks for the next several months. They would talk of credit incentives but also the need to eliminate old credit first. As such, FE-7 states upper management had clear visibility on "everything" but always came back with the need for more profits even in the face of detailed declining profits, growing competition, and large channel inventories in several countries.

220.    FE-7 also states that his finance department would have monthly meetings with their finance partners from Asia including Pakistan, New Zealand, Australia, China, and the Philippines, covering budgets and FMC revenues, receivables, increasing credit numbers, and the current markets. He states these meetings were led by an FMC Finance Director from Singapore. FE-7 states the finance departments shared all information contained in their respective monthly reports and upper management was fully aware but didn't care what the numbers showed, they just wanted increasing revenues. FE-7 reports that by well before 2020 FMC financial reporting was all digital at all levels on the FMC system and this financial information was shared. FE-7 states that a "Monthly Finance Deck" was also presented at these meetings, and included a slide that covered channel inventory.

### c.    Internal FMC Reports and Data Systems Provided Further Insight into Sales, Revenues, Channel Inventories, and Demand

221.    FEs explain that FMC maintained various internal data systems and produced reports reflecting metrics such as late payments from clients, client credit limits, product being stored in client warehouses, monthly client inventory levels, and sales by retailers.

222.    For example, FE-1 reports that LATAM CFO William Mills and other regional leaders regularly reported deterioration in prices up to Defendants Douglas and Sandifer on a

quarterly basis. He also states that FMC's senior management would receive "past due" reports on a quarterly and yearly basis, regarding late payments from distributors, which began to increase as distributors ordered more product in the period after COVID disruptions eased. FE-1 notes that FMC used a POG report that detailed how much FMC product sold to distributor clients was being stored at clients' warehouses, including resellers. According to FE-1, a separate financial report detailed clients' credit limits and their ability to "absorb" additional product sales from FMC. FMC tracked receivables on a weekly, monthly, and quarterly basis, and non-performing customers would ultimately be blocked from future orders. FE-1 reports that this data would be reviewed at the monthly S&OP meetings to evaluate which clients would receive credit limit increases and how much product would be sold to them.

223.    FE-1 further states that through at least mid-2022, FMC was able to track its distributor clients' inventory levels. The Commercial team had employees "on the ground" that would sign a contract with clients to provide FMC with their monthly inventory levels. FE-1 reports that FMC's clients either had their computer systems integrated with FMC's computer system or the clients would send inventory reports to FMC. This data would be used to compile FMC's POG reports.

224.    Likewise, FE-3 states that in Germany FMC and its distributor customers shared information regarding how much inventory and which products were at the customer warehouses.

225.    FE-9, an FMC Regional Business Manager in the U.S., confirms that FMC used SAP to count "product out the door to distribution," and that it contained detailed information on which distributors had placed orders, and how much product they had ordered. FE-9 states that FMC used the SAP data to assess profit or loss.

226.    FE-10, an FMC RMM in the U.S., also confirms that the SAP system contained information on sales by FMC to distributors.

227.    Beyond tracking the product that went to distributors in SAP, FMC also tracked sales to retailers and carried inventory at retailers through standard reports.

228.    FE-9 states that FMC used Point of Service, or POS, reports, in which retailers reported the amount of carryover inventory they held. FMC made providing POS reports a condition of FMC giving a retailer incentives, such as rebates. FMC would use information on retailer inventories on the POS reports to forecast sales.

229.    In addition, FMC utilized EDI reports to track sales of FMC products by retailers. By looking at EDI reports and SAP data, FMC could see how much product that FMC had shipped to distributors remained with distributors, unsold to retail. FE-9 states that an EDI would only be triggered when a retailer would purchase FMC products from a distributor—the sale would "sit in SAP" until the product arrived to the retailer, and then it would be tracked on EDI. The EDI showed the name of the purchasing retailer, the gallons they purchased, and the date of the purchase, as well as the distributor involved, according to FE-9. FE-9, as an RBM, received a daily report showing the sales of each of his sales representatives compared to their sales goals, while Divisional leader Young would receive a version of the report that showed all representatives on all teams in the entire region, and the goals for that region.

230.    FE-11 confirms that FMC tracked retail sales via EDI reports, which reported net sales from distribution to retail. In particular, EDI reports showed the specific name of the retailer making the purchase and the product being purchased. FE-10 also confirms that his sales were reported on EDI reports when a distributor sold to a retailer in his territory.

231. FE-15 states that EDI reports were also used in support of manufacturing and distributing analyses, and went to the C-Suite. He confirms that EDI reports were showing flat or downward trends by late 2022.

232. FE-9 also confirms that EDI was reported to FMC Corporate.

233. Further, FE-9 notes that FMC receives reports on sales to the distributor in SAP, what is sold to the retailers through EDI, and what is sold or still held in inventory by the retailer in POS reports. FE-9 states that, at every year-end, FMC would reconcile or audit what they see in EDI and compare to what a co-op or distributor reported as ending inventory. They had to come together within a 10% +/-. If they did not line up, questions would be raised to determine whether the reports from retailers were accurate or where the product went.

234. FE-9 confirms that FMC has insight into every single transaction that occurred in the period from the EDI report and the POS report at the end of the year. They can see that, for example, X Co-Op sold to Y customer at this address and this is the amount Y customer bought. FMC can also determine based on POS reports the amount of carryover inventory. FMC uses that information in determining whether to pay rebate incentives, for example, if a retailer has 1,000 gallons of carryover inventory, they will not receive a full rebate for sales made, it will be determined based on not selling 1,000 gallons to growers.

## V.    THE TRUTH IS GRADUALLY REVEALED

235. Through a series of disclosures beginning on May 1, 2023, new information emerged that partially corrected Defendants' prior misrepresentations and omissions of material fact and/or that represented a partial materialization of the risks that Defendants' misrepresentations and omissions concealed. As this information was released, Defendants continued to misrepresent and conceal material facts, as alleged below in Section VIII, until the complete truth was revealed on October 30-31, 2023, removing the remaining artificial inflation

that Defendants' Class Period misstatements created and/or maintained in the price of FMC common stock.

### A. Defendants Slash Guidance As Excess Inventory Leads to Volume Declines

#### 1. May 1-2, 2023: Defendants Cut 2Q 2023 Outlook

236.    After the market closed on May 1, 2023, FMC announced its 1Q 2023 results and the Company's outlook for the rest of the year in a press release and information on its website, to which the press release directed investors. While reporting a "solid first quarter" and raising its Adjusted EBITDA target for the full year, FMC also broke the news that it was lowering its outlook for 2Q 2023, including due to reduced volume (i.e., demand) for its products in certain markets. In so doing, FMC identified contributing factors, including "*channel inventory management in India*" and "*Diamides partners adjusting inventory levels*." FMC also indicated that "*channel inventory reduction in India*" was a cause of 1Q 2023 volume weakness in Asia, where FMC's revenues had declined by 22% year-over-year.

237.    Securities analysts reacted immediately to the negative news, and expressed "concerns," with Morgan Stanley stating in a May 1, 2023 report that "2Q was guided below the street," and that "*[f]rom a 2Q perspective, volume will be down given channel inventory management in India as well as diamide partners adjusting inventory levels*," and Seaport Research Partners noting that day, "we have some concerns about the volume weakness that appears to be dragging into Q2." (original emphasis omitted).

238.    On the Company's May 2, 2023 earnings call the next morning, Defendants elaborated on the disclosure, revealing, among other things, that the anticipated reduction in demand for certain FMC products, and the Diamides in particular, was based upon an increase in channel inventories and related destocking activities that drove the Company's reduced guidance for 2Q 2023. Securities analysts on the call pressed Defendants on FMC's growth prospects and

the outlook for the Company's Diamides for the remainder of 2023. For example, Joshua David

Spector of UBS asked Defendants, "on the diamides, where you talk about some partner channel

destocking. What's the visibility that, that doesn't bleed into the second half as well?" In response,

Douglas assured investors that channel inventory destocking was already accounted for in FMC's

guidance:

> I think on the channel inventories, we'll see how we go through the second quarter.
> The markets are moving. You know what, *if the market doesn't change much, yes,
> there will be some channel inventory hangover as we go into the next season.
> That occasionally happens. As the weather patterns improve as we go through
> the second quarter, we should be eating away at some of that inventory*. So we'll
> see where the market gets to.

> Our expectation, as we're forecasting is for a more normal season as we enter Q4
> and Q1 into next year in Latin America. *On the diamides, what we're telling you
> in our guidance now is that the partners that are reducing inventories, that's not
> just an event now that continues through the rest of the year. So that's already
> built into our forward-looking guidance.*

239.    In response to FMC's disclosures on May 1 and 2, 2023, the price of FMC common

stock plunged by $7.34 per share, or 5.93%, from its closing price of $123.76 per share on May 1,

2023 to close at $116.42 per share on May 2, 2023.

240.    Analyst reports following the press release and earnings call linked the sharp

decline in FMC's stock price to the Company's reduction in its 2Q 2023 guidance based upon

decreased demand for the Company's products. For example, BofA Global Research noted in a

May 3, 2023 report that "*FMC was down 6%*" and "*[w]e believe investors soured on the

unexpected volume decline of - 3% and a broader downgrade of the volume outlook – both for

FMC and the CPC market overall.*" Moreover, addressing "*[y]esterday's sell off*," Morgan

Stanley stated on May 3, 2023 that "*we believe that the core concern in the equity market relates

to the volume assumptions embedded in guidance*" and that "there is clearly some inventory

management taking place by the channel."

241.    While this was a first, partial disclosure of the misrepresented truth, Douglas's words of comfort had their intended effect of damage control, and certain securities analysts viewed FMC's reduced outlook for 2Q 2023 as a passing, limited-scale event, with Seaport Research Partners remarking in a May 3, 2023 report that it was "still encouraged on long-term opportunity" and "confident that FMC can deliver above-market growth."

### 2.    July 10, 2023: Defendants Further Cut 2Q 2023 Outlook and Reduce Full-Year 2023 Outlook

242.    Just two months after assuring the market that the demand headwinds including channel de-stocking was fully baked into FMC's forecast for the remainder of the year, Defendants partially revealed more of the true situation, as the Company negatively revised its story again. Before the market opened on July 10, 2023, it announced significant downward revisions of its expectations for 2Q and full-year 2023. In a press release, Douglas informed investors:

> ***Towards the end of May, we experienced unforeseen and unprecedented volume declines in three out of four operating regions, as our channel partners rapidly reduced inventory levels . . . Our full-year outlook for revenue and adjusted EBITDA has been revised to reflect these channel dynamics and their impact to volumes***, as well as the benefit from improved input costs and the significant operating cost mitigation actions we have already implemented.

243.    Despite having just raised its full-year Adjusted EBITDA outlook on May 1, 2023, FMC reported that it was drastically cutting its forecast across the board based on volume declines, reducing its: second quarter Adjusted EBITDA forecast by nearly 50%, from a range of $350-$370 million down to $185-$190 million; its full-year Adjusted EBITDA forecast from a range of $1.5-$1.56 billion down to $1.3-$1.4 billion; its revenue guidance for 2Q 2023 from a range of $1.42-$1.48 billion to $1-$1.03 billion; and its full-year 2023 revenue guidance from a range of $6.08-$6.22 billion to $5.2-$5.4 billion.

244.    In response to this new information on severely diminished demand for FMC's products that Defendants disclosed in the July 10, 2023 press release, the price of FMC common

stock dropped by $11.62 per share, or more than 11%, in a single trading day, from a close of $104.25 per share on Friday, July 7, 2023, to close at $92.63 per share on Monday, July 10, 2023.

245.    Media reports immediately connected the decline in FMC's common stock price to the Company's slashing of revenue and Adjusted EBITDA guidance based on the steep volume declines. For example, in an article issued just after the close of trading on July 10, 2023, Dow Jones Newswires excerpted news and analyst commentary issued during the trading day, including certain research analyst comments that "*[a] sharp guidance reduction by agricultural sciences FMC 'is a surprise, and not a positive one at that*,'" and "'*the order of magnitude of today's announcement is breath-taking*,'" and also reported that after "*[a]gricultural sciences company FMC's warning that its customers began to abruptly reduce inventory*," "*[s]hares of FMC fall 12% to $91.85 in midday trading*."

246.    Analyst reports on July 10, 2023 expressed shock at the severity of the 2023 guidance cuts that FMC announced earlier in the day, with BNP Paribas stating on July 10, 2023:

> FMC have warned on FY and Q2 numbers. Q1 adj EBITDA is now seen at USD 185-190m, implying a c50% miss vs consensus (cUSD360m, also where the company was previously guiding). For the full year, EBITDA is now seen at USD 1.3-1.4bn (vs USD1.5-1.56bn previously), implying a 10% cut to consensus, which currently sits at the midpoint of the previous guide
>
> ***
>
> *[C]learly the magnitude of the downgrade is higher than anticipated and we suspect investors may look at the continued H2 weight in guidance with some caution*.

247.    In a July 10, 2023 report entitled, "Worse Than We Thought," Morgan Stanley stated:

> *While most investors we spoke with after we cut numbers were also having trouble sizing the impact from destocking, we are confident that the outcome FMC presented this morning is worse than what had been contemplated.*
>
> *We expect a negative share price response to today's guidance reduction.*

Morgan Stanley also listed key questions that FMC's disclosure would trigger among investors, including: "Why is the destocking taking place given the company is calling out flat underlying grower consumption of FMC's products?"; "***Does this mean that volume sales in prior years[] overstated underlying demand and therefore this is actually an earnings reset*** (i.e., there won't be restocking in 2024 but rather just volume growth with consumption growth?)"; and "Will the company have to concede some price in future quarters to move volume (i.e., are channel partners holding back on inventory because their working capital has ballooned from multiple price increases and higher interest expense/carrying costs?)."

### B.    September 7, 2023: Blue Orca Publishes Report Revealing Misrepresented and Concealed Threats to Demand and Patent Protection for FMC's Diamides

248.    Defendants' demand story was punctured further on September 7, 2023, when investment firm Blue Orca Capital ("Blue Orca"), published a 38-page report detailing previously undisclosed legal defeats that FMC had suffered in attempting to protect its Diamide patents in China and India, as well as threats posed by the entry of generic diamide products into those key markets (the "Blue Orca Report"). The Blue Orca Report further revealed that FMC was on the brink of losing its Diamide patent protections in Brazil, which would trigger an influx of generic competition in that key market as well. Finally, the Blue Orca Report highlighted that FMC's deteriorating revenues, free cash flow constraints, entry of generic competitors, and heightened borrowing costs would likely push FMC's leverage ratio past the terms of its existing debt covenants.

249.    More specifically, Blue Orca detailed how FMC "concealed from investors the deterioration of [its] core business[], resulting in an inescapable cycle of falling revenues, plummeting cash flows, [and] declining profits." The Blue Orca Report also detailed how FMC "concealed from investors that it [had] suffered a recent string of stunning legal defeats around the

globe that [had] enabled competitors to now launch competing generics at prices up to 80% below the price of FMC's flagship insecticide product," the Diamides. It further stated that "[d]espite the expiration of the composition patents on FMC's diamides, FMC tells investors it will not face generic competition on its flagship products until 2026 at the earliest because FMC still holds a suite of 'process' patents, which FMC claims will bar generic entrants for the next several years. Absurdly, FMC even tells investors that 'there is not a single legal competitor . . . in the world today.' This is simply not true." (emphasis omitted).

250.    During the trading day on September 7, 2023, FMC responded with a press release in which the Company characterized the Blue Orca Report as making "misleading and factually inaccurate statements regarding FMC's patents for its diamide insecticide technology and inaccurately speculated on the strength of FMC's business," while not explaining a single putative material inaccuracy in the Blue Orca Report.

251.    In response to the new information in the Blue Orca Report, and despite FMC's same-day press release disputing the report's accuracy, the price of FMC common stock dropped $6.09 per share, or approximately 7.4%, from a close of $82.19 per share on September 6, 2023, to close at $76.10 per share on September 7, 2023.

252.    Analyst reports issued on September 7, 2023 directly connected FMC's steep stock price decline that day to the new information revealed in the Blue Orca Report that contradicted Defendants' prior statements. For example, in a September 7, 2023 report Morningstar noted:

> On Sept. 7, a short seller released a report asserting that FMC's diamide products, which generated 36% of revenue in 2022, have begun to see competition from generic producers. FMC's first diamide molecule went off patent last year. ***This report is in contrast to FMC management's prior statements that the company should not see the first generic sales until 2026 at the earliest because the company has key process manufacturing patents that will protect the premium diamide sales after the molecule patents expired***.

The Morningstar report also stated that "***FMC was down nearly 9% at the time of writing as the market reacted negatively to the report***." On September 11, 2023, Morgan Stanley issued a report stating, "FMC shares are down 40% year-to-date because of: i) the both unanticipated and unprecedented industry restocking that began in 2Q23; and now ii) rapidly increased investor anxiety regarding the expiration of the company's diamide insecticide patents (35% of sales)."

    **C.**    **October 23, 2023: Defendants Again Cut Outlook for 2023**

    253.    During trading on October 23, 2023, investors continued to learn more about the true scope of FMC's demand and corresponding revenue problem, as FMC issued a press release cutting its revenue and earnings outlook for 3Q and full-year 2023, which the Company claimed was "***mainly driven by substantially lower sales volumes in Latin America, particularly destocking in Brazil and to a lesser degree drought in Argentina***." The release further quoted Douglas as stating:

> ***During the third quarter, we observed continued channel destocking in all regions; however, the magnitude of the destocking in Brazil was much greater than we had anticipated. . . .*** While application of products by growers remains stable, significant global restocking impacts are expected to persist into next year and we have adjusted our full year outlook accordingly. ***With destocking conditions not expected to improve in the near-term, we have initiated an immediate restructuring process for our operations in Brazil and have launched a broader, more comprehensive process to review and adjust our total company cost structure.***

FMC also slashed its 3Q, 4Q, and full-year 2023 revenue and Adjusted EBITDA forecasts, as reflected in the following table:

**Table 3: October 23, 2023 Decline in Revenue and Adjusted EBITDA from Prior Guidance to Revised Guidance (in millions)**

|  | Previous Quarter Guidance | Revised Guidance October 23, 2023 | Percentage Decline |
|---|---|---|---|
| **3Q 2023 Revenue** | $1,190 to $1,270 | $982 | 17.5% to 22.7% |

|  | Previous Quarter Guidance | Revised Guidance October 23, 2023 | Percentage Decline |
|---|---|---|---|
| **4Q 2023 Revenue** | $1,660 to $1,780 | $1,139 to $1,379 | 17.0% to 36.0% |
| **FY 2023 Revenue** | $5,200 to $5,400 | $4,480 to $4,720 | 9.2% to 17.0% |
| **3Q 2023 Adjusted EBITDA** | $240 to $290 | $175 | 27.1% to 40.0% |
| **4Q 2023 Adjusted EBITDA** | $511 to $561 | $246 to $306 | 40.1% to 56.1% |
| **FY 2023 Adjusted EBITDA** | $1,300 to $1,400 | $970 to $1,030 | 20.8% to 30.7% |

254.    In response to this further disclosure, the price of FMC common stock declined $10.84 per share over the following two trading days, or approximately 16.2%, from a close of $66.95 per share on October 20, 2023, to close at $56.11 per share on October 24, 2023.

255.    Securities analysts quickly reacted to the negative new information that FMC revealed in its October 23, 2023 press release. For example, Morningstar issued a report during the October 23, 2023 trading day, stating:

> ***FMC shares were down 25% at the time of writing as the market reacted negatively to management's second 2023 guidance cut***. Admittedly, the rapid pace of inventory destocking that has occurred in crop chemicals this year caught us by surprise, including the continued destocking that occurred in the third quarter in Brazil, FMC's largest market, which was the basis of management's guidance cut.

256.    In its October 23, 2023 report, UBS reduced its 2023 earnings estimates, as well as its estimates for 2024-2025, noting "***[t]he dual impact of crop chemical destocking and revived questions on the defensiveness of FMC's diamides portfolio against competition will be overhangs for some time, in our view***."

257.    FMC's common stock price continued to decline the next trading day, October 24, 2023, as the market continued to digest the Company's unexpected October 23, 2023 disclosures.

At 10:49 a.m. on October 24, 2023, Bloomberg issued a story entitled "*FMC Falls on Multiple Post-Guidance Downgrades: Street Wrap*," in which it reported:

> ***FMC fell as much as 5.4% Tuesday to extend declines for a second day*** as three banks – Morgan Stanley, Goldman Sachs, and BofA Global Research – all downgraded their recommendation on the herbicide and pesticide maker. ***Still more analysts slashed their price targets on the stock after its 'shocking' guidance cut that Wall Street says has shaken confidence in the company***.

258.    Also on October 24, 2023, BMO Capital Markets issued a report in which it stated:

> ***We lower our price target to $80 following the shocking FY EBITDA guide down to ~$1B ~29%y/y), a level not seen since before the diamides acquisition.*** With near-zero visibility into 2024 earnings power, and untrusting investor base, and FMC clearly a 2024 show-me story, this stock call is not easy.

BMO Capital Markets further noted that "[m]anagement did not provide much color on Q4, just indicating de-stocking continues" and "***cash flow was not discussed***."

**D.    October 30-31, 2023: 3Q Results and Negative FCF Guidance**

259.    The truth regarding FMC's demand and revenue picture was fully revealed by a final corrective disclosure one week later. On October 30, 2023, after the market had closed, FMC issued a press release announcing its results for 3Q 2023. While the Company's 3Q results were generally in line with the revised outlook FMC had announced on October 23, the Company also provided surprising new information on its FCF for the year. In this regard, the October 30, 2023 press release informed investors that "*[t]he company is lowering full-year free cash flow guidance to a range of negative $860 million to negative $640 million due to the reduction in expected second half EBITDA and the impacts to working capital from higher inventory and lower payables*."

260.    Commenting on FMC's financial constraints, Douglas stated:

> The global crop protection market remains challenged with severe destocking across the channel impacting volume growth this year. In this environment, ***we are implementing a company-wide restructuring program to right-size our cost base***.

Slides published on FMC's website along with the release represented that third quarter revenues were down in all regions, with the leading cause identified as **"[l]ower volumes in all regions caused by destocking from channel customers and partners**." As for FCF, the slides identified "**drastically lower accounts payable**" as a leading cause.

261.    Analysts reacted immediately to the negative FCF disclosure. In an October 30, 2023 report, UBS declared "[g]iven FMC already pre-released, we don't expect a major stock reaction tomorrow. **But lower pricing and reduced FCF are some of the incremental data points, both are negative. FCF was updated to a use of $750M in 2023e, this is well below our $100M use estimate**." In a report released just after midnight on October 31, 2023, BNP Paribas pointed to FMC's FCF disclosure, stating **"[t]his could lead to another covenant issue, a likely key focus for the call tomorrow**."

