**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| *IN RE* **FMC CORPORATION SECURITIES LITIGATION** | No. 2:23-CV-4398-KNS |
| **This Document Applies to:** | CLASS ACTION |
| **ALL ACTIONS** | ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

**TABLE OF CONTENTS**

PAGE

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND .................................................................................................... 3

    A.    FMC and Its Business ............................................................................................ 3

    B.    Allegations Regarding Demand for FMC Products............................................... 3

    C.    FMC's Robust Risk Disclosures Concerning Product Demand .............................. 4

    D.    Alleged "Corrective" Disclosures......................................................................... 6

APPLICABLE LEGAL STANDARDS ..................................................................................... 7

ARGUMENT ............................................................................................................................. 8

    I.    PLAINTIFFS FAIL TO ALLEGE A FALSE OR MISLEADING STATEMENT ........... 8

    A.    Plaintiffs Fail to Allege that Statements Concerning  Demand and Channel Inventory Were False or Misleading....................................................................... 9

    B.    Plaintiffs Fail to Allege that Statements Concerning Generic Competition, Patent Protection Efforts, and Patent Litigation Were False or Misleading ........................ 15

    C.    Plaintiffs Fail to Allege that FMC Concealed Industry Consolidation........................ 21

    D.    Defendants' Alleged Misstatements Are Not Actionable as a Matter of Law ............. 21

    E.    Plaintiffs' Item 303 Claim Is Meritless.......................................................................... 24

    II.    THE COMPLAINT FAILS TO PLEAD FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER ........................................................................................ 25

    A.    Plaintiffs Do Not Attempt to Plead Defendants Were Motivated to Defraud .............. 26

    B.    Plaintiffs' Allegations Concerning Access to Information and General Knowledge About Demand Are Legally Insufficient............................................................... 26

    C.    Plaintiffs' Remaining, Scattershot Attempts to Plead Scienter Fail ............................ 29

    III.    PLAINTIFFS FAIL TO PLEAD "CONTROLLING PERSON" LIABILITY ............ 30

CONCLUSION.............................................................................................................................. 30

**TABLE OF AUTHORITIES**

PAGE

*In re Adolor Corp. Sec. Litig.*,
616 F. Supp. 2d 551 (E.D. Pa. 2009) .............................................................. 14, 26

*In re Aetna Sec. Litig.*,
617 F.3d 272 (3d Cir. 2010) ................................................................................ 24

*Alberici v. Recro Pharm., Inc.*,
No. 18-2279, 2020 WL 806719 (E.D. Pa. Feb. 14, 2020) ...................................... 28

*In re Alpharma Sec. Litig.*,
372 F.3d 137 (3d Cir. 2004) ................................................................................ 26

*In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*,
413 F. Supp. 2d 378 (E.D. Pa. 2005) .......................................................... 12–13, 18

*In re Amarin Corp. PLC Sec. Litig.*,
No. 21-2071, 2022 WL 2128560 (3d Cir. June 14, 2022) ............................ 10, 15–16, 19, 20

*In re Anadigics, Inc., Sec. Litig.*,
No. 08-5572, 2011 WL 4594845 (D.N.J. Sept. 30, 2011) ...................................... 24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................... 7

*In re Astea Int'l Inc. Sec. Litig.*,
No. 06-1467, 2007 WL 2306586 (E.D. Pa. Aug. 9, 2007) ...................................... 30

*Baer v. Shift4 Payments, Inc.*,
No. 23-3206, 2024 WL 3836676 (E.D. Pa. Aug. 14, 2024) .................................... 23

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................... 7

*Bldg. Trades United Pension Tr. Fund v. Kenexa Corp.*,
No. 09-2642, 2010 WL 3749459 (E.D. Pa. Sept. 27, 2010) .................................. 22

*Buck v. Hampton Twp. Sch. Dist.*,
452 F.3d 256 (3d Cir. 2006) ................................................................................ 3

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997) ............................................................................... 7

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004) ...................................................... 11, 12, 17–18, 26, 27, 29

*City of Edinburgh Council v. Pfizer, Inc.*,

ii

754 F.3d 159 (3d Cir. 2014) ............................................................................... 8

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
    713 F. Supp. 2d 378 (D. Del. 2009) ................................................... 26–27, 29

*In re Coca-Cola Enters. Inc. Sec. Litig.*,
    510 F. Supp. 2d 1187 (N.D. Ga. 2007) ...................................................... 14

*Fan v. StoneMor Partners L.P.*,
    927 F.3d 710 (3d Cir. 2019) ....................................... 8, 10, 15–16, 19, 20

*In re Galena Biopharma, Inc. Sec. Litig.*,
    336 F. Supp. 3d 378 (D.N.J. 2018) ............................................................. 9

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
    No. 13-7050, 2015 WL 4469143 (D.N.J. July 22, 2015) ............................ 24

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
    No. 13-7050, 2017 WL 1536223 (D.N.J. Apr. 27, 2017) ............................ 22

*In re Hertz Glob. Holdings, Inc.*,
    905 F.3d 106 (3d Cir. 2018) ....................................................................... 30

*Institutional Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) ................................................................. 23–24

*In re Intelligroup Sec. Litig.*,
    527 F. Supp. 2d 262 (D.N.J. 2007) ....................................... 12, 14, 27–28, 29, 30

*Kenneth v. Yeung Chi Shing Holding (Del.), Inc.*,
    No. 18-07644, 2020 WL 409010 (N.D. Cal. Jan. 24, 2020) ...................... 21

*Lichtenstein v. Cader*,
    No. 13-2690, 2013 WL 4774717 (S.D.N.Y. Sept. 6, 2013) ...................... 21

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
    601 U.S. 257 (2024) .................................................................................... 25

*Messner v. U.S. Techs., Inc.*,
    No. 15-5427, 2016 WL 1466543 (E.D. Pa. Apr. 13, 2016) ...................... 30

*In re NAHC, Inc. Sec. Litig.*,
    306 F.3d 1314 (3d Cir. 2002) ..................................................................... 11

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp., Inc.*,
    720 F. Supp. 2d 517 (D.N.J. 2010) .............................................. 26, 28, 29

*In re Nice Sys., Ltd. Sec. Litig.*,
    135 F. Supp. 2d 551 (D.N.J. 2001) ............................................................ 11

*Nikolov v. Livent Corp.*,
    470 F. Supp. 3d 461 (E.D. Pa. 2020) ...................................................................... 25

*In re NutriSystem, Inc. Sec. Litig.*,
    653 F. Supp. 2d 563 (E.D. Pa. 2009) ...................................................................... 24

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) ................................................................................................ 16

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000) ...................................................................................... 3

*Ortiz v. Canopy Growth Corp.*,
    537 F. Supp. 3d 621 (D.N.J. 2021) .......................................................................... 26

*Pamcah-UA Local 675 Pension Fund v. BT Grp. PLC*,
    No. 20-2106, 2021 WL 3415060 (3d Cir. Aug. 5, 2021) ........................................ 25

*In re Progress Energy, Inc. Sec. Litig.*,
    371 F. Supp. 2d 548 (S.D.N.Y. 2005) ............................................................... 19, 20

*In re Radian Sec. Litig.*,
    612 F. Supp. 2d 594 (E.D. Pa. 2009) .................................................................. 25, 27

*Rahman v. Kid Brands, Inc.*,
    736 F.3d 237 (3d Cir. 2013) .......................................................................... 12, 26, 28

*Rescue Mission of El Paso, Inc. v. K-Sea Transp. Partners L.P.*,
    No. 12-0509, 2013 WL 3087078 (D.N.J. June 14, 2013) ....................................... 11

*SLF Holdings, L.L.C. v. Uniti Fiber Holdings, Inc.*,
    499 F. Supp. 3d 49 (D. Del. 2020) .......................................................................... 16

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006) ..................................................................................... 29

*In re Synchronoss Sec. Litig.*,
    705 F. Supp. 2d 367 (D.N.J. 2010) .......................................................................... 11

*Teamsters Local 456 Pension Fund v. Universal Health Servs.*,
    396 F. Supp. 3d 413 (E.D. Pa. 2019) ................................................................. 28, 29

*Tracinda Corp. v. DaimlerChrysler AG*,
    197 F. Supp. 2d 42 (D. Del. 2002) .......................................................................... 14

*Underland v. Alter*,
    No. 10-3621, 2011 WL 4017908 (E.D. Pa. Sept. 9, 2011) ..................................... 22

*Utesch v. Lannett Co., Inc.*,
    316 F. Supp. 3d 895 (E.D. Pa. 2018) ............................................................. 10, 12, 28

*Williams v. Globus Med., Inc.*,
  869 F.3d 235 (3d Cir. 2017) ........................................................................ 24

*In re Wilmington Tr. Sec. Litig.*,
  852 F. Supp. 2d 477 (D. Del. 2012) ............................................................ 9

*Winer Family Tr. v. Queen*,
  503 F.3d 319 (3d Cir. 2007) ......................................................................... 8

### STATUTES & RULES

15 U.S.C. § 78u-4 .............................................................................. 8, 25

Fed. R. Civ. P. 9 ................................................................................. 1, 7

Fed. R. Civ. P. 12 ............................................................................... 1, 7

\*\*\*

**Note on Citation Format**: Unless otherwise noted, emphasis has been added to quotations, and internal quotations, brackets, citations, and footnotes have been omitted.  References to Ex.__ correspond to the exhibits attached to the Declaration of Dana M. Seshens, filed contemporaneously herewith.  References to page numbers within exhibits correspond to the PDF page number of the document, excluding the exhibit cover page, except that references to page numbers for excerpted exhibits correspond to the actual page number on the document itself.

