Exhibit 25

2022:DHC:3749



$\sim$

\*  **IN THE HIGH COURT OF DELHI AT NEW DELHI**

%  *Date of decision: 19th September, 2022*

+  CS(COMM) 349/2022 & I.A. 8132/2022, 9519/2022, 10886/2022

FMC CORPORATION & ORS.                    ..... Plaintiffs
> Through:   Mr. Sandeep Sethi, Senior Advocate with Dr. Sanjay Kumar, Ms. Arpita Sawhney, Mr. Arun Kumar Jana, Ms. Meenal Khurana, Mr. Harshit Dixit and Mr. Priyansh Sharma, Advocates.

> versus

NATCO PHARMA LIMITED                    ..... Defendant
> Through: Mr. Chander M. Lall, Senior Advocate with Mr. J. Sai Deepak, Mr. G.Nataraj, Mr. Avinash K. Sharma, Mr. Ankur Vyas, Ms. Ananya Chugh, Mr. Shashikant Yadav and Ms. Harshita Agarwal, Advocates.

**CORAM:**
**HON'BLE MS. JUSTICE JYOTI SINGH**

### JUDGEMENT

**JYOTI SINGH, J.**

**I.A. 8130/2022** (under Order 39 Rules 1 and 2 CPC, by Plaintiffs) **in CS(COMM) 349/2022**

1.  This judgment shall dispose of the present application filed by the Plaintiffs under Order 39 Rules 1 and 2 CPC.

2.  The suit out of which the application arises has been filed seeking a decree of permanent injunction against the Defendant and those acting on its behalf *inter alia* from infringing the patent rights of the Plaintiffs under Indian Patent No. 298645 (IN'645), by using directly or indirectly any process(s) covered by the said patent, granted by the Controller of Patents, in favour of the Plaintiffs on 06.12.2005.

2022:DHC:3749



3.    It is averred in the plaint that E. I. DU PONT DE NEMOURS AND COMPANY, a US based company, was granted the suit patent on 09.07.2018 under Section 43 of the Patents Act, 1970 (hereinafter referred to as the 'Act') titled 'METHOD FOR PREPARING N-PHENYLPYRAZOLE-1-CARBOXAMIDES'. By a confirmatory Assignment Agreement dated 01.05.2018, the rights in the suit patent were assigned in favour of the Plaintiffs with effect from 01.11.2017 and the patent is currently valid and subsisting. The date of expiry of IN'645 is 06.12.2025 and indisputably, no pre-grant and/or post-grant opposition or a revocation petition has been filed against IN'645, which fortifies the quality and strength of the suit patent.

4.    From the narrative in the plaint, the factual score is that Plaintiff No. 1/FMC Corporation is a Company incorporated under the laws of the State of Delaware, United States of America and Plaintiff No. 2/FMC Agro Singapore Pte. Ltd., is a Company registered under the laws of Singapore. Founded in 1883, Plaintiff No. 1 is engaged in the production and sale of chemicals including agrochemicals for more than a century and provides innovative and cost-effective solutions for enhancement of crop yield and quality by controlling a broad spectrum of insects, diseases etc. as well as in non-agricultural markets for pest control. It carries on business in several parts of the world. By virtue of the Assignment Agreements, each of the Plaintiffs is registered and recorded as patentee of the suit patent in the Register of Patents and conduct their agrochemical business in India through Plaintiff No. 3, which holds license to import and market the final product, 'Chlorantraniliprole' (CTPR).

5.    IN'645, the suit patent relates to a novel method for preparing anthranilic diamide insecticide compounds and a total of 12 claims have been granted in the suit patent. IN'645 discloses and claims *inter alia* a



method for preparing a compound of formula 1 including CTPR, in particular claim 1. The said method involves combining (1) a carboxylic acid compound, (2) an aniline compound and (3) a sulfonyl chloride, to prepare or manufacture CTPR. Thus, in the patented method, a pyrazole carboxylic acid of Formula 2, and aniline of Formula 3 and a sulfonyl chloride are combined (contacted) to prepare CTPR. The process of invention is depicted as follows:

Scheme 1

6.      It is further averred that from a document titled 'Environmental Management Plan for obtaining consent for establishment (CEF)-Expansion', submitted by the Defendant to A.P. State Pollution Control Board, Plaintiffs learnt of the process adopted by the Defendant for synthesis of CTPR and a perusal of the same reflects that Defendant is employing patented method claimed by claims 1, 5 to 8 and 11 to prepare the identical product, CTPR and, therefore, infringes the process of the suit patent. The route of synthesis as brought forth in the plaint is as follows:

2022:DHC:3749



## Route of synthesis:

7.     As the chronology goes, on 23.05.2022, summons were issued to the Defendant in the suit and on the said date while seeking time to file reply to the present application, learned counsel for the Defendant, on instructions, had stated that the Defendant does not intend to launch the product CTPR until the expiry of patents ending with numbers IN'307 and IN'332, which were expiring on 13.08.2022 and would launch the product post expiry of the said patents, using a process which does not infringe the suit patent IN'645.

8.     With the consent of the parties, *vide* order dated 29.07.2022, Dr. Gopakumar G. Nair and Dr. Raghavan Soman were appointed as Scientific Advisors to examine the two processes, and Terms of Reference were framed separately, on behalf of both the parties. On 08.08.2022, Prof. Bhalchandra Bhanage, was appointed in place of Dr. Soman, who expressed his inability to accept the assignment on account of other prior commitments. The Scientific Advisors rendered their respective Reports, copies of which were given to the learned counsels for the parties. Findings in the Reports shall be adverted to in later part of the judgment.

9.     Contentions articulated on behalf of the Plaintiffs can be captured as follows:



A. Defendant/Natco is guilty of infringing the suit patent IN'645. The alleged manufacturing process disclosed by Natco is 'equivalent' to the process claimed in IN'645. Both processes describe an amide bond formation and implement the activation of a carboxylic acid moiety to facilitate the amide formation, to yield CTPR. Compared with IN'645, Defendant's process (hereinafter referred to as 'Natco process') performs substantially the same function, i.e., activation of carboxylic acid moiety, in substantially the same way, i.e., coupling of carboxylic acid (Formula 2) with aniline (Formula 3), to achieve the same result, i.e., yield CTPR. IN'645 discloses that the invention relates to method for preparing compounds of Formula 1 by coupling carboxylic acids of Formula 2 with anthranilamides of Formula 3 using a sulfonyl chloride, in presence of a base and a solvent. Thus, the IN'645 and the Defendant's process, both rely on activation of 3-Bromo-1-(3-Chloro-2-pyridinyl)-1H-pyrazole-5-carboxylic acid into an activated intermediate, which reacts with 2-Amino-5-chloro-3, N-dimethylbenzamide to produce CTPR and are 'equivalent'. Plaintiffs have relied on the following schematic presentation:

[Schematic diagram showing: Carboxylic acid (A) with Br, HO, O, N, Cl groups → Activated intermediate (X = activating group) with Br, X, O, N, Cl groups, labeled "FMC X = RSO₃" and "Natco X = Cl" + Amine (aniline) (B) with MeHN, O, NH₂, Cl groups → CTPR with MeHN, O, Amide, Br, H, N, O, Cl groups]

2022:DHC:3749

B. Both these processes employ a similar synthetic strategy, i.e., stoichiometric activation of carboxylic acid moiety and judged from this perspective also, are equivalent. 'Doctrine of Equivalents' propounds that despite an absence of literal infringement of a patent claim, infringement can be proven if an element of the accused product or service and a claimed element of patented invention are found to be substantially equivalent. This prevents a person from practicing a fraud on a patent by substituting obvious equivalents of elements in the claims in order to avoid their literal language. If the proposition made by the Defendant that scope of a patent is limited to its literal elements is accepted, it would allow a competitor to make an unimportant or insubstantial change to a patented invention and defeat the patent. Moreover, where a patentee describes his invention and claims it in that form, which most perfectly embodies it, he is deemed to claim every form in which his invention may be copied. In ***Warner- Jenkinson Co., Inc. v. Hilton Davis Chemical Co., 520 U.S. 17 (1997)***, it is observed that equivalency must be determined against the context of the patent, the prior art and the circumstances of the case and is neither a prisoner of a formula nor an absolute to be considered in a vacuum.