262.    On October 31, 2023, prior to the market opening, the Company held its earnings call for 3Q 2023. Defendant Sandifer delivered prepared remarks on FMC's "cash flow and other financial topics," stating the following as to FMC's leverage and borrowing covenants:

> **As of September 30, gross debt-to-EBIDTA was 3.6x, while net debt-to-EBITDA was 3.3x, reflecting the sudden deceleration of our earnings beginning in Q2 and elevated debt levels due to higher workings capital resulting from this deceleration.** The covenants to our revolving credit facility evaluate our leverage using a metric that includes adjustments to both EBITDA and debt as reported. With these adjustments, covenant leverage was 3.8x as of September 30 relative to a maximum allowable of 4.0x. We do not view this as an acceptable leverage level relative to our covenant.
>
> In light of this and the reduced outlook for Q4, **we are currently in advanced discussions with our bank group to further amend our covenants to provide additional headroom for the company as we adjust our cost structure and debt levels to current market realities.**

263.    Sandifer also delivered prepared remarks on FMC's cash flow generation and outlook, stating:

FMC generated free cash flow of $32 million in Q3 down from $360 million in the prior year period. ***Cash from operations declined $316 million, with lower EBITDA and substantially lower payables as we adjust our operations to match current demand***.

\*\*\*

Year-to-date cash flow through September 30 was negative $790 million, $651 million lower than the prior year period. ***Nearly all of the reduction stems from lower cash from operations, which was down substantially due to lower EBITDA and lower payables.***

\*\*\*

We've reduced our free cash flow guidance for 2023 to negative $750 million at the midpoint, down from breakeven in our previous guidance. ***The reduction in full year cash flow outlook is a direct result of lower-than-expected second half EBITDA and the impact of reduced volumes on working capital***.

264.    In response to FMC's disclosures regarding significant FCF constraints driven by lower volumes, revenues, and receivables, which also drove the Company to renegotiate its debt covenants, the price of FMC common stock declined $4.76 per share, over 8%, from its closing price of $57.96 per share on October 30, 2023, to close at $53.20 per share on October 31, 2023.

265.    Analyst reports remarked on the surprising negative FCF outlook, the need for debt covenant relief, and how those concerns drove FMC's stock price decline on October 31, 2023. That day, Morningstar reported "***FMC's shares were down 9% at the time of writing. The market reacted negatively to management's outlook for free cash flow in 2023 and FMC having to negotiate temporary debt covenant relief.***"

266.    In its November 1, 2023 report, BofA Global Research similarly stated:

***Free cash flow is the next negative surprise.*** While revenues/EBITDA were in line with FMC's recent preannouncement, ***there were several additional negative surprises in the Q3 results. The first one is the updated free cash flow outlook . . . the FCF outlook has been reduced by $750mm, an unexpected and elevated drop.*** (first emphasis in original).

267.    Also that day, J.P. Morgan questioned FMC's claims that it could not have anticipated the level of inventory destocking activity that negatively impacted its financial results and FCF:

> Could the sharp de-stocking in the agricultural sector have been foreseen? FMC contended on its [October 31] conference call that the destocking was unforeseen because crop chemical inventories were held by growers.

***

> **_The issue of inventory reduction in crop chemicals seems like a business problem where the mosaic could have been put together._**

## VI.    POST-CLASS PERIOD EVENTS

### A.    FMC Further Amends the Fifth Credit Agreement

268.    On November 7, 2023, FMC entered into Amendment No. 2 to the Credit Agreement ("Amendment Two"). Amendment Two created a "Covenant Relief Period," during which the Leverage Ratio increased to as high as 6.50:1.00 for the fiscal quarters ended December 31, 2023, March 31, 2024 and June 30, 2024. In a press release dated November 7, 2023, Sandifer explained that Amendment Two provided "ample headroom and duration that is well beyond what we believe will be required as we navigate the current challenges to free cash flow."

269.    Also on November 7, 2023, the Company filed its Form 10-Q for the quarter ended September 30, 2023. The Company reported that its Leverage Ratio had risen to 3.80 for the previous four quarters ended September 30, 2023. The Company also reported that its total debt was $4,115.7 million, compared to cash and cash equivalents of $323.8 million and a FCF of negative $790.0 million for the nine months ended September 30, 2023.

### B.    Defendants' Admissions Regarding Channel Inventories

270.    On November 16, 2023, the Company held its annual Investor Day Conference. Presenting to the audience, Defendant Douglas explained that "[a] combination of inflationary

prices and concerns about supply security during 2021 and '22 resulted in channel participants and growers over-stocking in the last couple of growing seasons."

271.    At the Investor Day Conference, Sandifer claimed that the Company needed to "reexamin[e] how we approach forecasting, including improving on our market intelligence processes."

272.    On February 6, 2024, the Company held its 4Q 2023 earnings call. In his opening remarks, Douglas sought to explain the Company's shortcomings saying:

> At our November Investor Day, we acknowledge[d] that, although FMC had responded aggressively to market challenges in the second half of 2023[,] [b]roader actions were needed to better align our business operations with the current realities in the marketplace. We are moving quickly on a global restructuring plan that will fundamentally transform our operating model, including how we're organized, where we operate and the way we work. This is a multipronged approach that focuses on shorter-term expenses and longer-term structural costs as we restructure the operating model. These structural changes will position for success as we move beyond 2024 and towards our 2026 goals.

273.    When FMC published its Form 10-K for the year ended December 31, 2023 on February 27, 2024, the Company attempted to further explain to the public how it would right the ship. Underscoring the extent and scale of the fraud, as part of its "2023 Highlights" the Company described its new global restructuring plan, "Project Focus":

> As a result of increased inventory carrying costs and improved security of supply, distributors, retailers and growers rapidly reduced purchases across all four regions beginning in the latter half of the second quarter of 2023 and persisting through the remainder of the year. While grower consumption remained steady during 2023, volumes were down significantly driving a decline in results compared to the prior year. ***As a result of the destocking conditions and the related volume pressure, we initiated a global restructuring plan*** during the fourth quarter of 2023, which we refer to as "Project Focus" and discuss further under the section titled "Results of Operations."

274.    The 2023 Form 10-K also added a new risk factor regarding channel inventory behavior that had been known by the Company the previous year, but excluded from its public filings. Under *General Risk Factors*, the Company included the following risk disclosure:

The Company relies in many countries and in varying degrees on distribution channels to access the market and reach farmers or other end use customers. An abrupt and widespread shift in purchasing behaviors (e.g., the current inventory destocking phenomenon) by channel partners and end use customers has and may continue to negatively and materially impact the Company's volumes across important markets, which has adversely affected and may continue to adversely affect our results of operations. Such adverse effects could include but not be limited to materially reduced volumes purchased by customers, resulting in not only reduced sales, but also the Company bearing higher volumes of unsold product inventory, excess raw materials, and correspondingly increased carrying costs.

275.    On June 11, 2024, in an unplanned move, Douglas abruptly resigned his position as President and CEO of FMC.

## VII.    DEFENDANTS VIOLATED ITEM 303 OF REGULATION S-K

276.    Pursuant to Item 303(b)(2)(ii) of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii), an issuer must "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to cause a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." An issuing company must include disclosures pursuant to Item 303 in registration statements filed in connection with public stock offerings, proxy statements, and periodic reports filed pursuant to Sections 13 and 15 of the Exchange Act.

277.    In May 1989, the SEC issued an interpretive release discussing Item 303 (the "1989 Interpretive Release"). The 1989 Interpretative Release stated, in part:

Required disclosure is based on currently known trends, events and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.

*** 

A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

278.    The 1989 Interpretive Release also provided the following test to determine if disclosure under Item 303(a) is required:

Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

(1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.

(2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

279.    The SEC issued a final rule addressing registrants' disclosure obligations under Item 303 that became effective on April 7, 2003 ("2003 Rule"). The 2003 Rule emphasizes that Management Discussion and Analysis ("MD&A") disclosures are "of paramount importance in increasing the transparency of a company's financial performance and providing investors with the disclosure necessary to evaluate a company and to make informed investment decisions." The 2003 Rule further states that the MD&A affords "a unique opportunity for management to provide investors with an understanding of its view of the financial performance and condition of the company, an appreciation of what the financial statements show *and do not show*, as well as *important trends and risks* that have shaped the past *or are reasonably likely to shape the future*."

280.    Here, for the reasons discussed above in Section IV.F.1-3, above, declining demand for FMC's products, fueled by (i) saturated inventory channels at the distributor, retailer and/or end-user levels; (ii) increasing competition and market share gains in China, Brazil, India, the U.S., Southwest Asia and elsewhere from low-cost generics, including generics that competed with FMC's Diamides; (iii) legal losses regarding FMC's patent defenses against generics for its Diamides in China, India and Brazil; and (iv) industry consolidation among distributors and retailers in the North American market, constituted an trend or uncertainty known to Defendants, that was reasonably likely to have a material impact on FMC's revenues and results of operations.

Indeed, as alleged in Section IV.F.4, above, this demand reduction was already impacting FMC's profit margins and revenues and causing it to take various actions in response by 2022, including increasing client credit limits, providing discounts and lower prices or other forms of payment relief that increased client debt and caused deteriorating prices for FMC's products, accepting and providing credit for returned expired product that had shipped but not sold.

281. Accordingly, Defendants were obligated to disclose in the Company's Class Period Forms 10-K and 10-Q that the declining demand, saturated inventory channels, increasing generic competition with respect to the Diamides, legal losses regarding FMC's Diamide patent defenses, and industry consolidation were reasonably likely to have a material adverse impact on FMC's future revenues and results of operations. This disclosure was required by Item 303, and was necessary to make Defendants' statements about, among other things, FMC's Diamide patents and registrations and Defendants' efforts to enforce the protections, the potential for future competition from generics, inventory levels, and projected demand, not misleading. Their failure to make this required disclosure therefore constituted a violation of Item 303 and rendered Defendants' statements in these filings, which are set forth in Section VIII below, materially false or misleading.

## VIII.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### A.  February 8, 2022 4Q 2023 Earnings Press Release and February 9, 2022 4Q 2023 Earnings Call

282. On February 8, 2022, after the market closed, FMC announced "record fourth quarter results" in a press release filed on Form 8-K. According to the press release, the results were driven by "***strong demand*** and pricing actions." The press release also emphasized the impact of "new products and continued market expansion of Rynaxypyr® and Cyazypyr®."

283. Defendant Douglas expressed in the press release that FMC's financial performance "reflects the strength of our synthetic and biological portfolios, ***a healthy demand***

*environment* as well as accelerating price increases." Moreover, Douglas specified that "Revenue growth was particularly robust in North America and Latin America."

284.    In addition, during FMC's February 9, 2022 earnings call for 4Q 2021, Douglas delivered prepared remarks, informing investors, ***"[o]ur Asia business is expected to grow across several countries driven by diamides***, new products and biologicals. ***India will continue to be an important market for our diamides*** as well as the broader portfolio, especially in sugarcane, rice and specialty crops . . . ."

285.    During the question-and-answer portion of the 4Q 2021 earnings call, a Goldman Sachs analyst asked about "where you think channel inventories kind of ended the year and the headwind tailwind that, that might present to the volume opportunity." In response, Douglas expressed no worries about either demand or inventory levels stating:

> [F]rom a volume perspective . . . there's obviously—***there's very, very strong demand out there***. . . . I think ***from a market demand perspective, it's very strong all over the world. I mean when I think about channel inventories today, frankly, I have very, very few concerns from where I sit at FMC***. There are pockets in India following the spotty monsoon that we had last year, but they're not significant. ***Brazil, we have—from FMC's perspective, we got absolutely 0 concern***. From North America and probably the other way around when it comes to channel inventories, I'm more concerned that there is not enough material there. Europe, not really a problem at all. ***So channel inventories, frankly, in our own internal conversations has not really come up much in the last quarter. Demand has come up. Demand is very, very strong***.

286.    Later during the February 9, 2022 conference call, Christopher S. Parkinson from Mizuho inquired as to the anticipated growth contributions from FMC's Diamides and new products, asking "[C]an you just give us some additional color on the diamides as well as the new product penetration as well as some of the launches some of those things that are kind of rolling out of your [] R&D portfolio? So, just how should we be thinking about that growth contribution from FMC-specific sources versus your presumption of natural market contributions?"

287. In response, Douglas pointed to the Diamides' prior years' sales growth as supporting an expectation of future sales growth, stating:

> *I think what is most pleasing for us is we see the diamides continuing to grow in that mid- to high single-digits depending on the year, that keeps rolling through. We see that year in, year out since we acquired the products*.

288. The bolded statements set forth in ¶¶ 282-85 and 287 that, *inter alia*, FMC could report "very strong" and "healthy" demand for its products in markets around the world, "very, very few concerns" or "zero" concern with respect to channel inventories for FMC's products, and continued Diamides sales growth, were materially false or misleading when made. These statements misrepresented the fact that, by 2022, demand had dropped and was dropping for FMC's products, including the Diamides, and FMC revenues were predictably adversely affected as a result, due to several significant factors that were recognized internally at FMC but not disclosed to investors. These factors included:

    a.      Inventories in the sales and distribution channels for FMC's products were full by 2022, and there were excess inventories at the distribution, retail and end-user levels, due to the COVID-era bubble of over-purchasing and hoarding of FMC products. The de-stocking necessary to allow retailers to sell to end-users, and distributors to sell to retailers, would take many months or more in FMC's key markets around the globe. *See* ¶¶ 116-29, 134-37, 140-45.

    b.      As a result of full inventory channels, in 2022 distributors and retailers were not buying as much FMC product as they had in the past, and instead were slowing their purchases as they de-stocked. *See* ¶¶ 116-17, 121-22, 124-25, 128, 130, 132-37, 139-45.

c.    Overstocked inventories of FMC products caused numerous adverse financial effects, including price deterioration and lower margins for FMC's products as FMC attempted to achieve sales volume by selling products at discounts, product expiration issues leading to product returns and customer credits that impacted revenues, over-extending client credit limits and increasing bad debts, and employing various efforts to securitize client debts to generate free cash flow—all of which adversely affected FMC's revenues in key markets around the world. *See* ¶¶ 135-37, 139-42, 173-82, 185-88.

d.    Demand for FMC's products was also diminished as a result of steady encroachment into more regions of low-priced generic versions of FMC's Diamides, including in the U.S., India, China, Southwest Asia, and elsewhere, that undercut FMC's product sale prices and increasingly and predictably took FMC market share. *See* ¶¶ 157-68.

e.    Furthermore, industry consolidation among retailers and distributors in the North American market squeezed FMC's revenues by shrinking the number of distributors FMC could sell to, including because many distributors and retailers were economically incentivized to promote the products of FMC's competitors instead of FMC's products. *See* ¶¶ 170-72.

f.    In addition, the alleged misstatements regarding purportedly expected sales growth in ¶¶ 284-85 and 287 were materially false and misleading when made because they lacked a reasonable basis in fact, including because they did not reflect or take into account the undisclosed adverse facts regarding

demand, channel inventory, competition, and revenues from FMC's products set forth in subparagraphs a-e, above.

289.    In addition, by electing to speak publicly about the demand for FMC's products in markets around the world, Defendants' lack of concern with respect to channel inventories for the Company's products, and continued Diamide sales growth, Defendants put each of these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the declining demand for the Company's products due to, among other things, the full channel inventories, the encroachment of generic competitors, and the industry consolidation to avoid misleading investors. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

**B.    February 25, 2022 2021 Form 10-K**

290.    On February 25, 2022, FMC filed its 2021 Form 10-K for the period ending December 31, 2021. It was approved, signed, and certified by Defendants Douglas and Sandifer.

291.    The 2021 Form 10-K included the following "Risk Factor" regarding the risks the Company may face from competition:

> ***Our business faces competition, which could affect our ability to maintain or raise prices, successfully enter certain markets or retain our market position. Competition for our business includes not only generic suppliers of the same pesticidal active ingredients*** but also alternative proprietary pesticide chemistries and crop protection technologies that are bred into or applied onto seeds. ***Increased generic presence in agricultural chemical markets has been driven by the number of significant product patents and product data protections that have expired in the last decade, and this trend is expected to continue. . . . At this time, the scope and potential impact of these technologies are largely unknown*** but could have the potential to disrupt our business.

292.    Despite the increase in pressure that Defendants were already facing from competitors selling generic products in their key markets (as discussed in ¶¶ 157-68), this

disclosure was unchanged from FMC's 2020 and even 2019 Forms 10-K, which both used the same standard language to characterize a risk as more remote than it was.

293.    The 2021 Form 10-K also included the following Risk Factor regarding the impact that the expiration of FMC's patents, and its Diamide patents in particular, may have on its ability to compete in the future:

> Our future performance will depend on our ability to address active ingredient composition of matter patent expirations through effective enforcement of our patents that continue to cover key chemical intermediates and process patents, as well as portfolio life cycle management, particularly for our high value diamide insecticides . . . **Some of our competitors may secure patents on production methods or uses of products that may limit our ability to compete cost-effectively**.

294.    Relatedly, the 2021 Form 10-K also included the following Risk Factor regarding the enforcement of FMC's intellectual property rights against competitors:

> **The composition of matter patents on our Rynaxypyr® active ingredient is nearing its expiration in several key countries. We have a broad estate of additional patents regarding the production of Rynaxypyr® active ingredient, as well as trademark and data exclusivity protection in certain countries that extend well beyond the active ingredient composition of matter patents.** . . . **Other third parties may seek to enter markets with infringing products or may find alternative production methods that avoid infringement or we may not be successful in litigating to enforce our patents due to the risks inherent in any litigation.** . . . . **We are currently and may in the future be a party to various lawsuits or administrative proceedings involving our patents.** (See "Patents, Trademarks and Licenses" in Item 1.). Such challenges can result in some or all of the claims of the asserted patent being invalidated or deemed unenforceable. **In such circumstances, an adverse patent enforcement decision which could lead to the entry of competing chlorantraniliprole products in relevant markets may materially and adversely impact our financial results**.

295.    The bolded statements set forth in ¶¶ 291 and 293-94 regarding certain purported risks to FMC's revenues that "could" or "may" occur due to generic competition were materially false or misleading when made because they described as contingent or merely possible events or circumstances that had already occurred. Indeed, low-cost, generic competitors in key FMC

markets including China, India and others were already directly competing with FMC for market share and causing FMC to lower prices, as set forth in ¶¶ 157-68.

296.    The bolded statements set forth in ¶¶ 291 and 293-94 were also materially false or misleading when made and violated Item 303 because Defendants failed to disclose that the foregoing market factors concerning the demand for FMC's products were reasonably likely to have a material adverse effect on the Company's future revenues. *See* ¶¶ 280-81. In addition, by electing to speak publicly about the market and competition for FMC's products, Defendants put each of these subjects in play, triggering a duty to fully, completely, and accurately disclose all related material facts, including the adverse material demand factors noted in ¶ 288.a-f above, and the likely impact of these factors on the Company's revenues.

### C.    March 8, 2022 RBC Capital Markets Chemicals and Packaging Conference

297.    On March 8, 2022, at the RBC Capital Markets Chemicals and Packaging Conference, Douglas again praised the Company's channel inventory position saying:

> *Channel inventories for us are normal, if not low in some parts of Latin America. We've had very strong demand. A lot of that demand was used during the season*, *which is always a very good sign*. So I think with soft commodity prices as they are, you're going to see that trend pretty much everywhere in the world where products are getting used to make sure that the growers are getting the highest yields they possibly can. When you have record prices for soy, corn, wheat and you name your crop, cotton, sugar, they're all up there. People really want to protect those crops. *So we see that demand side being very strong*.

298.    The bolded statements set forth in ¶ 297 that, *inter alia*, FMC had "very strong" demand for its products, that "a lot of that demand was used during the season," and that "channel inventories for us are normal," were materially false or misleading when made for the reasons set forth in ¶ 288a.-f. above.

299.    In addition, by electing to speak publicly about the "normal" channel inventories and the "very strong" demand for FMC's products, Defendants put each of these subjects in play,

triggering a duty to fully, completely, and accurately disclose all material facts regarding the declining demand for the Company's products due to, among other things, the full channel inventories, the encroachment of generic competitors, and the industry consolidation to avoid misleading investors. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

### D.    May 3, 2022 1Q 2022 Form 10-Q

300.    On May 3, 2022, FMC filed its 1Q 2022 Form 10-Q, signed by Douglas and Sandifer. The Form 10-Q incorporated by reference the misleading risk disclosures from the 2021 Form 10-K noted above in ¶¶ 291, and 293-94, which were materially false or misleading and violated Item 303 for the reasons identified in above in ¶¶ 295-96.

### E.    May 3, 2022 1Q 2022 Earnings Call

301.    On May 3, 2022, the Company held its earnings call for 1Q 2022. During the question-and-answer portion of the call, Adam L. Samuelson, a Goldman Sachs analyst asked Defendants to provide an update on channel inventories throughout FMC's regions, asking:

> I would just love to get your thoughts on channel inventories. It seemed like there was a good amount of prebuying in a lot of different regions ahead of maybe an expectation of additional price increases, concerns around supply chain. And just if you could [talk] to around the world about where you think channel inventory sit as you're going into certainly the northern hemisphere growing season and in Brazil where you're more off season? Just how you think activity levels and restocking sits there?

302.    Douglas definitively brushed off the analyst's concerns, stating:

> ***Generally speaking, we are not concerned about channel inventories. There are a couple of pockets in the world. One we alluded to, which is India.*** In Q4, weather patterns were not great, and there is a reduction in rice acres in India, and you saw some of the comments about strong growth in ASEAN and Australia offset by India. ***We're taking the opportunity to reduce our channel inventories in India at the beginning of the year. We expect that to normalize pretty quickly as we go through the first half year.*** Outside of that, ***Northern Hemisphere, I don't think we'll carry in excess inventories as we're going into the channel into the seasons. . . .***

***So we're not seeing anything that we would say is concerning at all. They seem pretty normal to us. In Latin America, for us, normal. Argentina, Brazil, Mexico, India where we should be at this point of the season, demand has been very good for us.*** Our growth rates are in line with how we're penetrating the market. You'll recall on the call here, I just talked about the fact that we've been spending a lot of time and effort improving our market access into the soy complex in Brazil, and that's where our growth is coming from, whether it be with insecticides or some of the new herbicides that we have in place. ***We're not worried about where our inventory levels are at all in Brazil or Argentina.***

303.    Similarly, BNP Paribas analyst, Laurent Guy Favre, asked Douglas "if you could talk a little bit about, I guess, volumes including mix, so really intensity of use. Are there reasons why you would not expect the higher intensity of use, more spraying[?]"