Defendants FMC Corporation ("FMC"), Mark A. Douglas, and Andrew D. Sandifer (Mr. Douglas and Mr. Sandifer, together, the "Individual Defendants," and with FMC, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss Plaintiffs' Amended Complaint ("Complaint" or "AC") (ECF No. 30) pursuant to Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

Long on words, but short on plausible or particularized allegations, Plaintiffs' Complaint fails to plead any cognizable claim under the federal securities laws. Notwithstanding its 564 paragraphs, spanning nearly 200 pages, and its reliance on 19 anonymous former employee witnesses, the Complaint fails to adequately allege any statement that was purportedly false or misleading at the time it was made. Nor does it plead any facts, let alone with the requisite particularity, that give rise to a strong inference that any Defendant acted with fraudulent intent. Instead, the Complaint attempts impermissibly to plead "fraud by hindsight." Plaintiffs seek to hold Defendants liable for allegedly concealing that demand for FMC's products was declining as a result of customers' high inventories in the wake of a so-called "purchasing surge" during the COVID-19 pandemic—ignoring that Defendants *did* disclose heightened inventories as early as February 2023. Plaintiffs fail to plead any plausible basis to infer that FMC could or should have disclosed a decline in demand sooner than it did. Simply because FMC's stock price dropped when adverse business information was later disclosed does not mean Defendants engaged in securities fraud. They did not.

Plaintiffs assert claims primarily under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, which impose liability for fraud in connection with the purchase or sale of a security. Plaintiffs' claims are subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the latter of which requires that a securities plaintiff plead the elements

1

of its claim, including scienter, with particularity; vague, conclusory, and speculative allegations (no matter how numerous) do not suffice.  Plaintiffs fail to carry their burden here.

*First*, Plaintiffs fail to plead a material misstatement or omission.  The crux of Plaintiffs' Complaint is that Defendants did not adequately disclose rising inventories in distribution channels, which, in turn, they claim caused a decline in demand.  But, as noted, Plaintiffs fail to account for FMC's disclosure of rising inventories and declining demand beginning at its Q4 2022 earnings call in February 2023 and for months thereafter, and Plaintiffs do not plausibly allege any basis to infer that Defendants knew about or should have disclosed that information sooner.  Plaintiffs also contend that Defendants failed to adequately disclose various factors that purportedly affected demand, including the extent of generic competition, the expiration of key patents, certain adverse litigation rulings, and industry consolidation.  But, again, FMC disclosed such issues and events throughout the Class Period.  Finally, Plaintiffs challenge statements that are not actionable as a matter of law—either because they are statements of corporate optimism or "puffery" (e.g., regarding "strong demand" for FMC's products), statements of opinion or belief, and/or forward-looking statements protected by the PSLRA's "safe harbor."

*Second*, Plaintiffs' claims fail for the additional and independent reason that they do not plead facts giving rise to a "strong inference" of scienter.  Notably, Plaintiffs do not even attempt to plead that any Individual Defendant had a motive to deceive investors.  Nor do they allege that any of the numerous anonymous former employee witnesses on whom they rely had any direct or regular access to the Individual Defendants, let alone any reasonable basis to speak to the Individual Defendants' state of mind.  Instead, Plaintiffs offer a hodgepodge of disconnected scienter allegations of the kind routinely rejected in this Circuit, including vague allegations that the Individual Defendants had access to FMC's inventory-related information, that they

addressed inventory issues at conferences and on earnings calls, and that FMC's Diamides business was core to its financial performance. These allegations are fatally deficient.

For these reasons and the reasons set forth herein, Defendants respectfully request that the Court dismiss Plaintiffs' Complaint with prejudice.

## FACTUAL BACKGROUND[1]

### A.  FMC and Its Business

FMC is a Philadelphia-based agricultural sciences company. It develops, manufactures, and sells crop protection products that are used by farmers in 120 countries. Ex. 2 (2022 10-K) at 4; *see also* AC ¶ 54. FMC's product portfolio consists of herbicides, fungicides, and insecticides, including two diamide-class molecules, Rynaxypyr and Cyazypyr (the "Diamides"). Ex. 2 (2022 10-K) at 7, 8; *see also* AC ¶ 54. FMC maintains numerous United States and foreign patents which "cover many aspects of [its] business," including "chemical and biological active ingredients" and "manufacturing processes to produce such active ingredients." Ex. 2 (2022 10-K) at 9; *see also* AC ¶ 75. FMC distributes its products in the various geographic areas in which it operates primarily through networks of retailers, distributors, and co-ops that sell FMC's products to their own customers. Ex. 2 (2022 10-K) at 7; *see also* AC ¶ 54.

Mr. Sandifer is FMC's CFO, and Mr. Douglas was FMC's CEO and President during the alleged Class Period (Feb. 9, 2022 to Oct. 30, 2023). *See* AC at 1, ¶¶ 32–33.

### B.  Allegations Regarding Demand for FMC Products

Plaintiffs allege that, prior to the Class Period, during the COVID-19 pandemic, demand for FMC's products was at an all-time high in response to customer fears of "supply chain

---

[1] This section is drawn from the factual allegations in Plaintiffs' Complaint, which are assumed to be true solely for purposes of this motion, and from documents relied upon or integral to the Complaint, or incorporated therein by reference, and such other materials—including FMC's securities filings—of which the Court may take judicial notice and consider on a motion to dismiss. *See Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006); *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000).

disruptions." *Id*. ¶ 13.  According to Plaintiffs, however, FMC failed to disclose that this "pandemic-fueled" behavior resulted in "full inventory channels," allegedly leading FMC to undertake desperate measures to "maintain volumes" during the Class Period amid customer destocking and declining demand.  *See, e.g.*, *id*. ¶¶ 13, 288, 334, 354.  Plaintiffs also claim that, while the Diamides had been FMC's "flagship products and principal revenue driver" prior to the Class Period, FMC failed to disclose the "steady encroachment of low priced generic versions" of the Diamides and "conceal[ed]" patent-related "legal losses" in India, China, and Brazil, all of which allegedly also harmed demand.  *See, e.g.*, *id*. ¶¶ 1, 3, 288, 334, 354.  Finally, Plaintiffs claim that FMC supposedly failed to disclose increasing "consolidation among retailers and distributors" in "2022 and after," which allegedly affected demand and revenue by "shrinking the number of distributors [FMC] could sell to."  *See, e.g.*, *id.* ¶¶ 1, 288, 334, 354.

**C.  FMC's Robust Risk Disclosures Concerning Product Demand**

During the Class Period, FMC repeatedly disclosed that it faced risks related to customer demand and also made clear—contrary to Plaintiffs' meritless allegations—that some of those risks had already come to fruition.  These included risks arising from the COVID-19 pandemic, risks related to generic competition, and risks related to industry consolidation:

- **COVID-Related Impacts on Demand:**  FMC disclosed that it may "experience disruption caused by COVID in . . . pockets of demand," Ex. 3 (2020 10-K) at 13; Ex. 4 (2021 10-K) at 14, and that the "potentially adverse" "direct and indirect economic effects" of the pandemic were "uncertain and cannot be predicted with confidence."  *See* Ex. 3 (2020 10-K) at 22; Ex. 4 (2021 10-K) at 14, 22; Ex. 2 (2022 10-K) at 15, 23.

- **Variability of Demand:**  FMC disclosed that numerous factors could impact product demand, including "[c]limate change" and "changes in distribution channels," which could impact results by "impact[ing] [FMC's] ability to access the market."  *See* Ex. 3 (2020 10-K) at 13, 16; Ex. 4 (2021 10-K) at 13, 16; Ex. 2 (2022 10-K) at 14, 17.

- **Increased Competition from Generic Products:**  FMC disclosed that it "faces competition" from generics, that "[i]ncreased generic presence in agricultural chemical markets . . . has been driven by the number of significant product patents and product

data protections that have expired in the last decade," a "trend [] expected to continue." *See* Ex. 3 (2020 10-K) at 12; Ex. 4 (2021 10-K) at 12; Ex. 2 (2022 10-K) at 13.

- **Expiration of Rynaxypyr Composition of Matter Patents:**  FMC disclosed at various points in time that its "composition of matter patents on our Rynaxypyr® active ingredient is nearing its expiration in several key countries," *see* Ex. 3 (2020 10-K) at 15; Ex. 4 (2021 10-K) at 15, or was "expiring" or had "expired," in certain markets, *see* Ex. 5 (Q3 2022 10-Q) at 67; Ex. 2 (2022 10-K) at 10, 16.

- **Risk of Losing Litigation to Enforce IP Against Infringing Products**:  FMC acknowledged that "[o]ther third parties may seek to enter markets with infringing products or may find alternative production methods that avoid infringement or we may not be successful in litigating to enforce our patents" due to litigation risks.  *See* Ex. 3 (2020 10-K) at 15; Ex. 4 (2021 10-K) at 16; Ex. 2 (2022 10-K) at 16.  FMC added that its patents "may be deemed unenforceable, invalidated or circumvented," that it is "currently and may in the future be a party to" patent-related "lawsuits or administrative proceedings," and that because "patents involve complex factual and legal issues," "the validity or enforceability of any patent claims . . . cannot be clearly predicted."  *See* Ex. 3 (2020 10-K) at 15; Ex. 4 (2021 10-K) at 16; Ex. 2 (2022 10-K) at 16.

- **Chinese Patent Review Board Proceedings and Decisions:**  In its 2021 Annual Report, FMC disclosed that "[i]n early 2022, [it] received notice that certain third parties [were] seeking to invalidate [its] Chinese patents on a certain intermediate involved in producing" one of its Diamide products.  *See* Ex. 4 (2021 10-K) at 10.  In its Q3 2022 10-Q and 2022 Annual Report, FMC disclosed that "[d]uring the third quarter of 2022, the China Patent Review Board issued rulings" invalidating these patents in China, that it had "appeal[ed]," and that "the patents remain[ed] valid but [] not enforceable pending appeal."  *See* Ex. 5 (Q3 2022 10-Q) at 67; Ex. 2 (2022 10-K) at 10.