C. In order to examine the application of the doctrine, Courts have developed five legal tests: (a) all elements rule; (b) Tri-partite test; (c) insubstantial differences test; (d) obviousness test and (e) known-interchangeability test. In ***Sotefin SA v. Indraprastha Cancer Society and Research Center and Others, 2022 SCC OnLine Del 516***, this Court observed that in order to determine infringement, it is imperative to reach a finding that 'all essential elements' of the suit



patent are present in the infringing process and applied the Doctrine of Equivalents to test if Defendant's process infringed the suit patent. Court also relied on the pith and marrow doctrine to examine if the substituted element in the infringing product does the same task, in substantially the same way, to accomplish substantially the same result. In ***Raj Parkash v. Mangat Ram Chowdhry & Others, 1977 SCC OnLine Del 33***, it was held that a minor variation cannot be treated as a shield from piracy, relying on the judgment of the Supreme Court of Canada in ***Free World Trust v. Electro Sante Inc., (2000) 2 SCR 1024***, wherein it was held that non-essential elements may be omitted or substituted but that too would not shield infringement.

D. The issue that the Court needs to determine is whether Defendant's process covers all the essential features of the patented process and only omits, varies or adds some non-essential features. Analysis of the two processes leads to a conclusion that the answer to the question is in the affirmative and the difference that the Defendant endeavours to carve out between the reagents, i.e., thionyl chloride and sulfonyl chloride *per se* is immaterial.  In Line 10 of Page 9 of WO 2019/207595 it is disclosed that the process can use both organic and inorganic chloride, including thionyl chloride (inorganic) and oxalyl chloride (organic). The specific properties of these compounds, i.e., physical and chemical, are also irrelevant for the present purpose as chlorides serve only one purpose, i.e., stoichiometric activation of carboxylic acid group, which then reacts with the amino group to form CTPR and no material difference can be urged between the two processes, merely on account of use of a different chloride. The reagent sulfonyl chloride is a reactant which facilitates coupling



reaction between compound of Formula 2 and compound of Formula 3. The complete specification of IN'645 also contemplates various other equivalent reagents to facilitate the coupling reaction, which is evident from Page 8 Lines 13 to 25 of the Patent Specification IN'645, wherein it is clearly stated that sulfonyl chloride is 'preferred' because of its commercial availability. It is thus wholly irrelevant if thionyl chloride is different from sulphonyl chloride, as a minor variation cannot shield the Defendant from infringement.

E.  Stand of the Defendant that its process involves a difference sequence is also of no avail to the Defendant and it is deliberately attempting to introduce limitations into claim 1 of the suit patent, which do not exist. There is no base mentioned in claim 1 and certainly, no limitation with respect to sequence of combining the reactants. The reactants can be combined in a variety of orders, as stated on page 8 of IN'645, such as combining sulfonyl chloride with carboxylic acid of Formula 2 to form a mixture and then combining the mixture with aniline of Formula 3.

F.  CIBRC Registration Certificate of the Defendant states 'Methane Sulphonic acid impurities' are present in Defendant's approved process. These can be formed only if sulfonyl chloride is used. In any case, thionyl chloride stated to be used by the Defendant is equivalent to sulfonyl chloride since both are Reagents and have the same function. In essence, the starting materials are the same i.e. the acid and amide intermediates, the end result is the same i.e. CTPR and the Reagents are equivalent, leaving no doubt that the process of the Defendant infringes IN'645. IN'645 description is not limited to any sequence or any choice of reagent and any chloride can be used which explicitly shows that sulfonyl chloride is a non-essential element of

2022:DHC:3749



IN'645 process and the change of sequencing in the Defendant's process would have no impact.

G. Dr. Nair, in his report, clearly notes that there is equivalence in the two processes. In answer to question no. 7 (iv) of the FMC Terms of Reference, it is stated 'Yes, though not literally' and this is the essence of Doctrine of Equivalents. Infringement is not to be determined by the resultant characteristics of the by-products but by equivalence of processes and Dr. Nair's report acknowledges that impugned process is equivalent to IN' 645 process.

H. Dr. Vikrant Arun Adsool, who is presently a Chemistry Team Leader at FMC Agro Singapore Pte. Limited and an expert in organic and process chemistry, has filed an affidavit, after comparing and analysing the two processes and has categorically stated that the two processes are equivalent and that the process/routes employed by Natco falls within the scope of claim 1 of the suit patent.

10.   The arguments urged on behalf of the Defendant/NATCO, the litigation adversary, are encapsulated as follows:

A. IN'645 process and Natco process are for preparing anthranilic acid derivatives and compounds obtained include CTPR. IN'645 process involves using a specific organic chloride viz. sulfonyl chloride ($R^8SO_2Cl$) reagent for coupling carboxylic acid intermediate with aniline intermediate in a single step. The scope of protection *vide* claim 1 is expressly limited to this coupling using sulfonyl chloride in the light of Section 10(4)(c) and Section 48(b) of the Act. The only sulfonyl chloride exemplified is methane $SO_2Cl$ and IN'645 does not identify/refer/disclose any other organic or inorganic chloride, which could be used as a reagent. *Per contra*, Natco process, for which

approval was obtained for Technical Indigenous Manufacture under Section 9(3) of the Insecticides Act and disclosed in its EMP and Process Patent Application, involves two separate and discrete stages: (a) carboxylic acid intermediate is converted to an acid chloride using thionyl chloride in a first reactor and the bio-products so formed viz. $SO_2$ and HCl gases are scrubbed in caustic soda solution to give NaCl and $NaHSO_3$, which are useful in food and cosmetic industries; and (b) acid chloride of step (a) is reacted with amide intermediate in a second reactor to obtain CTPR.

B.  Natco process, approved by CIBRC, for manufacture of CTPR is different from IN'645 process and there is no infringement, since not only is the reagent used by Natco, i.e., inorganic thionyl chloride different from organic sulfonyl chloride, but even the sequence of reaction is different and the process is completely outside the scope of claims of IN'645. The Certificate of Analysis of Ross Laboratories, an independent laboratory certified by CIBRC, states that there is no methane sulfonic acid impurity in the Natco Approved process, which shows that the process does not use any sulfonic acid, let alone methane sulfonic acid. The scope of protection given by the claims of IN'645 is limited to coupling by using sulfonyl chloride, which is evident from its specification read with the objectives of the invention and the end result can only be achieved by using methane sulfonic chloride. Section 10(4) of the Act expressly states that the claim defines the scope of protection and claim 1 of IN'645 is limited to acid + amide + sulfonyl chloride. Section 48(b) militates against any broad extension of application of Doctrine of Equivalents since it uses the language 'that process' and 'product obtained directly by that process in India'.

2022:DHC:3749

C. The Supreme Court in *Martin F. D'Souza v. Mohd. Ishfaq, (2009) 3 SCC 1*, has expressly observed that where independent experts are appointed by a Court, their opinion should be considered binding. Both the Scientific Advisors appointed by this Court, with the consent of the parties have opined that Natco process is different from IN'645 process and the former is not within the scope of claims 1 to 5 of the latter, including the finding that Natco uses $SOCl_2$, which is not covered in claims of IN'645. Both the Advisors have specifically opined that the use of sulfonyl chloride to couple the acid and amide is essential to the process of IN'645.

D. In answer to a specific question, if any Methane Sulfonic acid impurity is present in CTPR formed in Natco process, the answer by Dr. Nair is 'No', while Prof. Bhanage has stated that it is not present in the dossier provided (Pages 73 to 96) and if it is present then it will arise only from methane sulfonyl chloride hydrolysis to acid and cannot be formed in the Natco process. Both Advisors agree that thionyl chloride is different from sulfonyl chloride. Insofar as equivalence of the processes is concerned, Dr. Nair has stated that they are not literally equivalent and that the impurity profile distinguishes the processes. Prof. Bhanage has elaborated on another aspect by showing differences between thionyl and sulfonyl chlorides in terms of reactivity and physical properties of the two reagents.

E. The judgment in *Sotefin SA (supra)*, relied upon by the Plaintiffs is inapplicable to the present case as the same is in the context of a product patent and not a process patent. While for a product patent, an overall comparison of the product to the claims may be permissible to determine equivalence, in a process patent separate considerations

2022:DHC:3749



apply and the relevant guidelines are to be found in the case of ***Warner-Jenkinson Co., Inc. (supra)***. The relevant test is 'all elements' test i.e. not only the starting materials and the end product, but all reagents and each step must be equivalent between the patented and the impugned process. This is supported by the Article ***Doctrine of Equivalents: Scope & Limitations by D. Patodia, S. Jain and U. Shukla,*** published in ***Journal of Intellectual Property Right (VOL. 12, May 2007, pp 314-329),*** relied upon by the Plaintiffs. In any event, the judgement in ***Sotefin SA (supra)*** does not aid the Plaintiffs as in the facts of that case the Scientific Advisors had opined that 17 out of the 19 elements were common in the competing products and after analysis the Court found that the distinction sought to be brought out in the remaining 2 'non-essential' elements was insubstantial, in contrast to the present case, where both Advisors have opined that use of sulfonyl chloride is 'essential' to the process claimed in IN'645 and the reagent used in Natco process differs, considerably in most properties. The case of ***Raj Parkash (supra)*** also does not support the Plaintiffs' case since it was under the 1911 Indian Patents and Designs Act, which did not have any provision *pari materia* to Section 10(4) of the Act.