304.    In response, Douglas stated:

***[O]ur backdrop is positive. [W]e believe markets will continue like this, certainly this year and probably into next year as well. We don't see anything on the horizon that will change that.*** So from our perspective, it is making sure that we can get those high-quality, newer technologies to the marketplace, certainly in the right time frame given all the disruptions we're seeing.

305.    Defendants' bolded statements set forth in ¶¶ 302 and 304 regarding channel inventories, demand and market conditions for FMC's products were materially false or misleading when made were materially false and misleading for the reasons set forth in ¶ 288.a.-f., above.

306.    In addition, by electing to speak publicly about their lack of concern regarding FMC's channel inventories and "very good" demand, Defendants put each of these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the declining demand for the Company's products due to, among other things, the full channel inventories, the encroachment of generic competitors, and the industry consolidation to avoid misleading investors. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

### F.    May 4, 2022 Wells Fargo Industrial Conference

307.    On May 4, 2022, an analyst at the Wells Fargo Industrials Conference asked about demand for FMC products in North America, "Why don't we shift to North America, the United States. It's the season now, so any quick thoughts on that?"

308.    Sandifer's response emphasized an increase in sales particularly in North America:

The U.S. -- *look, the U.S. market is still going gangbusters. We'll see how planning continues to proceed in early season, but it's been a good start to the season. We had very robust sales growth in both Canada and the United States in the first quarter*, and it is one place that I would know we definitely saw some advanced purchasing, all within the season for products that should be used within this growing season, but that blurring between Q2 and Q1.

309.    While recognizing that the level of demand was unusual for the season, Sandifer also stated that FMC expected those levels of demand to continue for several years:

Certainly, there were heightened concerns among retailers, distributors and growers on availability of materials. So we did see some early plays in the orders, and quite honestly, we had a very, very strong Q1. We could have sold more, but *we ended up with more demand particularly for products that aren't quite -- it's not quite the time for them to usually be consumed that we weren't prepared to produce just yet. That demand has been very, very strong. We see those conditions continuing. . . . And we see a pretty good market in the U.S., not only for this year but for several years.*

310.    Defendants' bolded statements set forth in ¶¶ 308 and 309 regarding demand and market conditions for FMC's products were materially false or misleading when made for the reasons set forth in ¶ 288.a.-f.

311.    In addition, by electing to speak publicly about sales growth in the U.S. and Canada, the "very, very strong" demand for FMC's products, and Defendants' view that these conditions would continue, Defendants put each of these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the declining demand for the Company's products due to, among other things, the full channel inventories, the encroachment of generic competitors, and the industry consolidation to avoid misleading investors. In light of these

undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

### G.    May 18, 2022 BMO Capital Markets Global Farm to Market Conference

312.    At the BMO Capital Markets Global Farm to Market Conference on May 18, 2022, BMO analyst Joel Jackson asked Douglas about the Company's channel inventory situation. Specifically, Jackson asked, "[W]hat are crop protection inventories like in the channel, in different markets—market dynamics in different markets? And how do you think your inventories compare to competitors."

313.    Douglas responded:

*[I]nventories are where they should be right now.* We had a very -- FMC had a very strong Q1, but we know some of that came from Q2 because people are just concerned about supply. Rightly so with what's happening in the chemical industry and the broader industry in general. *I think inventories are in good shape. The only one we highlighted at our February call, which we're working through now, is parts of India. There was less rice acres given the seasonal weather*, the monsoon in Q4. *So we had more inventory as FMC, and I'm sure others did as well, but everywhere else is in pretty good shape*.

314.    Later, in conveying a question from the audience, Jackson asked how FMC changed the way it was managing inventories, particularly in Brazil, where the Company previously "didn't have as much visibility" into inventory, inquiring "Where are you different now?"

315.    In response, Douglas assured that FMC had procedures in place to monitor demand for its products, explaining:

Today, we have a system that is very different. We manage inventory not only in our own facilities, not only in third-party warehouses but also at the grower level. So our sales force and our financial groups are actually lockstep in terms of how much product are we selling into the market? How much is actually getting through to the grower? And then importantly, how much is getting used on the ground? So the system is completely different to what it was 7, 8, 9 years ago in terms of how we manage inventory in Brazil.

316.    Douglas added that "***[R]ight now, as I said earlier, there are no issues with inventory in Brazil for us.***"

317.    Jackson also asked about FMC's five-year growth strategy initially announced in 2018, focusing on the EBITDA growth projections. One analyst asked, "So your midterm targets, right, you'll get 7%, 8%, 9% EBITDA growth every year. And that's deemed a very attractive exposure to ag for an investor. The last couple of years, there's been some ups and downs for different reasons. Can you elaborate on your ability to get back to that more predictable 7%, 8%, 9% EBITDA CAGR? What are the key drivers and risks to get there?"

318.    Douglas reaffirmed multiple projections, stating that the model was "intact":

> ***Yes. I mean we put our plan together back in 2018 after we acquired the DuPont assets, and we had really an algorithm that said 5% to 7% top line growth, 7% to 9% EBITDA growth and then EPS growing faster than EBITDA. We're generally on -- we're right the range for revenue.*** We're slightly below in terms of EBITDA, but we've had $1 billion of costs and FX that we didn't have in the plan***. So I feel very good where the company is.*** I think this year, we're at 6% EBITDA growth. So we're right at the range. It's a very attractive algorithm. When you think of a company like us, $5.5 billion in revenue, $1.4 billion in EBITDA, we're in a $65 billion market. We're a research company. We're applying 6% to 7% of our revenue into that model for R&D. You should be growing your EBITDA faster. And we have been. So ***I think that model is very much intact.*** . . .

319.    Drawing attention to recent declines in FMC's stock price, the BMO analyst asked, "[S]o given the strong Q1 and your outlook that you reiterated, are you surprised about the stock reaction more recently versus peers? What do you think people are missing or misunderstood from the earnings call?"

320.    In his response, Douglas attempted to reassure the public by emphasizing FMC's performance and specifically the strength of demand for its products:

> We're managing through a very volatile environment. We all know that. That will change as we go through the rest of the year and into next year, that should change. But ***the way the company is performing, dealing with all the activities that are out there, very strong demand, pricing actions where we delivered 8% price in the***

***quarter, roughly mid-single-digits for the full year to offset costs. I think the company is performing at a very high level.*** So we were surprised when we saw the stock go down. It's come back, not quite to the point that it was. But I think people are missing the fact that the company is performing at a high level. We have 26%, 27% EBITDA margins. There is nobody in the industry growing at 7% to 8% on the revenue line with those sort of EBITDA margins, despite the significant cost inflation that we've got.

321.    Defendants' bolded statements set forth in ¶¶ 313, 316, 318 and 320 regarding channel inventories, demand, market conditions for FMC's products and FMC's financial outlook were materially false or misleading when made for the reasons set forth in ¶ 288.a.-f., above.

322.    In addition, by electing to speak publicly about inventories being "in good shape," the Company's progress in meeting the five-year strategic plan, the "very strong demand," and the Company's performance "at a very high level," Defendants put each of these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the declining demand for the Company's products due to, among other things, the full channel inventories, the encroachment of generic competitors, and the industry consolidation to avoid misleading investors. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

### H.    August 3, 2022 2Q 2022 Form 10-Q

323.    On August 3, 2022, FMC filed its 2Q 2022 Form 10-Q, signed by Douglas and Sandifer. The Form 10-Q incorporated by reference the misleading risk disclosures from the 2021 Form 10-K noted above at ¶¶ 291 and 293-94, which were materially false or misleading and violated Item 303 for the reasons identified in above in ¶¶ 295-96.

### I.    August 3, 2022 2Q 2022 Earnings Call

324.    FMC held its 2Q 2022 earnings call on August 3, 2022. Jeffries analyst Laurence Alexander asked, "Can you give a bit more detail on inventory levels regionally that you're seeing heading into the back half of the year?"

325.    In responding, Douglas assured investors:

*We're very okay with inventory levels pretty much everywhere in the world right now*. I would say the only spot and I've commented on this at the last earnings call is there has been a significant reduction in rice acres in India. *And we're working through inventory in India. That will be done as we go through the second half of the year. Everywhere else, frankly speaking, is very good from our perspective on inventory. So we're not worried about that going into the end of the year*.

326.    Also during the August 3, 2022 conference call, Stephen V. Byrne of BofA Securities asked about the Diamide revenue stream contributions from FMC branded products as compared to those sold through the Company's third-party partners. In responding, Douglas indicated that the mix was 60% FMC-branded products and 40% from third-party partners, while also claiming:

I think the most important takeaway that you should take away from this conversation is the 40% as it grows, does not take away from the 60% as we grow. *It's an expansion of the market pool for the diamides . . . we see the diamides taking share from a number of older chemistries, whether they be neonicotinoids, some of the pyrethroids, and certainly some of the [carbonates] around the world*. (brackets in original).

327.    Defendants' bolded statements set forth in ¶¶ 325 and 326 regarding channel inventories, demand, and market conditions for FMC's products were materially false or misleading when made for the reasons set forth in ¶ 288.a.-f., above.

328.    In addition, by electing to speak publicly about inventory levels, the "very good" inventory, and Defendants' lack of worry about inventory "going into the end of the year," Defendants put each of these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the declining demand for the Company's products due to, among other things, the full channel inventories, the encroachment of generic competitors, and the industry consolidation to avoid misleading investors. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

**J.      November 1, 2022 3Q 2022 Earnings Press Release and November 2, 2022 3Q 2022 Earnings Call**

329.      On November 1, 2022, FMC issued a press release filed on Form 8-K, announcing the Company's 3Q 2022 results. According to Douglas, who was quoted in the press release "***FMC's strong growth continued in the third quarter driven by a robust start to the Latin American season*** and continued pricing actions across all regions." Turning to Latin America, FMC announced that regional sales "grew 35 percent year-over-year ***driven by strong herbicide and insecticide demand***." More specifically, the press release stated that "***In Brazil, FMC is reaping the benefits of investing in expanding market access for its products***."

330.      On November 2, 2022, the Company held its 3Q 2022 earnings call. In his prepared remarks, Douglas claimed that "***demand remains strong for new products based on the diamides and other chemistries***, and FMC continues to make significant progress by improving our market access in geographies where we are underrepresented."

331.      In his prepared remarks, Douglas stated:

Pricing momentum and volume growth are expected to more than offset FX headwinds in the quarter. We have good visibility into demand for the quarter with ***strong order books for both the Brazilian and US markets***. Cost increases are forecasted to be lower in Q4 compared to Q3. ***The combination of sales growth and lower cost headwinds is anticipated to result in EBITDA growth of 15% at the midpoint*** with EPS up 9% at the midpoint year-over-year.

332.      Among the analyst questions posed during the November 2, 2022 conference call, Christopher S. Parkinson from Mizuho asked Defendants to comment on growth rates for the Diamides. In response, Douglas stated "[t]his year, year-to-date, we're up in the high mid-single digits. ***We would expect that same growth rate next year as we go forward***. ***We're getting new registrations, especially for Cyazypyr***. ***That market is growing rapidly in many parts of the world, which is good news***."

333.    During the earnings call, Vertical Research Partners analyst Kevin William McCarthy asked "[A]re you seeing inventory levels that you would describe as outlying either in terms of being too high or too low in any of your major markets nowadays?" In response, Douglas sought to reassure investors that while there were "pockets" of higher inventories, these were largely due to weather issues, and the Company was unconcerned:

> *Well, I think generally speaking, overall, we would say we're happy where inventory levels are in the marketplace.* There are pockets of higher inventories. We talked about India before. The last few years, with the weather monsoons played out and rice acreage reductions, have not been great. So we're working through inventory there.

> *I would say in the U.S., things are fine.* Europe is pretty okay for us. 1 or 2 pockets in the South because of the dry weather that we had last year. *I would say in Latin America, there are parts of Brazilian market where they had a drought last year that you can imagine inventories are high. Inventories are high right now in Brazil because we're in the planting season. But we're happy with where our inventories are right now.*

334.    Defendants' bolded statements set forth in ¶¶ 329-33 regarding channel inventories, demand, market conditions for FMC's products and FMC's financial outlook were materially false or misleading when made. These statements misrepresented the fact that, by 2022, demand had dropped and was dropping for FMC's products including the Diamides, and FMC revenues were predictably adversely affected as a result, due to several significant factors that were recognized internally at FMC but not disclosed to investors. These factors included:

a.    Inventories in the sales and distribution channels for FMC's products were full by 2022, and there were excess inventories at the distribution, retail and end-user levels, due to the COVID-era bubble of over-purchasing and hoarding of FMC products. The de-stocking necessary to allow retailers to sell to end-users, and distributors to sell to retailers, would take many

months or more in FMC's key markets around the globe. *See* ¶¶ 116-129, 134-37, 140-45.

b.    As a result of full inventory channels, in 2022 distributors and retailers were not buying as much FMC product as they had in the past, and instead were slowing their purchases as they de-stocked. *See* ¶¶ 116-17, 121-22, 124-25, 128, 130, 132-37, 139-46.

c.    Overstocked inventories of FMC products caused numerous adverse financial effects, including price deterioration and lower margins for FMC's products as FMC attempted to maintain volumes by selling products at discounts, product expiration issues leading to product returns and customer credits that impacted revenues, over-extending client credit limits and increasing bad debts, and employing various efforts to securitize client debts to generate free cash flow—all of which adversely affected FMC's revenues in key markets around the world. *See* ¶¶ 135-37, 139-42, 173-82, 185-88.

d.    Demand for FMC's products including Diamides was also diminished as a result of steady encroachment into more regions of low-priced generic versions of FMC's Diamides, including in the U.S., India, China, Southwest Asia, and elsewhere, that undercut FMC's product sale prices and increasingly and predictably took FMC market share. In addition, by this time, FMC had suffered, or faced acute risk to suffer, legal losses regarding its purported patent protections for its Diamides in China, India and Brazil,

making the continued flood of generic entrants to those key markets and others far less likely to slow. *See* ¶¶ 147-52, 155-68.

e.    Furthermore, industry consolidation among retailers and distributors in the North American market squeezed FMC's revenues by shrinking the number of distributors FMC could sell to, including because many distributors and retailers were economically incentivized to promote the products of FMC's competitors instead of FMC's products. *See* ¶¶ 170-72.

f.    In addition, the alleged misstatements regarding purportedly expected market conditions and financial performance for FMC in ¶¶ 331-33 were materially false and misleading when made because they lacked a reasonable basis in fact, including because they did not reflect or take into account the undisclosed adverse facts regarding demand, channel inventory, competition, and revenues from FMC's products set forth in subparagraphs a-e, above.

335.    In addition, by electing to speak publicly about FMC's "strong growth," "strong demand," "strong order books," expected growth for the coming year, and the fact that Defendants were "happy" with current inventory levels, Defendants put each of these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the declining demand for the Company's products due to, among other things, the full channel inventories, the encroachment of generic competitors, and the industry consolidation to avoid misleading investors. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

**K.**      **November 2, 2022 3Q 2022 Form 10-Q**

336.      On November 2, 2022, FMC filed its 3Q 2022 Form 10-Q, signed by Douglas and

Sandifer.

337.      In the Form 10-Q, Defendants updated one of the Risk Factors from FMC's 2021

Form 10-K regarding the enforcement of intellectual property rights to specifically reference two

of FMC's patent enforcement proceedings in China as follows:

> *The composition of matter patents on our Rynaxypyr® active ingredient are*
> *nearing their expiration in several key countries. We have a broad estate of*
> *additional patents regarding the production of Rynaxypyr® active ingredient, as*
> *well as trademark and data exclusivity protection in certain countries that extend*
> *well beyond the active ingredient composition of matter patents*. . . . We intend to
> strategically and vigorously enforce our patents and other forms of intellectual
> property and have done so already against several third parties. *Other third parties*
> *may seek to enter markets with infringing products or may find alternative*
> *production methods that avoid infringement or we may not be successful in*
> *litigating to enforce our patents due to the risks inherent in any litigation*. . . . *We*
> *are currently and may in the future be a party to various lawsuits or*
> *administrative proceedings involving our patents.* Such challenges can result in
> some or all of the claims of the asserted patent being invalidated or deemed
> unenforceable. Two such proceedings in China are currently on appeal. . . . *In such*
> *circumstances, an adverse patent enforcement decision which could lead to the*
> *entry of competing chlorantraniliprole products in relevant markets may*
> *materially and adversely impact our financial results*.

338.      More specifically, the Company stated the following regarding its patent litigation

losses in China:

> As noted in our 2021 Form 10-K, in early 2022, we received notice that certain
> third parties were seeking to invalidate our Chinese patents on a certain
> intermediate involved in producing chlorantraniliprole and a process to produce
> chlorantraniliprole; we intend to defend vigorously the validity of both patents.
> During the third quarter of 2022, the China Patent Review Board issued rulings
> which held that the two challenged patents were not valid in China. We believe the
> Review Board's decisions are seriously flawed both on procedural and substantive
> ground and we have filed appeals. Under Chinese law, the patents remain valid but
> are not enforceable pending appeal. *Given the unique and specific Chinese patent*
> *law issues at issue in that situation, we do not believe that the China Patent*
> *Review Board's decisions would materially adversely impact our enforcement of*
> *similar patents in other countries*. . . .

The composition of matter patent that covers chlorantraniliprole (also known as Rynaxypyr® active) expired in a number of countries in August 2022; this patent will continue to remain in force in other countries throughout the world, expiring on a country-by-country basis at various dates through 2027. As described in our 2021 Form 10-K, *we are deploying a multi-pronged strategy to defend that business after active ingredient patent expiration, including enforcement of our patents in many countries which continue to cover chemical intermediates and manufacturing processes that are essential in the production of chlorantraniliprole*.

339.    The Form 10-Q also incorporated by reference the other misleading risk disclosures from the 2021 Form 10-K noted above in ¶¶ 291 and 293-94.

340.    Defendants' bolded statements set forth in ¶¶ 337-38 regarding generic competition and patent protection for FMC's products were materially false or misleading when made for the reasons set forth in ¶¶ 295-96, above.

341.    In addition, by electing to speak publicly about the patent portfolio for the Company's Diamide products and their efforts to enforce these patents, including two proceedings in China, Defendants put these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the declining demand for the Company's products due to, among other things, the full channel inventories, the encroachment of generic competitors, and the industry consolidation to avoid misleading investors. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

342.    Defendants' risk disclosure statements noted in ¶¶ 337-38 were also materially false or misleading when made and violated Item 303 for the reasons set forth in ¶¶ 280-81, above.

**L.    November 8, 2022 Morgan Stanley Global Chemicals, Agriculture and Packaging Conference**

343.    On November 8, 2022, during the Company's presentation at the Morgan Stanley Global Chemicals, Agriculture and Packaging Conference, Morgan Stanley analyst Vincent Stephen Andrews, asked the following question about FMC's working capital and free cash flow:

> If we shift to cash flow a little bit, obviously, we've talked a lot about raw materials. We talked a lot about pricing. What do those things do, they increase working capital, right? And so that's been an issue for the last couple of years. So as we move into '23 and those things start to actually move, I guess, pricing is still going up, but raws are coming down. How should we think about working capital and free cash flow conversion?

344.    Sandifer responded:

> We're also growing really rapidly. At the midpoint of our guidance for the full year, we're growing 13% in sales. We raised our guidance $100 million for revenue for the full year for essentially for the fourth quarter. . . . Similarly, as we've discussed, *we're expecting a pretty robust demand environment going into next year*. So we're actually building inventory slightly in addition to dealing with just the inflationary impact on inventory values. *But we're actually building and maintaining inventory despite the higher sales so that we're well prepared to go into Q1 and early Q2 with material.*

345.    Andrews then focused on FMC's projections for 2023, asking:

> [Y]ou also sort of began to discuss 2023, and there are probably 2 particular pieces of it that I'd like to dig into more. First was sort of your confidence in growing above the market, presumably on volume and price as well as anticipation for some raw materials deflation more later in the year, certainly even earlier in the year. But maybe you can put all that together for us.

346.    Referring to FMC's five-year growth strategy, Sandifer expressed confidence in FMC's ability to meet the guidance outlined for 2023 based on its performance:

> We sketched out -- we're going into the fifth year of our 5-year plan, the 5-year strategic plan we launched in 2018 after digesting the acquisition of the DuPont assets. First time in my career in the chemical industry, we've made it to the 5th year of a 5-year plan. So I think that says something about the strength of the platform despite all the volatility that we've seen in the world in the last several years. *But we're very excited about the ability to continue growing at a market -- above market level. So we could use that same range at 5% to 7% top-line growth*

*as a guidepost, which would be a significant premium to the overall market. And that's driven by both volume and pricing.*

\*\*\*

I think from a profit perspective, we're also very optimistic and particularly looking to return to our expectations of the bottom line growing substantially faster than the top line. *In our long-range plan, we had this algorithm, if you will, of growing the top line 5% to 7% and growing the bottom line 7% to 9%. And we think that's kind of a range that's well within reach for 2023 for the company.*

347.    Defendants' bolded statements set forth in ¶¶ 344 and 346 regarding channel inventories, demand, market conditions for FMC's products and FMC's financial performance were materially false or misleading when made for the reasons set forth in ¶ 334.a.-f., above.

348.    In addition, by electing to speak publicly about inventory levels and projected demand, as well as the patent portfolio for the Company's Diamide products and their efforts to enforce these patents, Defendants put each of these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the declining demand for the Company's products due to, among other things, the full channel inventories, the encroachment of generic competitors, and the industry consolidation to avoid misleading investors. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

## M.    February 7, 2023 4Q 2022 Earnings Press Release

349.    On February 7, 2023, FMC issued a press release filed on Form 8-K, announcing the Company's 4Q and full-year 2022 results. The Company reported total revenues of $5.8 billion, "reflecting 15 percent growth," Adjusted EBITDA of $1.407 billion, and FCF of $514 million. Notably, the 2022 Adjusted EBITDA was inching closer to the range targeted for 2023 in the Company's five-year strategic plan. FMC claimed that its "record fourth quarter and full-year 2022 results" were "*driven by robust volume and strong pricing.*"

116

350. Douglas, who was quoted in the press release, added that "FMC delivered record performance in the fourth quarter, ***driven by robust volume growth***, continued strong pricing actions as well as growth of new products." Douglas continued, "***North America delivered exceptional revenue growth, with Latin America and Europe, Middle East and Africa (EMEA) posting strong gains***."