- **Risk of Negative Impacts from Adverse Patent Expiration or Enforcement Developments:**  FMC disclosed that its "future performance" would depend on "effective enforcement of our patents that continue to cover key chemical intermediates and process patents, as well as portfolio life cycle management, particularly for our high value diamide insecticides."  *See* Ex. 3 (2020 10-K) at 15; Ex. 4 (2021 10-K) at 15; Ex. 2 (2022 10-K) at 16.  It also warned that generic competition "could affect our ability to maintain or raise prices, successfully enter certain markets or retain our market position" and that "an adverse patent enforcement decision" could permit entry of generic competitors and harm results.  *See* Ex. 3 (2020 10-K) at 12, 15; Ex. 4 (2021 10-K) at 12, 16; Ex. 2 (2022 10-K) at 13, 16.

- **Market Access Risks from Changes in Distribution Channels:**  FMC disclosed that "changes in distribution channels," including "consolidation of the value chain" and "acquisition of retailers and wholesalers" could "limit FMC's access in certain markets," "restrict [its] distribution footprint," and impact its results.  *See* Ex. 2 (2022 10-K) at 17; *see also* Ex. 3 (2020 10-K) at 16 (also noting "changes in distribution channels" could "impact [FMC's] ability to access the market"); Ex. 4 (2021 10-K) at 16 (same).

In every earnings release, earnings call, and quarterly report throughout the Class Period, FMC expressly referenced relevant risk disclosures and/or expressly directed investors to them.[2]

During the period Plaintiffs allege that high channel inventories caused destocking—beginning late 2022 or early 2023, *see* AC ¶¶ 142. 144—FMC also disclosed such developments:

- In FMC's Q4 2022 earnings call, Mr. Douglas flagged "elevated" or "high" channel inventories in Brazil, Argentina, southern Europe, and India "which we'll be working through." He also noted that inventories in North America were "a "bit elevated." Ex. 17 (Q4 2022 Earnings Tr.) at 16–17.

- In FMC's Q1 2023 earnings call, Mr. Douglas disclosed that India's channel inventories remained "elevated," which FMC was continuing to "actively manage." Ex. 19 (Q1 2023 Earnings Tr.) at 5. He further disclosed that "[o]ur diamides partners are lowering their inventory levels"—i.e., destocking—in light of working capital concerns." *Id*. at 5. He later reiterated that, "on the diamides, . . . the partners that are reducing inventories, that's not just an event now[,] *that continues through the rest of the year*." *Id*. at 15.

- In FMC's Q2 2023 earnings call, the Company underscored that "destocking is expected to continue," warned that "we expect destocking headwinds," flagged "continued high channel inventory" in various markets, and noted "recent hand-to-mouth inventory management," among numerous other cautionary statements. Ex. 22 (Q2 2023 Earnings Tr.) at 5; *see also* Ex. 23 (Q2 2023 10-Q) at 40 (noting decrease in EMEA and Latin America revenue caused in part by "channel destocking").

Plaintiffs either ignore these disclosures or claim they misleadingly failed to accurately predict the future impact of the identified risks. *See* AC ¶¶ 354, 359, 388, 412–413.

D.    Alleged "Corrective" Disclosures

Plaintiffs claim that the "truth" regarding FMC's alleged fraud was "gradually revealed" over a six-month period encompassing a series of alleged partial corrective disclosures and the materialization of purportedly undisclosed risks. AC ¶¶ 467–523. The Complaint alleges that

---

[2] *See* Ex. 6 (2/8/22 8-K) at 8–9; Ex. 7 (Q4 2021 Earnings Tr.) at 4; Ex. 8 (5/2/22 8-K) at 8–9; Ex. 9 (Q1 2022 Earnings Tr.) at 4; Ex. 10 (Q1 2022 10-Q) at 50; Ex. 11 (8/2/22 8-K) at 8, Ex. 12 (Q2 2022 Earnings Tr.) at 4; Ex. 13 (Q2 2022 10-Q) at 54; Ex. 14 (11/1/22 8-K) at 7-8; Ex. 15 (Q3 2022 Earnings Tr.) at 4; Ex. 5 (Q3 2022 10-Q) at 66; Ex. 16 (2/7/23 8-K) at 8–9; Ex. 17 (Q4 2022 Earnings Tr.) at 4; Ex. 18 (5/1/23 8-K) at 10; Ex. 19 (Q1 2023 Earnings Tr.) at 4; Ex. 20 (Q1 2023 10-Q) at 50; Ex. 21 (8/2/23 8-K) at 10; Ex. 22 (Q2 2023 Earnings Tr.) at 4; Ex. 23 (Q2 2023 10-Q) at 55; Ex. 24 (10/30/23 8-K) at 7–8.

6

FMC's downward adjustments to financial guidance in May, July, and October 2023—amid the aforementioned disclosures regarding customer destocking—partially revealed the truth, causing FMC's stock price to drop. *Id*. ¶¶ 467–475, 481–83, 502–04. The Complaint also alleges that a report published on September 7, 2023 by short-seller Blue Orca Capital revealed "legal defeats that FMC had suffered in attempting to protect its Diamide patents"; "the threats posed by entry of Diamide products" in China, India, and Brazil; and additional information about FMC's purportedly dire financial state, allegedly further affecting its stock price. *Id*. ¶¶ 490–496, 498. But, according to Plaintiffs, the truth was not "fully revealed" until FMC announced Q3 2023 results at the end of October 2023 and reduced its full-year free cash flow guidance. *Id*. ¶¶ 513–517, 520–523. Plaintiffs do not allege any connection between the alleged materializations of risk and the Complaint's various omissions theories. Nor do they explain with particularity how the alleged revelations supposedly corrected prior statements, which were already contextualized by FMC's risk and other disclosures.

## APPLICABLE LEGAL STANDARDS

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege sufficient factual matter "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Because Plaintiffs' Exchange Act claims allege fraud, Plaintiffs also must satisfy Fed. R. Civ. P. 9(b)'s heightened pleading standard, which mandates that "the circumstances constituting fraud or mistake [] be stated with particularity." Fed. R. Civ. P. 9(b); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997).

A securities fraud plaintiff also must meet the exacting pleading standards of the PSLRA. This means that, first, "the complaint shall specify each statement alleged to have been

misleading [and] the reason or reasons why the statement is misleading[.]"  15 U.S.C. § 78u–4(b)(1).  Second, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id*. § 78u–4(b)(2); *see also City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 166 (3d Cir. 2014).  These heightened standards are designed to "limit abusive securities class-action suits" and thereby accomplish the "twin goals" of the PSLRA to "curb frivolous, lawyer-driven litigation, while preserving the investors' ability to recover on meritorious claims."  *Winer Family Tr. v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007).

**ARGUMENT**

To state a claim under Rule 10b-5, "a plaintiff must plead: (1) a material misrepresentation (or omission); (2) scienter (a wrongful state of mind); (3) a connection between the misstatement and the purchase or sale of a security; (4) reliance upon the misstatement; (5) economic loss; and (6) loss causation."  *Fan v. StoneMor Partners L.P.*, 927 F.3d 710, 714 (3d Cir. 2019).  Here, Plaintiffs' Complaint must be dismissed because they have failed to plead any actionable misstatement or omission or any facts that give rise to a strong inference of scienter.

**I.     PLAINTIFFS FAIL TO ALLEGE A FALSE OR MISLEADING STATEMENT**

Notwithstanding Plaintiffs' massive Complaint, they fail to allege that any statement was false or misleading ***when made***.[3]  Plaintiffs claim that Defendants' supposed misrepresentations were *all* misleading because a list of "factors"—frequently having nothing to do with a particular challenged statement—purportedly were undisclosed.  *See* AC ¶¶ 288, 334, 354 (virtually identical lists of "factors"); *see also, e.g.*, *id.* ¶¶ 296, 298, 347, 378, 388 (repeatedly referring

---

[3] *See generally* Ex. 1 (Alleged Misstatements Summary Table) (summarizing alleged misstatements, identifying where each is addressed in Defendants' Memorandum of Law, and which bases for dismissal apply).

8

back to those lists).  But a complaint that repeatedly invokes "a laundry list of reasons why a statement *could* be untrue," requiring the Court to connect the dots, is "not sufficient" under the PSLRA.  *In re Wilmington Tr. Sec. Litig.*, 852 F. Supp. 2d 477, 490 (D. Del. 2012); *see also In re Galena Biopharma, Inc. Sec. Litig.*, 336 F. Supp. 3d 378, 393–94 (D.N.J. 2018) (similar).

This threshold pleading failure is only the beginning.  While asserting alleged misstatements concerning topics ranging from demand and channel inventory to FMC's patent portfolio and efforts to protect it, Plaintiffs ignore that FMC disclosed the very risks Plaintiffs claim it concealed or that the alleged misstatements are not actionable as a matter of law.  Plaintiffs' cavalry of largely irrelevant former employee witnesses ("FEs") cannot save Plaintiffs' claims, as the FEs either must be disregarded in whole or in material part because Plaintiffs fail to plead any credible basis for the allegations they provide or the FEs at most offer vague and conclusory allegations that do not satisfy the PSLRA's heightened pleading standard.

**A.    Plaintiffs Fail to Allege that Statements Concerning Demand and Channel Inventory Were False or Misleading**

Plaintiffs claim that myriad Class Period statements, including statements concerning "strong demand" for FMC's products or a lack of concern about channel inventory levels, were false and misleading because FMC purportedly knew that demand was declining and inventory levels were high.  *See, e.g.*, AC ¶¶ 288(a)–(c), 334(a)–(c), 354(a)–(c).  But Plaintiffs fail to plead particularized factual support for any such claim.

**1.    FMC Disclosed the Risks of Which Plaintiffs Now Complain**

FMC's alleged misstatements concerning product demand and channel inventory are not actionable because FMC disclosed the very information Plaintiffs now claim was omitted.  For example, FMC disclosed that customer demand levels could vary for many reasons, including climate conditions, and that the "potential[ly] adverse" "direct and indirect economic effects" of

the pandemic were "uncertain and cannot be predicted with confidence."  Ex. 4 (2021 10-K) at

14, 22; *see also* Ex. 2 (2022 10-K) at 15, 23.  Once FMC detected rising channel inventories—an

adverse, indirect effect attributable to the pandemic, as Plaintiffs allege, *see, e.g.*, AC ¶¶ 13–14—

FMC likewise disclosed the developing situation to investors, beginning in its Q4 2022 earnings

call and continuing thereafter.  *See* Background at 6, *supra*.