F. The product patent IN'307 has already expired on 13.08.2022 and given the clear findings of the two Scientific Advisors, in support of Natco as also considering that CTPR is a seasonal product with the primary season being the Kharif Season, from September to December, Natco be permitted to launch the product, subject to maintaining monthly statement of accounts and an assurance that Natco will not use the process claimed in IN'645 or any other process that infringes the suit patent. It is a settled law that no interim relief

2022:DHC:3749



should be granted unless there is a clear case of irretrievable harm which cannot be compensated in terms of damages. Plaintiffs do not work the suit patent IN'645 in India and are only trying to extend the monopoly over the product CTPR despite the product patent having lapsed on 13.08.2022. No equitable relief can, therefore, be granted to the Plaintiffs in terms of the judgment in *Franz Xaver Humer v. New Yash Engineers, 1996 SCC OnLine Del 243*, and in any case, if the Plaintiffs succeed, monetary compensation and damages would be an adequate remedy. In suit being CS(COMM) 608/2022, a Co-ordinate Bench of this Court had declined to grant an injunction on a process patent as the Court was of the view that the damages will ultimately suffice. Natco has already suffered a loss of at least Rs. 100 crores on account of the restraint order and any further restraint will destroy the entire investment and would also be detrimental to public interest. Plaintiffs have over 25 patents and applications for CTPR and will continue to litigate till 2041 while grave prejudice will be caused to Natco in case launch of its product is not permitted. Be it noted that even the process patent IN'332 with respect to which the Plaintiffs have an injunction in another suit has also expired on 13.08.2022.

## ANALYSIS

11.     At the outset and before proceeding to examine the case on merits, it is pertinent to note that Plaintiffs had an injunction in their favour in respect of the product patent IN 201307 (IN'307) and its process patent IN 213332 (IN'332) in CS(COMM) 611/2019 with respect to CTPR, however, both patents have expired on 13.08.2022.

12.     In the present application, this Court is concerned with the alleged infringement of the suit patent IN'645, which is a process patent and this

2022:DHC:3749



would entail a *prima facie* examination of the process under IN'645 and the process of the Defendant. For a *prima facie* comparison of the two processes, a brief backdrop of the two processes is essential.

13. **IN'645 Process:**

a) The patent was granted on 09.07.2018, titled 'METHOD FOR PREPARING **N-PHENYLPYRAZOLE-1-CARBOXAMIDES'.** A total of 12 claims have been granted in the said patent.  The Bibliographic details are as follows:

### TABLE 1

| | |
|---|---|
| Indian Patent No | IN 298645 |
| Patent Application No. | 3548/DELNP/2007 |
| Title | Method for preparing N-PHENYLPYRAZOLE-1-CARBOXAMIDES |
| Applicant | E. I. DU PONT DE NEMOURS AND COMPANY |
| Date of filing in India | 11.05.2007 |
| International Application No. | PCT/US2005/0444131 |
| International filing date | 06.12.2005 |
| Priority Dates | 07.12.2004 |
| WO Publication No | WO 2006/062978 A1 published on 15.06.2006 |
| Section 11A Publication | 31.08.2007 - The application was published in the official gazette issued by the Patent Office thereby being open for public to file pre-grant opposition. |
| Date of grant | 09.07.2018 |
| Grantee | E. I. DU PONT DE NEMOURS AND COMPANY |

2022:DHC:3749

| Section 43 (2) publication | 13.07.2018 Accordingly, the timeline to file post-grant opposition on the suit patent IN'645 expired on 13.07.2019. |
| --- | --- |
| Date of expiry of the patent | 06.12.2025 |
| Patentee/Assignee | FMC Corporation FMC Agro Singapore Pte. Ltd. By virtue of confirmatory assignment agreement dated May 1, 2018 with effective date of November 1, 2017 assigning absolute rights in the invention of the suit patent to the Patentees i.e., Plaintiff no. 1& 2 herein, taken on record by the Indian Patent Office on August 7, 2018. |

b) The process is depicted as follows:

Scheme 1

1. The patent discloses and claims *inter alia,* a method for preparing a compound of Formula 1 including CTPR, in particular Claim 1. The method combines (1) a carboxylic acid compound, (2) an aniline compound and (3) a sulfonyl



chloride, to manufacture CTPR. Thus, in the patented method, a pyrazole carboxylic acid of Formula 2, and an aniline of Formula 3 and a sulfonyl chloride combine and CTPR is manufactured. Method as claimed in Claims 1, 5 to 8 and 11, which have been granted, is as follows:

1.  *A Method for preparing a compound of Formula 1,*



*Wherein*

*R1 is CH₃ ……;*

*R2 is …. Cl,…. or CN;*

*R3 is ….. C1-C4 alkyl (CH₃);*

*R4 is ….. Br, ……or ……;*

*R5 is … Cl or ….;*

*R6 is H, … or ….;*

*Z is ….. or N;*

*combining (1) a carboxylic acid compound of Formula 2,*

2022:DHC:3749





**2**

(2) an aniline compound of Formula **3**,



**3**

and (3) a sulfonyl chloride to form the compound of Formula **1**,

5.    The method as claimed in claim 4 wherein a base is combined with the compounds of Formulae 2 and 3 to form the mixture before combining with the sulfonyl chloride.

6. The method as claimed in claim 5 wherein the base is selected from tertiary amines.

7.    The method as claimed in claim 6 wherein the base is selected from optionally substituted pyridines.

8. The method as claimed in claim 7 wherein the base is selected from 2-picoline, 3-picoline, 2,6-lutidine and pyridine.

2022:DHC:3749



11.     *The method as claimed in claim 10 wherein the solvent is acetonitrile.*

c) Patent description explains the meaning of the term 'Combining' as 'contacting the chemicals with each other'. The written description also provides reference to various embodiments relating *inter alia,* to the sequence of addition of carboxylic acid of Formula 2 with aniline of Formula 3 and the sulfonyl chloride as follows:

> *"Embodiments of the present innovation include:*
>
> *Embodiment M 14.* ***The method wherein the carboxylic acid of Formula 2, aniline of Formula 3 and sulfonyl chloride are*** <u>***combined***</u> *at a temperature is between about - 70 and 100°C.*
>
> *Embodiment M 17.* <u>***The method wherein the carboxylic acid of Formula 2 is combined with the aniline of Formula 3 to form a mixture, and then the mixture is combined with the sulfonyl chloride.***</u>
>
> *Embodiment M 18.* <u>***The method of Embodiment M17 wherein a base is combined with the mixture either before or after combining with the sulfonyl chloride.***</u> *Embodiment M 19.* ***The method of Embodiment M 17 wherein a base is combined with the compounds of Formulae 2 and 3 to form the mixture before combining with the sulfonyl chloride.***
>
> *Embodiment M 20.* <u>***The method wherein a base is combined with the compounds of Formulae 2 and 3 and the sulfonyl chloride.***</u>
>
> *Embodiment M29. The method of Embodiment M 17* <u>***wherein a solvent is combined with the compounds of Formulae 2 and 3 to form the mixture before combining with the sulfonyl chloride.***</u>*"*

2022:DHC:3749

d) The various embodiments, as rightly pointed out by the Defendant have one common factor, i.e., the sequence, where the carboxylic acid of Formula 2 and aniline of Formula 3 are first mixed, whether with the base or a solvent etc. and thereafter sulfonyl chloride is added to the mixture so obtained. In fact, emphasis on the sequence is further evident from the following:

> "*In the present method, the sulfonyl chloride is combined with the pyrazolecarboxylic acid of Formula 2 and the aniline of Formula 3. The reactants can be combined in a variety of orders, such as combining the sulfonyl chloride with the carboxylic acid of Formula 2 to form a mixture and then combining the mixture with the aniline of Formula 3. However, for preparing the particular N-phenylpyrazole- 1-carboxamides of Formula 1, the most preferable order of combination has been found to comprise combining the carboxylic acid of Formula 2 with the aniline of Formula 3 to form a mixture and then combining the sulfonyl chloride with the mixture (e.g., adding the sulfonyl chloride to the mixture of the compounds of Formulae 2 and 3), because this order of the addition allows convenient control of the coupling process. The rate of reaction is readily controlled by simply controlling the rate of addition of the sulfonyl chloride compound. Therefore, an embodiment of note of the present method comprises the sequential steps of (1) combining a carboxylic acid of Formula 2 and an aniline of Formula 3 to form a mixture, and (2) then combining the mixture with a sulfonyl chloride. Although addition of the sulfonyl chloride to the mixture containing the aniline of Formula 2 potentially could result in undesirable side reactions, it has been discovered that the particular stereoelectronic profiles of the*