351. Douglas also stated that ***"Full-year results were driven by significant volume and price gains in every region***. Our continued focus on new product development, commercial launches and market access investments delivered record results in 2022. More than $600 million in revenue was from new products introduced in the last five years, an increase of over 50 percent from the prior year, and approximately $100 million in revenue from launches in 2022"

352. The February 7, 2023 press release also announced the Company's outlook for 2023, stating that the "***2023 outlook reflects pricing momentum and robust demand.***" According to the press release, "Full-year 2023 revenue is forecasted to be in the range of $6.08 billion to $6.22 billion, representing an increase of 6 percent at the midpoint versus 2022, ***driven by strong pricing in all regions and growth in volume driven by new launches and market access***." The 2023 outlook also called for Adjusted EBITDA of $1.48 billion to $1.56 billion, and FCF of $530 million to $720 million.

353. Douglas added:

We anticipate a positive market backdrop for 2023 that will support our pricing actions ***as well as continued healthy demand for FMC's synthetic and biological product portfolios***. . . . we will continue to closely manage our supply chain in 2023 to take advantage of any cost improvement opportunities while ensuring product availability for our customers.

354. Defendants' bolded statements set forth in ¶¶ 349-53 regarding channel inventories, demand, market conditions for FMC's products and FMC's financial performance were materially false or misleading when made. These statements misrepresented the fact that, by 2022 and

117

continuing into 2023, demand had dropped and was dropping for FMC's products including the Diamides, and FMC revenues were predictably adversely affected as a result, due to several significant factors that were recognized internally at FMC but not disclosed to investors. These factors included:

      a.      Inventories in the sales and distribution channels for FMC's products were full by 2022 and continued to be full into 2023, and there were excess inventories at the distribution, retail and end-user levels, due to the COVID-era bubble of over-purchasing and hoarding of FMC products. The de-stocking necessary to allow retailers to sell to end-users, and distributors to sell to retailers, would take many months or more in FMC's key markets around the globe. *See* ¶¶ 116-29, 134-37, 140-45.

      b.      As a result of full inventory channels, in 2022 and 2023, distributors and retailers were not buying as much FMC product as they had in the past, and instead were slowing their purchases as they de-stocked. In EMEA, for example, there were "red flags everywhere" that FMC would not hit its sales targets because too much inventory remained in the channels, price increases were too high, and due to competitor products. *See* ¶¶ 116-17, 121-22, 124-25, 128, 130, 132-37, 139-45.

      c.      Overstocked inventories of FMC products caused numerous adverse financial effects, including price deterioration and lower margins for FMC's products as FMC attempted to maintain volumes by selling products at discounts, product expiration issues leading to product returns and customer credits that impacted revenues, over-extending client credit limits and

increasing bad debts, and employing various efforts to securitize client debts to generate free cash flow—all of which adversely affected FMC's revenues in key markets around the world. *See* ¶¶ 135-37, 139-42, 173-82, 185-88.

d.    Demand for FMC's products, including Diamides, was also diminished as a result of steady encroachment of low-priced generic versions of FMC's Diamides into more regions, including in the U.S., India, China, Southwest Asia, and elsewhere, that undercut FMC's product sale prices and increasingly and predictably took FMC market share. In addition, by this time, FMC had suffered, or faced acute risk to suffer, legal losses regarding its purported patent protections for its Diamides in China, India and Brazil, making the continued flood of generic entrants to those key markets and others far less likely to slow. *See* ¶¶ 147-51, 156-68.

e.    Furthermore, industry consolidation among retailers and distributors in the North American market squeezed FMC's revenues by shrinking the number of distributors FMC could sell to, including because many distributors and retailers were economically incentivized to promote the products of FMC's competitors instead of FMC's products. *See* ¶¶ 170-72.

f.    In addition, the alleged misstatements regarding purportedly expected market conditions and financial performance for FMC in ¶¶ 352-53 were materially false and misleading when made because they lacked a reasonable basis in fact, including because they did not reflect or take into account the undisclosed adverse facts regarding demand, channel inventory,

119

competition, and revenues from FMC's products set forth in subparagraphs a-e, above.

355.    In addition, by electing to speak publicly about the "robust" volume and demand, "exceptional revenue growth," "significant volume and price gains," and "continued healthy demand" with respect to FMC's products, Defendants put each of these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the declining demand for the Company's products due to, among other things, the full channel inventories, the encroachment of generic competitors, and the industry consolidation to avoid misleading investors. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

### N.    February 8, 2023 4Q 2022 Earnings Call

356.    FMC held its 4Q 2022 earnings call on February 8, 2023. During the call, Kevin William McCarthy, a Vertical Research Partners analyst asked Douglas, "[H]ow would you characterize channel inventory levels in the U.S., Brazil and Argentina exclusive of the nonselective herbicides where you don't compete?"

357.    Douglas responded:

Yes. I think -- so *from a North American perspective, U.S. in particular, I think channel inventories are a little bit elevated right now, but that's normal*. I would say, as you enter the season, most of retail and distribution is stocked up for a very good year. When I think of inventory levels for FMC compared to our sales on a percent basis, we're about the same place we were the year before. So I think it's pretty normal.

Brazil and Argentina, a different story. Forget the nonselective that we just talked about. I think because of the conditions that we saw in the south of *Brazil and in Argentina, it was very dry in the fourth quarter. I have no doubt that there is elevated channel inventories in that area, would not be a surprise at all.*

*If I run around the rest of the world, Europe, South of Europe is high again because of hangover from the last season. Northern Europe is pretty much okay, I think. In Asia, we've talked about India in the past. The weather didn't help*

*again in 2022. So we see high channel inventories in India, which we'll be working through. Parts of Indonesia are similar, somewhat high. Rest of Asia is good. So overall, it's pretty much what you would expect.*

358.    Also, during the February 8, 2023 conference call, Aleksey V. Yefremov from KeyBanc Capital Markets asked what level of growth one could expect for the Diamides "over the next 2, 3 years." Douglas responded:

> I think we've said in the past, sort of that mid-to high single digits is where we think it will pan out over time. I wouldn't change that view right now. ***We do continue to launch new diamide formulations around the world, and Cyazypyr is growing very nicely as we get the new registration****. **So I think the mid-to high single digit is a perfectly good range of legacy***.

359.    Defendants' bolded statements set forth in ¶¶ 357 and 358 regarding channel inventories, demand, market conditions for FMC's products and FMC's financial performance were materially false or misleading when made for the reasons set forth in ¶ 354.a.-f., above.

360.    In addition, by electing to speak publicly about "normal" inventory levels and the "very nice[]" growth of Cyazypyr, Defendants put each of these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the declining demand for the Company's products due to, among other things, the full channel inventories, the encroachment of generic competitors, and the industry consolidation to avoid misleading investors. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

**O.    February 21, 2023 Citi Global Industrial Tech and Mobility Conference**

361.    During the February 21, 2023 Citi Global Industrial Tech and Mobility Conference, Citigroup analyst Prashant N. Juvekar asked, "Can you talk about patent expirations on diamides? You've done some interesting deals like one you did in India with UPL. . . . Can you just talk about how do you see the cadence of these expirations and what can you do to extend a life?" In response, Sandifer stated:

[J]ust to give you the big picture, the diamides, Rynaxypyr and Cyazypyr, we have 30 patent families include about 1,000 patents, both granted and applied for that cover [a] broad array of issues that protect the diamides. The one that gets the most initial focus is the composition of matter patents, is literally the patent on the molecule itself. Some of those patents have already started to expire for Rynaxypyr. In fact, in several countries, China, India and certain Eastern European countries, the patent for Rynaxypyr expired in 2022.

Now, ***that's just one of a small part of the total layer of protections we have around these molecules.*** We also have patents on the manufacturing process to make Rynaxypyr and Cyazypyr. We have patents on the intermediates, the composition amount of patterns on the intermediate materials that are used in that process. So for example, for Rynaxypyr, it's a 16-stage synthesis process.

Many of the intermediate steps and the chemicals that are produced there really have no other use than for making Rynaxypyr. We have patents on their composition of matter. We have patents on the process to make several of those as well. We also have patents on formulations on how that product is finally formulated to take to market. So we've had this broad set of patent protections. We are also provided some protection to the use of our regulatory data and the way registrations are managed in different countries. ***They give us protection that continues well until the end of this decade and, in some cases, a bit longer.***

And certainly, with -- speaking directly to Rynaxypyr, which has earlier expiration dates, Cyazypyr goes a little bit further. But as you pointed to, P.J., ***it's not just relying on the patents themselves. And obviously, we've been very aggressive in enforcing the patents. We have won cases for infringement in both China and India and continue to aggressively defend our patents.*** But we've also engaged partners and brought other people in the business ahead of any kind of patent expiration. We don't believe that in our industry, in crop protection, that there really is a patent cliff. It's more of a long plateau as you transition from being a fully-patented to a post-patented life.

362.    Juvekar later returned to the topic of inventory levels, asking, "[C]an you talk about your inventory levels around the world. I know there is a drought going on in Argentina and Southern Brazil so inventories may be high there as farmers are not spreading chemicals as much. Can you just talk about where inventories are at your level, at the dealer level?"

363.    In response, Sandifer again claimed that besides weather concerns, there were no issues, saying:

Yes. I mean, certainly, when we talk about inventories, a lot of the focus is on the inventory that's in the channel so downstream from us and our direct customers,

whether that be distributors or retailers or growers depending on the market that we're in. Going around the world, let's say, ***we'll start with Latin America because I think you highlighted one of the hot points. There was a drought and very dry conditions in Southern Brazil and Argentina at the beginning of the growing season in October, November. Some acreage was pulled out of production. There is some lost volume there. So because of that, there is a bit of channel inventory, and something we're very conscious of and managing closely.*** I would say there has been improvement in precipitation over the past months. Some of that business is just lost. You're not going to pick it back up. Some of it may recover.

Rest of Brazil is actually in pretty good shape. So it's really the southern part of Brazil and Argentina that are the hotspot. When I look at the rest of the Americas, the U.S. market and Canada, Canada is still a little early. ***In the U.S. market, there is a lot of product in the channel because there should be a lot of product in the channel. Planning season starts here in another 4 weeks or so. You need that product in place.*** So for example, preemergent herbicides, which are an important product line for us. You put those now at or before planting. That's the -- ***now is the time to have that product in the channel. So I think, from our own estimation and analysis, that levels of channel inventory are in line with the level of sales we've been having***.

Going around the rest of the world, in Asia, we marked on the call and our most recent earning call highlighted in India. ***India is another place where we have a little bit of a backup of channel inventory. We have 3 years in a row of sort of uneven or weak monsoons.*** And I'm not a weather forecaster. I just -- I do know that at some point you revert to me whether that's this year or next year. We went through a similar issue with Australia several years ago. We had a number of years of really pronounced drought. Now they've sort of reversed the threat, and it's a bit of flooding. So I think, this year, India, which is our third largest country, is not likely to be a big contributor to growth as we try to manage through that channel inventory.

***Europe, generally speaking, pretty good shape***. There's a few spots in Southern Europe where there's some pretty hot and dry weather last year. ***There's a little bit of inventory in the channel, but it's not significant***.

364.    Juvekar clarified, "So what I'm hearing is there is some -- in some pockets, there is inventory, but you're not concerned overall for the company?" Sandifer responded, "***No. No, I think we're managing. I think we know where the issues are, and we're going to manage it proactively***."

365.    Defendants' bolded statements set forth in ¶¶ 361 and 363-64 regarding channel inventories, demand and competition, Diamide patent protection, and market conditions for FMC's

products were materially false or misleading when made for the reasons set forth in ¶ 354.a.-f., above.

366.    In addition, by electing to speak publicly about the "layer of protections" for the Diamides, the longevity of the Diamide patent protection, and the Company's infringement actions, as well as FMC's channel inventories around the world, Defendants put each of these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the declining demand for the Company's products due to, among other things, the full channel inventories, the encroachment of generic competitors, and the industry consolidation to avoid misleading investors. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

**P.    February 24, 2023 2022 Form 10-K**

367.    On February 24, 2023, FMC filed its Form 10-K for the period ending December 31, 2022, which was approved, signed and certified by Defendants Douglas and Sandifer. With regards to its patents, the Company stated the following:

> ***During 2022, we initiated proceedings to enforce several of our patents and trademarks against generic producers and infringers, resulting in multiple favorable judgments and settlements, including in India and China***. In early 2022, we received notice that certain third parties are seeking to invalidate our Chinese patents on a certain intermediate involved in producing chlorantraniliprole and a process to produce chlorantraniliprole; we intend to defend vigorously the validity of both patents. During the third quarter of 2022, the China Patent Review Board issued rulings which held that the two challenged patents were not valid in China. We believe the Review Board's decisions are seriously flawed both on procedural and substantive ground and we have filed appeals. Under Chinese law, the patents remain valid but are not enforceable pending appeal. Given the unique and specific Chinese patent laws and legal procedures at issue in that situation, we do not believe that the China Patent Review Board's decisions would materially impact our enforcement of similar patents in other countries. Patent challenges in response to enforcement efforts is expected as an ordinary defense tactic in patent enforcement cases, and have been raised in several of our enforcement cases to date; we intend to defend vigorously any diamide patents that are challenged. ***While***

*we believe that the invalidity or loss of any particular patent, trademark or license after appeal would be an unlikely possibility, our patent and trademark estate related to our diamide insect control products based on Rynaxypyr® and Cyazypyr® active ingredients in the aggregate are of material importance to our operations*.

368.    In addition, the 2022 Form 10-K included the same Risk Factor from FMC's

November 2, 2022 Form 10-Q regarding the risks the Company may face from competition:

*Our business faces competition, which could affect our ability to maintain or raise prices, successfully enter certain markets or retain our market position. Competition for our business includes* not only *generic suppliers of the same pesticidal active ingredients* but also alternative proprietary pesticide chemistries and crop protection technologies that are bred into or applied onto seeds. *Increased generic presence in agricultural chemical markets has been driven by the number of significant product patents and product data protections that have expired in the last decade, and this trend is expected to continue. . . . At this time, the scope and potential impact of these technologies are largely unknown* but could have the potential to disrupt our business.

369.    The 2022 Form 10-K also included the same Risk Factor regarding the impact of

the expiration of FMC's patents that was included in its 2021 Form 10-K:

Our future performance will depend on our ability to address active ingredient composition of matter patent expirations through effective enforcement of our patents that continue to cover key chemical intermediates and process patents, as well as portfolio life cycle management, particularly for our high value diamide insecticides . . . *Some of our competitors may secure patents on production methods or uses of products that may limit our ability to compete cost-effectively*.

370.    Relatedly, among the 2022 Form 10-K Risk Factors, as in the 2021 Form 10-K,

Defendants stated the following regarding the enforcement of FMC's intellectual property rights

against competitors:

*The composition of matter patents on our Rynaxypyr® active ingredient are expiring in several key countries. We have a broad estate of additional patents regarding the production of Rynaxypyr® active ingredient, as well as trademark and data exclusivity protection in certain countries that extend well beyond the active ingredient composition of matter patents. . . . Other third parties may seek to enter markets with infringing products or may find alternative production methods that avoid infringement or we may not be successful in litigating to enforce our patents due to the risks inherent in any litigation. . . . . We are currently and may in the future be a party to various lawsuits or administrative*

***proceedings involving our patents***. (See "Patents, Trademarks and Licenses" in Item 1). Such challenges can result in some or all of the claims of the asserted patent being invalidated or deemed unenforceable. Two such proceedings in China are currently on appeal. (See "Patents, Trademarks and Licenses" in Item 1). ***In such circumstances, an adverse patent enforcement decision which could lead to the entry of competing chlorantraniliprole products in relevant markets may materially and adversely impact our financial results***.

371.    Defendants' bolded statements set forth in ¶¶ 367-70 regarding certain purported risks to FMC's revenues that "could" or "may" occur due to generic competition or patent risks were materially false or misleading when made because they described as contingent or merely possible events or circumstances that had already come to pass. Indeed, low-cost, generic competitors in key FMC markets including China, India and others were already directly competing with FMC for market share and causing FMC to lower prices, and FMC had already suffered legal setbacks in China, Brazil and India in regards to its purported Diamide patent protections.

372.    In addition, by electing to speak publicly about the patent portfolio for the Company's Diamide products and their efforts to enforce these patents, Defendants put each of these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the declining demand for the Company's products due to, among other things, the full channel inventories, the encroachment of generic competitors, and the industry consolidation to avoid misleading investors. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

373.    Defendants' risk disclosure statements noted in ¶¶ 367-70 were also materially false or misleading when made and violated Item 303 for the reasons set forth in ¶¶ 280-81, above.

Q.      **March 1, 2023 Bank of America Global Agriculture and Materials Conference**

374.    On March 1, 2023, during the Bank of America Global Agriculture and Materials Conference, Bank of America analyst Stephen V. Byrne asked Douglas to "drill in on the diamides a little bit," and asked "[w]here are we at in the patent expiry outlook over the next couple of years and your preparedness for that given your existing contracts with some of the really big crop chemical peers?"

375.    In response, Douglas stated:

Yes. Listen, we've talked about the diamides a lot, obviously. We get a lot of questions about the patent estate. The patent estate is a matrix of just over 1,000 patents for the 2 molecules. The base composition of matter patents for Rynaxypyr started to come off last August. In some countries, we have runway in others. Same thing for Cyazypyr, which is the smaller molecule, the initial ones start to come off in August 2023 this year and again, spread out after that.

***There are also significant patents related to the whole process of manufacturing. These molecules are 15 or 16 synthetic steps, and we have many of those steps patented. I think it's worth noting today that the only legal material that's available is from FMC, even though the original patent has come off. Why is that? Because of the strength of the rest of the patent portfolio.*** . . . .

So we already have a strong network out there of people who are selling diamides, so in some cases, competing with us in different markets, in many cases, expanding the market by having routes to market or formulations that we don't have. That was the intent of the plan. That's what we're seeing today. ***So we expect the diamide growth to continue.***

Last year, diamides grew about 7%. I think in the mid- to long term, you're going to see them continue to grow in the mid-single digit. I think that's an important part of the algorithm of growth. They have been around for almost 20 years now. So that we talk about them as being new molecules, new technology, and they are, but they're coming off the end of their patent. ***And you should expect at some point towards the end of this decade, you will see generic manufacturing.*** That is what happens. So we're ready for that. We anticipated and we'll continue to invest in the diamides.

376.    Byrne followed up, asking "And then recall you have a couple of legal battles in India for some generic product. What's the status of those patent infringement cases?"

377.    Douglas stated in response:

***There's a couple of cases in India that we recently won, a couple of cases in China as well. It's interesting when we bought the assets in 2018, there was already illegal material being sold in China, way back in 2018***. That continues today. It's unfortunately a facet of the Chinese industry that many companies will not respect patents, and they go and make [il]legal materials. ***So it's not as if we're not used to competing with products out there that are of inferior quality but they are illegal, and we will enforce our patents all over the world***.

378.    Defendants' bolded statements set forth in ¶¶ 375 and 377 regarding competition, patent protection for the Diamides as well as the presence of "illegal" competition, and market conditions for FMC's products were materially false or misleading when made for the reasons set forth in ¶ 354.a.-f., above.

379.    In addition, by electing to speak publicly about the patent portfolio for the Company's Diamide products the longevity of the protection afforded by these patents, and their efforts to enforce these patents, Defendants put each of these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the declining demand for the Company's products due to, among other things, the full channel inventories, the encroachment of generic competitors, and the industry consolidation to avoid misleading investors. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

**R.    May 1, 2023 1Q 2023 Earnings Press Release and May 2, 2023 1Q 2023 Earnings Call**

380.    On May 1, 2023, FMC issued a press release filed on Form 8-K, announcing the Company's 1Q 2023 results and its guidance for 2Q 2023. According to Douglas, who was quoted in the press release, "FMC delivered a solid first quarter with strong pricing actions, growth of new products and cost discipline driving margin expansion. ***New product growth and expanded***

***market access contributed to robust North America sales***, which helped offset volume headwinds in other regions."

381.    FMC announced that for 2Q 2023, revenue was projected to be in the range of $1.42 billion to $1.48 billion. Meanwhile, FMC forecasted its Adjusted EBITDA for 2Q 2023 to be in the range of $350 million to $370 million. For the full-year 2023, the Company announced:

> FMC is raising its full-year adjusted EBITDA guidance by $10 million at the midpoint. Full-year adjusted EBITDA is now expected to be in the range of $1.50 billion to $1.56 billion, representing 9 percent year-over-year growth at the midpoint based on the first quarter performance, continued pricing gains, positive product mix and projected input cost tailwinds.

The revenue range of $6.08 billion to $ 6.22 billion remained unchanged in the Company's outlook.

382.    With regard to the 2Q 2023 and full-year guidance, Douglas stated in the press release:

> We expect second quarter results to be largely in line with the prior year. We are raising our full-year EBITDA guidance, and narrowing our range, based on the first quarter performance and our expectation of continued pricing gains, positive mix supported by new products as well as input cost tailwinds that are projected to be realized in the second half of the year, particularly in the third quarter. ***The strength of our portfolio, diversity of crop mix and investments in market access have positioned us well to deliver another year of revenue and earnings growth as well as margin expansion***.

383.    On May 2, 2023, FMC held its 1Q 2023 earnings call. During his prepared remarks, Douglas announced, "We are raising guidance for full year adjusted EBITDA by $10 million based on the first quarter outperformance, continued pricing gains, positive mix and projected cost tailwinds. ***We now expect full year EBITDA to be in the range of $1.5 billion to $1.56 billion, representing 9% year-over-year growth at the midpoint***."

384.    As alleged above in Section V.A.1 and below in Section XI.A, Defendants disclosed information during this call that partially corrected their prior material misstatements

and/or represented the materialization of the risks concealed by Defendants' prior misstatements. Defendants, however, continued to misrepresent and/or conceal material facts. In this regard, during the May 2, 2023 conference call, Mizuho analyst, Christopher S. Parkinson asked about FMC's "volume growth outlook for the balance of the year." In response, Douglas claimed:

> The market is still operating at a very, very high level. ***On the ground usage is very robust in most part of the world***. So the actual market itself is looking good in terms of soft commodity prices are remaining elevated, growers are looking to plant as much as they can . . . ***overall, the volume perspective as we go through the year will improve for FMC***.

385.    Also during the May 2, 2023 conference call, UBS analyst, Joshua David Spector, asked:

> I guess when you think about Latin America and the volume shortfalls in the first half because of the drought conditions, I guess, what gives you confidence that inventory levels aren't at risk to the back half or into next year? And kind of similarly on the diamides, where you talk about some partner channel destocking. What's the visibility that, that doesn't bleed into the second half as well?