Plaintiffs thus cannot meaningfully dispute that FMC *disclosed* destocking promptly

following its alleged emergence in later 2022 or early 2023.  *See, e.g.*, AC ¶ 142 (FE-7 alleging

that "*by 2023*, the bubble burst"); *id*. ¶ 144 (FE-11 alleging that retailer purchases began to

decline between "mid 2022" and "October 2022").  Where, as here, an issuer discloses the facts

allegedly concealed, no liability can follow.  *See, e.g.*, *StoneMor*, 927 F.3d at 717 (no liability

where alleged omission was in fact "readily and repeatedly disclosed"); *see also In re Amarin

Corp. PLC Sec. Litig.*, No. 21-2071, 2022 WL 2128560, at *3 (3d Cir. June 14, 2022) (no

omission where issuer "warn[s] of the exact risk the Plaintiffs argue they failed to disclose").

To the extent Plaintiffs contend that FMC should have disclosed destocking sooner, there

are no well-pled allegations that destocking had begun earlier or that FMC knew that was the

case.  At most, Plaintiffs rely on vague FE statements, *see, e.g.*, AC ¶ 136, that are entirely

insufficient.  *See, e.g.*, *Utesch v. Lannett Co., Inc.*, 316 F. Supp. 3d 895, 904 (E.D. Pa. 2018)

(discounting FE allegations that failed to give information about "where and when" alleged

events occurred).  Likewise, to the extent Plaintiffs allege that FMC's disclosures were not

sufficiently negative about FMC's prospects or that FMC's financial forecasts did not ultimately

correctly predict the effects of the decline in demand, *see generally* AC ¶¶ 104–114, that also

fails.  Putting aside that FMC's financial forecasts and predictions about destocking's impact on

FMC's business were protected forward-looking or opinion statements, *see* Sections I.D.2–3,

*infra,* FMC had no obligation to discuss its business in pessimistic terms after disclosing its developing inventory and demand issues.  *See, e.g.*, *In re Nice Sys., Ltd. Sec. Litig.*, 135 F. Supp. 2d 551, 575 (D.N.J. 2001) ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future."); *see also Rescue Mission of El Paso, Inc. v. K-Sea Transp. Partners L.P.*, No. 12-0509, 2013 WL 3087078, at *2 (D.N.J. June 14, 2013) (company disclosing declining demand indicators while expressing optimism about current quarter "under no duty to provide more dire specifics").  Nor can FMC be held liable for failing to predict the future accurately.  *In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 408 (D.N.J. 2010) (holding "securities law does not expect clairvoyance" and declining to impose liability on this theory).

In short, there can be no liability for FMC's alleged nondisclosure of rising inventories and channel destocking *after it disclosed those very occurrences*.

### 2.      FMC's Alleged Failure to Predict and Disclose Destocking Before It Occurred Is Unsupported and Not Actionable

The balance of Plaintiffs' theory is that FMC should have predicted and disclosed *prior to the Q4 2022 earnings call* that the high demand experienced during the pandemic would turn out to be "unsustainable."  AC ¶¶ 116, 117.  This theory also fails: "[F]raud cannot be inferred merely because "at one time the firm bathes itself in a favorable light but later the firm discloses that things are less than rosy."  *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 158 (3d Cir. 2004).  Rather, because "liability cannot be imposed on the basis of subsequent events," "[t]o be actionable, a statement or omission must have been misleading *at the time it was made*."  *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002).

Plaintiffs attempt to meet this burden by relying on assorted anonymous FE allegations that supposedly demonstrate that inventory channels were "saturated" and therefore FMC should have known that destocking was starting before FMC disclosed it.  But these allegations are

11

insufficient to render any statement false or misleading when made and further cannot be credited under Third Circuit law.  To rely on the anonymous statements of alleged former FMC employees, Plaintiffs must allege "(1) the time period that the confidential source worked at the defendant-company, (2) the dates on which the relevant information was acquired, and (3) the facts detailing how the source obtained access to the information."  *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 290 (D.N.J. 2007).  They also must describe each FE "with sufficient particularity to support the probability that a person in [his] position . . . would possess the information alleged."  *Chubb*, 394 F.3d at 148.  Plaintiffs do not satisfy these standards.

*First*, the anonymous FE statements are vague as to the date or even general time period discussed, instead alleging broadly that overbuying "started in approximately 2020 and lasted until 2022," AC ¶ 125 (FE-5), or was "always a problem for FMC in the 2020-2022 period," *id*. ¶ 126 (FE-3).  *See also id*. ¶¶ 118, 122, 124 (similar allegations from FE-6, FE-4, and FE-10). Such temporally unspecific allegations cannot show that any particular statement concerning destocking or inventory levels was false or misleading when made.  *See, e.g.*, *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245 (3d Cir. 2013) (discounting temporally vague FE allegations); *Utesch*, 316 F. Supp. 3d at 904 (same).

*Second*, no FE speaks to unusual demand for any particular product by any particular type of customer.  Instead, nearly all generally allege that orders for "FMC products" (or some variation thereof) from various broad categories of direct or indirect purchasers—"distributors," "retailers and farmers," "customers"—were "high" or "excessive."  *See, e.g.*, AC ¶ 143; *see also, e.g.*, *id*. ¶ 125 (alleging that FMC's customers "ordered too much product" and had "stocked up on product").  These allegations are not "sufficiently precise" to be credited and cannot be grouped together to try to overcome this pleading deficiency.  *In re Am. Bus. Fin. Servs., Inc.*

12

*Sec. Litig.*, 413 F. Supp. 2d 378, 390–92 (E.D. Pa. 2005) (rejecting assorted confidential witness allegations as insufficiently particularized to support the inference of a "fraudulent scheme").

*Third*, Plaintiffs offer no particularized allegations of customer behavior that could plausibly signal that a demand drop-off was "imminent." Some FEs discuss customer returns in 2021 (pre-Class Period), seemingly attempting to allege that the returns indicated that customers had too much product—but offer no context for the volume of returns relative to prior periods or any basis for the apparent assumption that customers returned product only when they had too much. AC ¶¶ 117, 134. Other FEs contradict each other in terms of when FMC's demand purportedly began to fall. *Compare, e.g., id.* ¶ 132 (FE-17 claiming "worldwide demand" was down "in 2021"), *with id.* ¶ 117 (FE-1 claiming "excess[ive]" orders of "huge volumes" into 2022). Yet other FEs claim sales were booked for later delivery or later payment, but again fail to allege the extent of any such incidents, whether that was inconsistent with prior periods or uncommon in the industry, or how it evidences customer oversupply. *Id.* ¶ 119. Still others report walking into warehouses where "pallets of inventory" were stacked "higher than usual," *id.* ¶¶ 143, 145, but offer no detail from which to infer the timing, extent or import of any such occurrences.

*Fourth*, many centrally featured FEs offer views on subjects about which they have no alleged basis to know. For example, the Complaint cites statements from FE-6, a manager based in the relatively small market of Pakistan, claiming that it was "apparent . . . during COVID that the downstream channels were becoming overstocked," *id.* ¶ 119, that he "kn[ew] that this issue . . . was occurring in various FMC regions, not just Pakistan," *id.* ¶ 186, and that he told "many people" that a drop-off was coming, *id.* ¶ 121. *See also id.* ¶ 118, 136. But the Complaint does not identify how FE-6 acquired this knowledge (and about what "regions") or

13

who was supposedly told.  Such statements should not be credited.  *See, e.g.*, *In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 574–75 (E.D. Pa. 2009) (rejecting confidential witness statements where witness was unlikely to be aware of information at issue).  Similarly, the Complaint relies on FE-4 for the notion that COVID-era purchasing was excessive, *see, e.g.*, AC ¶ 122, but FE-4 was an engineer, not in sales or sales forecasting, *id*. ¶ 38.  Even more remarkably, FE-18—a research scientist—faults FMC for "resisting lowering prices" when "inventory that was overbought during COVID was stockpiling over a lack of demand," *id*. ¶ 128.  But Plaintiffs do not explain how a research scientist came to have insight into real-time inventory management and pricing, much less why he would be qualified to opine about it.

*Finally*, numerous FE allegations relay subjective, hindsight opinions.  For example, FE-9 opines that ordering was "unnatural" during the pandemic, *id*. ¶ 129; FE-4 claims a drop in demand was "imminent" in spring 2022, *id*. ¶ 122; and FE-6 asserts that, in 2020, "*he expected sales numbers to drop dramatically*" in subsequent years, *id*. ¶ 121.  Absent any particularized factual explanation for *why* these FEs held these views—and there is none—these personal speculative opinions "add nothing."  *See, e.g.*, *Intelligroup*, 527 F. Supp. 2d at 360.[4]

---

[4] Plaintiffs also allege that FMC encouraged salespeople to sell, and customers to accept, unwanted product, including by raising customer credit limits to "maintain the illusion of organic growth" and "portray as sustainable the Company's impressive demand."  AC ¶ 130; *see generally id*. ¶¶ 130–145, 178–182, 187–188.  But three of the FEs on whom Plaintiffs principally rely for this theory—FE-2, FE-7, and FE-17—did not even work at FMC during the alleged Class Period.  *Id*. ¶¶ 38, 41, 51.  In any event, Plaintiffs provide no detail about FMC's sales goals, the customers who allegedly accepted unneeded product and why, or how these practices affected FMC's reported results (if at all).  Nor do Plaintiffs offer "factual allegations to support the conclusion that the incentive program was a sham" whose real purpose was to conceal declining demand.  *Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 42, 82 (D. Del. 2002) (rejecting "conclusory, non-specific" allegations that company offered incentives to "hide [its] deteriorating performance"); *see also, e.g.*, *In re Coca-Cola Enters. Inc. Sec. Litig.*, 510 F. Supp. 2d 1187, 1198 (N.D. Ga. 2007) (rejecting FE allegations of high returns and pressure to meet targets, but no specific material instances of channel stuffing).  And though Plaintiffs vaguely attempt to tie FMC's sales practices to alleged cash flow issues, *see, e.g.*, AC ¶ 288(c), they offer no support for this theory, relying solely on a LATAM-based FE who left FMC early in the Class Period, *id*. ¶ 35, and whose allegations focus on "2020 and 2021," *id*. ¶¶ 176, 178–179.