2022:DHC:3749



*compounds of Formulae 2 and 3 facilitate obtaining remarkably high yields of compounds of Formula 1 using the present method." [emphasis added]"*

e) Significantly, it is noted in the detailed description that though the reactants can be combined in a variety of orders, such as combining sulfonyl chloride with carboxylic acid to form a mixture and then combining the mixture with aniline, however, for preparing the particular **N-Phenylpyrazole-1-Carboxamide** of Formula 1, the most preferable order of combination is to combine the acid and aniline to form a mixture and then combine the sulfonyl chloride with the mixture, as this order allows convenient control of the coupling process and the rate of reaction is readily controlled by simply controlling the rate of addition of sulfonyl chloride compound. It is further described that as the starting materials of Formula 2 and 3 are typically solids at ordinary ambient temperatures, the method is most satisfactorily conducted using a solvent in which the starting compounds have significant solubility and thus the method is conducted in a liquid phase comprising a solvent. It needs emphasis that the written description also explains the role of sulfonyl chloride and notes that its compounds preferred for the present method, because of the commercial availability, include methanesulfonyl chloride and p-toluenesulfonyl chloride, however, methanesulfonyl chloride is more preferred for the reasons of lower cost, ease of addition and/or less waste.



14.  **Natco Process:**

a)  The process relates to 'AN IMPROVED PROCESS FOR THE PREPARATION OF ANTHRANILAMIDE DERIVATIVES'. The stated objective of the invention is to provide a simple and cost-effective process for preparation of CTPR of Formula-Ia and Cyantraniliprole of Formula-Ib with high purity and good yield on a commercial scale.

b)  The process as explained by Natco is in two stages:

Stage 1:

In reactor-1, 3-Bromo-1-(3-Chloro-2-pyridinyl)-1H-pyrazole-5-carboxylic acid is reacted with thionyl chloride in acetonitrile 75-80°C to get corresponding acid chloride intermediate. The reaction mass is directly taken to the next step without isolation of the intermediate. Sulphur dioxide and hydrogen chloride gases will be liberated during the reaction and are scrubbed.

Stage 2:

In reactor 2, 2-Amino-5-chloro-3, N-dimethylbenzamide, acetonitrile and 3-picoline are charged and then reaction mass from reactor 1 is added at 25-35°C to the above reaction mass. Hydrogen chloride gas, liberated during the reaction, is quenched with 3-picoline and the product is filtered to separate acetonitrile organic layer. The resulting product is further purified to obtain CTPR. The two stages are represented as follows in a condensed form:

2022:DHC:3749



## Route of synthesis:



15.     Plaintiffs have asserted their right of enforcement of the suit patent against the Defendant under Section 48 of the Act, which provides that subject to the other provisions of the Act and conditions specified in Section 47, a patent granted under the Act shall confer upon the patentee, where the subject matter of the patent is a process, the exclusive right to prevent third parties, who do not have his consent, from the act of using that process and from the act of using, selling, offering for sale product obtained directly by that process. It is a settled position in the Patents law that a product claim, if granted, confers monopoly on the patentee for the product, irrespective of the process by which the product was obtained. However, in a process claim, the monopoly is restricted to the method by which the product is manufactured and if the same product is manufactured through a different process/method, the patentee cannot extend its monopoly to the different process. It is an equally settled proposition that the scope of invention for which protection is claimed by the patentee is defined by the claims. Section 10(4) of the Act provides that specifications of a patent should fully and particularly describe the invention. Claim construction has to be done as a whole and there is also no quarrel that all essential elements of the suit patents claimed are required to be found in the infringing process to

2022:DHC:3749



establish infringement. In order to substantiate the case of infringement against the Defendant, Plaintiffs endeavoured to map the elements of Natco's process with the process under the suit patent.

16.    In order to reach a *prima facie* finding on the essentiality of the reagent used in the suit patent and equivalence of the 2 processes and looking at the technicalities of the issues involved, with the consent of the parties, this Court had appointed two Scientific Advisors, as aforementioned, for an expert opinion and both have rendered their respective Reports. In order to appreciate the findings in the Reports, I may first allude to the Terms of Reference, which are extracted hereunder for ready reference:

> **"*Terms of Reference (I) (NATCO)***
>
> *1.    Are 3-Bromo-1-(3-chloro-2-pyridinyl)-1H-pyrazole-5-carboxylic acid and 2-Amino-5-chloro-N,3-dimethylbenzamide intermediates used in suit patent IN'645 disclosed in prior art IN 215218 and IN 284017 and also in WO'518?*
>
> *2.    Are 3-Bromo-1-(3-chloro-2-pyridinyl)-1H-pyrazole-5-carboxylic acid and 2-Amino-5-chloro-N,3-dimethylbenzamide intermediates coupling disclosed in prior art WO'518 for example, in the pages and scheme and description reproduced above in Paragraph VI (A)?*
>
> *3.    Is the reagent thionyl chloride used in the Natco process for converting the pyrazole carboxylic acid to acid chloride the same as the reagent used for coupling the pyrazole carboxylic acid with aniline as set out in Claims 1 to 11 of IN 298645? Do thionyl chloride which is an inorganic chloride, and sulfonyl chlorides which are organic chlorides, have different physical and chemical characteristics?*
>
> *4.    Is Methane Sulfonic acid impurity present in Natco product as per data given in CIBRC dossier?*
>
> *5.    Are the following two process distinct or the same?*

2022:DHC:3749



| **NATCO Process** | **IN298645 process** |
|---|---|

**NATCO Process**

(1). HO₂C-pyrazole(Br)(pyridine-Cl) + Thionyl Chloride (SOCl₂)

↓

ClC(O)-pyrazole(Br)(pyridine-Cl)  (acid chloride).

(2). benzamide (X, CH₃, NH₂, HN-CH₃) + 3-Picoline (base)

↓

*Mixture of benzamide and 3-picoline base*

(3). acid chloride + Mixture of benzamide (X, CH₃, NH₂) and 3-Picoline base from (2) above

↓

Final product

*(If X= Cl, Chlorantraniliprole of formula-Ia; and if If X= CN, Cyantraniliprole of formula-Ib)*

**IN298645 process**

(1). Compound 2 (R⁴, R⁵, Z, R⁶) + Compound 3 (R¹, R², NH₂, C(O)NHR³)

↓

Mixture I (2 + 3)

(2). Mixture I (2+3) + Base

↓

Mixture II (2 + 3 + Base)

(3). Mixture II (2+3+Base) + Sulfonyl chloride (R⁸S(O)₂Cl)

↓

Final product (R⁴, R⁵, R¹, R², R⁶, Z, NH, C(O)NHR³)

2022:DHC:3749



*6.   In the process of IN'645 when sulfonyl chloride is used the chloride is knocked off and sulfonyl group attached to the pyrazole carboxylic acid to form mixed anhydride. Is this statement correct?*

*7.   In the NATCO Process when thionyl chloride is used the chloride group is attached to the carboxylic acid group in the pyrazole carboxylic acid to form carbonyl chloride which is not a mixed anhydride. Is this correct?*

*8.   Is the NATCO process which requires reacting a pyrazole carboxylic acid with thionyl chloride to obtain an acid chloride and then reacting the acid chloride so formed with an aniline within the scope of Claims 1 to 5 of IN'645? Is that correct?*

***Terms of Reference (II) (FMC)***

*(i)   Whether the Defendant's process is disclosed in the complete specification of the suit patent IN'645?;*

*(ii) What are the essential feature(s) of the process covered and claimed by the suit patent IN'645?*

*(iii) Whether the Defendant's process for preparing Chlorantraniliprole (CTPR) is covered and claimed by the process claimed by the suit patent IN'645?;*

*(iv) Whether the Defendant's process for preparing Chlorantraniliprole (CTPR) is equivalent to the process claimed by the suit patent IN'645?;*

*(v)   Whether       3-Bromo-1-(3-chloro-2-pyridinyl)-1H-pyrazole-5 carboxylic acid and 2-Amino-5-chloro-N,3-dimethylbenzamide used in the Defendant's process for preparing Chlorantraniliprole (CTPR) are same as claimed by the suit patent IN'645?;*

*(vi) Whether       3-Bromo-1-(3-chloro-2-pyridinyl)-1H-pyrazole-5 carboxylic acid and 2-Amino-5-chloro-N,3-dimethylbenzamide used in the Defendant's process for preparing Chlorantraniliprole (CTPR) are equivalent as claimed by the suit patent IN'645?;*

*(vii) Whether the Defendant's process for preparing Chlorantraniliprole (CTPR) as disclosed in the document*