386.    In response, Douglas represented:

> I think on the channel inventories, we'll see how we go through the second quarter. The markets are moving. You know what, ***if the market doesn't change much, yes, there will be some channel inventory hangover as we go into the next season. That occasionally happens.*** As the weather patterns improve as we go through the second quarter, we should be eating away at some of that inventory. So we'll see where the market gets to. Our expectation, as we're forecasting is for a more normal season as we enter Q4 and Q1 into next year in Latin America. ***On the diamides, what we're telling you in our guidance now is that the partners that are reducing inventories, that's not just an event now that continues through the rest of the year. So that's already built into our forward-looking guidance***.

387.    Adam L. Samuelson of Goldman Sachs inquired during the May 2, 2023 conference call concerning "the cadence of working capital and cash flow and just how you're thinking about how tightly you're managing that to the – in the current environment." Sandifer responded by stating:

> ***I think the pattern of our working capital and our cash flow for the year is very similar to what you've seen in the last 4 years***, strongly negative in Q1, will be

modestly positive in Q2, and then ***you see significant positive cash flows in Q3 and Q4 . . . we expect a normal pattern as we go through the rest of the year***.

388.    Defendants' bolded statements set forth in ¶¶ 380, 382-84 and 386-87 regarding channel inventories, demand and competition, and market conditions for FMC's products, as well as FMC's financial performance, were materially false or misleading when made for the reasons set forth in ¶ 354.a.-f., above.

389.    In addition, by electing to speak publicly about FMC's "robust" North America sales and "on the ground usage," expected revenue, earnings, cash flow, and channel inventories —and thereby putting these subjects into play, Defendants put each of these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the declining demand for the Company's products due to, among other things, the full channel inventories, the encroachment of generic competitors, and the industry consolidation to avoid misleading investors. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

**S.    May 2, 2023 1Q 2023 Form 10-Q**

390.    On May 2, 2023, FMC filed its 1Q 2023 Form 10-Q, signed by Douglas and Sandifer. The Form 10-Q incorporated by reference the misleading risk disclosures from the 2022 Form 10-K noted above at ¶¶ 367-70, which were materially false or misleading and violated Item 303 for the reasons identified in above in ¶¶ 280-81 and 371-73.

**T.    May 9, 2023 Goldman Sachs Industrials & Materials Conference**

391.    On May 9, 2023, FMC attended the Goldman Sachs Industrials & Materials Conference where Defendants reiterated that they were increasing guidance for 2023. Sandifer stated that FMC was experiencing growth in a number of its regions despite market conditions:

> Look, we reported last week earnings EBITDA that was about $7 million above the midpoint of our guidance range with earning -- EPS is well above midpoint of

guidance range. Revenue was a bit lighter than what we had guided. But ***overall, a strong quarter. And I think -- we think about what's going on in our space, another demonstration of our ability to deliver earnings as guided and predicted despite market conditions.*** And that's been very much a hallmark of FMC, particularly over the last 5 years, and our current iteration is a focused agricultural sciences company. In the quarter itself, a bit of revenue softness, two key spots drought in South and Southern Brazil and Argentina was a driver certainly in the lower volumes in the quarter as was some lower volumes in the cereal herbicide markets in Europe. ***I'd say low growth in Asia was expected and a very, very strong growth in North America also expected. So I think generally, the quarter largely as expected,*** big -- the real surprise was a bit of softness in some of the core European markets, which I would attribute to both falling crop prices for cereals, a little bit of hesitancy in the channel there around the channel inventory levels and stocking. ***But in general, I'd say, overall, a solid quarter. So we have outperformed our guidance. We carried a little bit more than that through in a raise of guidance for the full year in part because we do feel confident in our ability to deliver at the midpoint of our guidance range, $1.53 billion in EBITDA for 2023 with about $6.15 billion in revenue.*** So what's changed? ***I think our guidance and our outlook for the year has always been predicated on growth, more balanced between price and volume than in previous years with pricing as a strong contributor mid-single-digit pricing for the year, a bit stronger than that in the first half, a little less than that in the second half, complemented by continued volume growth, basically independent of what market conditions are.*** We've been a steady compounding, growing 5% to 7%, actually a little bit above 7% compounded for 5 years now, irrespective of what the growth of the market has been in each year because it's really been driven by technology penetration, by new products and to a lesser degree and more recent degree by some investments we've made in expanding our market access ***by putting more people on the ground, agronomists, marketing salespeople to help people understand how help growers in particular, understand how best to utilize our products. And that's starting to really pull through some demand***.

392.    Also during the May 9, 2023 conference, Goldman Sachs analyst Adam L. Samuelson asked, "your biggest business is your – it's a diamide insecticide franchise. It's over a third of your revenues . . . How do we think about that patent estate rolling off and kind of competition and pricing kind of factoring into that medium-term growth and the confidence that you have that your company cannot just grow sales, but EBITDA?"

393.    In response, Sandifer stated:

Some of the earliest patents which are around the composition of matter, composition of matter of the fundamental active ingredient molecules started

rolling off last year. Despite that, **there's not a single legal competitor in Rynaxypyr in the world today that said differently, that isn't buying it from us.** Now there are illegal competitors and have been since before we bought the business. **So there's been [illegal] material, particularly in China and India, always. But there are no current legal entrants in either of those markets where a the [sic] initial composition of matter patents have expired. And that's in part because that's just the beginning of the story around the patent protection.** We have patents on manufacturing processes. And the diamides are 15- and 16-step process is to produce a molecule we have patents on many of those individual steps. We have patents on the composition, a matter of many of the intermediates that are produced in those steps. Many of those intermediates have no other commercial use of this to be made and further refined into being Rynaxypyr or Cyazypyr. We have patents on formulations of products. So while we had a couple of patents roll off last year, we also had a number of new patents granted, including for some value-added formulations of Rynaxypyr, some of the new product growth we were talking about earlier. So the patent of the state is not a static asset. It is something that we're continuing to invest in, and we're continuing to renew. We have always presumed that over time, there would be generic entry into this marketplace. That's one of the reasons why we so aggressively pursued partnerships. . . . . So I think we've managed very aggressively that patent estate, the branding, the partnerships, continued innovation around those molecules. And while certainly, yes, we expect -- you're not going to grow doubling every 5 years forever, law of large numbers comes into play. **But we do see that the diamide family continuing to compound in that mid-single-digit range through the rest of the decade and continue to grow profit dollars, not just growing revenue.**

394.    During the same conference call, Goldman Sachs analyst Adam L. Samuelson

asked:

As we think about maybe first, just the channel inventory is always a common kind of topic of discussion for you given the working capital and lead times that are involved in your sector? How do we -- where do you see channel inventories today both coming out of the season in South America and going into the season in the Northern Hemisphere and the key kind of things you're watching to assess the demand later in the year?

395.    In response, Sandifer stated:

Look, I'd say there's a couple of hotspots around the world, but generally, we're pretty comfortable with channel inventory overall around the world, **places where we have a little -- some backup of channel inventory, Southern Brazil and Argentina, where there was a drought, and it was a pretty -- the consumption of crop chemicals was down a bit this year for the season that's wrapping up.** Certainly, there's a little bit of channel inventory there. . . . **But we see in demand for crop protection products being very, very healthy despite what may -- where there might be a little bit of channel inventory of different spots.**

133

396.     Defendants' bolded statements set forth in ¶¶ 391, 393 and 395 regarding channel inventories, demand and competition, and market conditions for FMC's products, as well as FMC's financial performance, were materially false or misleading when made for the reasons set forth in ¶ 354.a.-f., above.

397.     In addition, by electing to speak publicly about EBITDA guidance, the patent portfolio for the Company's Diamide products, and the presence of competitor products, as well as the channel inventories, Defendants put each of these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the declining demand for the Company's products due to, among other things, the full channel inventories, the encroachment of generic competitors, and the industry consolidation to avoid misleading investors. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

**U.    May 18, 2023 BMO Capital Markets Global Farm to Market Conference**

398.     At the May 18, 2023 BMO Capital Markets Global Farm to Market Conference, BMO analyst Joel Jackson asked Defendants Sandifer and Douglas about FMC's 2023 volumes. Specifically, Jackson asked: "I think there are some concerns about maybe volume this year, not being as strong as people think. Why don't we talk about how you see the year playing out and maybe some of your disappointment in the stock price?"

399.     Responding to this question, Douglas stated in part:

*When you think about actual volumes on the ground, so what is the grower using, volumes are very good. So we're seeing acreage increase overall in Brazil, good conditions expected in the U.S., especially in the Midwest, other parts of the world in good condition . . . . So the actual volume on the ground, what a grower is using, it might not be as high as 2022, but that was a record year. We're still at extremely high volumes. Where the volume discussion is, is what is happening in retail and distribution. So we feel good about the ultimate volume. It's managing through what is essentially the end of all the COVID supply chain issues that we've had that are bouncing through distribution and retail. So my message is*

*really good volumes down on the field. We see that all over the world.* There are pockets where it's not so good, and we can talk about that later. *But overall, volumes are good*.

400.    Later, Jackson asked Defendants to "go around the world and talk about the different regions because you're very diversified globally across different regions, which is a good strength of FMC. Talk about maybe how you see the dynamics in the market and channel inventories across different regions."

401.    In response, Douglas stated:

Yes. *Start off in North America. We feel very good about where the U.S. and Canadian markets are.* We had a very good first quarter, which is getting ready for the season. Obviously, the planting season, things are going well. So I think the U.S., assuming the weather patterns hold, should have a very, very good season. Don't forget, soft commodity prices are still high. They're not at record highs, but they're well above average. Most of the 10- and 5-year stock-to-use ratios for many of the soft commodities are below the averages. You have more weather impacts, as you just said around the world. So I think growers are feeling bullish about their ability to actually earn more money from what they're producing, which is always a good sign. *So U.S., North America, all good. I would say, in Europe, Northern Europe, we're gearing up for the season once again. Northern Europe is in pretty good shape.* Southern Europe is dry. You look at the press on what is happening in Spain, parts of Italy, northern part of Italy, a lot of rain. So guess what the trend is I'm talking about here, it's volatile weather patterns, much more than we ever used to see 10 years ago. *But Europe, overall, pretty good*. Southern Europe, a little dry. *Asia, India, we've talked about a number of times. We have channel inventory in India, so do other people in the industry. A couple of bad years of monsoon, rice acreage reductions that is hopefully turning around this year. So we should work our way through that as we go through 2023*. Australia, very dry, unexpectedly. We had 3 years of very good weather. Now we're in a drought situation in Australia, which impacted Q1 in Asia. *Latin America, Brazil, the North Mexico, all good, the south of Brazil and Argentina, I think it's been well documented, extremely dry in Q4 and in Q1. That has continued. Argentina being the worst impacted. So I would expect channel inventories in Argentina or in the south of Brazil as we go through this season will remain elevated*. So it's as usual, a mixture of what we see in the world. But what we do see is those more volatile weather patterns occurring all over the world now.

402.    Jackson also asked Defendants about FMC's Diamide patent portfolio:

So, to a generalist, so over the years, there's been concerns as your diamides portfolio. . . . As it starts to roll off this year some exclusivities and patents across different regions across the decade. So it's just been concern that, hey, you're going

to see the business fall off. Can you describe why you don't believe that maybe for a generalist, how would you describe how we'd know it's going to grow and flourish?

403.    Douglas responded:

Yes. And you're right. It's been a fantastic acquisition for us 5 years ago. When we bought that set of products, they were about $1 billion in size. Today, they are $2.1 billion. So we've more than doubled that business in 5 years. The chemistry is some of the most recent chemistry as an insecticide. It's very targeted. It has a great environmental profile. What we've done over the last 5 years is a couple of things. *First of all, there is a very strong patent estate around these products. The composition of matter patents for one of the main molecules came off last year. However, there are numerous process patents, et cetera, that follow on from that, that allow us patent protection in some countries through 2029. What we did was also apply for more registrations.* So for a generalist in this industry, it's one of the most regulated industries in the world, and you cannot sell a product without a registration. And that registration basically says you can sell this product at these rates, application rates on this crop in this geography, and you can't sell without that. What we've done is applied for more registrations for these products around the world on different crops in different geographies. *So we still have a long runway of registrations to come. Something like 60% to 70% of the registrations we have, there is an additional amount to come. So we know we have a runway of taking share in markets where the products are not currently registered. That's good for us.* It's good for the industry. The second piece is really the insecticide market is about a $16 billion market around the world. And there are some older chemistries that are losing their registrations around the world. Now when a product is removed from a registration, it means you can't sell it but the grower still needs products to sell -- to buy to take the pests away. So we're taking share from a lot of the older chemistries. So I think sort of the mid- to longer-term growth rate for these types of products are in the mid-single-digit range. I do see the fact that those molecules are very large now. I mean *Rynaxypyr is one of the largest molecules in the world. You're reaching the law of big numbers. So mid-single digit for a $2.1 billion portfolio is a good growth rate. We believe that will continue as we -- as I said, take the registrations, take market share from older chemistries.*

404.    Defendants' bolded statements set forth in ¶¶ 399, 401 and 403 regarding channel inventories, demand and market conditions for FMC's products, and the strength of the Diamide patent estate were materially false or misleading when made for the reasons set forth in ¶ 354.a.-f., above.

405.    In addition, by electing to speak publicly about "actual volumes on the ground," "extremely high volumes," and "really good volumes" for FMC's products "all over the world,"

Defendants' "very good" feeling about channel inventories, and the "strong patent estate" around the Diamides, Defendants put each of these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the declining demand for the Company's products due to, among other things, the full channel inventories, the encroachment of generic competitors, and the industry consolidation to avoid misleading investors. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

### V.    August 3, 2023 2Q 2023 Earnings Call

406.    On August 3, 2023, FMC conducted its earnings call for 2Q 2023. Following the Individual Defendants' prepared remarks, Salvator Tiano of BofA Capital Markets asked a two-part question:

> [Y]ou're talking about the destocking. So essentially, your view and your understanding is that diamide demand, whether it's branded products or from your partners, is holding up, but your partners like UPL are going above and beyond to lower their AI purchases firstly. And secondly, I think UPL specifically entered the U.S. market with its SHENZI product a few months ago. What is the impact for this to your own branded business in the U.S.?

407.    In response to the first question regarding demand for the Diamides, Douglas represented:

> So first of all, when we talk about supply and technical-grade diamides to our partners, think of us as essentially a raw material supplier. So they're treating as a raw material supplier, the same as we're treating our raw material suppliers. So it's nothing more than that. It is a simple case of they obviously have demands on their inventories that they're having to reduce, and we are part of that. We do that to our own suppliers and are doing it right now. So you see that. ***From a demand perspective, we don't think their demand is slowing down at all, neither [is] ours***, as we just commented on.

408.    In response to the analyst's second question concerning the generic competition in the U.S., Douglas downplayed the danger posed by generics, stating:

To the second part of your question with regards to competition in the U.S., we've seen competition for some time in many parts of the world with the diamides. What we do know is that our branded products and the new introductions that we're making of new formulations are moving the needle. ***In other words, we're not selling the same products that we were selling 5 years ago. We're selling more sophisticated, higher-concentration formulations to our current customers. So where generics are coming in with a certain type of product, we're not selling those products anymore. We're selling something completely different.***

409.    Later, during the August 3, 2023 conference call, Paul Christian Staudinger of KeyBanc Capital Markets followed up, asking "[D]o you see the supply of more competitive products entering the market?" Douglas responded by saying:

Listen, generics play a major role in the marketplace. They have been around and they are around. ***We don't necessarily play in a lot of those markets***. It's not to say that the markets they play in are not valuable, they are, ***but we don't have a lot of generic pressure in a lot of our product lines, mainly because of how we differentiate through either new active ingredients or new formulations that we bring to market***. So I expect the generic market to get more competitive, but we don't play in that space.

410.    During the same conference call, an analyst also asked about channel inventory destocking, referring to FMC's previous long-term issues with destocking, which impacted earnings for multiple seasons: "I thought I remembered in 2015, 2016 that channel inventory destocking became a multi-season issue. I was wondering how things are different now and if that is somewhat of a risk to happen again."

411.    Douglas distinguished FMC's previous multi-season destocking issue from the inventory issues it was experiencing:

Yes. 2015, you've got to remember back to 2015, it seems a long time ago now, but that was a particular event in Brazil. It was both inventory, it's currency impact. And it was, again, that scarcity of products leading into that. ***I think this is different in the sense of it's broader and it's happening much faster. In other words, the decreases we're seeing on a quarterly basis right now, they're much more extreme than they were before.*** I think the other thing for us, in particular, although there was a lot of people impacted by the Brazilian event, there was a new seed trait that was introduced into Brazil for soybeans, which impacted insecticides within a reasonably short time frame. That was a factor that it's certainly not at play today

in any way, shape or form. ***So I don't necessarily look back on Brazil as a proxy for what is happening today.***

412.    Defendants' bolded statements set forth in ¶¶ 407-09 and 411 regarding channel inventories, demand and market conditions for FMC's products were materially false or misleading when made for the reasons set forth in ¶ 354.a.-f., above.

413.    The alleged misstatements regarding purportedly expected market conditions for FMC in ¶¶ 407-10 were also materially false and misleading when made because they lacked a reasonable basis in fact, including because they did not reflect or take into account the undisclosed adverse facts regarding demand, channel inventory, competition, and revenues from FMC's products set forth in ¶ 354.a.-e., above.

414.    In addition, by electing to speak publicly about demand, the absence of generic competitors for FMC's products, and destocking in Brazil—Defendants had a duty to fully, completely, and accurately disclose all material facts regarding the declining demand for the Company's products due to, among other things, the full channel inventories, the encroachment of generic competitors, and the industry consolidation to avoid misleading investors. As a result of the foregoing, undisclosed material facts, Defendants' public statements lacked a reasonable basis when made and were materially false and misleading at all relevant times.

## IX.    SUMMARY OF SCIENTER ALLEGATIONS

415.    The Individual Defendants acted with scienter in that they knew or were reckless in not knowing that the public statements set forth in Section VIII above were materially false or misleading when made, and knowingly or recklessly participated in the issuance or dissemination of such statements as primary violators of the federal securities laws. In addition to the facts alleged in Sections IV.A.4, IV.B, IV.C, IV.D, IV.E and IV.F., above, the Individual Defendants' scienter is evidenced by the specific facts discussed below.

### A.    Defendants' Access to Information Reflecting Demand and Inventory Levels Among Other Metrics

416.    Throughout the Class Period, Defendants received or had access to data and information related to current demand for FMC's products, including information on channel inventories, sales numbers, and forecasts. For example, as part of the Company's demand planning process, leadership at the regional level reported up to the C-Suite regarding regional sales performance, updated sales goals, and customer payment issues such as delinquencies or "past dues," as well as the demand levels and budgets for each region. *See supra* Sections IV.F.1., IV.F.2., IV.F.3., IV.F.4., IV.F.5.

417.    Defendant Douglas and FMC's VPs from around the globe were also involved in monthly ESOP Meetings and Douglas met the regional heads following the regional demand planning meetings. In addition, FMC's regional leaders made presentations to the Company's U.S. management team, including Douglas and Sandifer, regarding the regional budget and objectives, demand, and other metrics including financials, revenue, margins, pricing, operating expenses, head counts, and the inventory on FMC's books. The U.S. management team, including Douglas, was also directly involved in developing the sales goals and set the target sales numbers for each region. Despite the fact that FMC employees often flagged these targets as unrealistic and unreasonable, FMC's leadership pushed the regions to hit their goals, regardless of what it took. *See supra* Sections IV.F.1., IV.F.2., IV.F.3., IV.F.4., IV.F.5.

418.    Defendants also participated in and spoke at Company-wide meetings where topics such as channel inventories, demand, sales forecasts, revenues were discussed. For example, Douglas led the quarterly "All Hands" meetings at the Company's corporate headquarters during which members of FMC's executive team presented on various topics, including the Company's quarterly performance, inventory levels, sustainability, and a "look forward" that involved issues

such as inventory levels and market dynamics. Douglas and Sandifer also spoke at FMC "Town Hall" meetings where, among other things, the inventory issues in Brazil were discussed. In addition, Douglas and other members of the C-Suite attended FMC's Annual Sales Meetings. *See supra* Section IV.F.5.

419.    FMC also convened annual Company meetings wherein slides were presented showing revenues, projected revenues, and channel inventories. The slides also reflected Sales and EBITDA numbers for the Month To Date, Quarter To Date and Year To Date, measured against the FMC budget and forecast for the given country as well as cash flow information for FMC's businesses at the country level. Through these presentations, FMC's upper management had detailed visibility into "everything," and pushed for more profits notwithstanding their knowledge of declining profits, growing competition, and large channel inventories in several countries. *See supra* Section IV.F.5.

420.    In addition, Defendants Douglas and Sandifer received information through direct reporting of metrics such as late payments from clients and client credit limits, product being stored in client warehouses, monthly client inventory levels, and sales by retailers. For example, the regional leaders regularly reported deterioration in prices up to FMC CEO Douglas and CFO Sandifer on a quarterly basis. FMC's senior management would receive "past due" reports on a quarterly and yearly basis, regarding late payments from distributors. *See supra* Sections IV.F.4, IV.F.5.

421.    Defendants also had insight into: (i) inventory at the customer level through POG reports detailing how much FMC product sold to distributor clients was being stored in clients' warehouses; (ii) clients' credit limits and their ability to "absorb" additional product sales detailed in financial reports; (iii) receivables, which were tracked on a weekly, monthly, and quarterly

basis; (iv) FMC employees "on the ground" who were contractually obligated to provide FMC with information on their monthly inventory levels; (v) data regarding inventory from clients' computer systems that were integrated with FMC's systems or from reports provided by clients; (vi) EDI reports that were used to track sales of FMC products by retailers and were also used to compile manufacturing and distributing analyses that went to the C-Suite; and (vii) FMC's "Sales Return Database" that would have captured and reflected the returns and disposals of products that were oversold during COVID and expired while sitting on the shelves. *See supra* Sections IV.F.4, IV.F.5.

422.    Further, FMC's implementation of the SAP system in July 2020 provided Defendants with access to myriad data and information. Defendants touted this new platform as providing a "a single, modern system across the entire company." Sandifer claimed that the SAP S/4HANA allowed the Company to "gain scale economies by consolidating transactional activity into hubs," and with respect to Brazil specifically, Douglas stated that the Company's mobile CRM system was "tied directly to our SAP system, ensuring live, real time accuracy." The Company's SAP system tracks "everything that FMC does" and provides "instant access to information," including up-to-date information concerning sales, forecasting, inventory, invoicing customers, purchasing, manufacturing, raw goods, supply, and long-term pricing as well as Accounts Payable, Accounts Receivable and other transactions for the Company. *Supra* ¶¶ 67-72. Through this SAP system, management at FMC headquarters could access all data related to any region. *Supra* ¶ 71.