**B.**     **Plaintiffs Fail to Allege that Statements Concerning Generic Competition, Patent Protection Efforts, and Patent Litigation Were False or Misleading**

Plaintiffs' allegations concerning misstatements and omissions about generic competition, FMC's patents, and patent litigation results are a variation on their theory that FMC failed to disclose declining demand, but are equally unavailing.  Plaintiffs claim that adverse patent-related developments constituted additional (allegedly undisclosed) reasons for that decline.  Yet, once again, Plaintiffs ignore that FMC disclosed the very risk that allegedly manifested and otherwise fail to allege any well-pled facts to support their theory.

**1.**     **FMC Adequately Disclosed Risks Related to Generic Competition and Patent Protection Efforts**

Plaintiffs allege that an assortment of FMC statements about generic competition, patent protection, and demand were misleading because of alleged "encroachment" from generics that "directly compet[ed]" with FMC.  *See, e.g.*, AC ¶¶ 289, 295–96, 334(d), 340–41, 335, 354(d), 355, 371–72.  But FMC repeatedly and affirmatively disclosed such competition.  For example, FMC disclosed during the Class Period that it currently "*faces* competition" from "generic suppliers"; that "[i]ncreased generic presence . . . *has been driven* by the number of significant product patents and product data protections that *have expired*," a trend that was "expected to *continue*"; and that it was "currently" party to patent-related proceedings in which it "may not be successful."  AC ¶¶ 291, 294, 300, 323, 337, 339, 368–369, 390; *see* Background at 4–5, *supra*.  FMC also disclosed early in the Class Period that the Rynaxypyr patents were "nearing their expiration" in "several key countries," *see, e.g.*, Ex. 4 (2021 10-K) at 15, and later that the patents were "expiring" or had "expired," *see, e.g.*, Ex. 2 (2022 10-K) at 16.  *See* Background at 5, *supra*.  Because FMC affirmatively disclosed the facts and circumstances Plaintiffs allege were "recognized internally at FMC but not disclosed to investors," AC ¶ 288, Plaintiffs' claims fail.  *See, e.g.*, *StoneMor,* 927 F.3d at 717 (no liability when company discloses fact allegedly

concealed); *Amarin*, 2022 WL 2128560, at *3 (same).[5]

Plaintiffs also challenge FMC's statements, including the aforementioned risk disclosures themselves, on the ground that they described as "contingent or merely possible" events that had already transpired, alleging that generic competitors "were already directly competing with FMC" and "causing FMC to lower prices."  *See, e.g.*, AC ¶¶ 295, 371 (addressing 2021 10-K); *see also* AC ¶ 300 (Q1 2022 10-Q); AC ¶ 323 (Q2 2022 10-Q); AC ¶¶ 339–340 (Q3 2022 10-Q); AC ¶¶ 371 (2022 10-K); AC ¶ 390 (Q1 2023 10-Q).  But that argument ignores that FMC disclosed that it *presently* was facing challenges with respect to generic competition and patent protection.  *See* Background at 4–5, *supra*.  These risks were not identified as future or hypothetical, but, rather, as circumstances FMC was facing at the time of disclosure.

In a similar vein, Plaintiffs challenge as misleading FMC's disclosures that generic competition "*could* affect [FMC's] ability to maintain or raise prices" or "successfully enter certain markets or retain [its] market position" because generic competition already had affected FMC and its pricing.  *See, e.g.*, AC ¶¶ 295, 371; *see generally* Background Section C, *supra* (quoting disclosures).  But Plaintiffs fail to allege any such pricing impact, and, in fact, allege just the opposite—that FMC intended to raise prices, which was a reason that customers purportedly were overbuying in preceding periods.  *Id*. ¶ 169.  Though Plaintiffs cite a litany of FE statements in support of this price impact theory, *see, e.g.*, *id*. ¶ 295 (citing *id*. ¶¶ 157–168), no FE alleges that FMC actually lowered prices during the Class Period or that generic

---

[5] Plaintiffs seek to avoid this result by cherry-picking isolated optimistic statements about future demand for FMC's products or the scope of patent protection.  *See, e.g.*, AC ¶¶ 361, 375, 377 (claiming as misleading statements that "we expect the diamide growth to continue," that "we will enforce our patents all over the world," and that certain overlapping protections for patents and regulatory data "give us protection that continues well until the end of this decade and, in some cases, a bit longer").  But such statements must be evaluated "fairly and in context," *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,* 575 U.S. 175, 194 (2015), which includes "all of the company's disclosures and the entirety of market information," *see SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*, 499 F. Supp. 3d 49, 60 (D. Del. 2020), *aff'd*, No. 20-3427, 2022 WL 3442353 (3d Cir. Aug. 17, 2022).

competition compelled it to do so.[6]

Plaintiffs further rely on FE statements that supposedly show that "generic competitors in key FMC markets including China, India, and others were already directly competing with FMC for market share and causing FMC to lower prices." *See, e.g.*, *id*. ¶¶ 295, 300, 323, 340, 371, 390. But these alleged statements establish nothing more than what FMC had already disclosed. *See id*. ¶¶ 158, 160, 163, 164 (FE statements regarding products "coming off patents," patents "expiring," and concerns regarding "pending expirations"); *id.* ¶¶ 159–163, 165–168 (FE statements regarding increased "generic competitors," sales of "competing generic products," lower-priced generic products, and concerns with illegal competition).

To the extent the FEs attempt to go beyond merely confirming what was already disclosed regarding generic competition and patent protection, the allegations generally concern information the FE has no alleged or plausible basis to know. *See, e.g.*, AC ¶¶ 35, 158 (failing to allege how FE-1, a manager in FMC's LATAM Structured Finance Group, would have any basis to know that FMC's distributors' marketing departments "blamed reduced FMC product orders on . . . FMC's products coming off patents").[7] Such statements need not be credited under Third Circuit law. *See, e.g.*, *Chubb*, 394 F.3d at 148 (declining to credit claims of confidential witness

---

[6] Plaintiffs also repeatedly rely on the Blue Orca Report's claim that, despite upcoming patent expirations and supposedly "lost" patent claims in India and China, FMC "outrageously" "continue[d]" to tell investors that it "will not" face generic competition on flagship products "until 2026" and is "successfully defending its patent claims." *See* AC ¶¶ 249, 491–492, 495. But the only statement Plaintiffs identify to this effect is from 2021 (prior to the Class Period) and addresses FMC's "*expect[ation]*" that it would not face a "legitimate" generic competitor "that uses the approved manufacturing process" until 2026. AC ¶ 88. Notably, this statement is not alleged to be misleading and predates the alleged adverse patent-related decisions in China, India, and Brazil. Further, as discussed, FMC repeatedly disclosed, *during* the alleged Class Period, that it "*faces* generic competition" and "may *not* be successful in litigating to enforce [its] patents." *See* AC ¶¶ 291, 294, 300, 323, 337, 339, 370, 390.

[7] *See also, e.g.*, AC ¶¶ 36, 166 (statements from FE-2 about registrations and sales of competing generics in Q2 2022 and 2023 when FE-2 allegedly only worked at FMC through "early 2022"); *id*. ¶¶ 46, 162 (statements from FE-12 regarding "pending expirations" in "various foreign jurisdictions," concerns about "illegal" competition in "foreign countries," and how "the strength of a process patent depends on the country" but failing to allege how FE-12, a U.S.-based scientist for FMC, is qualified to opine on patent law in a wide array of countries).

where allegations did not "support the probability that a person in the position occupied by the [FE] would possess the information alleged"). Other allegations merely relay the FEs' subjective opinions, but offer no particularized facts to support those personal viewpoints. *See, e.g.*, AC ¶ 164 (statement from FE-4 that it was "kind of a long shot" for FMC to be "banking a lot on the protection of the process patents"); *id.* ¶ 163 (statement from FE-12 that "any claim that FMC has a strong patent portfolio all over the world is 'overstated'"). Still others involve broad, vague statements not grounded in any facts, *see, e.g.*, *id.* ¶ 164 (mentioning "concerns over process patents" without explaining what that means or how it conflicts with any public statement by FMC), rendering such allegations "[in]sufficiently precise" to be credited, *Am. Bus. Fin. Servs.*, 413 F. Supp. 2d at 390.[8]

## 2.    FMC Adequately Disclosed Patent Proceedings and Legal Risks

Plaintiffs also claim that various FMC statements about demand, generic competition, and patent protection were false or misleading because of alleged "legal setbacks" or "losses regarding FMC's patent defenses against generics for its Diamides in China, India, and Brazil," which purportedly resulted in diminished demand for FMC's products. *See, e.g.*, AC ¶¶ 334(d), 354(d), 371, 390. Plaintiffs, however, offer no particularized allegations in support of the notion that these "setbacks" impacted demand or any plausible explanation as to how in-progress litigation could have a real-time impact on demand at all.[9] More fundamentally, Plaintiffs' allegations cannot withstand FMC's risk disclosures directly addressing the relevant issues.

---

[8] *See also, e.g.*, *id.* ¶ 159 (claiming "FMC's China business had been reduced by as much as 50% by generics" but failing to explain the basis for the 50% figure or what it means for "business" to have been "reduced"); *id.* ¶¶ 43, 165 (claiming "the market was obliterated" when the generic versions of "FMC's Hero product became available" but not explaining when the generic became available, what "obliterated" means, or which "market" is referenced).