2022:DHC:3749



*"Environment Management Plan for obtaining consent for establishment (CFE)- Expansion" submitted to AP State Pollution control Board is same as disclosed by the Defendant at the Central Insecticides Board and Registration Committee (CIB&RC) in light of the documents submitted by the Defendant by virtue of the disclosure/discovery?;*

*(viii)        Whether the impurity profile of the end product, CTPR obtained in the Defendant's process is same as the impurity profile of the product, CTPR, submitted by the Defendant at the Central Insecticides Board and Registration Committee (CIB&RC) in light of the documents submitted by the Defendant by virtue of the disclosure/ discovery?*

*(ix) Whether Annexure VII shows identical impurity profile to the Plaintiffs' registered CTPR made by patented process IN'645. Attention is drawn to same Annexure VII at page 7, section 15 shows the Defendant's alleged process for manufacture.*

*(x)    Whether Annexure VIII which is an independent analysis of the Defendant's CTPR, shows the same impurity profile as the Plaintiffs' CTPR?*

*(xi) Whether Annexure IV which is the Defendant's TIM registration certificate shows the exact impurity profile of the Plaintiffs' CTPR.*

*(xii) On reviewing the documents submitted, as the Defendant has tied its raw materials (including, thionyl chloride) with the Plaintiffs' impurity profile, whether the process of the Defendant can still be considered to be different than the process of the Plaintiff's patented process covered by IN'645."*

17.    Case of the Plaintiffs is primarily predicated on the Doctrine of Equivalents and it is sought to be contended that even if the Natco process does not literally infringe the suit patent, it may be found to infringe on the bedrock of 'equivalence'. Contention of the Defendant is that element-to-element test must be applied and tested on that anvil, in the present case



there is no infringement since the reagent i.e. sulfonyl chloride is an essential element in Plaintiffs' process and the Natco process admittedly uses thionyl chloride as the reagent, which has different and distinct role in achieving the same task and accomplishing substantially, the same result. Use of a different reagent and a completely different sequence of reactions in the Natco process cannot be termed as a minor or insubstantial variation, so as to accuse the Defendant of infringement and piracy.

18. Insofar as the law on the subject is concerned, in my view, the same is well-settled and no longer *res integra*. I may usefully allude to the observations in a recent decision of this Court in ***Sotefin SA (supra),*** where the Court has held that in order to determine infringement, it is imperative to reach a finding that 'all essential elements' of the suit patent are present in the infringing process. It was also held that in order to examine if the substituted element in the infringed product does the same task, in substantially the same way, to accomplish substantially the same result, the pith and marrow doctrine, also known as Doctrine of Purposive Construction, needs to be applied by the Court. Reliance was placed on the judgement in ***Rodi & Wienenberger A.G. v. Henry Showell Ltd., 1966 RPC (441),*** wherein it was propounded that all essential elements of the suit patent must be found in the process alleged to be infringing. Relevant para is as follows:

> *"If the language which the patentee has used in the claims which follow the description upon its true construction specifies a number of elements or integers acting in a particular relation to one another <u>**as constituting the essential features of his claim,**</u> the monopoly which he obtains is for that specified combination of elements or integers so acting in relation to one another-and for nothing else. <u>**There is no infringement of his monopoly unless each and every one of such elements is present in the process or article which is alleged to infringe his**</u>*

2022:DHC:3749



*__patent and such elements also act in relation to one another in the manner claimed.__ The law as to the principles of construction of claims in specifications in the modern form seems to me so laid down clearly and authoritatively in the Judgment of Upjohn, L.I. in Van de Leiy v. Bamfords 20 Ltd. [1961] R.P.C. 296, which was approved by the majority of the House of Lords on appeal: [1963] R.P.C. 61."*

19.     In order to avoid prolixity, I may refer to relevant passages from the judgment in **Sotefin SA (supra),** wherein the judgments in cases of **Raj Parkash (supra)** and **Free World Trust (supra)**, have been noted and the Court has observed that for determining the question of infringement, it must be borne in mind that the non-essential or trifling variations or additions in the product would not be germane, so long as substance of the invention is found to be copied. Relevant paras are as follows:

> *"**33.** The critical question is whether the elements not found in the Smart Dollies, are essential or not, so as to construe an infringement. For determining the question of infringement, it must be borne in mind that the non-essential or trifling variations or additions in the product would not be germane, so long as the substance of the invention is found to be copied. Pure literal construction is not be adopted, rather, doctrine of purposive construction should be applied. The court shall also apply Doctrine of Equivalence to examine if the substituted element in the infringing product does the same work, in substantially the same way, to accomplish substantially the same result. On this aspect, lets first take note of the judicial precedence. In the case of Raj Prakash v. Mangat Ram, a division bench of this court held that a minor variation cannot be treated as a shield from piracy, in the following words:*
>
> > *"12. We have, therefore, to read the specifications and the claims from the point of view of the persons in the trade manufacturing film strip viewers. It is the pith and marow of the invention claimed that has to be looked into and not get bogged down or involved in*

2022:DHC:3749



*the detailed specifications and claims made by the parties who claim to be patentee or alleged violaters. (See Birmingham Sound Reproducers Ld. v. Collaro Ld. and Collaro Ld. v. Birmingham Sound Reproducers Ld, 1956 RP.C 232)(2)."*

34. Next at para 16 it was noted that:

*"A.I.R. 1969 Bombay 255(8), held that the main function of the court is to construe the claims (stated at the end of specifications in the patent) which are alleged to have been infringed without reference to the body of the specifications and to refer to the specification only if there is any ambiguity or difficulty in the construction of the cliams in question. He further observed that where one of the claims in respect of which infringement is alleged is wide enough to cover all methods for achieving particular result, the question is not as to the method actually followed by the plaintiffs but is whether the method followed by the defendants is covered by the claim in the plaintiff's patent. The onus as to the invalidity of a plaintiff's patent and the grounds of insufficiency of description, want of novelty, absence of inventive steps and want of utility was rightly placed on the defendants. The learned Judge further observed that in an action for infringment of patent to meet the defence under Section 29(2) read with Section 26, that the patent was invalid due to insufficiency of description, the claim in the specifications of the patent need only be as clear as the subject admits, and the patentee need not so simplify his claim as to make it easy for infringers to evade it."*

35. Further at para 25 and 26 it was observed as follows: *"25. The patented article or where there is a process then the process has to be compared with the infringing article or process to find out whether the patent has been infringed. This is the simplest way and indeed the only sure way to find out whether there is a piracy. This is what was done in the hair-pin case, above-referred to, and is, indeed, always done.*



*Unessential features in an infringing article or process are of no account. If the infringing goods are made with the same object in view which is attained by the patented article, then a minor variation does not mean that there is no piracy. A person is guilty of infringement if he makes what is in substance the equivalent of the patented article. Some trifling or unessential variation has to be ignored. There is a catena of authority in support of this view. We need not cite all those cases which were brought to our notice at the Bar. Suffice it to quote the words of Lord Denning, M. R. in Beecham Group Limited v. Bristol Laboratories Ltd. and another, 1967 (16) R.P.C. 406 (12):-*

*"The evidence here shows that in making hetacillin in the United States the defendants use a principal part of the processes which are protected here by the English patents. The importation and sale here is prima facie infringement.*

*"There is a further point. A person is guilty of infringement, if he makes what is in substance the equivalent of the patented article. He cannot get out of it by some trifling or unessential variation…… On the evidence as it stands, there is ground for saying that hetacillin is medically equivalent to ampicillin. As soon as it is put into the human body, it does, after an interval, by delayed action, have the same effect as ampicillin. In these circumstances, I think there is a prima facie case for saying there was an infringement. The process is so similar and the product so equivalent that it is in substance the same as ampicillin."*

26.    *We have seen the viewers marketed by the defendants and the viewers produced by the plaintiff. The viewers marked and kept on record as (1), (1A) Mecorama and a fourth viewer are definitely objects*

2022:DHC:3749



*produced by piracy of the plaintiff's patent. The defendants have made certain variations in its viewers but these are unessential; and what the defendants market is substantially the same thing, as was conceived by the plaintiff. By trifle variations if the effect obtained by the defendants is the same, and we hold that it is the same, then according to the rule enunciated in the Ampicillin case, referred to above, there is a clear piracy. The idea of the plaintiff which is a novelty is clearly infringed. In any case, the infringement is admitted by defendants 1 and 2. We have dealt with this matter in detail because the defendant No. 3 has put in appearance at the last stage but does not admit infringement. Therefore, we hold that there is clear infringement of the plaintiff's patent, which we have delineated above."*

**36.** *Reliance is also placed upon the decision of the Supreme Court of Canada in the case of Free World Trust v. Electro Sante Inc., wherein the court formed the view that non-essential elements may be omitted or substituted, but that too would not shield infringement. It summarized the issue as follows:*