**B.    Defendants Repeatedly Addressed Demand for FMC's Products, Inventory Levels, and Competition in Response to Analyst and Investor Questions and Professed to Have Knowledge and Insight into These Topics**

423.    As discussed in Section IV.E above, throughout the Class Period, analysts were keenly focused on the demand for FMC's products, the channel inventory levels, and the impact of generic competition, and Defendants constantly fielded analyst questions about these topics. In

responding to analyst questions, Defendants provided a high level of detail regarding the demand and inventory numbers, as well as potential competition from generics, and also claimed to be knowledgeable about these topics and have insight into the underlying facts and data.

424.    For example, during FMC's February 9, 2022 earnings call for 4Q 2021, Douglas responded to an analyst question regarding "where . . . channel inventories" ended in 2021, stating "**from a market demand perspective, it's very strong all over the world**" and further representing that FMC had "0 concern" regarding channel inventory.

425.    During the Company's May 3, 2022 earnings call for 1Q 2022, Douglas responded to an analyst question regarding "where you think channel inventory sit" "around the world," stating: "**Generally speaking, we are not concerned about channel inventories**." Douglas continued: "So we're not seeing anything that we would say is concerning at all. They seem pretty normal to us. In Latin America, for us, normal. Argentina, Brazil, Mexico, India where we should be at this point of the season, demand has been very good for us."

426.    Then, at the BMO Capital Markets Global Farm to Market Conference on May 18, 2022, an audience member specifically asked Douglas to speak to FMC's ability to "manage inventories" and its "visibility . . . into your inventory in Brazil." In response, Douglas claimed that FMC could track and manage inventory down to the "grower level" and reiterated that the Company was not seeing any issues with inventory in Brazil:

> *We manage inventory not only in our own facilities, not only in third-party warehouses but also at the grower level. So our sales force and our financial groups are actually lockstep in terms of how much product are we selling into the market? How much is actually getting through to the grower? And then importantly, how much is getting used on the ground? . . . And right now, as I said earlier, there are no issues with inventory in Brazil for us.*

427.    In responding to an analyst question during FMC's 3Q 2022 earnings call on November 2, 2022 about whether the Company was "seeing inventory levels that you would

describe as outlying either in terms of being too high or too low in any of your major markets nowadays," Douglas specifically addressed the inventory levels in each of FMC's major regions and represented that the Company was "happy" with these levels:

> Well, I think generally speaking, overall, we would say we're happy where inventory levels are in the marketplace. There are pockets of higher inventories. We talked about India before. . . . I would say in the U.S., things are fine. Europe is pretty okay for us. 1 or 2 pockets in the South because of the dry weather that we had last year. I would say in Latin America, there are parts of Brazilian market where they had a drought last year that you can imagine inventories are high. Inventories are high right now in Brazil because we're in the planting season. But we're happy with where our inventories are right now.

428.    In response to an analyst question at the Citi Global Industrial Tech and Mobility Conference on February 21, 2023 regarding "some pockets" of inventory and Defendants' overall lack of concern regarding inventory levels, Sandifer stated: "***No. No, I think we're managing. I think we know where the issues are, and we're going to manage it proactively***."

429.    At the BMO Capital Markets Global Farm to Market Conference on May 18, 2023, Douglas also responded to an analyst question regarding "concerns about maybe volume this year, not being as strong as people think" and reassured the market that FMC was "seeing acreage increase overall in Brazil, good conditions expected in the U.S., especially in the Midwest, other parts of the world in good condition. . . ." Douglas further stated:

> There is a concertina effect as people are managing their inventories, mainly because of the cost of capital today after many years of free capital. We're seeing that around the world. . . . So we feel good about the ultimate volume. It's managing through what is essentially the end of all the COVID supply chain issues that we've had that are bouncing through distribution and retail. So my message is really good volumes down on the field. We see that all over the world. . . . But overall, volumes are good.

430.    During the Company's 2Q 2023 earnings call on August 3, 2023, Douglas again represented that Defendants had insight at the "grower level" in responding to an analyst question regarding how FMC was "trying to understand what farmers are doing." In his response, Douglas

represented that the methodologies used to track "what is happening at the grower level" included monitoring "acreage that gets planted . . . around the world" as well as "other independent sources that we put information in and the rest of the industry puts information in and then you get an aggregate output" which is "particularly strong in Brazil" and the U.S. Douglas further represented that FMC had an "understanding on the ground of what's getting planted and then what is being applied" as well as access to "third-party independent sources."

431.    In responding to analyst questions regarding the looming expirations of the Company's Diamide patents and potential for competition with respect to these products, Defendants claimed that the Company was actively monitoring any potential infringement and also provided significant detail regarding both the processes through which the Diamides were manufactured and the applicable patents. For example, in response to a question at the May 18, 2022 BMO Global Farm to Market Conference regarding the "Rynaxypyr patent infringement," Douglas represented that FMC had a dedicated team monitoring patent infringement in particular in India and China: "***So in India and in China, there are companies that are trying to illegally produce the products that we have that are patented. We have a whole team set up inside the company that monitors the market, monitors who is doing what in those 2 countries.***"

432.    At the Citi Global Industrial Tech and Mobility Conference on February 21, 2023, an analyst asked Sandifer to "talk about patent expirations on diamides" and "the cadence of these expirations and what you can do to extend a life." In response, Sandifer stated that FMC had "30 patent families [that] include about 1,000 patents" and explained that the composition of matter patents were "just one of a small part of the total layer of protections we have around these molecules" and that FMC also had "patents on the intermediates, the composition amount of patterns on the intermediate materials that are used in that process." Sandifer went on to discuss

the "16-stage synthesis process" for Rynaxypyr and detailed the various levels of patent protection for that product.

433.    In response to an analyst question at the March 1, 2023 Bank of America Global Agriculture and Materials Conference regarding "the patent expiry outlook over the next couple of years" for the Diamides, Douglas also referenced the "15 or 16 synthetic steps" involved in the Diamide manufacturing process, representing that "we have many of those steps patented."

434.    These public statements support a strong inference that Defendants possessed detailed knowledge of, or access to, material facts that were misrepresented or concealed from investors, or that Defendants were reckless in failing to investigate the issues which they repeatedly spoke about in detail to investors.

### C.    Defendants Professed to Have Detailed Knowledge and Insight into Factors Driving Demand, Including Channel Inventory and Competition from Generic Products and Routinely Discussed These Topics in Prepared Remarks and SEC Filings

435.    In addition to their responses to analyst questions, Defendants also repeatedly addressed demand, inventory, and FMC's patent portfolio in their prepared remarks delivered during the Class Period and in the Company's SEC filings. Among other things, Defendants reinforced their detailed knowledge and insight into these topics.

436.    Defendants addressed the demand for the Company's products and the channel inventory levels in the Company's February 8, 2022 earnings press release and February 9, 2022 earnings call, referring to the demand as "strong," "healthy," and "robust."

437.    In the Company's November 1, 2022 earnings press release filed on Form 8-K, Douglas referenced the "strong herbicide and insecticide demand" in Brazil as driving sales growth for the LATAM region and during the Company's 3Q 2022 earnings call on November 2, 2022, Douglas represented that "demand remains strong for new products based on the diamides and

other chemistries." During this call, Douglas further claimed that FMC had "good visibility into demand for the quarter with strong order books for both the Brazilian and U.S. markets."

438.    Regarding the Company's efforts to fend off generic competition including with respect to the Diamides, FMC stated in each of its 2021, 2022, and 2023 Forms 10-K that it "actively monitor[ed] and manage[d] our patents and trademarks to maintain our rights in these assets." Defendants also represented in FMC's 2022 Form 10-K that "[w]e are deploying a multi-pronged strategy to defend that business after active ingredient patent expiration, including enforcement of our patents in many countries which continue to cover chemical intermediates and manufacturing processes that are essential in the production of chlorantraniliprole."

439.    These public statements support a strong inference that Defendants possessed detailed knowledge of, or access to, material facts that were misrepresented or concealed from investors, or that Defendants were reckless in failing to investigate the issues which they repeatedly spoke about in detail to investors.

### D.    Diamide Revenues and Revenues from LATAM and Asia Drove Revenues for FMC

440.    The fact that the alleged false and misleading statements and omissions concern FMC's core products in three of its principal markets bolsters the inference of scienter.

441.    FMC identified the Diamides as a key driver of the Company's revenues leading up to and throughout the Class Period. During FMC's August 4, 2021 earnings call for 2Q 2021, Douglas commented: "Since we launched FMC as a pure-play agricultural science company, diamides have been a core part of our business. Rynaxypyr and Cyazypyr have grown to be almost 40% of FMC sales today."

442.    In 2022, the Diamides comprised approximately $2.1 billion in combined sales and approximately 36% of the Company's total revenue. In 2023, the Diamides became even more

important and contributed approximately 39% of the Company's total revenue. As shown in the table below, from 2019 through the end of the Class Period, revenue attributable to the Diamides represented at least 35% of FMC's total annual revenues.

**Table 4: Percent of Total Revenue (in Millions) Attributable to Diamide Sales**

|  | **2019** | **2020** | **2021** | **2022** | **2023** |
|---|---|---|---|---|---|
| **Diamide Revenue** | $1,600 | $1,800 | $1,900 | $2,100 | $1,800 |
| **Total Revenue** | $4,609.8 | $4,642.1 | $5,045.2 | $5,802.3 | $4,486.8 |
| **Percent of Total Revenue** | 35% | 39% | 38% | 36% | 39% |

443.    Sandifer also acknowledged that the Diamides were FMC's core product during the February 21, 2023 Citi Global Industrial Tech and Mobility Conference, stating: "[T]here's a lot of focus on the diamide portfolio at FMC and there should be. It's a little more than 1/3 of our total sales. It's more than that of our profit. It's been a big driver of our success."

444.    Additionally, throughout the Class Period, three of FMC's core markets outside of the U.S. were China, India, and Brazil. For example, in 2021 and 2022, of FMC's reported total revenues of $5.0 billion and $5.8 billion, respectively, Brazil alone accounted for $1.2 billion in sales 2021 and $1.6 billion in 2022. In 2023, sales in Brazil totaled over $1 billion, making Brazil the highest earning country for the Company that year.

445.    In its 2022 Form 10-K, FMC indicated that between 2021 and 2022 revenue in its LATAM region increased approximately 28% and that "[g]rowth in the region was primarily driven by Brazil and Argentina." Likewise, FMC disclosed that in 2021, its revenue in FMC's APAC region increased 13% versus the prior year, "primarily driven by growth in Australia, India,

ASEAN zone and Korea" and that "[s]ales of our diamides were robust across the region despite erratic rainfall in several countries."

446.    The Individual Defendants also confirmed the importance of these regions in statements during industry conferences. For example, during the May 23, 2022 Sanford C. Bernstein Agriculture Conference, Douglas stated: "Asia is generally speaking, one of the fastest-growing regions of the world . . . So for us, it's a very important market, whether it's India, all the way through ASEAN into Northeast Asia and then obviously down to Australia and New Zealand." He continued: "I would say the second [fastest-growing region], if you're exposed to soy, then Brazil and Argentina would be the fastest-growing markets . . . ."

447.    Given the importance of Diamides and the importance of the Chinese, Indian, and Brazilian markets to FMC, it is implausible that Defendants were not aware that demand for the Company's product, including its flagship Diamides, had dropped off due in large part the inventory backlog and the encroachment of generic competition.

### E.    Additional Indicia of Scienter

448.    The following facts and circumstances further support a strong inference of Defendants' scienter. *First*, many of Defendants' statements were made just months before the market began to learn the truth about the state of FMC's business and Defendants continued to mislead investors even as they started to reveal that demand was flagging and the channels were flooded with inventory. For example, throughout the Class Period, Defendants materially misrepresented the demand for the Diamides, implying that the demand was sustainable and that channel inventories were normal. On May 1, 2023, while FMC lowered its outlook for 2Q 2023, but nonetheless claimed that "[t]he strength of our portfolio . . . positioned us well to deliver another year of revenue and earnings growth as well as margin expansion." Just two months later, on July 10, 2023, FMC reduced its second quarter guidance again, slashing this number by almost

50%, and also reduced its full-year 2023 guidance. The temporal proximity between Defendants'
misrepresentations in May and the partial corrective disclosure in July renders implausible any
claim that Defendants did not know the severity of the demand and inventory issues. As FE-19
observed: "You don't discover in two months that your inventory is full." On October 23, 2023
FMC announced that it was cutting its guidance again, this time for the third and fourth quarters
of 2023 and for the full year.

449.    *Second*, the Individual Defendants occupied high-level executive positions
throughout the Class Period. As the CEO and CFO of FMC, Defendants Douglas and Sandifer,
respectively, controlled the Company's daily operations, directly participated in the Company's
management, and received material nonpublic information and updates about FMC's core
operations, including the demand for its products in key markets, the outcomes of its litigation to
protect its Diamide patents, and its exposure to competition from generic Diamide manufacturers.

450.    Because of their positions as the Company's senior-most officers, the Individual
Defendants also controlled the contents of, drafted, reviewed, and/or disseminated the material
misstatements and omissions alleged in Section VIII; were provided with, or had access to, the
material misstatements and omissions prior to, or shortly after, their issuance, and had the power
and authority to prevent their issuance or cause them to be corrected; and knew, or were
deliberately reckless in not knowing, that the adverse facts alleged herein had not been disclosed
to, and were being concealed from, the public, and that the positive representations made to
investors were materially false, misleading and incomplete.

451.    *Third*, Defendant Douglas resigned just months after Defendants' fraud was
revealed to the market. On June 11, 2024, Douglas suddenly resigned his position as CEO after
spending four years in the position. FMC further announced that it would replace Douglas with his

predecessor, Pierre Brondeau, who retired in 2020. Brondeau took on the role effective immediately. FMC offered no further explanation for the unplanned departure of its highest executive.

452.     Douglas's sudden and unexplained resignation just months after the disclosure of FMC's fraud further strengthens the inference of scienter.

453.     *Fourth*, the terminations and forced resignations of FMC employees who pushed back against the Company's attempts to make up for the flagging demand by imposing impossible sales goals and raising prices, among other things, also supports an inference of scienter. FMC personnel ranging from executives at the regional level down to sales people were impacted by these adverse employment actions. For example, when FMC Regional Managers spoke up about the unrealistic sales goals or refused to raise forecasts to be in line with the Company's imposed revenue goals, they were forced to resign. *See supra* ¶ 207. These forced resignations included a General Manager in the Philippines and Bob Trogele, a Regional Manager in FMC's Asia region. *Id*. European Market Manager Olivier Ryckeboer was also terminated after he pushed back on the strategy of raising prices to compensate for declining sales volumes in Europe. *See supra* ¶181.

454.     At the sales team level, FMC employees began to over-extend credit to customers due to the pressure to meet improbable revenue demands and when FMC was found to be out of compliance due to this practice, Finance Directors were pressured to resign in Pakistan, India, and elsewhere. *See supra* ¶ 141.

455.     Defendants' retaliation against these employees who challenged the Company's unreasonable sales tactics further strengthens the inference of scienter.

456.     *Finally*, the fact that analysts and media outlets recognized and highlighted the surprising discrepancies between Defendants' Class Period statements and the information

revealed through the corrective disclosures, suggesting that Defendants should have known about the subsequently disclosed facts, also contributes to a strong inference of scienter. For example, reports and media publications issued in the wake of Defendants' guidance reductions announced in May and July 2023 referred to the reductions as "unexpected" and "supris[ing]," and specifically stated with respect to the July disclosure that "the order of magnitude of today's announcement is breath-taking." *See supra* ¶¶ 240, 245-48. Morgan Stanley expressly questioned the veracity of Defendants' reported metrics from the Class Period in a July 10, 2023 report, stating that Defendants' disclosure earlier that day could "***mean that volume sales in prior years' overstated underlying demand***." *See supra* ¶ 247. In a July 11, 2023 report, BofA Securities called out the "***lack of information re: channel inventories that could have helped gauge how far along we are in the destocking process, as well as the impact on free cash flow***." *See infra* ¶ 489.

457.    Following the Company's October announcement of dismal 3Q 2023 results and drastically reduced FCF guidance, J.P. Morgan issued a report on November 1, 2023 questioning FMC's claimed inability to predict the level of destocking that ultimately impacted its results and FCF, positing: "Could the sharp de-stocking in the agricultural sector have been foreseen? FMC contended on its [October 31] conference call that the destocking was unforeseen because crop chemical inventories were held by growers." *See infra* ¶ 528. J.P. Morgan further commented: "***The issue of inventory reduction in crop chemicals seems like a business problem where the mosaic could have been put together.***" *Id.*

458.    These reports and publications questioning the accuracy of Defendants' Class Period statements in light of the disclosures and suggesting that Defendants should have been able to observe and anticipate the destocking and demand declines that drove the Company's disappointing financial results and guidance further strengthen the inference of scienter.

## X.   NEITHER THE STATUTORY SAFE HARBOR NOR THE BESPEAKS CAUTION DOCTRINE APPLIES

459.    The Private Securities Litigation Reform Act's statutory safe harbor and/or the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein.

460.    Statements complained of herein were not forward-looking statements. Rather, they were historical statements or statements of purportedly current facts and conditions at the time each statement was made and or statements that omitted material current or historical facts necessary to make the statements made not misleading.

461.    To the extent that any materially false or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was a mixed statement of present and/or historical facts and future intent, and is not entitled to safe harbor protection with respect to the part of the statement that refers to the present and/or past.

462.    To the extent that any materially false or misleading statement alleged herein, or any portions thereof, may be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement or portion thereof. As alleged above in detail, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false or misleading statements.

463.    To the extent that the statutory safe harbor may apply to any materially false or misleading statement alleged herein, or a portion thereof, Defendants are liable for any such false or misleading statement because at the time such statement was made, the speaker knew the statement was false or misleading, did not actually believe the statement, had no reasonable basis

for making the statement, or the statement was authorized and approved by an executive officer of FMC who knew that such statement was false or misleading.

## XI.    LOSS CAUSATION

464.    The fraud alleged herein was the direct and proximate cause of the economic losses suffered by Plaintiffs and the Class. There was a causal connection between the alleged fraud and the loss (i.e., stock price declines) alleged herein.

465.    During the Class Period, Plaintiffs and the Class purchased or otherwise acquired FMC common stock at artificially inflated prices and were damaged thereby when the price of FMC common stock declined in response to the disclosures alleged in this section and above in Section V (¶¶ 236-67) and/or when the risks previously concealed by Defendants' material misrepresentations and omissions materialized.

466.    Throughout the Class Period, Defendants' materially false or misleading statements and omissions artificially inflated the price of FMC common stock and/or maintained FMC's common stock at artificially inflated prices. The price of FMC common stock significantly declined, causing investors to suffer losses, in response to a series of partial disclosures concerning and proximately caused by the facts misrepresented and concealed by Defendants, and/or as the foreseeable risks concealed or obscured by Defendants' misrepresentations and omissions were revealed and/or materialized through the disclosure of new information, which disclosures are described more fully above in Section V (¶¶ 236-67) and as follows.

### A.    First Partial Corrective Disclosure: May 1-2, 2023

467.    After the market closed on May 1, 2023, FMC issued a press release announcing its results for 1Q 2023 as well as the Company's outlook for the remainder of the year. FMC reported a "solid first quarter," but announced that it was lowering its outlook for 2Q 2023 based upon, among other things, reduced demand for its products in certain of its markets:

Second quarter revenue is expected to be in the range of $1.42 billion to $1.48 billion, which is flat at the midpoint compared to second quarter 2022. ***Headwinds from lower volumes in select markets*** and FX are expected to be offset by gains from pricing actions and sales of new products. Adjusted EBITDA is forecasted to be in the range of $350 million to $370 million, which is flat at the midpoint versus prior-year period.

468.    Under the heading, "Supplemental Information," the May 1, 2023 press release directed investors to the Company's website for additional information, including slides that would accompany FMC's earnings call scheduled to commence before the market opened the next morning. The slides provided further information on, among other things, the lower product volumes that the Company's May 1, 2023 press release identified as "headwinds" to its 2Q 2023. In this regard, the slides to which FMC directed investors' attention indicated that the reduced outlook for FMC's 2Q 2023 was based upon, among other things, "***[c]hannel inventory management in India***" and "***Diamides partners adjusting inventory levels***." These slides further indicated that 1Q 2023 volume weakness in Asia, where FMC's revenues had declined by 22% year-over-year, largely resulted from "***channel inventory reduction in India***."

469.    Securities analysts quickly responded to this news. For example, Morgan Stanley issued a report on May 1, 2023 stating, among other things, that "2Q was guided below the street," and that ***"[f]rom a 2Q perspective, volume will be down given channel inventory management in India as well as diamide partners adjusting inventory levels***." Also on May 1, 2023, Seaport Research Partners noted that "we have some concerns about the volume weakness that appears to be dragging into Q2." (original emphasis omitted).

470.    On May 2, 2023, FMC held its first quarter 2023 earnings call to discuss the information addressed in its May 1, 2023 press release in greater detail. Among other things, Defendants revealed during this conference call that the anticipated reduction in demand for certain

of its products, and the Diamides in particular, was based upon an increase in channel inventories and related destocking activities that drove the Company's reduced guidance for 2Q 2023.

471. In his prepared remarks delivered during the May 2, 2023 conference call, Defendant Douglas provided the following statement, revealing the impact that increased channel inventory and the resulting decreased demand had upon FMC's outlook for 2Q 2023 and the remainder of the year:

> We anticipate revenue in the second quarter to be flat compared to the prior year, with further price increases, particularly in EMEA, growth of new products as well as market access gains to be offset by lower overall volumes and FX headwinds. North America purchase patterns are expected to return to normal levels after 2 consecutive quarters of very strong demand. ***Channel inventory – Channel inventory is anticipated to remain a focus in India as it will for the rest of the year. Our diamides partners are lowering their inventory levels in light of working capital concerns impacting volumes in Q2 and the rest of the year.*** EBITDA guidance is flat compared to the prior year of $360 million, and EPS is expected to decline by 9% year-over-year, primarily due to higher interest rates.

472. Following Defendants' prepared remarks, securities analysts sought further information on FMC's growth prospects and the outlook for the Company's Diamides for the remainder of 2023. In this regard, Mizuho securities analyst Christopher S. Parkinson asked Defendants to address "your volume outlook for the balance of the year." In response, Douglas attempted to minimize any concerns about FMC's lower sales volumes and growth, asserting that FMC's outlook for the remainder of 2023 had to be considered against the backdrop of the prior "record year" for crop protection chemicals:

> I think one thing you have to put in perspective is that although we're talking about volumes in Q1 and Q2, ***you have to remember that last year was an absolute record year in terms of total market for crop protection chemicals, driven by a lot of volume, not just price.*** So, although we're looking in the first half at what we would consider somewhat low volumes, it's lower. It's not absolutely low.