[9] At most, Plaintiffs allege that legal setbacks enabled competitors to enter the market, largely relying on claims in the Blue Orca Report. *See* AC ¶¶ 151, 249, 491. But FMC disclosed the existence and increase of generic competition, including that it could impact the Company's pricing and market position. *See* Section I.B.1, *supra*.

FMC disclosed repeatedly that it was "currently," and "may in the future" be, party to patent-related legal proceedings; that it "may not be successful in" patent enforcement litigation; and that adverse decisions could harm its results or market position. *See, e.g.*, Ex. 4 (2021 10-K) at 10, 12, 15–16; *see* Background at 5, *supra*. FMC also advised investors that "[p]atents involve complex factual and legal issues"; that their "scope, validity or enforceability" could not be "clearly predicted"; and that they "may be deemed unenforceable, invalidated or circumvented" in court. *See, e.g.*, Ex. 4 (2021 10-K) at 15–16; *see* Background at 5, *supra*.

Particularly in the context of these repeated disclosures, there is no basis for Plaintiffs' claim that FMC was "obligated to disclose" legal losses in any of the three countries on which the Complaint focuses—China, India, and Brazil—or that FMC's alleged failure to do so was materially misleading. *See, e.g.*, AC ¶ 281.

*China.* FMC timely disclosed the 2022 decisions of China's Patent Review Board, which deemed two of its patents "not valid" in China. *See* Background at 5, *supra*. FMC also disclosed that it had appealed the decisions, which it viewed as "flawed on both procedural and substantive grounds," that the appeals were pending, and that, "[u]nder Chinese law, the patents remain valid but are not enforceable pending appeal." *See, e.g.*, Ex. 5 (Q3 2022 10-Q) at 67; Ex. 2 (2022 10-K) at 10; *see also* Background at 5, *supra*. As disclosed in FMC's subsequent filings, those proceedings remained on appeal throughout the Class Period. *See, e.g.*, Ex. 5 (Q3 2022 10-Q) at 67; Ex. 2 (2022 10-K) at 10. Given these disclosures—which Plaintiffs do not challenge—any assertion that FMC misled investors by "conceal[ing]" the Patent Review Board "legal losses" is nonsensical. *See, e.g.*, *StoneMor*, 927 F.3d at 717; *Amarin*, 2022 WL 2128560, at *3; *In re Progress Energy Inc. Sec. Litig.,* 371 F. Supp. 2d 548, 552 (S.D.N.Y. 2005).[10]

---

[10] Although Plaintiffs challenge FMC's statement that, "[g]iven the unique and specific Chinese patent law issues at issue," FMC did not believe the Chinese Patent Review Board decisions would "materially adversely impact []

*India and Brazil.*  Plaintiffs allege no duty to disclose the legal "setbacks" they identify in India and Brazil.  They do not claim that FMC was required by statute or regulation to disclose those proceedings.  Instead, they argue that their omission rendered misleading FMC's general statements about patent enforcement efforts and the status of generic competition (including its risk disclosures) because they allegedly described events as possible that had already transpired.  AC ¶¶ 367–370, 390.[11]  But, again, FMC adequately disclosed these risks, *see* Section I.B.1, *supra*, which encompassed the India and Brazil decisions at issue.  Thus, no liability can attach.  *See, e.g.*, *StoneMor*, 927 F.3d at 717; *Amarin*, 2022 WL 2128560, at *3; *Progress Energy*, 371 F. Supp. 2d at 552.

Regardless, Plaintiffs do not—and cannot—show that the omission of nonfinal orders issued in ongoing litigations rendered any statement by FMC false or misleading.  Although Plaintiffs claim the India and Brazil decisions "seemingly clear[ed] the way," "establish[ed] a path," or "provided a . . . path" for generic competition, Plaintiffs do *not* allege that any of these decisions made a final determination that generic competitors could enter the relevant markets permanently.[12]  *See* AC ¶¶ 146–156.  Indeed, the September 16, 2022 Brazil decision Plaintiffs highlight was later suspended and then reversed and dismissed *during the Class Period*—two

---

enforcement of similar patents in other countries," AC ¶ 338 (quoting Q3 2022 10-Q), Plaintiffs allege no basis to infer this statement—which is one of subjective opinion or belief, *see* Section I.D.2, *infra*—was false or misleading when made.

[11] Plaintiffs also allege that FMC had initially obtained a temporary injunction against Natco, a competitor, in 2021, which it allegedly "publicly touted" at an unspecified time in an unspecified way.  AC ¶ 149.  But Plaintiffs do not actually identify any such "touting" and therefore have no basis to argue that it somehow gave rise to a duty to disclose any legal victories Natco allegedly later obtained.

[12] This is consistent with the text of the decisions themselves.  *See* Ex. 25 (9/19/22 High Court of Delhi Decision) ¶¶ 36, 45 (describing the Court's "*prima facie* view" in Natco's favor and setting case for "further proceedings"); Ex. 26 (12/5/22 High Court of Delhi Decision) ¶¶ 1, 52 ("concur[ring] with the aforesaid *prima facie* finding" in "intra-court appeal"); Ex. 27 (11/14/22 High Court of Delhi Decision) ¶¶ 73, 76 (dismissing "application for [an] *interim* injunction" and noting that "anything said in the present order, shall not bind the final adjudication of the suit"); Ex. 28 (9/16/22 *Rainbow* Decision) at 12 (granting request for "urgent *interim* relief" to compel regulatory agencies to "evaluat[e]" Rainbow's application).

developments Plaintiffs conveniently ignore.  *See generally* Ex. 29 (7/28/23 *Rainbow* Decision); Ex. 30 (9/25/23 *Rainbow* Decision).[13]  Tellingly, Plaintiffs do not allege that generics actually entered the market in Brazil, following the September 16, 2022 decision or at any other time.

### C.    Plaintiffs Fail to Allege that FMC Concealed Industry Consolidation

Plaintiffs further allege that FMC concealed that "industry consolidation among retailers and distributors in the North American market . . . [was] squeez[ing] FMC's revenues."  AC ¶¶ 288(e), 334(e), 354(e).  But this theory is based entirely on statements by FE-10, a Midwest-based retail manager, multiple reporting levels removed from management.  *Id*. ¶¶ 44, 170–172.  His anecdotal statements offer no insight into the overall effects of consolidation.  More importantly, FMC *disclosed* that "changes in distribution channels," including "consolidation of the value chain" and "acquisition of retailers and wholesalers" could "limit FMC's access in certain markets," "restrict [its] distribution footprint," and impact its results.  *See* Ex. 2 (2022 10-K) at 17; Ex. 3 (2020 10-K) at 16 (similar); Ex. 4 (2021 10-K) at 16 (similar).  This disclosure—which Plaintiffs ignore—dooms their claim.

### D.    Defendants' Alleged Misstatements Are Not Actionable as a Matter of Law

Many statements that Plaintiffs challenge independently cannot give rise to a cognizable claim because they are not actionable as a matter of law.

### 1.    Statements of General Optimism Are Nonactionable Puffery

Plaintiffs challenge numerous statements of "general optimism" on which no reasonable investor would rely—including statements referencing FMC's "strong demand" or "healthy

---

[13] While not cited in the Complaint, these later decisions are judicially noticeable.  *See, e.g.*, *Kenneth v. Yeung Chi Shing Holding (Del.), Inc.*, No. 18-07644, 2020 WL 409010, at *4, n.5 (N.D. Cal. Jan. 24, 2020) ("[C]ourts may take judicial notice of foreign judgments and court documents."); *Lichtenstein v. Cader*, No. 13-2690, 2013 WL 4774717, at *2 (S.D.N.Y. Sept. 6, 2013) (holding that "foreign judgments are matters subject to judicial notice" and taking judicial notice of the "written final decision of the Hong Kong High Court").

demand," *see, e.g.*, AC ¶¶ 282, 353;[14] generalized statements referring to FMC's patent estate as "strong" or its process patents as "significant," *see, e.g., id*. ¶¶ 375, 403;[15] and statements describing FMC's financial results as "solid," *see, e.g., id*. ¶ 391.[16]  Such statements are nonactionable puffery.  *Bldg. Trades United Pension Tr. Fund v. Kenexa Corp.*, No. 09-2642, 2010 WL 3749459, at *12 (E.D. Pa. Sept. 27, 2010) (deeming puffery statements "describ[ing] demand as strong and the company's growth as solid").[17]

## 2.    Statements of Opinion or Belief Likewise Are Nonactionable

Plaintiffs also challenge expressions of opinion, i.e., "subjective" statements that do not "express certainty about a thing" and do not purport to offer "objective fact."  *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, No. 13-7050, 2017 WL 1536223, at *11–12 (D.N.J. Apr. 27, 2017), *aff'd sub nom. In re Hertz Glob. Holdings Inc.*, 905 F.3d 106 (3d Cir. 2018).  This includes opinions regarding the status of FMC's channel inventories and demand, *see, e.g.*, AC ¶ 302 ("*we are not concerned* about channel inventories);[18] FMC's patents and the state of competition,

---

[14] The Complaint challenges numerous additional statements of puffery regarding sales growth and demand.  *See, e.g.*, AC ¶¶ 283 ("healthy demand environment"), 285 ("Demand is very, very strong"); *see also id*. ¶¶ 297, 302, 307, 308, 309, 313, 320, 325, 329, 330–33, 344, 349–50, 352, 380, 384, 395, 399.

[15] The Complaint challenges numerous additional statements of puffery regarding FMC's patents and the state of generic competition.  *See, e.g.*, AC ¶¶ 294 ("broad estate" of patents), 403 ("very strong patent estate"); *see also id*. 337, 361, 370, 375, 403, 405, 408.

[16] The Complaint challenges numerous additional statements of optimism regarding FMC's financial results.  *See, e.g.*, AC ¶¶ 308 ("very robust sales growth"), 350 ("robust volume growth"); *see also id*. ¶¶ 318, 320, 329, 351–53, 382, 387, 391.