> *"**31.** The appeal thus raises the fundamental issue of how best to resolve the tension between "literal infringement" and "substantive infringement" to achieve a fair and predictable result. There has been considerable discussion of this issue in Canada and elsewhere, which I will discuss briefly in support of the following propositions:*
>
> *(a) The Patent Act promotes adherence to the language of the claims.*
> *(b) Adherence to the language of the claims in turn promotes both fairness and predictability.*
> *(c) The claim language must, however, be read in an informed and purposive way.*
> *(d) The language of the claims thus construed defines the monopoly. There is no recourse to such vague notions as the "spirit of the invention" to expand it further.*

2022:DHC:3749



*(e)  The claims language will, on a purposive construction, show that some elements of the claimed invention are essential while others are non-essential. The identification of elements as essential or non-essential is made:*

> *(i) on the basis of the common knowledge of the worker skilled in the art to which the patent relates;*
>
> *(ii) as of the date the patent is published;*
>
> *(iii) having regard to whether or not it was obvious to the skilled reader at the time the patent was published that a variant of a particular element would not make a difference to the way in which the invention works; or*
>
> *(iv) according to the intent of the inventor, expressed or inferred from the claims, that a particular element is essential irrespective of its practical effect;*
>
> *(v) without, however, resort to extrinsic evidence of the inventor's intention.*

*(f)  There is no infringement if an essential element is different or omitted. There may still be infringement, however, if non-essential elements are substituted or omitted.*

*32.    Based on the foregoing principles, I conclude that the appellant's arguments must be rejected. As stated, the ingenuity of the patent lies not in the identification of a desirable result but in teaching one particular means to achieve it. The claims cannot be stretched to allow the patentee to monopolize anything that achieves the desirable result. It is not legitimate, for example, to obtain a patent for a particular method that grows hair on bald men and thereafter claim that anything that grows hair on bald men infringes. I turn then to the first of the propositions listed above.""*

20.    The principles that can be culled out from the conspectus of the aforesaid judgments, in the context of the present case involving a process

2022:DHC:3749



patent are that the patented process has to be compared with the infringing process to find out if the patent has been infringed. This is the simplest way and indeed the only sure way to find out whether there is a piracy. Unessential features in an infringing article or process are of no account. If the infringing goods are made with the same object in view which is attained by the patented article, then a minor variation does not mean that there is no piracy. A person is guilty of infringement if he makes what is in substance the equivalent of the patented article. Some trifling or unessential variation has to be ignored and if the two processes are the same, a minor variation by the infringer will not shield him from piracy and an apt example of this was in the case of **Beecham Group Ltd. v. Bristol Laboratories Ltd., 1967 (16) R.P.C. 406 (12),** referred to above.

21.    Plaintiffs heavily relied on an article on Doctrine of Equivalents from a Journal of Intellectual Property Right, Vol. 12, May, 2007, Pages 314-329, which in my view states nothing different from what has been held in the aforesaid judgments, i.e., the Doctrine of Equivalents mandates that in the absence of literal infringement, a product may be found to infringe a patented product, if it is found to be its substantial equivalent and if the proposition that the scope of a patent is limited to its literal elements is accepted, it would allow a competitor to make an unimportant or insubstantial change to a patented invention and defeat the patent. Thus, the scope of a patent is not limited to its literal terms but embraces all equivalents to the claims described.

22.    I may also allude to the judgment in **Warner-Jenkinson Co., Inc. (supra),** relevant paras of which are as under:

>    "
>
>    ...
>    *We concur with this apt reconciliation of our two lines of precedent. Each element contained in a patent claim is*



*deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole. It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety. So long as the doctrine of equivalents does not encroach beyond the limits just described, or beyond related limits to be discussed infra this page and 31-34, 39, n. 8, and 39-40, we are confident that the doctrine will not vitiate the central functions of the patent claims themselves.*

*xxx                    xxx                    xxx*

*…*

*In our view, the particular linguistic framework used is less important than whether the test is probative of the essential inquiry: Does the accused product or process contain elements identical or equivalent to each claimed element of the patented invention? Different linguistic frameworks may be more suitable to different cases, depending on their particular facts. A focus on individual elements and a special vigilance against allowing the concept of equivalence to eliminate completely any such elements should reduce considerably the imprecision of whatever language is used. An analysis of the role played by each element in the context of the specific patent claim will thus inform the inquiry as to whether a substitute element matches the function, way, and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element. With these limiting principles as a backdrop, we see no purpose in going further and micromanagaing the Federal Circuit's particular word choice for analyzing equivalence. We expect that the Federal Circuit will refine the formulation of the test for equivalence in the orderly course of case-by-case determinations, and we leave such refinement to that court's sound judgment in this area of its special expertise."*



23.    Relevant it is to note that learned counsels for the Defendant had specifically urged that the judgment in ***Warner- Jenkinson Co., Inc. (supra),*** by the US Supreme Court is perhaps the only decision on the Doctrine of Equivalents on Chemical Processes. The submission to this effect is unrebutted on behalf of the Plaintiffs and nothing was shown contrary thereto. In ***Warner- Jenkinson Co., Inc. (supra),*** the Supreme Court held that in cases of process patent infringement, the Doctrine of Equivalents must be applied to individual elements of the claim and an analysis of the role played by each element in the context of the specific patent claim will thus inform the enquiry as to whether a substitute element matches the function, way and result of the claimed element or whether the substitute element plays a role substantially different from the claimed element. The determination of equivalents should be applied as an objective inquiry on an element-by-element basis.

24.    Seen in this backdrop and examining on an element-to-element basis and also keeping in view the undisputed fact that 3-Bromo-1-(3-Chloro-2-pyridinyl)-1H-pyrazole-5-carboxylic acid and 2-Amino-5-chloro-3, N-dimethylbenzamide, used in Defendant's process for preparing CTPR are the same as claimed in the suit patent, the first question that begs an answer is what are the essential feature(s) of the process covered and claimed by the suit patent.

25.    In order to answer this question, I may refer to the Reports of the Advisors, more specifically question (ii) in the Terms of Reference (II)/ (FMC). The question as formulated is as under:

> "*ii. What are the essential feature(s) of the process covered and claimed by the suit patent IN'645?*
>
>   a)  The answer by Prof. Bhanage, is as follows:

2022:DHC:3749



> *"Reacting 2 and 3 in presence of R-sulfonyl chloride to form a compound to form final product."*

b) The reply by Dr. Nair, is as under:

> *"The essential features of the process covered in the suit patent IN'645 comprises combining the carboxylic compound of Formula 2 with the aniline compound of Formula 3 in the base to form a mixture and then addition of the sulfonyl chloride $R_8S(O)^2Cl$ of Formula 4 to the mixture in a single reactor."*

26. In view of the said findings coupled with the specification of IN'645 and the detailed description therein, in my *prima facie* view, sulfonyl chloride, more particularly, methanesulfonyl chloride is an essential and integral part of the suit patent and on this count, the stand of the Defendant is correct.

27. The settled law for determining the question of infringement is that it has to be kept in mind that non-essential or trifling variations in the allegedly infringing process would not be germane, so long as the substance of the suit patent is copied. Doctrine of Equivalents should be applied to examine if the substituted element(s) in the infringing product does the same work, in substantially the same way, to accomplish the same result. Seen in this light, it is now required to be considered, if the use of thionyl chloride in the Natco process is a minor/trivial change from use of sulfonyl chloride, which as a reagent is critical to the novelty and functionality of the suit patent, so as to infringe the suit patent, applying the Doctrine of Equivalents. Both Advisors agree that thionyl chloride and sulfonyl chloride are different. Relevant would it be in this regard to refer to question no. (iii) in Terms of Reference (I)/Natco. The question formulated is as under:



*"3. Is the reagent thionyl chloride used in the Natco process for converting the pyrazole carboxylic acid to acid chloride the same as the reagent used for coupling the pyrazole carboxylic acid with aniline as set out in Claims 1 to 11 of IN 298645? Do thionyl chloride which is an inorganic chloride, and sulfonyl chlorides which are organic chlorides, have different physical and chemical characteristics?"*

In response to the said question, Prof. Bhanage has found that the two reagents are not the same. Dr. Nair, has given a detailed answer, elaborating on the physical and chemical properties of thionyl chloride (inorganic chloride) in comparison to sulfonyl chloride (organic chloride). The reply is as follows:

*"Reply: No, the reagents, thionyl chloride and sulfonyl chlorides are different. The said reagents have different physical and chemical characteristics.*

*The reagent thionyl chloride ($SOCl_2$) used in Defendant's process is different from the reagent sulfonyl chloride of formula 4 i.e. $R_8S(O)_2Cl$ claimed in claims 1 to 11 of IN298645. The suit patent IN'645 particularly uses methane sulfonyl chloride as claimed in claim 3.*