473.    Parkinson asked a follow-up question, focusing specifically on demand and growth prospects for the Diamides. In response, Douglas again assured investors that portfolio and Diamide growth remained "good" and in the mid-single digit range:

> So listen, on the portfolio itself, last year, we had 15% growth as a company. And this year, we're aiming for our rough 6% growth. When you look at the portfolio itself, the rest of the portfolio last year grew faster than the diamides. And that's not to say that the diamides weren't growing at a good rate. They were, and have been since we acquired the products. ***This year, we expect the diamides to grow in that sort of mid-single-digit range, and the rest of the portfolio will grow at the same rate***.

474.    Also during the May 2, 2023 conference call, Joshua David Spector of UBS asked Defendants to shed further light on FMC product volumes, including "on the diamides, where you talk about some partner channel destocking. What's the visibility that, that doesn't bleed into the second half as well?" In response, Douglas again assured investors that FMC had insight into partner channels, and asserted that channel inventory issues were already accounted for in FMC's guidance:

> I think on the channel inventories, we'll see how we go through the second quarter. The markets are moving. You know what, ***if the market doesn't change much, yes, there will be some channel inventory hangover as we go into the next season. That occasionally happens. As the weather patterns improve as we go through the second quarter, we should be eating away at some of that inventory***. So we'll see where the market gets to.
>
> Our expectation, as we're forecasting is for a more normal season as we enter Q4 and Q1 into next year in Latin America. ***On the diamides, what we're telling you in our guidance now is that the partners that are reducing inventories, that's not just an event now that continues through the rest of the year. So that's already built into our forward-looking guidance.***

475.    In response to FMC's May 1, 2023 press release and May 2, 2023 conference call, which revealed that FMC was reducing its 2Q 2023 guidance based upon a build-up of channel inventory, resulting destocking activity, and decreased demand for the Company's products, the

price of FMC common stock declined by $7.34 per share, or 5.93%, from its closing price of $123.76 per share on May 1, 2023 to close at $116.42 per share on May 2, 2023.

476.    Media reports generated during the trading day on May 2, 2023 immediately connected the decline in the price of FMC common stock to the Company's reduction in its 2Q 2023 guidance based upon decreased demand for the Company's products. For example, in an article entitled "*FMC Tumbles as Second-Quarter Forecast Disappoints*" issued during the trading day, Bloomberg reported that FMC "***[s]hares are down as much as 9.6%, the most intraday since March 18, 2020***," while also noting:

- "FMC Corp. declines the most intraday since 2020 after the agricultural chemicals company provided a disappointing forecast for the second quarter[]"; and

- "The company said 2Q results will be hurt by lower volumes in some markets and FX headwinds."

477.    Numerous securities analysts also issued reports following FMC's May 1-2, 2023 disclosures of new information concerning channel inventories, demand, and sales volumes for its products, including the Diamides, and attributed the sharp decline in FMC's stock price on May 2, 2023 to the Company's reduced guidance for 2Q 2023 based upon these factors.

478.    For example, BofA Global Research noted in a May 3, 2023 report that "***FMC was down 6%***" and "***[w]e believe investors soured on the unexpected volume decline of -3% and a broader downgrade of the volume outlook – both for FMC and the CPC market overall.***" Morningstar similarly stated in a May 2, 2023 analyst note that "***FMC shares were down nearly 8% on the day (May 2) as the market reacted negatively to FMC's slowdown in key growth markets including Latin America and India***."

479.    Analysts continued issuing reports on May 3, 2023, which drew the same connections. Commenting on "***[y]esterday's sell off***," Morgan Stanley stated "***we believe that the***

***core concern in the equity market relates to the volume assumptions embedded in guidance***"
and that "there is clearly some inventory management taking place by the channel." RBC Capital
Markets stated: "We lower our FY23 estimates on volume weakness, and lower our price target to
$136, from $140."

480.    Despite this partial disclosure of the misrepresented and concealed truth and/or a
partial materialization of the risks concealed by Defendants' misrepresentations and omission, and
consistent with Douglas's reassuring statements that reduced volumes due to channel inventories
were already baked into FMC's guidance, certain securities analysts viewed FMC's reduced
outlook for 2Q 2023 as a transient event of limited scope, with Seaport remarking in a May 3, 2023
report that it was "still encouraged on long-term opportunity" and "confident that FMC can deliver
above-market growth." Wells Fargo also issued a report on May 3, 2023, in which it reiterated its
overweight rating on FMC based upon its view that product cost recovery and new product
launches would drive earnings growth at the Company.

**B.    Second Partial Corrective Disclosure: July 10, 2023**

481.    Before the market opened on the morning of July 10, 2023, FMC issued a press
release announcing significant downward revisions of its expectations for 2Q and full-year 2023.
In this press release, Douglas informed investors:

> Towards the end of May, we experienced unforeseen and unprecedented volume
> declines in three out of four operating regions, as our channel partners rapidly
> reduced inventory levels . . . ***Our full-year outlook for revenue and adjusted
> EBITDA has been revised to reflect these channel dynamics and their impact to
> volumes***, as well as the benefit from improved input costs and the significant
> operating cost mitigation actions we have already implemented.

482.    Despite raising its full-year Adjusted EBITDA outlook just over two months earlier
on May 1, 2023, FMC reported that it was cutting its second quarter Adjusted EBITDA forecast
by nearly 50%, from $350 to $370 million down to a range of $185 to $190 million, and its full-

year Adjusted EBITDA forecast from $1.50 to $1.56 billion down to a range of $1.30 to $1.40 billion. In the July 10, 2023 press release, the Company further reported that, based upon the same volume declines that Douglas referenced in the press release, it had revised its revenue guidance for 2Q 2023 from a range of $1.42 to $1.48 billion to a range of $1.00 to $1.03 billion, and that it had revised its full-year 2023 revenue guidance from a range of $6.08 to $6.22 billion to a range of $5.20 to $5.40 billion. The foregoing revisions, and the percentage declines from Defendants' May 1, 2023 guidance, are reflected in the following table.

**Table 5: July 10, 2023 Decline in Revenue and Adjusted EBITDA from Prior Guidance to Revised Guidance (in millions)**

|  | Previous Quarter Guidance | Revised Guidance July 10, 2023 | Percentage Decline |
|---|---|---|---|
| **2Q 2023 Revenue** | $1,420 to $1,480 | $1,000 to $1,030 | 27.5% to 32.4% |
| **FY 2023 Revenue** | $6,080 to $6,220 | $5,200 to $5,400 | 11.2% to 16.4% |
| **3Q 2023 Adjusted EBITDA** | $350 to $370 | $185 to $190 | 45.7% to 50% |
| **FY 2023 Adjusted EBITDA** | $1,500 to $ $1,560 | $1,300 to $1,400 | 6.7% to 16.7% |

483.    In response to the new and unexpected information that Defendants disclosed in the July 10, 2023 press release based upon product volume declines, the price of FMC common stock dropped by $11.62 per share, or more than 11%, from a close of $104.25 per share on Friday, July 7, 2023, to close at $92.63 per share on Monday, July 10, 2023.

484.    Media reports generated during the trading day on July 10, 2023 immediately connected the decline in the price of FMC common stock to the Company's reduction of its revenue and Adjusted EBITDA guidance for the remainder of 2023 based upon the steep volume declines for the Company's products and reflected the market's surprise at the news. For example,

in an article issued just after the close of trading on July 10, 2023, Dow Jones Newswire excerpted

news and analyst commentary issued during the trading day, which included repeating comments

from Frank Mitsch and Aziza Gazieva of Fermium Research in reporting "*[a] sharp guidance*

*reduction by agricultural sciences FMC 'is a surprise, and not a positive one at that*,'" and that

"'*the order of magnitude of today's announcement is breath-taking*.'"

485.    Analysts covering the Company also issued reports on July 10, 2023, expressing

shock at the severity of the 2023 guidance cuts that FMC announced earlier in the day, which

drove the Company's stock price down that day. For example, BNP Paribas issued a report on July

10, 2023 stating:

> FMC have warned on FY and Q2 numbers. Q1 adj EBITDA is now seen at USD 185-190m, implying a c50% miss vs consensus (cUSD360m, also where the company has been guiding). For the full year, EBITDA is now seen at USD 1.3-1.4bn (vs USD1.5-1.56bn previously), implying a 10% cut to consensus, which currently sits at the midpoint of the previous guide.
>
> ***
>
> *[C]learly the magnitude of the downgrade is higher than anticipated and we suspect investors may look at the continued H2 weight in guidance with some caution*.

486.    Similarly, in a July 10, 2023 report entitled, "Worse Than We Thought," Morgan

Stanley stated:

> *While most investors we spoke with after we cut numbers were also having trouble sizing the impact from destocking, we are confident that the outcome FMC presented this morning is worse than what had been contemplated.*
>
> *We expect a negative share price response to today's guidance reduction.*

(second emphasis in original).

487.    Morgan Stanley's July 10, 2023 report also set forth a list of questions that it

believed FMC's guidance cut announced that morning would trigger among investors, including:

"Why is the destocking taking place given the company is calling out flat underlying grower

consumption of FMC's products?"; "***Does this mean that volume sales in prior years' overstated underlying demand and therefore this is actually an earnings reset*** (i.e., there won't be restocking in 2024 but rather just volume growth with consumption growth?)"; and "Will the company have to concede some price in future quarters to move volume (i.e., are channel partners holding back on inventory because their working capital has ballooned from multiple price increases and higher interest expense/carrying costs?)"

488.    Morningstar issued a July 10, 2023 report during the trading day, in which it connected FMC's severe intraday stock price decline to the Company's surprise guidance cuts, stating: "***FMC shares were down nearly 8% at the time of writing as management reduced its revenue and adjusted EBIDTA guidance for the year by 14% and 12%, respectively, due to lower volumes, partially offset by lower unit production costs***." In a July 10, 2023 report, RBC likewise noted, "[a]lthough this destocking and reduction in channel inventories by customers is significantly greater than anticipated, we believe a good portion of this weakness is reflected in the stock's ~15% decline today and ~27% decline YTD." (emphasis omitted).

489.    Further, BofA Global Research issued a July 11, 2023 report, noting that (i) "[y]esterday, FMC provided a surprising guidance update with the Q2 revenue outlook cut by 30% to $1-1.03bn and EBITDA cut by almost 50% to $185-190mn"; and (ii) ***[t]he stock closed down 11% on the day, with the sell-off exacerbated in our view from the lack of information re: channel inventories that could have helped gauge how far along we are in the destocking process, as well as the impact on free cash flow***."

### C.    Third Partial Corrective Disclosure: September 7, 2023

490.    On September 7, 2023, investment firm Blue Orca issued the Blue Orca Report detailing previously undisclosed legal defeats that FMC had suffered in attempting to protect its Diamide patents in China and India and the threats posed by the entry of generic diamide products

into those key markets. The Report further revealed that FMC was on the brink of losing its

Diamide patent protections in Brazil, which would trigger an influx of generic competition in that

key market as well. Finally, the Report highlighted that FMC's deteriorating revenues, free cash

flow constraints, entry of generic competitors, and heightened borrowing costs would likely push

FMC's leverage ratio past the terms of its existing debt covenants.

491.    More specifically, with respect to the patent protection for FMC's Diamides and

the Company's ability to fend off generic competitors, the Report stated:

> ***FMC continues to misrepresent to investors that it will not face generic competition for its flagship diamides when in reality, as a result of devastating recent legal defeats, generics have already launched in key markets of India and China and are on the precipice of launching in Brazil.***
>
> ***
>
> In China, for example, competitors are selling generics for up to ***80% below the price of FMC's branded equivalent. In FMC's key market of India, the Delhi High Court recently found FMC guilty of misleading the court and the patent office, and well-capitalized competitors have now launched generic versions of FMC's top selling CTPR product*** at cut prices and are already projected to take 40-50% of FMC's CTPR diamide market share in India next year.
>
> ***
>
> Given that FMC's patented diamides account for an estimated 60%+ of EBITDA, we expect that a tidal wave of generic competition on FMC's flagship product will crush FMC's revenues and profits while blowing out its leverage covenants.

(final emphasis in original).

492.    Moreover, Blue Orca detailed how FMC "concealed from investors the

deterioration of [its] core business[,] resulting in an inescapable cycle of falling revenues,

plummeting cash flows, [and] declining profits." The Blue Orca Report also detailed how FMC

"concealed from investors that it [had] suffered a recent string of stunning legal defeats around the

globe that [had] enabled competitors to now launch competing generics at prices up to 80% below

163

the price of FMC's flagship insecticide product," the Diamides. The Blue Orca Report further
stated:

> Despite the expiration of the composition patents on FMC's diamides, FMC tells
> investors it will not face generic competition on its flagship products until 2026 at
> the earliest because FMC still holds a suite of 'process' patents, which FMC claims
> will bar generic entrants for the next several years. Absurdly, FMC even tells
> investors that 'there is not a single legal competitor . . . in the world today.' This is
> simply not true.

(emphasis omitted).

493.    With respect to India, the Blue Orca Report set forth how, starting at least as early
as September 2022, "***Indian courts have recently and unequivocally rejected FMC's process
patent defenses and refused to enjoin generic competitors from manufacturing and selling
competing generic***" products. The Blue Orca Report further noted that "hundreds of product
registrations" had been submitted in India.

494.    The Blue Orca Report similarly revealed, also beginning at least as early as
September 2022, "***the China National Intellectual Property Administration ruled that FMC's
process patent of an intermediate of CTPR and its synthesis process was invalid***." The Blue Orca
Report further stated that this legal loss in China "pav[ed] the way for competitors, who,
undisclosed to FMC investors, are already launching almost 90,000 tons of cheap generic CTPR
to undercut FMC's prices and market share." (emphasis omitted).

495.    Summarizing the legal landscape for the Diamide patents in India and China, the
Blue Orca Report stated:

> ***By our count, FMC asserted multiple different patents in different legal
> proceedings in India and China and has lost on each material patent claim FMC
> asserted in those cases. Yet, outrageously, FMC continues to tell investors that it
> is successfully defending its patent claims and that such alleged victories will
> keep generic competitors at bay in India and China until 2026 and beyond. We
> simply have no idea how to reconcile FMC's statements with the rulings in India
> and China***.

496.    Finally, the Report detailed how the combined effects of full channel inventories and the impending entry of additional generic competition to FMC's diamide business, based, in part, on FMC's patent litigation losses in China, India, and Brazil, would have catastrophic effects on the Company's financials. Calling an investment grade downgrade "likely," the Blue Orca Report said *"[u]ltimately, we think that rising short-term borrowing costs, deteriorating revenues, profits and cash flows will push [FMC's] leverage ratio to dangerous heights well higher than permitted under its credit agreement*."

497.    After the Blue Orca Report was issued, but still during the trading day on September 7, 2023, FMC issued a press release entitled, "FMC Corporation response to inaccurate short-seller report," in which the Company characterized the Blue Orca Report as making "misleading and factually inaccurate statements regarding FMC's patents for its diamide insecticide technology and inaccurately speculated on the strength of FMC's business." While not pointing out a single putative inaccuracy in the Blue Orca Report, FMC's September 7, 2023 press release also claimed that "FMC has always been clear and transparent about its diamide growth strategy[,]" including by "consistently disclos[ing] material developments in diamide litigation in SEC filings."

498.    In response to the new information in the Blue Orca Report concerning FMC's Diamide patents, emerging generic competition, and FMC's cash flow constraints, and despite FMC's same-day press release disputing the Blue Orca Report's accuracy, the price of FMC common stock declined $6.09 per share, or approximately 7.4%, from a close of $82.19 per share on September 6, 2023, to close at $76.10 per share on September 7, 2023.

499.    Media reports generated during the trading day on September 7, 2023 immediately connected the decline in the price of FMC common stock to the new information in the Blue Orca Report concerning FMC's Diamides. For example, Bloomberg noted at 1:13p.m. on September 7,

2023 that "***FMC Corp., a maker of insecticides, falls as much as 8.5% in New York after Soren Aandahl's Blue Orca Capital says its short the shares***."

500.    Analyst reports issued on September 7, 2023 also connected FMC's steep price decline that day to the new information revealed in the Blue Orca Report. In its September 7, 2023 report entitled, "FMC: Shares Plunge as Short Seller Says Generic Competition is Hitting Market Early," Morningstar noted:

> On Sept. 7, a short seller released a report asserting that FMC's diamide products, which generated 36% of revenue in 2022, have begun to see competition from generic producers. FMC's first diamide molecule went off patent last year. ***This report is in contrast to FMC management's prior statements that the company should not see the first generic sales until 2026 at the earliest because the company has key process manufacturing patents that will protect the premium diamide sales after the molecule patents expired***.

The Morningstar report also stated that "***FMC was down nearly 9% at the time of writing as the market reacted negatively to the report***."

501.    In a report issued on September 11, 2023, BNP Paribas noted that "***[s]ince Blue Orca published their report pre-open on Thursday, FMC shares have collapsed 8%***." Also on September 11, 2023, Morgan Stanley issued a report stating, among other things, that "FMC shares are down 40% year-to-date because of: i) the both unanticipated and unprecedented industry restocking that began in 2Q23; and now ii) rapidly increased investor anxiety regarding the expiration of the company's diamide insecticide patents (35% of sales)."

**D.    Fourth Partial Corrective Disclosure: October 23, 2023**

502.    During trading on October 23, 2023, FMC issued a press release cutting its revenue and earnings outlook for 3Q and full-year 2023, which the Company claimed was "***mainly driven by substantially lower sales volumes in Latin America, particularly destocking in Brazil and to a lesser degree drought in Argentina***."

503.    Specifically, Douglas gave the following explanation for FMC's most recent downward revisions of its 2023 financial outlook, as set forth in the Company's October 23, 2023 press release:

> *During the third quarter, we observed continued channel destocking in all regions; however, the magnitude of the destocking in Brazil was much greater than we had anticipated. . . .* While application of products by growers remains stable, significant global restocking impacts are expected to persist into next year and we have adjusted our full year outlook accordingly. *With destocking conditions not expected to improve in the near-term, we have initiated an immediate restructuring process for our operations in Brazil and have launched a broader, more comprehensive process to review and adjust our total company cost structure.*

504.    In its October 23, 2023 press release, FMC announced that it now expected: (i) its 3Q 2023 revenue to be $982 million with an Adjusted EBITDA of $175 million, down from ranges of $1.19 to $1.27 billion and $240 to $290 million, respectively; (ii) 4Q 2023 revenue in the range of $1.139 to $1.379 billion with an Adjusted EBITDA range of $246 to $306 million, down from ranges of $1.66 to $1.78 billion and $511 to $561 million, respectively; and (iii) full-year 2023 revenue to in the range of $4.48 to $4.72 billion with an Adjusted EBITDA of $970 million to $1.03 billion, down from ranges of $5.20 to $5.40 billion and $1.30 to $1.40 billion, respectively. FMC explained that its surprising downward revisions to the Company's outlook for the remainder of 2023 were based upon decreased demand resulting from the intensified destocking of its products "in all regions." In response, the price of FMC common stock declined $10.84 per share, or approximately 16.2%, from a close of $66.95 per share on October 20, 2023, to close at $56.11 per share on October 24, 2023. Specifically, FMC's common stock declined $8.83 per share on October 23, 2023, and another $2.01 per share on October 24, 2023.

505.    Media reports generated during the trading day on October 23, 2023 directly connected the decline in the price of FMC common stock that day to the new information set forth in the Company's October 23 press release. For example, Dow Jones Newswires published a story

at 10:43 a.m. on October 23 entitled "*FMC Shares Hit 6-Year Low After Latest Guidance Cut*," which stated, among other things, that "*[s]hares of FMC fell to a six-year low after the company cut its full-year guidance for the second time in four months*." A few hours later, at 1:30 p.m., Bloomberg published a story entitled "*FMC Declines After Cutting Guidance, Peers Follow Suit*," which reported that "*FMC [] shares plunge as much as 26% on Monday, biggest intraday drop since March 2020, after the agricultural chemicals company slashed adjusted earnings per share guidance for the third quarter*."

506.    Securities analysts quickly reacted to the negative new information that FMC revealed in its October 23, 2023 press release, with numerous firms issuing reports that day in response to the surprising news that drove FMC's stock price into a steep decline.

507.    Morningstar, for example, issued a report during the October 23, 2023 trading day, stating:

> *FMC shares were down 25% at the time of writing as the market reacted negatively to management's second 2023 guidance cut*. Admittedly, the rapid pace of inventory destocking that has occurred in crop chemicals this year caught us by surprise, including the continued destocking that occurred in the third quarter in Brazil, FMC's largest market, which was the basis of management's guidance cut.

508.    In an October 23 report, BofA Global Research stated, "*[t]his morning FMC disclosed another surprise profit warning, based on Q3 volumes and continued destocking globally but mostly in Brazil*." Based upon the severe and unexpected reductions in the Company's Adjusted EBITDA and sales outlook for 3Q and its 4Q Adjusted EBITDA outlook, BofA cut its 2023 EBITDA estimates for FMC, while stating "*[o]ur confidence in the company's prospects has been greatly reduced*."

509.    In its October 23, 2023 report, UBS reduced its 2023 earnings estimates, as well as its estimates for 2024-2025, noting "*[t]he dual impact of crop chemical destocking and revived questions on the defensiveness of FMC's diamides portfolio against competition will be*

*overhangs for some time, in our view*." In retaining its neutral rating on FMC stock, UBS also stated "2023 volume declines are believed to be more of a normalization vs. a temporary decline, & therefore creating a lower base for future earnings with only a limited volume rebound."

510.    Also on October 23, 2023, BNP Paribas issued a report addressing FMC's 2023 guidance cuts, remarking "[a] slow start to the LATAM season had been expected, though *the magnitude of negative operating leverage will take the market by surprise*." BNP Paribas further observed, "[v]olume downgrades may end up putting more pressure on working capital and push leverage well over 3x ND/EBITDA."

511.    FMC's common stock price continued to decline the next trading day, October 24, 2023, as the market continued to digest the Company's unexpected October 23, 2023 disclosures and the resulting analyst downgrades of their FMC stock recommendations. At 10:49 a.m. on October 24, 2023, Bloomberg issued a story entitled "*FMC Falls on Multiple Post-Guidance Downgrades: Street Wrap*," in which it reported:

> *FMC fell as much as 5.4% Tuesday to extend declines for a second day* as three banks – Morgan Stanley, Goldman Sachs, and BofA Global Research – all downgraded their recommendation on the herbicide and pesticide maker. *Still more analysts slashed their price targets on the stock after its 'shocking' guidance cut that Wall Street says has shaken confidence in the company*.