[17] Subjective characterizations— e.g., that sales in Latin America were "driven by strong herbicide and insecticide demand" (AC ¶ 329), that FMC had a "strong order book in Brazil" (AC ¶ 331)—also are nonactionable puffery and/or opinion, *see* Section I.D.2, *infra*.  *See Underland v. Alter*, No. 10-3621, 2011 WL 4017908, at *7, n.94 (E.D. Pa. Sept. 9, 2011) (statement that defendant's economic condition was "very strong" was nonactionable opinion); *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, No. 13-7050, 2017 WL 1536223, at *11 (D.N.J. Apr. 27, 2017).  Even if these statements could be construed as containing representations of existing fact, Plaintiffs allege no facts contradicting or undermining such statements for the reasons discussed above.  *See* Sections I.A–I.C, *supra*.

[18] *See also* AC ¶ 285 ("When *I think* about channel inventory" as of February 2022, "*I have* very, very few concerns *from where I sit* at FMC."); *id*. ¶¶ 284, 297, 302, 313, 320, 325, 331, 333, 357, 363–64, 386, 395, 399, 401, 407, 411.

22

*see, e.g.*, *id*. ¶ 377 (claiming competitor products are "of inferior quality but they are illegal");[19] and FMC's future financial performance, *see, e.g.*, *id.* ¶ 401 ("We feel very good about where the U.S. and Canadian markets are.").[20]  It is well-settled, however, that such statements of opinion are actionable only if they "(i) [were] not sincerely believed when made; (ii) contain[ed] an expressly embedded, untrue factual assertion; or (iii) reasonably impl[ied] untrue facts and omit[ted] appropriate qualifying language."  *Baer v. Shift4 Payments, Inc.*, No. 23-3206, 2024 WL 3836676, at *9 (E.D. Pa. Aug. 14, 2024).  Plaintiffs allege none of that; thus, their claims based on such statements necessarily fail.

### 3. Defendants' Forward-Looking Statements Fall Within the PSLRA's Safe Harbor and Therefore Are Not Actionable

Plaintiffs also challenge statements providing guidance about FMC's future performance. But, under well-settled law, statements about anticipated *future* growth,[21] *future* demand and inventory levels, [22] or *future* generic competition[23] are protected by the PSLRA's safe harbor, which encompasses statements "containing a projection of revenues . . . or other financial items," describing "plans and objectives of management for future operations," or discussing "future

---

[19] *See also* AC ¶ 338 ("*We do not believe* that the Chinese Patent Review Board's decisions would materially impact our enforcement of similar patents in other countries . . ."); *id.* ¶¶ 326, 332, 337, 361, 367, 375, 377, 382, 390, 393, 403, 405, 408–09.

[20] *See also* AC ¶ 284 ("[o]ur Asia business *is expected to* grow across several countries . . . ."); AC ¶ 320 ("sales growth and lower cost headwinds [] *anticipated to result in* EBITDA growth . . . ."); *id.* ¶¶ 287, 318, 326, 331, 346, 352, 358, 382, 383, 387, 391, 401.  Statements forecasting future results are also nonactionable forward-looking statements, *see* Section I.D.3, *infra*.

[21] *See, e.g.*, AC ¶ 358 ("I think the mid-to high single digit is a perfectly good range of legacy"); *see also id.* 284–85, 318, 326, 331-32, 346, 352, 358, 382-83, 387, 391, 403.

[22] *See, e.g.*, AC ¶¶ 302 ("*We expect* heightened channel inventories in India to normalize pretty quickly as we go through the first half year."); *see also id.* ¶¶ 297, 304, 308–9, 320, 325, 344, 382, 384, 386, 395, 401, 407, 411.

[23] *See* AC ¶ 393 ("[W]e do see [] the diamide family *continuing to compound* in that mid-single-digit range *through the rest of the decade . . . .*"); *see also id.* ¶¶ 293–94, 300, 323, 333, 337–38, 339, 353, 361, 364, 367–70, 375, 377, 390, 393, 403, 409.

economic performance" or underlying assumptions. *Institutional Invs. Grp. v. Avaya, Inc.*, 564

F.3d 242, 254 n.18, 255–56 (3d Cir. 2009) (quoting 15 U.S.C. § 78u–5(i)(1)(A)–(D)).  The safe

harbor applies if such statements are "(1) identified as [forward-looking] and accompanied by

meaningful cautionary statements; *or* (2) immaterial; *or* (3) made without actual knowledge that

the statement was false or misleading." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 278–79 (3d

Cir. 2010); *see also In re Hertz Glob. Holdings, Inc. Sec. Litig.*, No. 13-7050, 2015 WL

4469143, at *14 n.13 (D.N.J. July 22, 2015) (three prongs are disjunctive).

Most of Defendants' forward-looking statements were accompanied by cautionary

language, including by reference to SEC filings containing extensive risk disclosures.[24]  Others

merely repeated previous guidance and thus did not "alter the total mix of information," i.e.,

were immaterial.[25]   *See In re Anadigics, Inc., Sec. Litig.*, No. 08-5572, 2011 WL 4594845, at

*26 (D.N.J. Sept. 30, 2011) (granting motion to dismiss challenging oral statements "as they are

forward-looking and immaterial"), *aff'd*, 484 F. App'x 742 (3d Cir. 2012).  Finally, all of the

forward-looking statements were made without scienter, satisfying prong three.  *See* Section II,

*infra*; *see also Williams v. Globus Med., Inc.*, 869 F.3d 235, 245–46 (3d Cir. 2017).

### E.    Plaintiffs' Item 303 Claim Is Meritless

Plaintiffs claim that "declining demand, saturated inventory channels, increasing generic

competition with respect to the Diamides, legal losses regarding FMC's Diamide patent

---

[24] *See* AC ¶¶ 284, 331–332, 352, 358, 381–384, and 386–387 (including cautionary language or incorporating by reference cautionary language in SEC filings).  Cautionary language may be incorporated by reference, including by reference to SEC filings.  *In re NutriSystem, Inc. Sec. Litig.*, 653 F. Supp. 2d 563, 579 (E.D. Pa. 2009).

[25] *Compare* AC ¶ 318 (maintaining guidance), *with* Ex. 8 (5/2/22 8-K) at 6 (FMC "maintains its guidance ranges"); AC ¶ 346 (predicting continued growth through 2023), *with* Ex. 15 (Q3 2022 Earnings Tr.) at 8 ("we expect FMC's growth momentum will continue throughout next year [*i.e.*, 2023]"); AC ¶ 391 ("we do feel confident in our ability to deliver at the midpoint of our guidance range, $1.53 billion in EBITDA for 2023 with about $6.15 billion in revenue."), *with* Ex. 18 (5/1/23 8-K) at 6 ("forecasting full-year 2023 revenue to be in the range of $6.08 billion to $6.22 billion" and "adjusted EBITDA is now expected to be in the range of $1.50 billion to $1.56 billion"); AC ¶ 403 (forecasting continued diamide growth), *with* Ex. 19 (Q1 2023 Earnings Tr.) at 5 ("Branded diamides grew mid-single digits . . . . We still expect to deliver revenue growth . . . .").

defenses, and industry consolidation" were required to be disclosed pursuant to Item 303 of Regulation S-K.  AC ¶ 281.  That claim also fails.

First, FMC *disclosed* increasing competition expressly as a "trend," *see, e.g.*, Ex. 3 (2020 10-K) at 12; Ex. 4 (2021 10-K) at 12; Ex. 2 (2022 10-K) at 13, and regularly disclosed channel destocking as soon as it emerged, *see* Section I.A.1, *supra*.  Second, Plaintiffs merely assert that each item on the laundry list "constituted a[] trend or uncertainty known to Defendants," AC ¶¶ 280–281, which is insufficient.  *See, e.g.*, *Nikolov v. Livent Corp.*, 470 F. Supp. 3d 461, 480 (E.D. Pa. 2020) (dismissing conclusory allegations that alleged actions constituted a "trend or uncertainty").  Further, "[f]ailure to disclose information required by Item 303 can support a Rule 10b–5(b) claim only if the omission renders affirmative statements [] misleading." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 265 (2024).  Plaintiffs fail to identify any specific, affirmative statement that was rendered misleading on account of this purported omission, offering only the conclusory assertion that the omission "rendered [] statements in" assorted SEC filings "materially false or misleading."  AC ¶ 281.

## II.  THE COMPLAINT FAILS TO PLEAD FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER

Plaintiffs separately fail to plead the required "strong inference" of scienter, i.e., that Defendants acted with "the intent to deceive, manipulate, or defraud either knowingly or recklessly."  *Pamcah-UA Local 675 Pension Fund v. BT Grp. PLC*, No. 20-2106, 2021 WL 3415060, at *1 (3d Cir. Aug. 5, 2021) (citing 15 U.S.C. § 78u-4(b)(2)(A)); *see also In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 622 (E.D. Pa. 2009) (showing of recklessness requires allegations of conduct that "closely approaches that which attaches to conscious deception").  Plaintiffs' claims do not support a culpable inference that is, as required, "cogent and at least as compelling as [a] nonculpable inference," *id.* at 616.  This independently requires dismissal.

25

### A.    Plaintiffs Do Not Attempt to Plead Defendants Were Motivated to Defraud

A plaintiff's failure to "demonstrate that the individual defendants had a motive for their wrongful conduct" is "significant." *Rahman*, 736 F.3d at 245.  Here, Plaintiffs do not even attempt to plead motive.  There are no allegations, for example, that either Individual Defendant sold any stock during the *nearly 20-month* Class Period, nor are there any other allegations of motive.  On the contrary, both Individual Defendants *increased* their FMC shareholdings during the putative Class Period, "rais[ing] a compelling inference *against* scienter." *Adolor*, 616 F. Supp. 2d at 572–73 (emphasis in original).[26]

### B.    Plaintiffs' Allegations Concerning Access to Information and General Knowledge About Demand Are Legally Insufficient

Because Plaintiffs fail to plead motive, alleged "circumstantial evidence of intent or recklessness . . . must be even greater." *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 553 (D.N.J. 2010); *see also Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 678 (D.N.J. 2021) (similar).  Here, such allegations are wholly deficient.