*The inorganic chloride i.e. thionyl chloride ($SOCl_2$) has different physical and chemical properties in comparison to the organic chloride i.e. sulfonyl chloride ($RSO_2Cl$) which comprises an alkyl group.*

| <br>Thionyl chloride<br>Boiling point: 79°C<br><br>Melting point: -105°C<br>Density: 1.631 g/mL at 25°C (lit.) | H₃C–S–Cl (methane sulfonyl chloride structure)<br>Methane sulfonyl chloride<br>Boiling point: 161°C<br><br>Density: 1.480 g/mL |
|---|---|

2022:DHC:3749



| It is a dense, volatile liquid. Soluble in most aprotic solvents: toluene, chloroform, diethyl ether. Reacts with protic solvents such as alcohols and water. | It is a colourless liquid that dissolves in polar organic solvents but is reactive toward water, alcohols, and many amines. |
| --- | --- |
| The by-products are SO2 (gas) and HCl (gas) which can be trapped in alkali leaving behind pure alkyl chloride. | The by-product is methane sulfonic acid which needs to be removed through purification. |

28.     From the above findings, the *prima facie* conclusions are (1) sulfonyl chloride is an essential element of the suit patent and (2) thionyl chloride used as a reagent in the Natco process, differs from sulfonyl chloride in its physical and chemical properties. Additionally, it requires a mention that in the Natco process, thionyl chloride is used as a chlorinating agent to react with carboxylic acid to displace the –OH group present in the acid and replace it with the chlorine atom to form an acid chloride, while in the Plaintiffs' process sulfonyl chloride is added to the mixture of a Carboxylic acid, Amide, Analine and a Base to activate the process and thus acts as a 'coupling agent' to control the rate of reaction as well as the yield produced by it. In fact, it the case of the Plaintiffs that the advantages of sulfonyl chloride according to IN'645 reside in its utility for acid-amide coupling besides its convenience to use, low cost and the advantage of being able to control the rate of coupling. 'Chlorination' is a process in which chlorine is introduced into a molecule while 'coupling reaction' refers to class of organic reactions that involve joining of two chemical species, usually with the help of a metal catalyst. Coupling Agent is a compound which provides a chemical bond between two dissimilar materials, usually an inorganic and

2022:DHC:3749



an organic. These chemicals usually modify the surface functionality of filler effectively to aid easy bonding with polymer chains.

29.     In the context of sequence and nature of the chemical reaction, I may refer to the answers given by Dr. Nair, in response to questions (7) and (8) [Terms of Reference (I)/NATCO], which are as under:

> ***"7. In the NATCO Process when thionyl chloride is used the chloride group is attached to the carboxylic acid group in the pyrazole carboxylic acid to form carbonyl chloride which is not a mixed anhydride. Is this correct?***
>
> ***Reply:*** *Yes, it is correct.*
>
> *In Defendant's process R-CO-Cl the corresponding carbonyl chloride (acid chloride) is formed which is not an anhydride.*
>
> ***8. Is the NATCO process which requires reacting a pyrazole carboxylic acid with thionyl chloride to obtain an acid chloride and then reacting the acid chloride so formed with an aniline within the scope of Claims 1 to 5 of IN'645? Is that correct?***
>
> ***Reply:*** *No*
>
> *Defendant's Process is distinct from the process claimed in claims 1 to 5 of IN'645. Moreover, in IN'645 sulfonyl chloride is used and also all the three reagents i.e. the acid, the aniline compound and sulfonyl chloride are added in a single reactor. In Defendant's process the carboxylic acid is first converted to its acid chloride using thionyl chloride in a first reactor. The acid chloride so obtained is reacted with 2-Amino-5-chloro-N,3-dimethylbenzaraide in another reactor to obtain the final product.."*

30.     Since much has been argued on behalf of the Plaintiffs on the equivalence of the two processes, I may refer to the findings on question (iv) [Terms of Reference (II)/(FMC)] which are extremely relevant and are as follows:



*"(a). (iv) Whether the Defendant's process for preparing Chlorantraniliprole (CTPR) is equivalent to the process claimed by the suit patent IN'645?*

Dr. Nair's Report:

***Reply:*** *Yes, though not literally. The equivalence is distinguished in resultant impurity profile of the final product (CTPR) obtained by using thionyl chloride in place of methane sulfonyl chloride in the Defendant's two-step process as against the Plaintiff's process in a single reactor.*

*In the suit patent IN'645, the process for preparing Chlorantraniliprole(CTPR) comprises reacting carboxylic acid of Formula 2, the aniline compound of Formula 3 and the sulfonyl chloride of Formula (4) particularly methane sulfonyl chloride in single reactor.*

*Moreover, in IN'645 process due to the use of methane sulfonyl chloride there is formation of the solid toxic by-product methane sulfonic acid which is harzardous to the environment. In Defendant's process the use of thionyl chloride results in liberation of $SO_2$ (gas) and HCl (gas). The liberated gases are scrubbed and absorbed in caustic soda solution to give sodium chloride and sodium bisulfite having use in food and cosmetic industry.*

*The results of the reaction using methane sulfonyl chloride in the suit patent IN'645 compared to the reaction using thinoyl chloride in the defendant's process does not produce the same result in view of the resultant characteristics of the by-products and impact of the impurity profile of the final product.*

*As such there is no literal equivalence between the Defendant's process and the Plaintiff's IN'645 process."*

*(b).* Additionally, in the earlier Report dated 05.08.2022, Dr. Nair, had observed as under:

> *"Moreover, in IN'645 process due to the use of methane sulfonyl chloride **there is formation of the solid toxic by-product methane sulfonic acid which***



*is harzardous to the environment. In Natco's process the use of thionyl chloride results in $SO_2$ (gas) and HCl (gas) which are released and may be collected and converted to respective acids. There is no formation of solid by-products that could cause harm to the environment in the Natco's process. Further, IN'645 employs costly reagent methane sulfonyl chloride, compared to thinoyl chloride used by the Defendant.*

*The results of the reaction using methane sulfonyl chloride compared to the reaction using thinoyl chloride does not produce the same result in view of the resultant characterstics of the by-products and impact of the impurity profile of the final product. As such there is no equivalence.*

*(c). Prof. Bhanage's Report:*

*Answer: 'No. Though starting materials are same, one process uses thionyl chloride ($SOCl_2$) (NATCO) and another process uses R-sulfonyl chloride (FMC) for conversion to CTPR are different. They are different compound with different reactivity and physical properties'."*

31.    It would be apposite at this stage to mention that a specific question was posed to the Advisors as to whether the Defendant's process is covered and claimed by the process claimed by the suit patent and the answer was 'No'. Dr. Nair has stated 'The Defendant's process for preparing Chlorantraniliprole (CTPR) is not covered by the process claimed by the suit patent IN'645'. Prof. Bhanage stated 'No, as they are using $SOCl_2$ and which is not covered claims of IN'645'.

32.    Pertinently, in response to a specific term *viz*. if the two processes are 'distinct or same', the finding by Prof. Bhanage is as follows:

> *"Are the following two process distinct or the same?*
> *Answer: **They are distinct**.*

2022:DHC:3749



| **NATCO Process** | **IN298645 process** |
|---|---|

**NATCO Process**

(1). HO₂C-pyrazole(Br)-pyridine(Cl) + Thionyl Chloride (SOCl₂)   +

↓

ClC(O)-pyrazole(Br)-pyridine(Cl)   (acid chloride).

(2).

X-benzamide(HNMe)(NH₂)(CH₃) + 3-Picoline (base)

↓

*Mixture of benzamide and 3-picoline base*

(3).

ClC(O)-pyrazole(Br)-pyridine(Cl) + Mixture of [X-benzamide(HNMe)(NH₂)(CH₃)]

and 3-Picoline base from (2) above

↓

X-benzamide-NH-C(O)-pyrazole(Br)-pyridine(Cl)

*(If X= Cl, Chlorantraniliprole of formula-Ia; and If X= CN, Cyantraniliprole of formula-Ib)*

**IN298645 process**

(1).

[pyrazole with R⁴, R⁵, Z, R⁶ - carboxylic acid] **2**   +   [aniline with R¹, R², C(O)NHR³, NH₂] **3**

↓

Mixture I (2 + 3)

(2). Mixture I (2+3) + Base

↓

Mixture II (2 + 3 + Base)

(3).