512.    Also on October 24, 2023, BMO Capital Markets issued a report in which it stated:

> *We lower our price target to $80 following the shocking FY EBITDA guide down to ~$1B (down ~29%y/y), a level not seen since before the diamides acquisition.* With near-zero visibility into 2024 earnings power, and untrusting investor base, and FMC clearly a 2024 show-me story, this stock call is not easy.

BMO Capital Markets further noted that "[m]anagement did not provide much color on Q4, just indicating de-stocking continues" and "*cash flow was not discussed*."

E.   **Final Partial Corrective Disclosure: October 30-31, 2023**

513.   On October 30, 2023, after the market had closed, FMC issued a press release announcing its results for 3Q 2023, in which the Company also confirmed its full-year 2023 outlook and provided surprising negative FCF guidance. Consistent with the previously announced downward revised 3Q guidance, FMC reported "third quarter 2023 revenue of $982 million, a decrease of 29 percent versus third quarter 2022 and down 29 percent organically." FMC further reported "a net loss of $0.03 per diluted share in the third quarter, down 103 percent versus third quarter 2022" as well as adjusted earnings of "$0.44 per diluted share, a decrease of 64 percent versus third quarter 2022."

514.   The press release stated: "Revenue in the quarter was driven by a ***26 percent decline in volume***. Price increases in North America, EMEA, and Asia were more than offset by price decreases in Latin America." The press release further stated: "***Sales in all regions declined versus the prior year as partners, the distribution channel and growers continued to reduce inventory levels***." The press release also quoted Douglas's comments on the Company's results: "***Our results were significantly below the prior year driven by volume headwinds from a continuation of channel destocking behavior that began in the prior quarter. Destocking was much worse than anticipated in Brazil***."

515.   While the Company's 3Q 2023 results were generally in line with the revised outlook FMC had announced just a week earlier on October 23, the Company also provided surprising new information on its FCF for the year. In this regard, the October 30, 2023 press release informed investors that "***[t]he company is lowering its full-year free cash flow guidance to a range of negative $860 million to negative $640 million due to the reduction in expected second half EBITDA and the impacts to working capital from higher inventory and lower payables***." Commenting on FMC's financial constraints, Douglas stated:

The global crop protection market remains challenged with severe destocking across the channel impacting volume growth this year. In this environment, we are implementing a company-wide restructuring program to right-size our cost base.

516.    Under the heading, "Supplemental Information," the October 30, 2023 press release directed investors to the Company's website for additional information, including slides that would accompany FMC's earnings call scheduled to commence before the market opened the next morning. The slides provided further information on, among other things, the impact of channel destocking on 3Q regional revenues, the Company's FCF constraints, and outlook for FMC's Diamides.

517.    The earnings call slides represented that one of the key drivers of FMC's third quarter 28% year-over-year decline in revenues from Asia was "continued channel destocking especially in India." Additionally, the slides represented that third quarter revenues were down in all regions, with the leading cause identified as ***"[l]ower volumes in all regions caused by destocking from channel customers and partners***." As for FCF, the slides identified "***drastically lower accounts payable***" as a leading cause. FMC also included a number of slides detailing the market for its Diamides, as well as patent and regulatory timelines for those products, presumably in response to the Blue Orca Report released the preceding month.

518.    Although FMC issued its press release and slides to accompany its next-morning conference call with analysts and investors after the market closed on October 30, certain securities analysts issued reports in response to the October 30, 2023 press release and 3Q 2023 earnings slides alone.

519.    For example, in an October 30, 2023 report, Morgan Stanley noted that "***the incremental financial disclosure from today's release is that free cash flow is now expected to be -$840 million [sic] to -$640 million versus MSe of - $748 million*** – we had simply assumed that FCF would move lower 1:1 with the most recent cut to full year EBITDA." (original emphasis

omitted). RBC similarly observed in its October 20, 2023 note that "FMC is lowering its FCF guidance to -$860M to -$640M (from - $175M to +$175M [sic] due to lower 2H EBITDA and impacts to WC from higher inventory levels and lower payables." In its October 30, 2023 report, UBS declared "[g]iven FMC already pre-released, we don't expect a major stock reaction tomorrow. ***But lower pricing and reduced FCF are some of the incremental data points, both are negative. FCF was updated to a use of $750M in 2023e, this is well below our $100M use estimate***." In a report released just after midnight on October 31, 2023, BNP Paribas pointed to FMC's FCF disclosure, stating ***"[t]his could lead to another covenant issue, a likely key focus for the call tomorrow***."

520.    On October 31, 2023, prior to the market opening, the Company held its earnings call for 3Q 2023. In his prepared remarks delivered during the October 31, 2023 conference call, Douglas made the following statements concerning FMC's third quarter financial results:

> During Q3, we observed a continuation of the industry-wide destocking activity as the value chain resets inventory levels in response to increased security of supply and higher interest rates. ***This led to significantly lower volumes versus the prior year***.
>
> ***
>
> It is our view that when the global destocking ends and channel inventories have been reset, there will not be a snapback restocking period. Rather, ***we expect the crop protection market will grow from that reset inventory base at a more historical growth rate***.
>
> As a result, and as we noted in our prerelease, we are taking significant actions with regards to our company's cost structure. With an announced restructuring of our Brazilian operations as well as a review and adjustment of our total company cost base, we are rightsizing our cost base to better reflect market conditions, protect our margins, and position us for future success.

521.    After Douglas handed the call off to Sandifer to deliver his prepared remarks on FMC's "cash flow and other financial topics," Sandifer stated the following with respect to FMC's leverage and its impact on the Company's borrowing covenants:

*As of September 30, gross debt-to-EBIDTA was 3.6x, while net debt-to-EBITDA was 3.3x, reflecting the sudden deceleration of our earnings beginning in Q2 and elevated debt levels due to higher workings capital resulting from this deceleration.* The covenants to our revolving credit facility evaluate our leverage using a metric that includes adjustments to both EBITDA and debt as reported. With these adjustments, covenant leverage was 3.8x as of September 30 relative to a maximum allowable of 4.0x. We do not view this as an acceptable leverage level relative to our covenant.

In light of this and the reduced outlook for Q4, *we are currently in advanced discussions with our bank group to further amend our covenants to provide additional headroom for the company as we adjust our cost structure and debt levels to current market realities.*

522.    Sandifer also delivered prepared remarks on FMC's cash flow generation and outlook, stating:

FMC generated free cash flow of $32 million in Q3 down from $360 million in the prior year period. Cash from operations declined $316 million, with lower EBITDA and *substantially lower payables as we adjust our operations to match current demand*.

\*\*\*

Year-to-date cash flow through September 30 was negative $790 million, $651 million lower than the prior year period. *Nearly all of the reduction stems from lower cash from operations, which was down substantially due to lower EBITDA and lower payables.*

\*\*\*

We've reduced our free cash flow guidance for 2023 to negative $750 million at the midpoint, down from breakeven in our previous guidance. *The reduction in full year cash flow outlook is a direct result of lower-than-expected second half EBITDA and the impact of reduced volumes on working capital*.

523.    In response to FMC's disclosures on October 30 and 31, 2023, signaling significant FCF constraints driven by lower volumes, revenues, and receivables, which also drove the Company to renegotiate its debt covenants, the price of FMC common stock declined $4.76 per share, over 8%, from its closing price of $57.96 per share on October 30, 2023, to close at $53.20 per share on October 31, 2023.

524.    Media reports generated during the trading day on October 31, 2023 immediately connected the decline in the price of FMC common stock that day to the new information concerning the Company's FCF constraints revealed in FMC's October 30, 2023 press release and during its October 31, 2023 earnings call. For example, in an article published at 11:19 a.m., Bloomberg reported:

> ***FMC drops as much as 9.5% to its lowest intraday level in a week after cutting its adjusted earnings per share forecast for the year to a level below analyst estimates. Analysts see weak cash flows over the next year and note that third-quarter results met expectations, which were recently lowered.***

525.    Analyst reports issued after the Company's October 31, 2023 earnings call also remarked on the surprising negative FCF outlook, which necessitated temporary debt covenant relief, and how those concerns drove FMC's stock price decline on October 31, 2023. In this regard, Morningstar reported "***FMC's shares were down 9% at the time of writing. The market reacted negatively to management's outlook for free cash flow in 2023 and FMC having to negotiate temporary debt covenant relief.***" Also on October 31, Wells Fargo issued a report noting that "FMC's revised FCF guidance of -$640MM to -$860MM is significantly below prior guidance, reflecting the impact of lower expected EBITDA." Wells Fargo further stated that "[a]s a result of the significant negative FCF in 2023, FMC's balance sheet is materially weaker, with leverage now up as net debt to EBITDA was 3.3x as of Sept. 30."

526.    Analysts continued to issue reports on November 1, 2023, with BNP Paribas releasing a report entitled "A long road to build credibility." Among other things, this report stated:

> On top of last week's warning showing further worsening of an unprecedented destocking, Q3 details ***yesterday only added bad news, with working capital compounding the profit step-down, leading to a negative free cash flow guided around $740 million for the year and total working capital to sales ratio we see topping 70%.***

527.    In its November 1, 2023 report, entitled "Trimming PO further as FCF is the next shoe to drop; reiterate Neutral," BofA Global Research similarly stated:

> ***Free cash flow is the next negative surprise[.]*** While revenues/EBITDA were in line with FMC's recent preannouncement, ***there were several additional negative surprises in the Q3 results. The first on is the updated free cash flow outlook . . . the FCF outlook has been reduced by $750mn, an unexpected and elevated drop.***

(first emphasis in original).

528.    In its November 1, 2023 report, J.P. Morgan raised questions about FMC's consistent claims that it could not have anticipated the level of destocking activity that negatively impacted its financial results and FCF:

> Could the sharp de-stocking in the agricultural sector have been foreseen? FMC contended on its [October 31] conference call that the destocking was unforeseen because crop chemical inventories were held by growers.
>
> ***
>
> ***The issue of inventory reduction in crop chemicals seems like a business problem where the mosaic could have been put together.***

529.    As set forth in the table below, the disclosure of the relevant truth and/or materialization of the risks concealed by Defendants' fraud directly and proximately caused declines in the price of FMC common stock on the dates in question by removing the artificial inflation in the price of FMC common stock created and maintained by Defendants' fraud.

**Table 6: Dates and Stock Price Reactions for Corrective Events**

| Date of Corrective Event[4] | Closing Stock Price After Disclosure | Common Stock Price Change[5] | Common Stock % Change[6] | Trading Volume |
|---|---|---|---|---|
| 5/1/23-5/2/23 (5/2/23) | $116.42 | -$7.34 | 5.93% | 3,243,300 |
| 7/10/23 (7/10/23) | $92.63 | -$11.62 | 11.15% | 8,312,700 |
| 9/7/23 (9/7/23) | $76.10 | -$6.09 | 7.41% | 7,138,500 |
| 10/23/23 (10/23 & 10/24/23 | $56.11 | -$10.84 | 16.19% | 12,625,300[7] |
| 10/30/23-10/31/23 (10/31/23) | $53.20 | -$4.76 | 8.21% | 3,714,900 |

530.    Throughout the disclosure period, Defendants mitigated the price declines of FMC common stock by making additional false assurances concerning the alleged fraud, as alleged herein.

531.    It was entirely foreseeable that Defendants' materially false or misleading statements and omissions of material fact alleged herein would artificially inflate and/or maintain the price of FMC common stock at artificially inflated levels. It was also foreseeable to Defendants

---

[4] The date(s) in parentheses refer to the date(s) of the stock price decline resulting from the alleged corrective event, for which the Trading Volume is recorded in the column so-labeled.

[5] This column records the decline in the price of FMC common stock as measured from the closing price before the corrective event and the price at the close of trading after the stock price decline resulting from the corrective event.

[6] This column records the percentage of the price decline resulting from the corrective event.

[7] This is the combined trading volume for October 23 and October 24, 2023.

that the disclosures of the previously misrepresented and/or concealed facts and materializations of the previously concealed risks would cause the price of the Company's common stock to fall as the artificial inflation caused or maintained by Defendants' misstatements and omissions was removed. Thus, the stock price declines alleged above were directly and proximately caused by Defendants' materially false or misleading statements and omissions of material fact during the Class Period.

## XII.    CLASS ACTION ALLEGATIONS

532.    Plaintiffs bring this action on their own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on their own behalf and on behalf of a class consisting of all persons and entities who purchased or otherwise acquired FMC common stock during the period, from February 9, 2022 through and including October 30, 2023, and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of FMC or any of FMC's subsidiaries or affiliates, members of FMC's Board of Directors, and members of the immediate families of each of the foregoing (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii))); (iii) any of the foregoing individuals' and entities' legal representatives, heirs, successors, or assigns; and (iv) any entity in which any Defendant has a controlling interest.

533.    The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, FMC had more than 124,758,887 shares of common stock outstanding and actively trading on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery and procedure, Plaintiffs believe that the proposed Class numbers at least in the thousands and is geographically widely dispersed. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency

of this action by mail, using a form of notice similar to that customarily used in securities class actions.

534.    Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and all other members of the Class purchased or otherwise acquired shares of FMC common stock during the Class Period and were similarly affected by Defendants' alleged conduct in violation of the Exchange Act as complained of herein. Plaintiffs have no interests that are adverse or antagonistic to the interests of other Class members.

535.    Plaintiffs will fairly and adequately protect the interests of the other members of the Class. Plaintiffs have retained counsel competent and experienced in class and securities litigation.

536.    There is a well-defined community of interest in the questions of law and fact that this action presents. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class, which predominate over any questions solely affecting individual members of the Class, include:

(i)      whether Defendants violated the federal securities laws by their acts and omissions, as alleged herein;

(ii)     whether Defendants' statements to the investing public during the Class Period misrepresented and/or omitted material facts;

(iii)    whether and to what extent the market price of FMC's common stock was artificially inflated and/or distorted during the Class Period due to the material misrepresentations and/or omissions alleged herein;

(iv)     whether Defendants named under Section 10(b) of the Exchange Act knew or recklessly disregarded that their statements were materially false or misleading, thus acting with the requisite level of scienter;

(v)      whether reliance may be presumed pursuant to the fraud-on-the-market doctrine and/or the *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972) presumption;

(vi)     whether the members of the Class have sustained damages as a result of the

conduct complained of herein and, if so, the proper measure of damages; and

    (vii)    whether the Individual Defendants were controlling persons of the Company.

A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in managing this action as a class action.

## XIII.   THE FRAUD ON THE MARKET PRESUMPTION APPLIES

537.   Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things, during the Class Period:

    (i)    Defendants made public material misrepresentations and/or failed to disclose material facts;

    (ii)    The misrepresentations and omissions were material;

    (iii)    FMC's common stock traded in an efficient market;

    (iv)    The misstatements alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

    (v)    Without knowing the misrepresented and/or omitted facts, Plaintiffs and the other members of the Class purchased or otherwise acquired FMC common stock between the time that Defendants misrepresented and/or failed to disclose material facts and the time that the true facts were disclosed.

538.   At all relevant times, the market for FMC common stock was efficient for the following reasons, among others:

    (i)    FMC's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

    (ii)    As a registered and regulated issuer of securities, FMC filed periodic public reports with the SEC and the NYSE, in addition to the Company's frequent voluntary public dissemination of information;

    (iii)    FMC regularly and publicly communicated with investors via established

market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(iv)    FMC was followed by multiple securities analysts employed by major brokerage firms who wrote reports, which were distributed to those firms' respective sales forces and to certain customers of their respective brokerage firms, and which were. Each of these reports was publicly available and entered the public marketplace.

539.    As a result of the foregoing, the market for FMC common stock promptly digested current information regarding FMC from all publicly available sources and reflected such information in the price of FMC's stock. Under these circumstances, those who purchased or acquired FMC common stock at artificially inflated prices suffered similar injury through their transactions and a presumption of reliance applies.

540.    Further, at all relevant times, Plaintiffs and other members of the putative Class reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings. Plaintiffs and the other members of the Class would not have purchased or otherwise acquired FMC common stock at artificially inflated prices if Defendants had disclosed all material information, as required. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Plaintiffs and other members of the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

## XIV.   CAUSES OF ACTION

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against FMC and the Individual Defendants

541.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

542.    Plaintiffs assert this Count on behalf of themselves and all other members of the Class against FMC and the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

543.    As alleged herein, throughout the Class Period, FMC and the Individual Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme, and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

544.    FMC and the Individual Defendants intended to and did, as alleged herein: (i) deceive the investing public, including Plaintiffs and the other members of the Class; (ii) artificially inflate the price of FMC common stock and maintain the Company's common stock price at artificially inflated prices; and (iii) cause Plaintiffs and the other members of the Class to purchase or otherwise acquire the Company's common stock at artificially inflated prices.

545.    The Individual Defendants were individually and collectively responsible for making the materially false and misleading statements and omissions alleged herein. FMC and the Individual Defendants engaged in a plan, scheme, and course of conduct designed to deceive Plaintiffs and the other members of the Class, by virtue of making public statements and preparing, approving, signing, and/or disseminating documents that contained false statements of material fact and/or omitted material facts necessary to make the statements therein not misleading.

546.    As set forth above, FMC and the Individual Defendants made the materially false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful

deceit and fraud upon Plaintiffs and the other members of the Class who purchased or otherwise acquired the Company's common stock during the Class Period.

547.    In ignorance of the materially false and misleading nature of FMC's and the Individual Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for FMC's common stock, Plaintiffs and the other members of the Class purchased or otherwise acquired the Company's common stock at artificially inflated prices during the Class Period.

548.    FMC's and the Individual Defendants' wrongful conduct, as alleged above, directly and proximately caused the damages that Plaintiffs and the other Class members suffered. But for FMC's and the Individual Defendants' wrongful conduct, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired the Company's common stock at the artificially inflated prices that they paid. It was foreseeable to FMC and the Individual Defendants that misrepresenting and concealing material facts from the public would artificially inflate the price of FMC common stock, and that the ultimate disclosure of the misrepresented and concealed information, or the materialization of the risks that FMC and the Individual Defendants concealed in their materially false or misleading statements, would cause the price of FMC common stock to decline.

549.    As alleged herein, when the true facts were subsequently disclosed, or the risks concealed by FMC and the Individual Defendants' public statements materialized, the price of FMC's common stock declined precipitously, and Plaintiffs and other Class members were harmed and damaged as a direct and proximate result of their purchases and/or acquisitions of the Company's common stock at artificially inflated prices.

550. By virtue of the foregoing, FMC and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

551. This claim is timely within the applicable statute of limitations and repose.

<u>**COUNT II**</u>
**For Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

552. Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

553. Plaintiffs assert this Count on behalf of themselves and all other members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

554. The Individual Defendants, Douglas and Sandifer, acted as controlling persons of FMC within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

555. By reason of their high-level positions of control and authority as FMC's most senior officers, Defendants Douglas and Sandifer had the authority to influence and control, and did influence and control, the day-to-day decision-making and activities of FMC and its employees, and to cause FMC to engage in the wrongful conduct complained of herein. The Individual Defendants were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by FMC during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

556. The Individual Defendants communicated with investors or the public on behalf of FMC during the Class Period. Defendants Douglas and Sandifer were provided with, or had unlimited access to, copies of the Company's press releases, public filings, and other statements alleged by Plaintiffs to be materially false or misleading prior to and/or shortly after these

statements were made and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. Therefore, Defendants Douglas and Sandifer were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by FMC during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

557.    FMC violated Section 10(b) of the Exchange Act by virtue of the acts and omissions of its top executives, including Defendants Douglas and Sandifer, as alleged in this Complaint.

558.    By virtue of their positions as controlling persons of FMC, and as a result of their own aforementioned conduct, Defendants Douglas and Sandifer are liable pursuant to Section 20(a) of the Exchange Act to Plaintiffs and the other members of the Class who purchased or otherwise acquired FMC common stock during the Class Period. As detailed above, during all relevant times, Douglas was the CEO of FMC, and Sandifer was the CFO of FMC.

559.    As a direct and proximate result of the Individual Defendants' conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases or acquisitions of FMC common stock.

560.    This claim is timely within the applicable statutes of limitations and repose.

## XV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment as follows:

561.    Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiffs as class representatives, and appointing Kessler Topaz Meltzer & Check, LLP as class counsel pursuant to Rule 23(g);

562.    Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial together with prejudgment interest thereon;

563.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

564.     Granting such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: July 17, 2024                              Respectfully submitted,


                                                   _s/ Joshua E. D'Ancona_
                                                   Joshua E. D'Ancona (PA #206438)
                                                   **KESSLER TOPAZ MELTZER
                                                    & CHECK, LLP**
                                                   Johnston de. F. Whitman, Jr. (PA#207914)
                                                   David A. Bocian (PA #315542)
                                                   Margaret E. Mazzeo (PA #312075)
                                                   Vanessa M. Milan (PA #329312)
                                                   280 King of Prussia Road
                                                   Radnor, PA 19087
                                                   Telephone: (610) 667-7706
                                                   Facsimile: (610) 667-7056
                                                   jdancona@ktmc.com
                                                   jwhitman@ktmc.com
                                                   dbocian@ktmc.com
                                                   mmazzeo@ktmc.com
                                                   vmilan@ktmc.com

                                                   *Counsel for Ruth Asset Management and Lead
                                                   Counsel for the Class*


                                                   **BLEICHMAR FONTI & AULD LLP**
                                                   Javier Bleichmar
                                                   Thayne Stoddard
                                                   300 Park Ave, Suite 1301
                                                   New York, New York 10022
                                                   Telephone: (212) 789-1340
                                                   Facsimile: (212) 205-3960
                                                   jbleichmar@bfalaw.com
                                                   tstoddard@bfalaw.com

                                                   -and-

185

Nancy A. Kulesa
George N. Bauer
75 Virginia Road
White Plains, New York 10603
Telephone: (914) 265-2991
Facsimile: (212) 205-3960
nkulesa@bfalaw.com
gbauer@bfalaw.com

*Counsel for Additional Plaintiff Oklahoma*
*Firefighters Pension and Retirement System*

## CERTIFICATE OF SERVICE

I, Joshua E. D'Ancona, hereby certify that on July 17, 2024, I caused a true and correct copy of the foregoing Amended Complaint for Violations of the Federal Securities Laws to be filed electronically with the Clerk of the Court using the ECF system, and it is available for viewing and downloading from the ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

 s/ Joshua E. D'Ancona
Joshua E. D'Ancona (PA #206438)
**KESSLER TOPAZ MELTZER**
 **& CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
jdancona@ktmc.com

*Counsel for Ruth Asset Management and Lead Counsel for the Class*