The vast majority of Plaintiffs' scienter allegations focus on the Individual Defendants' supposed "access to information" reflecting demand and inventory levels and alleged knowledge of these topics as part of running FMC.  *See* AC ¶¶ 416–439.  But such allegations are insufficient to establish a strong inference of scienter under Third Circuit law.  *See, e.g.*, *Chubb*, 394 F.3d at 147 (allegation that memo "went to [a] branch" without specifying who reviewed it inadequate for scienter); *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 151 (3d Cir. 2004) (same for allegation that information "was sent to [] headquarters" and "available for . . . review"); *City*

---

[26] *See* Ex. 31 (3/11/22 Proxy) at 26 (Mr. Douglas held 127,644 FMC shares and Mr. Sandifer 55,491 on 12/31/21); Ex. 32 (3/15/24 Proxy) at 27 (Mr. Douglas held 260,209 FMC shares and Mr. Sandifer 79,380 on 12/31/23). Indeed, Mr. Douglas made *open-market* purchases during the time period in which Plaintiffs claim he was supposedly concealing from the market an imminent drop in demand.  *See* Ex. 33 (5/4/23 Form 4) (purchase of over 4,000 FMC shares (at over $115 per share) with code "P," indicating an open-market or private purchase).

*of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 398 (D. Del. 2009) (same for "nonspecific references to 'documents' and 'spreadsheets'"); *Radian*, 612 F. Supp. 2d. at 619 (finding alleged "systematic process for monitoring" loan default rates did not "establish with specificity" what defendants knew and when).

Moreover, Plaintiffs' allegations are fatally deficient insofar as they fail to plausibly allege what information the Individual Defendants would have known through "access to information" that is contrary to what FMC disclosed.  Instead, the Complaint relies principally on the same flawed FE allegations addressed above.  Such allegations are too vague and conclusory to satisfy Plaintiffs' heightened pleading burden and/or cannot be credited because Plaintiffs plead no basis to infer that the FE had reason to know the information alleged or that any such information was known to either Individual Defendant.

Though various FEs claim that the Individual Defendants knew or would have known of information undermining public statements, *see, e.g.*, AC ¶¶ 121, 136, 139, 195–220, there is no reasonable "probability" that any "would possess the information alleged" about the Individual Defendants' scope of knowledge.  *Chubb*, 394 F.3d at 148.  *None* reported directly to an Individual Defendant.  *See generally* AC ¶¶ 34–53.  Indeed, no FE alleges *any* direct interaction with any Individual Defendant during the Class Period.[27]  Only FE-4 and FE-16 claim to have attended "All Hands" or "Town Hall" meetings also attended by the Individual Defendants, *id.* ¶¶ 211, 217, but they do not allege when those meetings took place, what specifically was said, and how (if at all) it supposedly conflicted with public statements.  This is insufficient.  *See Intelligroup*, 527 F. Supp. 2d at 358–59 (requiring FEs to provide "dates on which the relevant

---

[27] FE-17 alleges discussions with Mr. Sandifer and others "in 2020 to 2021" regarding efforts to increase cash flow. AC ¶ 177.  But these vaguely described conversations predate the putative Class Period, and Plaintiffs provide no explanation of how such efforts rendered any Class Period statement false or misleading.

information was acquired" and "detailed descriptions of the alleged events"). Other FEs allege "myriad meetings and calls" in which "channel inventories, demand, sales forecasts, revenues and other information" were discussed, *see generally* AC ¶¶ 210–220, but similarly do not provide any specifics—or even claim to have attended the meetings themselves. *See Pharmanet*, 720 F. Supp. 2d at 543 (discounting "second-hand" information about meetings witnesses did not attend); *see also Rahman*, 736 F.3d at 245 (discounting allegations of source with no alleged "way of knowing what was discussed in [] closed-door meetings").

Plaintiffs further claim that Defendants' discussions of demand, channel inventory, and patents, including in response to questions from analysts, suffice to plead each Individual Defendant's knowledge of undisclosed demand issues. *See* AC ¶¶ 423–439, 436–438. But the mere fact that Defendants discussed these broad topics in general terms does not show that they possessed specific countervailing information. *See, e.g.*, *Utesch*, 316 F. Supp. 3d at 406 (responses to analyst questions about price competition did not "point to an inference" that defendants were aware of price-fixing conspiracy). Indeed, the fact that FMC disclosed negative information on those subjects *undermines* any possible inference of scienter. [28] *See, e.g.*, *Alberici v. Recro Pharma, Inc.*, No. 18-2279, 2020 WL 806719, at *18 (E.D. Pa. Feb. 14, 2020) (disclosure of data suggesting issues with drug's efficacy indicated defendants did not intend to defraud "because if they had, they would not have disclosed the data"); *Teamsters Local 456 Pension Fund v. Universal Health Servs.*, 396 F. Supp. 3d 413, 472 (E.D. Pa. 2019) (disclosure of red flags indicating misconduct "significantly detract[ed] from any inference of scienter").

*Finally*, the FEs claim "everyone knew" about the alleged problems. *See, e.g.*, AC

---

[28] *See* Background at 4–6, *supra* (discussing FMC's disclosures regarding rising inventories and destocking); Ex. 5 (Q3 2022 10-Q) at 67 (disclosing adverse decision regarding Chinese patents).

¶¶ 121, 122, 125.  Such conclusory statements are "undisputedly insufficient" to support scienter. *See, e.g.*, *Chubb*, 394 F.3d at 155; *Universal Health Servs.*, 396 F. Supp. 3d at 471 (similar).[29]

### C.      Plaintiffs' Remaining, Scattershot Attempts to Plead Scienter Fail

Plaintiffs offer a grab-bag of other circumstantial allegations of scienter.  All fail.

*First*, Plaintiffs allege that scienter can be inferred from "the fact that" the alleged fraud concerned "FMC's core products in three of its principal markets"—allegedly the markets for Diamides in China, India, and Brazil.  AC ¶ 440.  But Third Circuit courts have emphasized that it is not "automatically assumed that a corporate officer is familiar with certain facts just because these facts are important to the company's business; there must be other, individualized allegations that further suggest that the officer had knowledge."  *Pharmanet*, 720 F. Supp. 2d at 556; *see also Horizon Lines*, 686 F. Supp. 2d at 423 (similar).  Such allegations are absent here. Although Plaintiffs relatedly allege that Defendants' C-suite roles inherently mean that they "knew, or were deliberately reckless in not knowing" that adverse information was "being concealed," AC ¶ 450, the Third Circuit has rejected arguments that an executive "must have known of the fraud given his or her position."  *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 282 (3d Cir. 2006).

*Second*, Plaintiffs highlight the temporal proximity between the allegedly misleading statements and "corrective disclosures."  But most challenged statements fall between February and November 2022, AC ¶¶ 282–348, *well before* the first alleged "corrective disclosure" in May

---

[29] Plaintiffs allude to FE allegations that certain FMC employees were fired in retaliation for raising issues regarding customer demand and inventory.  *See* AC ¶¶ 453–455.  But the FEs' basis for this knowledge is not alleged; they do not claim personal involvement in the terminations.  *See id.* ¶¶ 141, 181, 207.  Allegations that amount to repetition of secondhand rumor and conjecture should be discounted.  *See Intelligroup*, 527 F. Supp. 2d at 361 (rejecting statements of witness "who was not providing firsthand information").  Further, even if Plaintiffs *had* alleged *the FEs'* personal knowledge of the terminations, which they do not, these allegations still would be irrelevant because Plaintiffs do not allege that *the Individual Defendants* were involved in or even aware of them.

2023, *id.* ¶ 236.  Significantly shorter lapses "give[] rise to mere speculation and not a 'strong inference'" of scienter.  *In re Astea Int'l Inc. Sec. Litig.*, No. 06-1467, 2007 WL 2306586, at *17 (E.D. Pa. Aug. 9, 2007) (five-month lapse).  Plaintiffs also ignore that the later statements, AC ¶¶ 349–414, came amid disclosures affirmatively identifying inventory issues and describing adverse patent decisions, *see* Background at 4–6, *supra*.  Even if a denial followed quickly by a contradictory revelation *could* support scienter, that is not what happened here.

*Finally*, Plaintiffs suggest that Mr. Douglas's resignation "just months after Defendants' fraud was revealed to the market" supports an inference of scienter.  It does not.  Plaintiffs fail to plead "particularized allegations connecting the departure[] to the alleged fraud."  *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 118 (3d Cir. 2018).  Absent that, an executive's resignation does not "amount even to a piece of the scienter puzzle."  *Intelligroup*, 527 F. Supp. 2d at 347.

## III.    PLAINTIFFS FAIL TO PLEAD "CONTROLLING PERSON" LIABILITY

Because Plaintiffs fail to plead a primary violation of Section 10(b) of the Exchange Act, their Section 20(a) control person claims against the Individual Defendants also fail.  *See, e.g.*, *Messner v. USA Techs., Inc.*, No. 15-5427, 2016 WL 1466543, at *12 (E.D. Pa. Apr. 13, 2016).

## CONCLUSION

For the reasons above, Defendants respectfully submit that the Complaint should be dismissed with prejudice.

Dated:    September 17, 2024

**BALLARD SPAHR LLP**

/s/ *M. Norman Goldberger*

M. Norman Goldberger
Laura E. Krabill
Lauren Engelmyer
1735 Market Street, 51st Floor
Philadelphia, PA  19103
(215) 864-8850
goldbergerm@ballardspahr.com
krabilll@ballardspahr.com
engelmyerl@ballardspahr.com


**DAVIS POLK & WARDWELL LLP**

Dana M. Seshens (*pro hac vice*)
Brian M. Burnovski (*pro hac vice*)
450 Lexington Avenue
New York, NY  10017
(212) 450-4000
dana.seshens@davispolk.com
brian.burnovski@davispolk.com

*Attorneys for Defendants FMC Corporation,*
*Mark A. Douglas, and Andrew D. Sandifer*