Mixture II (2+3+Base)   +   Sulfonyl chloride (R⁸S(O)₂Cl)

↓

[final product with R¹, R², R³, R⁴, R⁵, R⁶, Z, NH, C(O)NHR³]

2022:DHC:3749



33. Reply given by Dr. Nair is as follows:

*"5. Are the following two process distinct or the same?*

*Reply:* **Distinct as explained below.**

*The processes of Defendant (Defendant) and of the suit Patent IN298645 are distinct.*

*In the Defendant's process, 3-Bromo-1-(3-Chloro-2-pyridinyl)-1H-pyrazole-5-carboxylic acid is reacted in the first reactor with thionyl chloride (SOCl2) to obtain the intermediate acid chloride. The sulphur dioxide and hydrogen chloride gases liberated during the reaction were scrubbed out during the reaction. In reactor-2 2-Amino-5-chloro-N,3-dimethyl benzamide, acetonitrile and 3-picoline were charged and then the reaction mass from the reactor -1 were added to the above reaction mass to yield the final product chlorantraniliprole of Formula-Ia wherein X is Cl.*

*In the Defendant's process, 3-Bromo-1-(3-Chloro-2-pyridinyl)-1H-pyrazole-5-carboxylic acid is converted to its chloride prior to the reaction with 2-Amino-5-chloro-N,3-dimethyl benzamide.*

*In suit patent IN298645, the carboxylic acid of formula 2 (e.g. 3-Bromo-1-(3-Chloro-2-pyridinyl)-1H-pyrazole-5-carboxylic acid) and the aniline of formula 3 (e.g. 2-Amino-5-chloro-3, N-dimethylbenzamide) are first mixed in base to obtain the mixture followed by addition of sulfonyl chloride (R8S(O)2Cl) in the same reactor to yield the final product of formula 1, as claimed in claim 1, claims 5 to 9 and described in the specification.*

*In the suit patent IN'645, the base is combined with the compounds of Formulae 2 and 3 to form the mixture before combining with sulfonyl chloride. All the three reagents are added for the reaction to occur in a single reactor.*

*It is noted that the by-products in Defendant process are SO2 (gas) and HCl (gas) which are scrubbed and absorbed in caustic soda solution to give sodium bisulfite and sodium chloride respectively, whereas, in the suit patent IN298645 the by-product is solid methane sulphonic acid.*



*Hence, the Defendant's process is different and distinct from the suit Patent IN298645."*

34.    For a ready reference, a comparative of the reactions components between FMC and Natco process for CTPR synthesis is scanned and placed below:



35.    It will also be useful to allude at this stage to the conclusion of Prof. Bhanage, as follows:-

"**Conclusion**:

1. The processes mentioned in these two patents are different.

2. Impurity profile provided by Natco in various annexures mentioned in points 9, 10 and 11 is possible with Patent IN'645.

3. More particularly impurity methane sulfonic acid is not possible with Natco Process."



36.     From the aforesaid analysis and the categorical findings of the both the Scientific Advisors and applying the principles enunciated in the judgements, aforementioned, this Court is of the *prima facie* view that the suit patent process and the Natco process are distinct and different. Sulphonyl chloride is an essential element of suit patent and use of thionyl chloride as a reagent coupled with a different sequence of the reaction, as brought forth by the Scientific Advisors, cannot be termed as an insignificant or trivial or insubstantial change in the Natco process and thus the process *prima facie* does not come under the rigors of Doctrine of Equivalents. The Advisors were appointed with the consent and agreement of the parties and needless to state their opinion and findings needs to be respected. Moreover, there is no challenge to the findings of the Advisors. Learned counsel for the Defendant has rightly relied on the judgment of the Supreme Court in **Martin F. D'Souza (supra),** for the proposition that Courts are not experts and should not substitute their views or opinion for those of the experts or specialists in the field.

37.     This Court also finds *prima facie* merit in the submissions on behalf of the Defendant that IN'645 focuses on acid-amide coupling where both the acid and amide intermediates are known compounds for which patent protection expired on 13.08.2022 and where the only reagent used is sulfonyl chloride. The product CTPR obtained at the end of process of claim 1 in IN'645 is not new since it was already known and was disclosed and claimed in IN'978 and thereafter again in IN'307, both of which were published before the priority date of IN'645. The Reports of the Scientific Advisors supports the fact that the acid and bromide intermediates used in the suit patent are disclosed in prior art IN'218, IN'017 and WO'518.

38.     An argument was also raised on behalf of the Plaintiffs with regard to presence of impurity methane sulfonic acid in CTPR formed in Natco



process. Dr. Nair, in response to Natco's Terms of Reference has stated that the documents/extracts of the Defendant's application for approval by CIBRC show methane sulfonic acid impurity as 'Nil', though Certificate of Registration issued by CIBRC shows impurity not exceeding (maximum) 0.30%. Prof. Bhanage has stated that the impurity will arise only from methane sulfonyl chloride hydrolysis to acid (from the patent IN'645).

39.      Plaintiffs have also relied on an affidavit filed by Dr. Vikram Adsool, to which the Defendant responded by arguing that Dr. Adsool is an FMC employee and thus much credence cannot be given to his opinion. Suffice would it be to state at this stage that in the light of the opinions given by two Scientific Advisors, as aforementioned, the affidavit filed by Dr. Adsool cannot be placed on a higher pedestal, besides the fact that he is an employee of the Plaintiffs. In my *prima facie* view, even otherwise the conclusion drawn by Dr. Adsool does not seem to be correct in view of the fact that when sulfonyl chloride is used in a reaction, the process proceeds differently as compared to when thionyl chloride is used i.e. equating the formation of acid chloride in the Natco process to coupling of carboxylic acid and amide intermediates in the FMC process is wholly incorrect, as opined by both the Scientific Advisors. It bears repetition to state that Section 10(4) of the Act expressly states that claims define the scope of protection. Claim 1 of IN'645 is limited to acid+amide+sulfonyl chloride. On a pointed query, the Advisors have opined that the Natco process is outside the scope of claims of IN'645, where the suit patent is limited to coupling of carboxylic acid intermediate with analine using sulfonyl chloride. This is apparent from the complete specification of IN'645 which sets out the objective of the invention which can only be achieved by using sulfonyl chloride, particularly, methane sulfonic chloride.

2022:DHC:3749



40.     Plaintiffs have thus been unable to discharge the burden of proving that the Natco process is equivalent to the suit patent process and *prima facie* no case of infringement is made out. Balance of convenience also lies in favour of Natco. It was stated on behalf of the Natco that it has already suffered a loss of nearly 100 crores on account of not being able to launch its product. The product patent IN'307 has already expired on 13.08.2022. The product in question is an insecticide and as rightly pointed out by the learned counsels for the Defendant, is required between September to December in the Kharif season. Seen holistically, the restraint order passed against the Defendant from launching the product CTPR deserves to be vacated.

41.     Learned Senior Counsel for the Plaintiffs heavily relied on the judgment in **Sotefin SA (supra)**, for the proposition that it is imperative to reach a finding that all essential elements of the suit patent are present in the infringing process, in order to determine infringement. The proposition of law is beyond any debate, however, on facts the said judgment is distinguishable from the present case. Bare reading of the judgment shows that in the said case the independent Scientific Advisors had opined that 17 of the 19 elements of claim No. 1 of the suit patent were found in the infringing product. On an analysis of the Report as well as having examined the two elements, i.e., 'hinges' and 'immobilization of rear wheels' in the infringing product, Court was of the view that these elements did not make any substantial difference in the functionality and did not have material effect on the working of the invention, as asserted by the Defendants therein. In this background, the Court found that the changes were insignificant and *prima facie* case of infringement of suit patent was made out by the Plaintiff therein. In contrast to the said facts, in the present case both Scientific Advisors have opined that the competing processes are distinct, different and not 'equivalent'. The judgment, therefore, does not aid the Plaintiffs.

2022:DHC:3749



42.    In *Raj Parkash (supra),* relying on the settled proposition of law that a person is guilty of infringement if he makes an equivalent patented article and trifling or unessential variation has to be ignored, Division Bench of this Court found in the facts of the case that Defendants had made variations which were unessential and were marketing a product which was substantially the same as the one conceived by the Plaintiff, which is diametrically opposite to the facts of the present case. Therefore, the Plaintiffs cannot seek refuge under the said judgment.

43.    In view of the aforesaid, Natco is permitted to launch its product, i.e., CTPR, with a caveat that it shall remain bound by the undertaking and assurance given to the Court that it will not use a process claimed under IN'645 or any other process, which infringes the suit patent IN'645. Additionally, Natco shall keep accounts of the sales and shall file the same on an affidavit on a quarterly basis in this Court.

44.    Present application is accordingly dismissed in the aforesaid terms.

**CS(COMM) 349/2022 & I.A. 8132/2022, 9519/2022, 10886/2022**

45.    List before learned Joint Registrar for further proceedings on 28.11.2022.


                                                        **JYOTI SINGH, J**

**SEPTEMBER  19th, 2022***/shivam/rk*