**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| *IN RE* **FMC CORPORATION SECURITIES LITIGATION** | Case No.: 2:23-cv-04398-KNS |
| **This Document Applies To:**<br>**ALL ACTIONS** | <u>CLASS ACTION</u> |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO
<u>DISMISS THE AMENDED COMPLAINT</u>**

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ................................................................................1

II.   STATEMENT OF FACTS ....................................................................................4

    A.    FMC's Business and Sales Model ..............................................................4

    B.    Defendants' Assurances to Investors Regarding Demand.........................5

    C.    Unbeknownst to Investors, Ballooning Channel Inventories and Generic
        Diamides Caused Demand for FMC's Products to Plummet .....................7

    D.    The Truth is Revealed to the Market .......................................................10

III.  LEGAL STANDARD............................................................................................12

IV.   ARGUMENT.........................................................................................................12

    A.    The Detailed, Corroborative FMC FE Accounts Should be Credited ....12

    B.    Plaintiffs Adequately Allege Material Misstatements .............................16

        1.    Defendants' Statements About Demand Are Actionable ...........................16

        2.    Defendants' Truth-on-the-Market Defense Fails.....................................19

        3.    The Safe Harbor Does Not Shelter Defendants' Misstatements...............22

        4.    Defendants' Misstatements Are Not Mere Puffery ..................................24

        5.    Defendants' Misstatements Are Not Inactionable Opinions ....................26

        6.    Plaintiffs Adequately Allege an Item 303 Violation................................27

    C.    Plaintiffs Adequately Allege Defendants' Scienter ................................28

        1.    Defendants Claimed Knowledge of Demand Issues, Drivers and
            Data.........................................................................................................28

        2.    Defendants Attended Meetings Where Demand Trends Were
            Discussed and Had Access to Reports and SAP Data Reflecting
            Demand Metrics.......................................................................................30

        3.    Defendants Repeatedly Spoke on Issues Affecting Demand,
            Including in Response to Analyst Questions ............................................31

        4.    The Importance of the Diamides and the LATAM and APAC
            Markets Contributes to an Inference of Scienter ......................................33

        5.    Additional Allegations Support an Inference of Scienter .........................34

    D.    Plaintiffs Sufficiently Allege Control Person Liability .........................35

i

V.    CONCLUSION..........................................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alberci v. Recro Pharma, Inc.*,
  2020 WL 806719 (E.D. Pa. Feb. 14, 2020) ...................................................................33

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
  532 F. Supp. 3d 189 (E.D. Pa. 2021) ...............................................................23, 32, 33

*In re Allergan Generic Drug Pricing Sec. Litig.*,
  2019 WL 3562134 (D.N.J. Aug. 6, 2019) .....................................................................34

*In re Alpharma Inc. Sec. Litig.*,
  372 F.3d 137 (3d Cir. 2004)...........................................................................................31

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013)........................................................................................................20

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................................................12

*In re ATI Techs., Inc. Sec. Litig.*,
  216 F. Supp. 2d 418 (E.D. Pa. 2002) .............................................................................26

*Burtch v. Millberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011)...........................................................................................12

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004)...............................................................................12, 30, 31

*In re Campbell Soup Co. Sec. Litig.*,
  145 F. Supp. 2d 574 (D.N.J. 2001) ................................................................................34

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*,
  2019 WL 3451523 (D.N.J. July 31, 2019)................................................................16, 21

*City of Hialeah Emps.' Ret. Sys. & Laborers Pension Tr. Funds for N. Cal.
  v. Toll Bros., Inc.*, 2008 WL 4058690 (E.D. Pa. Aug. 29, 2008)............................................24

*City of Roseville Ret. Sys. v. Horizon Lines, Inc.*,
  713 F. Supp. 2d 378 (D. Del. 2010)...............................................................................31

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
  70 F.4th 668 (3d Cir. 2023) ........................................................... 12-13, 14, 16, 21

*City of Warwick Ret. Sys. v. Catalent, Inc.*,
2024 WL 3219616 (D.N.J. June 28, 2024) ................................................................4, 29, 31

*In re Coca-Cola Enters., Inc. Sec. Litig.*,
510 F. Supp. 2d 1187 (N.D. Ga. 2007) ...........................................................................15

*In re Coinbase Glob., Inc. Sec. Litig.*,
2024 WL 4053009 (D.N.J. Sept. 5, 2024) .......................................................................18

*In re CommVault Sys., Inc. Sec. Litig.*,
2016 WL 5745100 (D.N.J. Sept. 30, 2016) .....................................................................13

*Cont'l Gen. Ins. Co. v. Olafsson*,
2024 WL 4263211 (D.N.J. Sept. 23, 2024) .....................................................22, 24, 25, 35

*Curran v. Freshpet, Inc.*,
2018 WL 394878 (D.N.J. Jan. 12, 2018) .........................................................................23

*In re Dentsply Sirona, Inc. Sec. Litig.*,
665 F. Supp. 3d 255 (E.D.N.Y. 2023) ............................................................................19

*Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*,
794 F.3d 297 (2d Cir. 2015).........................................................................................19

*Emps. Ret. Sys. of P.R. Elec. Power Auth. v. Conduent Inc.*,
2020 WL 3026536 (D.N.J. June 5, 2020).................................................................22, 23

*In re Enzymotec Sec. Litig.*,
2015 WL 8784065 (D.N.J. Dec. 15, 2015)............................................................. *passim*

*Feinberg v. Am. Express Co.*,
2011 WL 4807916 (E.D. Pa. Oct. 7, 2011).....................................................................19

*Hall v. Johnson & Johnson*,
2019 WL 7207491 (D.N.J. Dec. 27, 2019)......................................................................29

*Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*,
2022 WL 889158 (E.D. Pa. Mar. 25, 2022)............................................................. 25-26, 31

*In re Hertz Glob. Holdings Inc.*,
905 F.3d 106 (3d Cir. 2018)..........................................................................................28

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
2017 WL 1536223 (D.N.J. Apr. 27, 2017), *aff'd sub nom. In re Hertz Glob.
Holdings, Inc.,* 905 F.3d 106 (3d Cir. 2018).....................................................................26

*Industriens Pensionsforsikring A/S v. Becton Dickinson & Co.*,
620 F. Supp. 3d 167 (D.N.J. 2022) ...........................................................................13, 17

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
  2020 WL 1479128 (E.D. Pa. Mar. 25, 2020)..................................................20, 21, 24

*Institutional Invs. Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009).........................................................................16, 32, 35

*In re Intelligroup Securities Litigation*,
  527 F. Supp. 2d 262 (D.N.J. 2007) ....................................................................15, 35

*Kenneth v. Yeung Chi Shing Holding (Delaware), Inc.*,
  2020 WL 409010 (N.D. Cal. Jan. 24, 2020) .............................................................18

*La Quinta Worldwide, LLC v. Q.R.T.M, S.A. de C.V.*,
  2011 WL 13233546 (D. Ariz. Feb. 16, 2011)............................................................18

*Loc. 731 I.B. -of T. Excavators & Pavers Pens. Tr. Fund v. Swanson*,
  2011 WL 2444675 (D.N.J. June 14, 2011) ...............................................................23

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ....................................................................................34

*In re Merck & Co. Inc. Sec., Deriv. & ERISA Litig.*,
  2012 WL 3779309 (D.N.J. Aug. 29, 2012) .........................................................17, 20

*In re Merck & Co. Sec., Deriv. & ERISA Litig.*,
  2015 WL 2250472 (D.N.J. May 13, 2015)................................................................27

*In re Merck & Co. Sec. Litig.*,
  432 F.3d 261 (3d Cir. 2005)......................................................................................14

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
  761 F.3d 245 (2d Cir. 2014)................................................................................ 23-24

*Mill Bridge V, Inc. v. Benton*,
  2009 WL 4639641 (E.D. Pa. Dec. 3, 2009)..............................................................34

*Nikolov v. Livent Corp.*,
  470 F. Supp. 3d 461 (E.D. Pa. 2020) .......................................................................28

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)......................................................................................26

*In re Novo Nordisk Sec. Litig.*,
  2018 WL 3913912 (D.N.J. Aug. 16, 2018) .........................................................21, 35

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015).............................................................................................26, 27

v

*Oran v. Stafford,*
 226 F.3d 275 (3d Cir. 2000)................................................................................18

*Pelletier v. Endo Int'l PLC,*
 439 F. Supp. 3d 450 (E.D. Pa. 2020) ....................................................................13

*Phillips v. Cnty. of Allegheny,*
 515 F.3d 224 (3d Cir. 2008)................................................................................12

*In re Radian Sec. Litig.,*
 612 F. Supp. 2d 594 (E.D. Pa. 2009) ....................................................................31

*Rahman v. Kid Brands, Inc.,*
 736 F.3d 237 (3d Cir. 2013).............................................................................14, 28

*In re Res. Am. Sec. Litig.,*
 2000 WL 1053861 (E.D. Pa. July 26, 2000)....................................................20, 21

*Roofer's Pension Fund v. Papa,*
 2018 WL 3601229 (D.N.J. July 27, 2018).......................................................22, 28

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona, Inc.,*
 2024 WL 1898512 (S.D.N.Y. May 1, 2024) ..................................................... 29-30

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC,*
 351 F. Supp. 3d 874 (E.D. Pa. 2018) ................................................................ *passim*

*Shapiro Fin. Corp. v. UJB,*
 964 F.2d 272 (3d Cir. 1992)..............................................................................2, 17

*In re Signet Jewelers Ltd. Sec. Litig.,*
 2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018).......................................................27

*Stadium Cap. LLC v. Co-Diagnostics, Inc.,*
 2024 WL 456745 (S.D.N.Y. Feb. 5, 2024).............................................................29

*Teamsters Loc. 456 Pension Fund v. Universal Health Servs.,*
 396 F. Supp. 3d 413 (E.D. Pa. 2019) ....................................................................33

*Tellabs, Inc. v. Makor Issues & Rights, Ltd,*
 551 U.S. 308 (2007)...........................................................................................28

*In re Toronto-Dominion Bank Sec. Litig.,*
 2018 WL 6381882 (D.N.J. Dec. 6, 2018)..........................................2, 14, 15, 25

*Tracinda Corp. v. DaimlerChrysler AG,*
 197 F. Supp. 2d 42 (D. Del. 2002).......................................................................15

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
   625 F. Supp. 3d 164 (S.D.N.Y. 2022).................................................................................35

*In re Urb. Outfitters, Inc. Sec. Litig.*,
   103 F. Supp. 3d 635 (E.D. Pa. 2015) ...................................................................14, 16, 19, 31

*Utesch v. Lannett Co., Inc.*,
   316 F. Supp. 3d 895 (E.D. Pa. 2018) ...........................................................................14, 16, 32

*In re Viropharma Inc. Sec. Litig.*,
   21 F. Supp. 3d 458 (E.D. Pa. 2014) .................................................................................18, 23

*In re Viropharma, Inc. Sec. Litig.*,
   2003 WL 1824914 (E.D. Pa. Apr. 7, 2003) .........................................................................25

*W. Palm Beach Pol. Pens. Fund v. DFC Glob. Corp.*,
   2015 WL 3755218 (E.D. Pa. June 16, 2015).................................................................25, 35

*Weston v. DocuSign, Inc.*,
   669 F. Supp. 3d 849 (N.D. Cal. 2023) .................................................................................19

*Winer Fam. Tr. v. Queen*,
   2004 WL 2203709 (E.D. Pa. Sept. 27, 2004), *aff'd*, 503 F.3d 319 (3d Cir.
   2007) ............................................................................................................................ 19-20

*Wu v. GSX Techedu Inc.*,
   2024 WL 3163219 (D.N.J. June 25, 2024) .....................................................................13, 32

**Statutes**

15 U.S.C. § 78u-5(c)(1)(A)(i) ....................................................................................................23

**Other Authorities**

17 C.F.R. § 229.303(b)(2)(ii)......................................................................................................27

**GLOSSARY OF TERMS**

| Term | Definition |
|---|---|
| ¶ | Refers to a paragraph in the Complaint |
| 2Q23 | The second quarter of FY23, running from April 1, 2023 to June 30, 2023 |
| 3Q23 | The third quarter of FY23, running from July 1, 2023 to September 30, 2023 |
| APAC | FMC's Asia-Pacific region (*see* ¶31) |
| Blue Orca | Blue Orca Capital (¶248) |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| Class Period | February 9, 2022 to October 30, 2023, both dates inclusive |
| Company | FMC |
| Complaint | Amended Complaint for Violations of the Federal Securities Laws (ECF No. 30) |
| Defendants | FMC, Douglas, and Sandifer |
| Diamides | FMC's two diamide agricultural insecticides, Rynaxypyr and Cyazypyr (¶2) |
| Douglas | Individual Defendant Mark A. Douglas (¶32) |
| EBITDA | Earnings Before Interest, Taxes, Depreciation, and Amortization |
| EDI report | Electronic Distribution Invoice report (¶72) |
| EMEA | FMC's Europe, Middle East, and Africa region (¶31) |
| ESOP | Executive Sales and Operations Planning (¶199) |
| FCF | Free Cash Flow |
| FE(s) | Former Employee(s) |
| FMC | FMC Corporation |
| FY23 | The 2023 fiscal year |

| | |
|---|---|
| IP | Intellectual Property |
| LATAM | FMC's Latin America region (¶31) |
| Leadership Calls | FMC's monthly Leadership Calls with all regional leaders (¶66) |
| Motion | Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (ECF No. 36) |
| MTD | Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (ECF No. 36-1) |
| Plaintiffs | Court-appointed Lead Plaintiff Ruth Asset Management and additional plaintiff Oklahoma Firefighters Pension and Retirement System |
| POG report | Product on the Ground report (¶72) |
| POS report | Point of Service report (¶72) |
| PSLRA | Private Securities Litigation Reform Act |
| S&OP | Supply and Operations Planning (¶65) |
| Sandifer | Individual Defendant Andrew D. Sandifer (¶33) |
| SAP | Systems Applications and Products in Data Processing program (¶6) |

***

**Note on Citation Format:** Unless otherwise noted, all emphasis is added, and all internal citations and quotation marks are omitted.

ix

## I.    PRELIMINARY STATEMENT

The law in this Circuit and District is clear: "once a company has chosen to speak on an issue . . . it cannot omit material facts." *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 897 (E.D. Pa. 2018). The Complaint alleges violations of this fundamental rule by Defendants—FMC and its former CEO Douglas and CFO Sandifer—with exhaustive particularity. It pleads that, after a years-long growth boom, FMC faced staggering headwinds to its ability to increase revenues in 2022 and 2023, but, instead of accurately disclosing these internally-recognized facts to investors, Defendants publicly misrepresented FMC's faltering demand through materially false and misleading half-truths. The Complaint also pleads, in uncontested loss causation allegations, that Defendants' misconduct caused the destruction of billions of dollars in shareholder equity. This lawsuit seeks a remedy for investors injured by Defendants' fraud.

Plaintiffs' claims are underpinned by a chorus of ***nineteen*** former FMC employees who, despite working in different units around the globe, tell a unified story of collapsing demand buffeting the Company in the Class Period. Specifically, they recount that a COVID-driven buying surge did not represent a new baseline of demand, but was a ***bubble*** that led to flooded inventories throughout FMC's distribution channels—and, in turn, a severe demand drop-off that would persist indefinitely. By 2022, these channel inventory issues were "exploding," and customers put "the brakes on buying," and even returned excess product. New generic competition for FMC's leading insecticides, the Diamides, in China, India, and elsewhere further dampened demand.

Defendants knew all of this. FEs recount that FMC's demand issues, post-COVID, were seen and reported internally in multiple ways. FMC managers discussed them in regular demand planning meetings at the regional and corporate level, in monthly Leadership Calls among regional managers and corporate executives, and in emails between the regions and FMC headquarters. They were also reflected in inventory and sales reports, internal SAP and data management

1

systems, and on customer warehouse floors. Nevertheless, Douglas and Sandifer rejected sales plans reflecting FMC's true, reduced demand, in 2022 to 2023. As one FMC FE put it, "no one had the gumption to tell the investors that the party was over."

Instead, during the Class Period, Defendants misled investors, representing that FMC's remarkable growth story continued unabated: demand for FMC's products was "very strong," channel inventories were normal and no cause for concern, and generic competition was not meaningfully impacting sales. Douglas and Sandifer spoke on these topics in commanding detail, assuring investors that their knowledge was based on FMC's ability to monitor inventory and track "***what is happening at the grower level***." Meanwhile, they glossed over any inventory increase FMC did disclose as isolated and transitory (i.e., due to weather). These misrepresentations drove FMC's stock price to all-time highs until the truth came out in disclosures from May to October 2023, which together caused FMC's stock price to fall more than ***$30 per share***. Stunned investment analysts asked whether FMC had previously "overstated underlying demand." It had.

This is a quintessential securities fraud. Defendants were not free to characterize FMC's demand (or factors underlying it, such as channel inventories) in glowing terms while leaving out material, adverse facts that would provide investors with a complete and accurate picture. *Shapiro Fin. Corp. v. UJB*, 964 F.2d 272, 282 (3d Cir. 1992) (statements that put topics "in play" are actionable if they omit contrary facts). Cases in this Circuit finding that such materially misleading half-truths violate Section 10(b) are legion.

Defendants' arguments for dismissal go nowhere. First, their attacks on the validity of Plaintiffs' allegations based on FMC FE reports demand a level of specificity that the law does "not require[]." *See In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *5 (D.N.J. Dec. 6, 2018). The detail about tenure and job responsibility provided as to each FE—showing

2

their basis to possess the information they supply—and the mutually consistent reports these independent sources state about conditions at FMC at relevant times, are more than sufficient.

Defendants also assert that their misstatements could not be false because FMC had already disclosed the allegedly misrepresented facts, but this "truth on the market" defense fails. This defense is both so "intensely fact specific" and demanding that it is "rarely an appropriate basis for dismissing a §10(b) complaint," *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *16 (D.N.J. Dec. 15, 2015), and it is irreconcilable with what Defendants actually said to the market and investors' negative reaction (and FMC's stock price drops) when the true demand deterioration was laid bare. Defendants' argument that boilerplate risk disclosures informed the market of FMC's demand spiral ignores the disclosures' portrayal of existing risks as merely hypothetical, as well as investors' shock upon learning the truth.

Next, in claiming that their misstatements about demand and inventory were immaterial puffery, Defendants improperly take statements out of context and disregard that they addressed concrete, verifiable points on matters of clear importance to investors—the opposite of puffery. Similarly, Defendants' argument that their statements were protected as forward-looking fails because the challenged statements were assertions about current or historical facts, and so fell outside the PSLRA's safe harbor. The misrepresentations also were not subjective opinions immunized from liability because Defendants' statements concerning demand, inventories, and IP protections concealed myriad facts cutting the other way.

Defendants also sidestep the substantial particularized facts showing their scienter. First and foremost, Douglas and Sandifer's ***own words*** trumpeting FMC's direct line of sight into, and management of, product inventories at the retailer and grower level preclude them from claiming ignorance as to FMC's swamped channel inventories and failing demand. Their boasts were

3

consistent with FE accounts regarding comprehensive demand and inventory data systems, plans, and reports that were accessible and shared up to the highest levels of the Company during the Class Period, which reinforce a finding of scienter. *See City of Warwick Ret. Sys. v. Catalent, Inc.*, 2024 WL 3219616, at \*15 (D.N.J. June 28, 2024). Adding to the inference, Douglas and Sandifer spoke in authoritative detail in answering pointed analyst questions about allegedly misrepresented topics—demand and underlying factors like channel inventories and encroaching generics, and FMC's ability to meet its revenue plan—further undermining their claims that they knew nothing.

Defendants' Motion should be denied, permitting this case to enter discovery.

## II.    STATEMENT OF FACTS

### A.    FMC's Business and Sales Model

FMC develops and sells agricultural chemicals in four regions—LATAM (including Brazil, its largest market), North America, APAC (including India, another key market), and EMEA—selling directly to retailers and end-users in some markets (e.g., Brazil), and through distributors who sell to retailers in others (e.g., North America). ¶¶31, 54-56. FMC's leading products are the Diamides, acquired from DuPont de Nemours, Inc. for $1.2 billion in 2017. ¶74.

In December 2018, on the expected revenue boost from the Diamides, FMC rolled out an aggressive five-year plan calling for robust annual growth and revenues of $5.5 to $6 billion by 2023. ¶79. Before the Class Period, FMC delivered, reporting total revenues of $4.61 billion in 2019 (35% from the Diamides), $4.64 billion in 2020 (39% from the Diamides), and $5.05 billion in 2021 (38% from the Diamides). ¶¶83, 87. Defendants hailed the Diamides as "a core part of our business" and "a critical component of our product offerings," and assured the market that the Diamides' market share was protected from any "legitimate generic competitor" until at least 2026.

4

¶¶85-86, 88.[1] FMC's burgeoning revenues over this period spanned the globe—the Company's total LATAM revenues grew from $1.4 billion in 2019 to $1.6 billion in 2021, and APAC revenues jumped from $1.0 billion in 2019 to $1.3 billion in 2021. ¶87.

**B.      Defendants' Assurances to Investors Regarding Demand**

From the start of the Class Period, Defendants told investors that FMC's revenue growth was continuing, propelled by robust demand for its products. For example, on February 9, 2022, Douglas emphasized the sustainability of FMC's revenue growth in response to analyst questions, remarking on the "*very, very strong demand out there*," and stating "*from a market demand perspective, it's very strong all over the world*." ¶¶92, 285. Douglas also addressed "channel inventories"—i.e., the amount of product in FMC's distribution network—which investors deemed a key gauge of demand conditions (¶5), stating: "[W]hen I think about channel inventories today, frankly, *I have very, very few concerns from where I sit*." ¶¶92, 285.

Throughout 2022, Defendants maintained that demand was strong across all markets and there were no channel inventory issues, often highlighting the protection from diamide competition afforded by FMC's IP portfolio. For example, on May 4, 2022, Sandifer addressed an analyst question about demand, claiming, "*the U.S. market is still going gangbusters . . . demand has been very, very strong*," and assuring investors: "*We see those conditions continuing . . . . we see a pretty good market in the U.S., not only for this year but for several years*." ¶¶308-09. Days later, he emphasized FMC's "broad base of IP [for the Diamides] that makes it very hard to legally enter these markets for quite some time," and said the Diamides would be "an anchor for the company to continue growing over the . . . rest of the decade." ¶¶96-97. On November 2, 2022,

---

[1]      The suite of IP protections that FMC acquired with the Diamides included "composition of matter" and "process" patents, and protections afforded by registration, which when combined, FMC stated could "*extend well beyond the active ingredient composition of matter patents*" that began expiring in 2022. ¶294; *see also* ¶¶75-78.

Douglas told investors to "expect that same growth rate next year" for Diamides, stating that the "market is growing rapidly in many parts of the world" and that Defendants were "happy where inventory levels are in the marketplace." ¶¶101-02, 333. He brushed off an analyst question about "outlying" inventory levels, claiming any "pockets of higher inventories" were isolated and due to weather—monsoons in India, dry weather in Southern Europe, and drought in Brazil. ¶¶102, 333.

Bolstering their representations, Defendants assured investors that they saw clearly into FMC's channels, with respect to inventories and usage. For example, on May 18, 2022, after an analyst asked about "visibility" into Brazil inventories, Douglas stated that FMC was "manag[ing] inventory not only in our own facilities, *not only in third-party warehouses, but also at the grower level*" such that FMC knew both "how much product are we selling into the market" and "[h]ow much is actually getting through to the grower" and "*how much is getting used on the ground*." ¶¶98-99, 314-15.[2] Multiple FEs confirm that Defendants could monitor channel inventory levels and demand in real-time, through Company-wide reporting systems including SAP, and that these topics were regularly discussed at periodic meetings including S&OP meetings held monthly at the regional level and semi-annually at the corporate level. *See* ¶¶197-99, 203. FEs further recount that inventory and demand issues were discussed at monthly planning meetings, which culminated in presentations to FMC executives. *See, e.g.*, ¶¶65, 199-204.

In 2023, Defendants' refrain was unchanged: demand was strong, channel inventories were normal, and the Diamides were insulated from competition by IP protections. For example, on February 8, 2023, Douglas characterized channel inventories as "normal," dismissing any elevated pockets as weather-related. ¶¶104, 357. Less than two weeks later, Sandifer again assured investors

---

[2]     *See also* ¶428 ("I think we know where the issues are, and we're going to manage it proactively."); ¶430 (FMC tracks "*what is happening at the grower level*," including monitoring "acreage that gets planted . . . *around the world*" and has an "*understanding on the ground of what's getting planted and then what is being applied*.").

that FMC's Diamides IP "*give[s] us protection that continues well until the end of this decade*," and highlighted its "aggressive[]" efforts to "defend our patents." ¶¶105-06, 361. Sandifer also addressed questions on inventory levels, asserting they were something FMC was "*conscious of and managing closely*" and "going to manage [] proactively." ¶¶107-08, 363-64. On May 2, 2023, when an analyst asked about FMC's confidence in its volume growth outlook, Douglas said, "all the signs are all good" and "*the volume perspective as we go through the year will improve*." ¶¶111, 384. A week later, Sandifer told investors that "*we're pretty comfortable with channel inventory overall around the world*," reiterating that "demand for crop protection products" is "*very, very healthy*." ¶¶113, 395. Speaking to investors on August 3, 2023, Douglas made light of any threat from generics, saying "where generics are coming in with a certain type of product, we're not selling those products anymore[,]" and "we don't have a lot of generic pressure in a lot of our product lines[.]" ¶¶408-09.

Defendants' assurances had their intended effect. FMC's stock price soared to record highs during the Class Period, exceeding $135 per share on numerous trading days. ¶12.

### C. Unbeknownst to Investors, Ballooning Channel Inventories and Generic Diamides Caused Demand for FMC's Products to Plummet

In stark contrast to Defendants' representations, demand for the Company's products was nosediving throughout the Class Period. The truth, which Defendants knew, was that FMC confronted a massive backup of channel inventory due in large part to product stockpiling during the COVID pandemic. The resulting demand weakness was exacerbated by the entrance of generic Diamide competitors in several key markets, among other factors.

As recounted by FEs from across FMC's major markets, as early as 2020, FMC's customers were buying up as much product as possible, based on fears of supply chain disruptions. *See* ¶¶116-29. As COVID wore on, distributors and direct buyers continued to stockpile product.

7

*See, e.g.*, ¶118 (FE-6: starting in 2020, direct buyers and distributors for Pakistan region overbooked purchases in order to guarantee sufficient stock); ¶117 (FE-1: LATAM distributors were amassing "huge volumes" of "excess" inventory in late 2021 to early 2022); ¶124 (FE-10: in 2021 U.S. clients purchased product 2 years in advance because of COVID); ¶125 (FE-5: customers over-ordered due to supply chain concerns from 2020 to 2022); ¶126 (FE-3: overstocked inventories were a problem for FMC from 2020 to 2022). Within FMC, it was "common knowledge" that this demand "bubble" was "unnatural" and unsustainable. *See, e.g.*, ¶122 (FE-4: everyone at FMC "always knew that we would hit a wall" and that "[i]t had to happen and there was no way it couldn't"); *see also* ¶¶116, 119, 121, 125, 129.

FEs also report that by 2022, it was clear internally that FMC's inventory channels were oversaturated and demand was dropping as distributors, retailers, and farmers began working through their stockpiles, and even returned unused product. *See, e.g.*, ¶132 (FE-17: sales in India began lagging in 2021); ¶124 (FE-10: by 2022, North American sales members could not ask distributors and retailers to take more product as "barns were full"); ¶117 (FE-1: by mid-2022, excess inventory issues were "already exploding" in LATAM); ¶142 (FE-7: FMC had to accept returns of product that expired on warehouse floors due to destocking); ¶180 (FE-6: many FMC products sold during COVID expired in 2022 which led customers to demand replacements).

Despite crashing demand, Defendants implemented unachievable sales targets and resorted to offering deep discounts and credit on unfavorable terms to try to sustain the revenue growth and demand levels they had promised to investors. *See, e.g.*, ¶143 (FE-4: FMC management pushed to "shove products into the channel" despite inventories "stacked to the ceiling"); ¶136 (FE-6: FMC management increased sales targets by 10% or more over the prior year's COVID-inflated targets); ¶134 (FE-3: it was "crazy" trying to sell product to customers that already had enough); ¶¶117,

8

178-79 (FE-1: FMC gave unfavorable credit terms to push sales); ¶¶132, 137 (FE-17 and FE-14: FMC forced to grant lower prices to move product).

FMC management knew that employees engaged in improper practices to hit management's sales targets. *See, e.g.*, ¶136 (FE-6: U.S. headquarters informed by email of practice of overbooking sales and warehousing undelivered product); ¶141 (FE-7: overextending credit in Asia). Alarms from the field regarding the impossible sales targets fell on deaf ears as Defendants imposed top-down numbers, rejecting demand plans that did not align with these unrealistic sales goals. *See, e.g.*, ¶¶132-35, 138-43, 181-82, 209 (FE-3: demand planning was "futile exercise" because FMC leadership vetoed submitted numbers, saying, "these are your numbers").

FEs also report that the demand decline was amplified by the encroachment of generic diamides. For example, by late 2021, FMC's LATAM distributors began to blame reduced product orders partially on FMC products losing IP protection. ¶158. By 2022, generic insecticides also competed with FMC products in Pakistan, India, and Europe, and had reduced its China sales by as much as 50%. ¶159.[3] At the same time, FMC suffered a number of legal setbacks that removed certain hurdles for generic diamides in the key APAC and Brazilian markets. *See, e.g.*, ¶148 (Sept. 12, 2022 Chinese regulator ruling invalidating Rynaxypyr process patent); ¶156 (Sept. 16, 2022 Brazilian court decision ordering regulators to assess generic Rynaxypyr for launch); ¶¶149, 153 (Sept. 19 and Nov. 14, 2022 Indian court rulings clearing way for generic Rynaxypyr).

Numerous FEs confirm that Defendants had access to detailed information regarding demand and inventory levels through various reports and data systems, and participated in regular meetings where these topics were discussed. For example, Defendants participated in meetings, including monthly ESOP and demand planning meetings, where demand issues and metrics were

---

[3] *See also* ¶¶160, 166-68.

aired, and attended presentations addressing demand and inventory across FMC's regions. *See, e.g.*, ¶¶197-203, 211, 416-20. Informing these reviews, FMC's SAP system let management track "everything that FMC does" and provided "instant access" to up-to-date information concerning sales, forecasting, inventory, and supply for any FMC region.[4] ¶¶67-72, 129, 142, 221-34. Through these systems, reports, meetings, and other sources, Defendants were keenly aware of the demand downturn, including ballooning channel inventories and rising generic competition. Notwithstanding their knowledge of and access to this information, Defendants concealed the true state of affairs at FMC throughout the Class Period. In the words of FE-10: "***no one had the gumption to tell the investors that the party was over***." ¶174.

### D.      The Truth is Revealed to the Market

Through a series of disclosures beginning in May 2023, investors sequentially learned the truth regarding FMC's floundering demand. In releases on May 1-2, 2023, FMC lowered its 2Q23 outlook, citing reduced demand and some channel inventory issues, including destocking activities, in certain markets. ¶¶236, 238. The guidance reduction came less than three months after Defendants told the market that inventory levels were "normal." ¶¶104, 357. As FE-19 observed: "***You don't discover in two months that your inventory is full***." ¶183. However, FMC reassured investors that its new outlook fully accounted for any channel inventory issues. ¶386 ("that's ***already built into*** our forward-looking guidance"). FMC's common stock fell more than $7 per share on this news, with analysts noting that the lowered guidance signaled there was "clearly some inventory management taking place by the channel," but largely accepting Defendants' claim that any issues were 'baked in' to the newly revised forecast. ¶¶237-40.

On July 10, 2023, FMC again slashed its 2Q23 guidance, along with its FY23 forecasted

---

[4]      Information related to demand and inventory was also addressed in POG and EDI reports, provided by FMC employees "on the ground," and reflected in data and reports that FMC received from clients. ¶¶222-23, 229-34, 421.

Adjusted EBITDA and revenues, claiming "unforeseen and unprecedented volume declines in three out of four" regions due to "channel partners rapidly reducing inventory levels." ¶242. Analysts called it "*a surprise, and not a positive one*," stating "the order of magnitude of today's announcement is *breath-taking*," and questioning if "*volume sales in prior years [] overstated underlying demand*," while FMC's common stock fell more than $11 per share. ¶¶244-45, 247.

Then, on September 7, 2023, Blue Orca published a 38-page report claiming that FMC "concealed from investors" the deterioration of its "core business[,] resulting in an inescapable cycle of falling revenues, plummeting cash flows, [and] declining profits." ¶¶248-49. Blue Orca also characterized FMC's claims that "it will not face generic competition on its flagship products until 2026 at the earliest" and that "'there is not a single legal competitor . . . in the world today'" as "simply not true." ¶249. In response, FMC's common stock dropped more than $6 per share. ¶251. Analysts noted the contrast between Blue Orca's claims and FMC's statements that generic diamide sales would not be seen "until 2026 at the earliest." ¶252.

On October 23, 2023, FMC *again* cut its revenue outlook, this time for 3Q23 and FY23, pointing to "*substantially lower sales volumes in Latin America*." ¶253. Upon this disclosure, which Bloomberg characterized as a "*shocking* guidance cut," FMC's common stock price fell nearly $11 per share. ¶¶254, 257. Then, on October 30, 2023, FMC lowered its FY23 FCF guidance. ¶259. On its next-day earnings call, Sandifer told investors that FMC's poor cash flow and gross debt-to-EBITDA ratio had led it to seek "discussions with our bank group to further amend our covenants." ¶262. In response, FMC's common stock dropped more than $4 per share. ¶264. Analysts called FCF the "*next negative surprise*" and noted "*several additional negative surprises*" in the results, remarking: "*The issue of inventory reduction in crop chemicals seems like a business problem where the mosaic could have been put together*." ¶¶266-67.

11

## III.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a court should dismiss a complaint if it fails "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint states a plausible claim for relief when it alleges "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element[s]" of a claim. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008). When analyzing a motion to dismiss, inferences must be drawn and facts must be construed "in the light most favorable to the plaintiff." *Burtch v. Millberg Factors, Inc.*, 662 F.3d 212, 220 (3d Cir. 2011).

## IV.    ARGUMENT

### A.    The Detailed, Corroborative FMC FE Accounts Should be Credited

The Complaint's allegations based on FMC FE accounts are reliable and amply support the falsity and scienter elements of Plaintiffs' claims. Courts credit FE-supplied facts when, as here, allegations state the FE's position, tenure, and relevant responsibilities, and other corroborative facts "support[ing] the probability" that someone in that position "would possess the information alleged." *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 148 (3d Cir. 2004).

Defendants contend there are inadequate details to support just three FE accounts, thus conceding that Plaintiffs adequately plead facts required to credit the other sixteen. *See* MTD at 13-14 (attacking FEs 4, 6, and 18). Defendants' arguments fall short. For example, while seeking to impugn facts FE-4 provided on "COVID-era purchasing" because he did not manage sales or forecasting, Defendants ignore that: (i) he worked at FMC for over 20 years, sought to expand product use among farmers, and ultimately reported to FMC's Chief Marketing Officer (¶38); and (ii) FEs 1, 3, 5, 6, 9, 10, 11, 17, and 18 corroborate FE-4's report of stockpiling (¶¶117-19, 121, 123-29). There is no basis to discount FE-4. *See City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 691 (3d Cir. 2023) (evaluating "degree to which other

12

testimony or evidence corroborates" witness account); *Industriens Pensionsforsikring A/S v. Becton Dickinson & Co.*, 620 F. Supp. 3d 167, 186 (D.N.J. 2022) (rejecting FE attack that "fails to appreciate the level of corroborating information").[5]

Next, while suggesting that FE-6's managerial position in Pakistan (responsible for supplying and warehousing FMC products) (¶40) could give him no visibility beyond that market (MTD at 13-14), Defendants ignore, among other things: (i) his report that FMC used SAP to track transactions (¶71);[6] (ii) other allegations corroborating his account (¶¶122-29); (iii) that reduced demand, full channel inventories, and desperate sales measures were widely discussed at FMC's regional and corporate meetings (¶¶191, 195-204, 211, 217-20); and (iv) his report that country managers frequently discussed the oversupply problems in their territories during Teams meetings (¶214). These are strong indicia of credibility. *See, e.g.*, *In re CommVault Sys., Inc. Sec. Litig.*, 2016 WL 5745100, at *7 (D.N.J. Sept. 30, 2016) (marketing employees "most likely had the firsthand knowledge as to the impact occurring on the ground"; and "would know the pulse of the company"); *see also Wu v. GSX Techedu Inc.*, 2024 WL 3163219, at *8 (D.N.J. June 25, 2024) (FE's "allegations rest on sturdy-enough ground—direct knowledge").[7]

Defendants' other efforts to discredit FE facts also fail. *First*, the FE accounts are not

---

[5]     In contesting FE-18's report because he was a research scientist (MTD at 14), Defendants challenge facts relaying the basics of supply and demand, which require no expertise, and overlook corroborating allegations. ¶¶117-19, 121, 123-29. *See Pelletier v. Endo Int'l PLC*, 439 F. Supp. 3d 450, 468 n.8 (E.D. Pa. 2020) (approving allegations that were "specific, mutually consistent, and plausibly within the scope of knowledge each [FE] would have acquired during his or her employment").

[6]     Defendants ignore all allegations regarding the Company-wide, real-time sales, forecasting, inventory, and other business information that FMC's SAP system housed. ¶¶67-72, 81, 142, 225-27, 233.

[7]     Defendants' lone case on this point is inapposite. MTD at 14 (citing *In re Adolor Corp. Sec. Litig.* 616 F. Supp. 2d 551, 567-68 (E.D. Pa. 2009) (CW merely suggested conduct "may have" occurred)).

13

"vague" as to timing (MTD at 12),[8] but consistently recount that the COVID purchasing binge led to clogged channels and slowing sales by 2022. *See* ¶117 (FE-1: excess inventory and lower profit margins discussed at monthly S&OP meetings in late 2021; "exploding" inventory issues in 2022);[9] ¶134 (FE-3: the "channels were already full" by mid-2022); ¶140 (FE-2: FMC sales channels were stuffed, as discussed at monthly Leadership Calls until early 2022 departure); ¶142 (FE-7: excess channel inventories decreased sales in India, China, and Australia in 2021 to 2022, as reflected in SAP); ¶144 (FE-11: retailers had too much FMC product in 2022, and by February or March 2022, "started putting the brakes on buying").[10] Given the "consistency of the statements between different levels of employees at different locations," *Toronto-Dominion*, 2018 WL 6381882, at *7, the FE allegations should be credited. *See also City of Warren*, 70 F.4th at 692 (crediting FE facts that "fit[] within a coherent narrative").

*Second*, the FEs need not identify specific products impacted by declining demand due to over-purchasing (MTD at 12), particularly because the FEs uniformly report a Company-wide problem. ¶¶116-29, 132-42. Defendants cite no authority requiring such detail. *See Toronto-Dominion*, 2018 WL 6381882, at *5 ("It seems Defendants would only find these [witness] statements 'particular' if all the alleged bad actors stepped forward and provided statements concerning the specific date, location, ***and product***. . . . That is not required."). Even so, FEs specifically identified the Diamides as suffering from overstocking and decreased demand. *See,*

---

[8] Defendants' cases are distinguishable. *See Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245 (3d Cir. 2013) (alleging no dates); *Utesch v. Lannett Co., Inc.*, 316 F. Supp. 3d 895, 904 (E.D. Pa. 2018) (discounting one FE who provided no dates). In addition, FE-2, FE-7, and FE-17's pre-Class Period employment at FMC is no basis to discredit their information. MTD 14 n.4. *See, e.g.*, *In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 649 n.2 (E.D. Pa. 2015)("post-Class and pre-Class-Period data is relevant"); *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005) (same).

[9] As with SAP, Defendants' MTD fails to address the S&OP meetings. *See* ¶¶65, 117, 175, 196-99, 222.

[10] Additionally, FEs 4, 5, 6, 9, 10, 17, and 18 also report that 2020-2022 stockpiling led to clogged channels for FMC. ¶¶118-19, 121-26, 128-29.

*e.g.*, ¶¶143, 159, 180.[11]

*Third*, also without supporting authority, Defendants protest that Plaintiffs fail to allege customer behavior that plausibly signaled a demand decline. MTD at 13. But Plaintiffs allege just that. *See, e.g.*, ¶117 (FE-1: by end of 2021, clients that had stockpiled inventories requested discounts and sought to return products); ¶180 (FE-6: 2022 marked by slowing sales and customers returning expired products); ¶122 (FE-4: customer pre-orders and over-purchases); ¶124 (FE-10: customers hoarded FMC products in 2021).[12] Defendants again sidestep allegations pertaining to FMC's SAP system, despite their public statements celebrating its capabilities, and their related boasts that FMC monitored and managed inventory down to the end-user. *See, e.g.*, ¶81 (Douglas: SAP provides "live, real time accuracy"); *see also* ¶¶67-72, 99, 225-26, 233, 430. Based upon the same data and systems that Defendants told investors *they* monitored, the FEs report consistent facts on customer demand declines and issues worldwide.

*Fourth*, the FEs do not relay mere "subjective, hindsight opinions" (MTD at 14) but describe the trends they tracked and related discussions, based on their significant responsibilities in FMC's business and data. ¶¶67-72, 81, 142, 225-33.[13] FE-4, FE-6, and FE-9 were highly-experienced managerial employees whose responsibilities included tracking sales trends relying upon SAP and other FMC data systems and reports. ¶¶38, 40, 43, 71, 121-22, 129, 211, 225, 228-

---

[11] FE-4 and FE-16 need not provide precise dates and details of "what specifically was said" during meetings. MTD at 27. *See Toronto-Dominion*, 2018 WL 6381882, at *5 ("Defendants place too much emphasis on the particularity requirement.").

[12] FE-1 and FE-17 do not contradict each other. MTD at 13. FE-1 reported that there were "huge volumes" of "excess" inventory (i.e., *products already purchased*, not new orders, as Defendants disingenuously claim) in late 2021 or early 2022. He also described that "by the end of 2021" demand had fallen because of the stockpiling, and FMC's clients began negotiating *returns* – not placing new orders. ¶117. FE-17 likewise reported that FMC sales were lagging, and worldwide demand was down in 2021. ¶132.

[13] Defendants' cases are off-point. *See Tracinda Corp. v. DaimlerChrysler AG,* 197 F. Supp. 2d 42, 82 (D. Del. 2002) (no supporting sources identified); *In re Coca-Cola Enters., Inc. Sec. Litig.*, 510 F. Supp. 2d 1187, 1198 (N.D. Ga. 2007) (channel stuffing claims with pleading requirements not present here). And, in *In re Intelligroup Securities Litigation*, 527 F. Supp. 2d 262, 360 (D.N.J. 2007) (MTD at 14), the court discounted an FE's "personal opinions" about a defendant's social skills and leadership approach. The Complaint contains no such allegations.

15

29, 233-34. These consistent FE accounts are credible. *See Urb. Outfitters*, 103 F. Supp. 3d at 649 (crediting allegations where several FEs "in locations throughout the United States, asserted the existence of unusual promotional activity and lagged sales trends in each of their stores").

*Finally*, "[t]he fact that the [FEs] did not have contact with [the individual defendants] does not render their statements immaterial." *Carmignac Gestion, S.A. v. Perrigo Co. PLC,* 2019 WL 3451523, at *14 (D.N.J. July 31, 2019). Such a direct "connection to or communication" is not required to credit FE facts. *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 268-69 (3d Cir. 2009); *see also id*. at 265-66 (crediting "relatively low-level" FEs); *cf.* MTD at 27.

## B.      Plaintiffs Adequately Allege Material Misstatements

### 1.      Defendants' Statements About Demand Are Actionable

To plead falsity, Plaintiffs need not allege "irrefutable evidence," but only facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *City of Warren*, 70 F.4th at 680-81. "[T]he test" is whether Defendants' statements, "taken together and in context, would have misled a reasonable investor." *Utesch*, 385 F. Supp. 3d at 418.[14]

During the Class Period, Defendants repeatedly represented to investors that FMC's demand was strong, channel inventory levels were normal, and generic diamides posed no concern.[15] Plaintiffs adequately plead that these assertions were false and misleading because they left out and misrepresented material, adverse facts. *See* ¶¶90-114, 130-45.[16] By choosing to speak

---

[14]      Defendants' Exhibit 1 "misstatement chart" divorces certain misstatements from their context. *See* DX 1 n.2 ("certain of these non-bolded and non-italicized statements are not included in this chart"). Attached hereto as Appendix A ("App. A") is a table that mirrors Defendants' Exhibit 1, but reflects alleged statement language that Defendants omitted, and includes a column titled "Plaintiffs' Response" that generally notes Plaintiffs' points in response to Defendants' asserted bases for dismissal.

[15]      *See generally* App. A; *see also supra* Section II.

[16]      Defendants' core contention that they disclosed increased inventories (and decreased demand) beginning in February 2023, ***"[o]nce FMC detected*** rising channel inventories" (MTD at 10) (emphasis added), presents an unsupported factual dispute—challenging the Complaint's consistent and corroborative facts showing known elevated inventory levels far earlier—that cannot be resolved at this stage. *See infra* Section IV.B.2; *Avaya*, 564 F.3d at 260 n.31 (courts "do not resolve factual disputes" at the motion to dismiss phase and must instead "accept all factual allegations in the complaint as true").

about demand (and the related issues of inventory levels and patent protections), Defendants put these subjects "in play," creating a duty to address them fully and truthfully. *In re Merck & Co. Inc. Sec., Deriv. & ERISA Litig.*, 2012 WL 3779309, at *3 (D.N.J. Aug. 29, 2012); *see also UJB*, 964 F.2d at 282 (by speaking on a topic "a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully"). Defendants failed to fulfill their duties, and their statements are actionable.

FMC's growth surge in 2020 and 2021 did not reflect a 'new normal' of demand, but a bubble, fueled by unsustainable purchasing in response to the pandemic, as was recognized internally at the Company. *See* ¶¶115-29, 140, 144. Keeping investors in the dark, Defendants concealed, among other things that:

- Inventory issues were "already exploding" by 2022 (¶117), directly resulting in declining demand for FMC products (¶¶173-88).

- Customers' "unnatural" stockpiling of inventory and "huge increase in orders" in the SAP system in 2021-22 (¶129), encouraged by FMC's push sales model (¶¶131-34, 140-41), clogged the channels with months' to years' worth of "excess" product (¶¶116-29).

- Customers "started putting the brakes on buying" in early 2022 to work through their supplies (¶144; *see also* ¶¶134-37, 140-43), and a drop in demand was imminent (¶122).

- FMC continued to push unneeded product by aggressively extending credit and pricing terms (¶¶132, 137, 141, 178-79, 182, 187-88) saddling FMC with debt.

- FMC suffered patent litigation losses in Brazil, China, and India, as generic Diamide competition encroached, reducing sales by as much as 50% in China. ¶¶147-68.

- North American retailer and distributor mergers were shrinking the buyer base. ¶¶170-72.

Because Defendants failed to adequately disclose these material adverse facts, their statements about demand and related issues were actionable half-truths. *See Becton*, 620 F. Supp. 3d at 186 ("Defendants may not describe a favorable picture of a material issue without including the details that would have presented a complete and less favorable one."). To be sure, Plaintiffs do not allege a "failure to predict" backed-up channels and destocking (MTD at 11), but that these issues were

17

seen at FMC in real-time by 2022. ¶¶67-72, 81, 99, 226, 430; *see also infra* Section IV.C.

Defendants also wrongly contend that "Plaintiffs allege no duty to disclose" FMC's legal setbacks in India and Brazil. MTD at 20. Even if the High Court of Delhi's September 19, 2022 decision involving competitor Natco was a "nonfinal order[] issued in ongoing litigations" (*id.*, n.12), it immediately enabled generic diamide products to be marketed—a direct threat to FMC.[17] Moreover, because Defendants repeatedly boasted about FMC's various IP litigation wins (*see, e.g.*, ¶¶361, 367, 377), they had a duty to disclose the losses so as not to mislead. *See, e.g.*, *In re Coinbase Glob., Inc. Sec. Litig.*, 2024 WL 4053009, at *10 (D.N.J. Sept. 5, 2024) (statements regarding risks to customers' assets created "duty to provide the complete picture of known risks"); *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 472 (E.D. Pa. 2014) (statements about drug's marketing exclusivity imposed duty to disclose regulator's conclusions bearing on exclusivity). The 7.4% decline in FMC's stock price in response to the September 7, 2023 revelation of FMC's loss before the High Court of Delhi (among other losses (¶251)), confirms that the concealed information was material. *See Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) (materiality "may be measured" based on stock price movement "following disclosure").

Furthermore, Defendants misrepresented that FMC's demand was sustainable and driving increasing revenues and EBITDA. *See, e.g.*, ¶331 (Nov. 2, 2022: "combination of sales growth and lower cost headwinds is anticipated to result in EBITDA growth of 15% at the midpoint"); ¶352 (Feb. 7, 2023: "[f]ull-year 2023 revenue is forecasted to . . . increase [ ] 6 percent. . . driven

---

[17]     Natco announced the rollout of generic Rynaxypyr products on September 24, 2022. ¶¶149, 151. Defendants' request that the Court interpret Brazilian decisions of foreign patent law to determine which is final and binding is outside the proper scope of judicial notice. *See La Quinta Worldwide, LLC v. Q.R.T.M, S.A. de C.V.*, 2011 WL 13233546, at *8 (D. Ariz. Feb. 16, 2011) (denying judicial notice of Mexican court decision because "the [c]ourt is not in a position to interpret the submitted decision since it is based entirely on Mexican trademark law" and "there are material differences in the . . . laws of other countries"); *cf. Kenneth v. Yeung Chi Shing Holding (Delaware), Inc.*, 2020 WL 409010, at *5 n.5 (N.D. Cal. Jan. 24, 2020) (*unopposed* request for judicial notice of foreign court's decisions supporting inadequacy under Rule 23).

by strong pricing in all regions and growth in volume"). These representations, too, hid the adverse impact of clogged inventory channels, decreasing sales, extensions of customer credit, increasing returns and generic competition, and industry consolidation.[18] Courts routinely find such statements overstating demand to be actionable. *See, e.g.*, *Urb. Outfitters*, 103 F. Supp. 3d at 648 (allegations that defendant misrepresented "that the demand for his company's products was 'solid,' 'strong,' and 'good' when the actual condition of sales was 'disappointing' and had 'declined,' [are] sufficiently particularized"); *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 300-01 (2d Cir. 2015) (statement that inventory was at "appropriate levels" false when FEs described inventory stacked "up to the rafters," requiring expired product disposal); *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 879 (N.D. Cal. 2023) (statement portraying steady demand misleading because demand "would not last, based on multiple internal warning signs"); *see also In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 283 (E.D.N.Y. 2023) ("The statements could mislead a reasonable investor because, whether the revenues were driven by inflated channel inventory or end-user demand fundamentally differ in sustainability.").

### 2. Defendants' Truth-on-the-Market Defense Fails

Defendants contend none of their alleged misstatements could have misled investors because FMC disclosed "the facts allegedly concealed" (i.e., "rising channel inventories") once it detected them in 2023 and warned investors "that customer demand levels could vary." MTD at 9-10.[19] This "truth on the market" affirmative defense requires proof that the allegedly truthful information was "transmitted to the public with the degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created" by the misstatements. *Winer Fam.*

---

[18]     *See* ¶¶116-37, 139-45, 147-51, 157-68, 170-82, 185-88; *see also supra* Section II.

[19]     Defendants' claim that FMC did not "detect" elevated channel inventories until February 2023 contradicts the Complaint's allegations, and "the Court may not consider defendant's version of the facts at the motion-to-dismiss stage." *Feinberg v. Am. Express Co.*, 2011 WL 4807916, at *3 (E.D. Pa. Oct. 7, 2011).

19

*Tr. v. Queen*, 2004 WL 2203709, at *4 (E.D. Pa. Sept. 27, 2004), *aff'd*, 503 F.3d 319 (3d Cir. 2007). The inquiry is "intensely fact-specific" and "rarely an appropriate basis" for dismissal. *Enzymotec*, 2015 WL 8784065, at *16; *see also Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 481-82 (2013) (this defense "is a matter for trial"). Because the putative "disclosures" downplayed the severity and breadth of the demand issues besetting FMC, described risks that had already come to pass as merely hypothetical, and omitted material facts about rising generic diamides, Defendants cannot meet their high burden. *See supra* Sections II, IV.B.1; *see also In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at *14 (E.D. Pa. Mar. 25, 2020) (rejecting argument that prior disclosures rendered alleged omissions immaterial).

For example, during FMC's February 8, 2023 earnings call, Defendants mentioned "elevated" channel inventories in Brazil, Argentina, southern Europe, and India, and stated that inventories in North America were "a bit elevated." MTD at 6. Though omitted from Defendants' brief, in the same breath they claimed that inventory in North America was "***normal***," attributed the increases elsewhere to the weather, and summarized the inventory situation at the time as "***pretty much what you would expect***." ¶357. Far from disclosing the truth, these representations downplayed the dire inventory levels,[20] blamed the weather, said nothing of "destocking," and claimed inventories were as expected—not even hinting that overstuffed channels were impacting FMC globally (and would continue to do so for the foreseeable future), and demand was cratering. ¶¶116-45; *see also Merck*, 2012 WL 3779309, at *3; *In re Res. Am. Sec. Litig.*, 2000 WL 1053861, at *4 (E.D. Pa. July 26, 2000) (rejecting truth on the market defense where "plaintiffs allege that defendants' disclosures were inadequate and fraudulent" due to omitted facts).

In claiming they then continued to disclose the "developing [inventory] situation,"

---

[20]   Notably, in response to an analyst question during the same call regarding "the negatives we should be thinking about," Douglas *said nothing* of elevated inventories or destocking. DX 17 at 15 (MTD at 6).

Defendants merely point to certain of the partial corrective disclosures, in which they also misrepresented channel inventory levels and concealed the leading cause. *See* MTD at 6, 10. For example, on May 2, 2023, Douglas acknowledged India's "elevated" channel inventories and inventory destocking purportedly due to "working capital concerns" (*id.*), but omitted material facts evidencing FMC's true demand headwinds (while also assuring investors that any demand issues ***were accounted for*** in FMC's revised revenue outlook). *See supra* Sections II, IV.B.2.[21]

Likewise, FMC's risk factors (MTD at 4-6) misleadingly described generic competition as a "potential impact" that "could" affect FMC (¶¶291-92), when such competition for the Diamides was ***already*** impacting its critical markets in Brazil, India, and China. ¶¶147-60, 166-68; *see also Perrigo*, 2019 WL 3451523, at *10 (disclosures insufficient as defendants "were facing more than the possibility of increased competition"). Defendants' mention of the expiration of the Rynaxypyr composition patent (MTD at 5) also did not outweigh their consistent claims that other Diamide protections would inhibit generic competition late into the decade. ¶¶96-97, 105, 361, 375, 393.[22]

Finally, courts reject the truth-on-the-market defense "when drops in stock prices have created reasonable inferences of the materiality of information not previously available." *Innocoll,* 2020 WL 1479128, at *15.[23] Here, the stock price declines caused by each alleged partial

---

[21]   The proximity of this first corrective disclosure to the February 2023 misstatements further supports a falsity finding. *See City of Warren*, 70 F.4th at 693-94 (falsity inference "easier to justify" for statements "followed shortly by corrective disclosures") (collecting cases). Douglas's August 3, 2023 statements also glossed over the demand plunge, noting only "continued high channel inventory" in India from weather, and misleadingly assured investors issues would improve with "product launches and higher volume in Latin America." *See* DX 22 at 5 (MTD at 6).

[22]   Evaluating these statements in context (MTD at 16 n.5) supports Plaintiffs. The specific misleading statements Defendants made in response to analyst questions supersede FMC's generic risk factors. *See In re Novo Nordisk Sec. Litig.*, 2018 WL 3913912, at *6 (D.N.J. Aug. 16, 2018) (10-K disclosures inadequate where "shareholders were misled by [d]efendants' contrary statements"). *See, e.g.*, ¶361 (Sandifer declaring Diamides' "broad set of patent protections" will "give us protection that continues well until the end of this decade and, in some cases, a bit longer").

[23]   "In the Third Circuit, when a stock is traded in an efficient market, the materiality of disclosed information may be measured *post hoc* by looking to the movement, in the period immediately following disclosure[,] of the price of the firm's stock." *Id*. at *14 (quoting *Oran*, 226 F.3d at 282). Plaintiffs allege that FMC stock traded in an efficient market (¶¶537-40), which Defendants do not challenge.

disclosure of the fraud demonstrate that the market was not previously aware of the negative demand issues or their impact. ¶¶475, 483, 498, 523.

### 3. The Safe Harbor Does Not Shelter Defendants' Misstatements

The PSLRA safe harbor is inapplicable to the alleged misrepresentations for several reasons. *First*, statements purporting "to describe historical facts or a then-present state of affairs" are not forward-looking. *Emps. Ret. Sys. of P.R. Elec. Power Auth. v. Conduent Inc*., 2020 WL 3026536, at *6 (D.N.J. June 5, 2020); *see also Enzymotec*, 2015 WL 8784065, at *11 ("well positioned for future growth" and "achieving rapid penetration" conveyed "then-existing conditions as opposed to future projections"). Contrary to Defendants' argument (MTD at 23-24), their statements about growth in various regions implicated ***current or past*** trends, as shown by language such as "***there's*** very, very strong demand out there." ¶285; *see also* ¶297 ("[c]hannel inventories for us ***are*** normal" and "*[w]e've had* very strong demand"). Defendants' claim that "there's not a single legal competitor in Rynaxypyr in the world today" (¶393) and others like it (¶¶97, 112, 375, 377) were similarly based on FMC's current IP portfolio, which they represented would stand "until the end of this decade" (¶361)—and thus concerned putative current facts. *See Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *15 (D.N.J. July 27, 2018) (no safe harbor for statements representing company's present ability to deliver growth).

The present part of a mixed present/future statement is likewise not protected by the safe harbor. *Cont'l Gen. Ins. Co. v. Olafsson*, 2024 WL 4263211, at *11 (D.N.J. Sept. 23, 2024). For example, Douglas's statement, "We're very okay with inventory levels pretty much everywhere in the world right now. . . . And we're working through inventory in India. That will be done as we go through the second half of the year" (¶325), purports to describe current inventory levels. There is no safe harbor for this mixed present/future statement, and others regarding demand (including how FMC's IP portfolio would impede generic competition).

22

*Second*, the safe harbor does not protect "omissions of existing facts or circumstances" because they "are not forward-looking." *Viropharma*, 21 F. Supp. 3d at 471; *see also Curran v. Freshpet, Inc.*, 2018 WL 394878, at *4-5 (D.N.J. Jan. 12, 2018) (no safe harbor for statements "made misleading by material omissions"). Here, Defendants omitted a swath of materially adverse facts, precluding application of the safe harbor. *See supra* Sections II, IV.B.1; *see, e.g.*, *Conduent*, 2020 WL 3026536, at *7 (material omissions are not forward-looking and "do not qualify for safe harbor protection"); *see also SEB*, 351 F. Supp. 3d at 901 (same).

*Finally*, even if forward-looking, Defendants' misstatements are actionable because: (i) Defendants had actual knowledge that their statements were false or misleading; and (ii) the statements were not accompanied by meaningful cautionary language. Plaintiffs have sufficiently alleged that Defendants knew facts contradicting their Class Period misstatements, such that the safe harbor does not apply. *See infra* Section IV.C; *see also Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 209 (E.D. Pa. 2021) (safe harbor protection only if statements "were made without actual knowledge that the statement was false or misleading").

In addition, none of Defendants' statements was paired with "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those" stated. 15 U.S.C. § 78u-5(c)(1)(A)(i). "[C]autionary language must be extensive yet specific and touch upon the subject matter of the misrepresentation in order for the safe harbor to apply." *Enzymotec*, 2015 WL 8784065, at *7; *see also Loc. 731 I.B. of T. Excavators & Pavers Pens. Tr. Fund v. Swanson*, 2011 WL 2444675, at *13 (D.N.J. June 14, 2011) (cautions not sufficiently specific when none warned of "secular decline" referenced in claims); *cf.* MTD at 4-5. "[G]eneric warning[s]," such as FMC's Form 10-K risk factors, "will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability." *Meyer*

*v. Jinkosolar Holdings Co., Ltd*., 761 F.3d 245, 251 (2d Cir. 2014). Defendants' cited language could have applied to any agricultural chemicals company. *See, e.g.*, MTD at 4 (COVID "disruption" or "climate change" could affect demand); *see also Innocoll*, 2020 WL 1479128, at *18 ("generic warning" that is "inherently true" not meaningful). Meanwhile, the "undisclosed facts on the ground" included: (i) oversaturated channels filled with months' or years' worth of product; (ii) slowing purchases and increasing returns; (iii) escalating generic competition; and (iv) industry consolidation. *See supra* Sections II, IV.B.1; *SEB*, 351 F. Supp. 3d at 897 (cautions "must include facts that the issuer knows contradict the forward-looking statement").

The referenced disclosures also presented generic risks as mere possibilities that "may" or "could" occur (MTD at 4-5) when, in fact, specific risks had already materialized. For example, FMC's disclosures flagged "changes in distribution channels" as something that "could impact results" while channels were jammed with product and FMC was already trying to artificially spur further purchases. ¶¶132-42. Defendants also highlight language purporting to warn that industry consolidation "could" occur (MTD at 21), but this had already "negatively affected sales in all regions" in North America. (¶¶170-72). *See, e.g.*, *City of Hialeah Emps.' Ret. Sys. & Laborers Pension Tr. Funds for N. Cal. v. Toll Bros., Inc*., 2008 WL 4058690, at *4 (E.D. Pa. Aug. 29, 2008) (cautions not meaningful "in light of [ ] alleged failure to disclose then-existing material facts"). As for FMC's patent losses (MTD at 18-21), for years, Defendants vaguely portrayed patent litigation as a potential risk (as with any company selling patented products), without disclosing rising generics and that FMC had lost critical Diamides cases.

### 4.        Defendants' Misstatements Are Not Mere Puffery

Defendants wrongly contend that certain excerpted statement snippets are immaterial "puffery." MTD at 21-22. Puffery is a statement "too vague to ascertain anything on which a reasonable investor might rely." *Olafsson*, 2024 WL 4263211, at *11. Beyond the fact that

24

materiality challenges are inapt at this stage, their argument is meritless. *Toronto-Dominion*, 2018 WL 6381882, at *11 (materiality is "not typically a matter for Rule 12(b)(6) dismissal"); *see also Enzymotec*, 2015 WL 8784065, at *14 (same).

*First*, to evaluate puffery, courts "must examine the context in which the statement was made," *In re Viropharma, Inc. Sec. Litig.*, 2003 WL 1824914, at *6 (E.D. Pa. Apr. 7, 2003), yet Defendants challenge words and phrases in isolation. *See, e.g.*, MTD at 21 (challenging phrase, "strong demand," omitting that FMC attributed "***record fourth quarter results***" to that factor) (¶282); 22 (deeming term "significant" puffery when describing patents but omitting reference to accompanying statements that "[w]e get a lot of questions about the patent estate," that FMC had "the only legal material that's available," and that because of Diamide IP portfolio, "you're going to see them continue to grow in the mid-single digit[s]") (¶375).[24] These statements, when viewed in context, address "fundamental" revenue-driving aspects of FMC's business and are not puffery. *W. Palm Beach Pol. Pens. Fund v. DFC Glob. Corp.*, 2015 WL 3755218, at *13 (E.D. Pa. June 16, 2015) ("fraudulent comments regarding such a fundamental aspect of DFC Global's business are of vital importance to investors") (collecting cases); *see also Olafsson*, 2024 WL 4263211, at *11 (statements not puffery where, "[t]o a reasonable investor, the statements . . . create an illusion that the Company was thriving, when indeed, it was not").

*Second*, the statements Defendants challenge also misled by omission, concealing known weak demand due to packed channel inventories and increasing generic competition (*see supra* Sections II, IV.B.1), and therefore, are not puffery. *See Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*, 2022 WL 889158, at *10 (E.D. Pa. Mar. 25, 2022) (statements

---

[24]     More broadly, the majority of statements challenged as puffery assured investors that FMC would continue to grow revenues based upon demand for its products, including the Diamides, which putatively had patent protection that ran through the end of the decade. *See also* App. A (highlighting and/or adding context Defendants ignore in labeling misstatements "puffery").

not puffery when defendants omitted true reason for product's success); *see also Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (statements that "inventory situation was 'in good shape' or 'under control'" actionable because of knowledge to the contrary); *see infra* Section IV.C.

*Third*, the statements in question are not puffery because they provided "investors with concrete information." *In re ATI Techs., Inc. Sec. Litig.*, 216 F. Supp. 2d 418, 436 (E.D. Pa. 2002); *see also In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *10-11 (D.N.J. Apr. 27, 2017) ("verifiable" statement not puffery), *aff'd sub nom. In re Hertz Glob. Holdings, Inc.,* 905 F.3d 106 (3d Cir. 2018). For example, statements that FMC's sales growth was "driven by strong herbicide and insecticide demand" (¶329) and that "demand remains strong for new products based on the diamides" (¶330) addressed verifiable facts. Douglas *admitted* the same in celebrating FMC's ability to monitor inventories throughout the distribution channels. *See, e.g.*, ¶¶98-99, 430. Defendants cannot insist now that their statements were insubstantial.

*Finally*, the market reaction to corrective disclosures revealing the truth about flagging demand and generic diamide competition demonstrates materiality here. *See supra* Section IV.B.2.

### 5.    Defendants' Misstatements Are Not Inactionable Opinions

"A fact is a thing done or existing or an actual happening," whereas an opinion is "a belief[,] a view, or a sentiment." *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015).[25] Many misstatements that Defendants deem opinions were actually representations of putative fact. *See, e.g.*, ¶333 ("There are pockets of higher inventories. We talked about India before. The last few years, with the weather monsoons played out and rice acreage reductions, have not been great."); ¶337 ("We have a broad estate of additional patents regarding the production of Rynaxypyr . . . as well as trademark and data exclusivity

---

[25]    *See id*. at 184 ("a determinate, verifiable statement" is a fact representation).

protection in certain countries that extend well beyond the active ingredient composition of matter patents."). As a matter of law, these are not opinion statements.[26] *See In re Merck & Co. Sec., Deriv. & ERISA Litig.*, 2015 WL 2250472, at *11 n.7 (D.N.J. May 13, 2015); *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *11-12 (S.D.N.Y. Nov. 26, 2018) (claims that credit portfolio was "strong," "robust," "very healthy," "very stringently managed," not opinions).

Further, even if any misstatement were deemed an opinion, it is actionable because: (i) it "omit[ted] material facts about the [Defendants'] inquiry . . . or knowledge"; and (ii) the omitted facts "conflict[ed] with what a reasonable investor would take from the statement." *Omnicare*, 575 U.S. at 189.[27] For example, Defendants' statement that "we are not concerned about channel inventories. There are a couple pockets in the world . . . [o]ne . . . is India. In Q4, weather patterns were not great" (¶302) omitted that by 2022, inventory channels were saturated and purchases were stalling, resulting in declining demand. ¶¶115, 130-45, 207.

### 6.    Plaintiffs Adequately Allege an Item 303 Violation

Item 303 of SEC Regulation S-K requires disclosure of "any known trends or uncertainties that have had or that are reasonably likely to have a material . . . unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii).

Contrary to their arguments (MTD at 25), Defendants did not adequately disclose the true state of FMC's demand, including vis-a-vis generic competition, before the alleged corrective disclosures. *See supra* Sections II, IV.B.1-2. Rather than merely alleging a "laundry list" (MTD at 25), Plaintiffs plead particularized trends, including "declining demand" "fueled by[] saturated

---

[26]    *See, e.g.*, ¶287 ("we see [Diamides' sales growth] year in, year out"); ¶297 ("[c]hannel inventories for us are normal, if not low in some parts of Latin America"); ¶331 ("[w]e have good visibility into demand for the quarter with strong order books for both the Brazilian and US markets . . ."); ¶332 ("[t]hat market is growing rapidly in many parts of the world, which is good news"); ¶361 ("We also have patents on the manufacturing process to make Rynaxypyr and Cyazypyr"); *see also* App. A (identifying arguments on statements challenged as putative opinions).
[27]    *See also id*. at 192 ("[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another.").

27

inventory channels," "increasing [generic] competition," "legal losses regarding FMC's patent defenses" and "industry consolidation among distributors and retailers." ¶280.[28] Defendants' assertion that Plaintiffs have not identified "any specific, affirmative statement" rendered misleading (MTD at 25) also fails because Plaintiffs allege multiple statements rendered misleading by Defendants' failure to disclose material trends (*see* ¶¶291-94, 296, 300, 323, 337-38, 342, 367-70, 373, 390), and for each, allege violations of Item 303 due to their omissions concerning declining demand, legal setbacks, and saturated inventory channels.

## C.  Plaintiffs Adequately Allege Defendants' Scienter

Scienter is "the defendant's intention to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*, 551 U.S. 308, 313 (2007). In the Third Circuit, scienter may be established by setting forth facts that constitute circumstantial evidence of either recklessness or conscious behavior. *Roofer's*, 2018 WL 3601229, at *15. Plaintiffs can plead scienter through allegations regarding "defendants' knowledge of facts or access to information contradicting their public statements . . . [i.e., that] defendants knew or, more importantly, should have known that they were misrepresenting material facts." *Id*. at *18. A court must evaluate scienter allegations "collectively," not in isolation. *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 114 (3d Cir. 2018). The inference "need not be irrefutable, i.e., of the smoking gun genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324.[29]

### 1.  Defendants Claimed Knowledge of Demand Issues, Drivers and Data

The scienter inference is extraordinarily strong here in light of Defendants' own statements professing direct visibility into FMC's demand drivers, including channel inventory levels and

---

[28]    *See also* ¶¶291, 293-94, 296, 300, 323, 337-38, 342, 367-70, 373, 390. Thus, *Nikolov v. Livent Corp.*, 470 F. Supp. 3d 461, 479-80 (E.D. Pa. 2020) (MTD at 25) is inapposite, as the court there dismissed the Item 303 claim when it was not *mentioned* in the complaint, and no supporting facts were pled.

[29]    As Defendants' cited authority makes clear, "it is not necessary to plead motive to establish that a defendant acted with scienter." *Rahman*, 736 F.3d at 245 (MTD at 26).

product usage, as well as generic diamide issues, across all regions. *See, e.g.*, *Catalent*, 2024 WL 3219616, at *14 (defendants' statements touting their "hands-on" and "active[]" involvement "alone separate this case from others in which courts have found that scienter was inadequately pled"). For example, on May 18, 2022, in response to analyst questions on FMC's ability to "manage inventories" and its "visibility . . . into [its] inventory in Brazil," Douglas asserted: "*We manage inventory* not only in our own facilities, *not only in third-party warehouses but also at the grower level*. . . . [O]ur sales force and our financial groups are actually *lockstep in terms of how much product are we selling into the market*. . . *[h]ow much is actually getting through to the grower. . . how much is getting used on the ground*." ¶¶98-99, 426. That same day, as to FMC's Diamide IP defenses, Douglas said, "*We have a whole team set up inside the company that monitors the market, monitors who is doing what in [India and China]*." ¶431.[30] On August 3, 2023, when an analyst asked Douglas how FMC worked to "understand what farmers are doing," he stated that FMC tracks "*what is happening at the grower level*" world-wide, and had an "*understanding on the ground of what's getting planted and then what is being applied*." ¶430.[31]

Defendants' own words conveying granular knowledge regarding the demand for FMC's products and factors driving it, including channel inventories and encroaching generic competition, support a scienter inference. *See, e.g.*, *SEB*, 351 F. Supp. 3d at 906 (scienter where "officers were speaking as authoritative sources who possessed the information to support their statements").[32]

---

[30]     *See also* ¶438 (FMC's 2021, 2022, and 2023 Forms 10-K represented that the Company "actively monitor[ed] and manage[d] our patents and trademarks to maintain our rights in these assets").

[31]     *See also* ¶428 (Sandifer: "we know where the [inventory level] issues are"); ¶331 (Douglas: "We have good visibility into demand for the quarter. . ."); ¶353 (Douglas: "[W]e will continue to closely manage our supply chain in 2023. . ."); ¶384 (Douglas: "*On the ground usage is very robust in most part of the world*.").

[32]     *See also Hall v. Johnson & Johnson*, 2019 WL 7207491, at *22 (D.N.J. Dec. 27, 2019) (finding scienter where CEO claimed he was "paying attention to the significant amount of clinical information [and] control data"); *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at *6 (S.D.N.Y. Feb. 5, 2024) (defendants' statements that "we keep a close eye" on orders and "we are . . . able to monitor the daily influx of demand" supported inference of scienter; *see also San Antonio Fire & Police Pension Fund v. Dentsply Sirona, Inc.*, 2024 WL 1898512, at *8

### 2. Defendants Attended Meetings Where Demand Trends Were Discussed and Had Access to Reports and SAP Data Reflecting Demand Metrics

Defendants' repeated claims of knowledge and insight into demand-related issues are corroborated by FMC FE accounts, which confirm that Defendants: (i) attended periodic meetings where demand-related issues across FMC's markets were regularly discussed; and (ii) had access to myriad internal reports and data systems tracking and reflecting information related to demand.[33]

*First*, multiple FEs reported that Defendants attended various regular meetings during which the status of distribution channels, sales figures, and inventory levels were routinely discussed. *See supra* Section II; *see also* ¶¶195-209. For example, Douglas met with FMC's VPs from around the globe at monthly ESOP Meetings, during which regional heads presented on issues including demand, budget, revenues, margins, pricing, and inventory. ¶¶199-201. FEs also reported that Defendants were directly involved in setting sales goals in each region and spoke at Company-wide meetings, discussing inventory levels and market dynamics. *See supra* Section II; *see also* ¶132 (FE-17: senior management, including Sandifer, rejected budget numbers that did not meet management goals); ¶211 (FE-4: Douglas led quarterly "All Hands" meetings where issues related to demand were discussed).

*Second*, FEs detailed FMC's numerous information systems, including the firmwide SAP system, and internal reports, including POG, POS, and EDI reports, that provided current information concerning sales, forecasting, inventory, and other metrics. *See supra* Section II. FMC

---

(S.D.N.Y. May 1, 2024) ("If, on the other hand, [defendants] didn't monitor these topics but made definitive statements as if they did, they still might have been reckless.").

[33] Unlike *Chubb,* 394 F.3d at 155 (MTD at 27), where cited FE statements were "attributed to no source and [were] based on nothing more than speculation," Plaintiffs specify the FMC FE who provided the basis for each allegation and the FE accounts are based on first-hand knowledge. *Id*. The fact that none of these FEs reported directly to Douglas or Sandifer (MTD at 27) is beside the point—these FE accounts are both credible and reliable. *See supra* Section IV.A.

touted SAP as "a single, modern system across the entire company" and Douglas claimed, for example, that it "ensur[ed] live, real time accuracy" with respect to operations in Brazil. ¶¶67-81. FMC FE accounts confirm not only that Defendants had access to SAP, but also that certain reports reflecting demand levels were provided directly to "FMC Corporate" and the "C-Suite." ¶¶67-71, 231-32.[34] These well-pled allegations align with Douglas's and Sandifer's claimed granular insight, and confirm that they received or had access to information regarding factors directly impacting demand for FMC's products. *See, e.g.*, *SEB*, 351 F. Supp. 3d at 906 (executive's scienter supported by access to "detailed information regarding the company's business operations and financial condition," including facts provided at monthly meetings); *Catalent*, 2024 WL 3219616, at *13 ("Defendants had access to a dashboard that tracked both quality and financial data, as well as multiple other information sources about Catalent's performance across various areas.").[35]

### 3. Defendants Repeatedly Spoke on Issues Affecting Demand, Including in Response to Analyst Questions

Defendants' frequent, detailed statements responding to analyst questions about demand, channel inventories, and generic competition further strengthen the inference of their scienter. *See Teva*, 2022 WL 889158, at *14-15 (inference of scienter where defendants "spoke in great detail about [drug], its success, and the reason for its success," and repeatedly noted its "key position in [the company's] portfolio"); *Urb. Outfitters*, 103 F. Supp. 3d at 653 ("the most powerful evidence

---

[34]     *See also* ¶69 (FE-8: "everything that FMC does, [SAP] tracks"); ¶142 (FE-7: SAP reflected excessive channel inventory in Pakistan and returns of expired product); ¶188 (FE-7: credit extensions requested through SAP).

[35]     Unlike Defendants' inapposite cases (MTD at 26-27)—*Chubb*, 394 F.3d at 147 (plaintiffs relied on internal memo but failed to allege its provenance or basis), *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 151 (3d Cir. 2004) ("the Complaint simply alleges that a sales manager in AHD's Brazil division notified employees in New Jersey of the accounting irregularities"), *In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 620 (E.D. Pa. 2009) (none of the FEs were ever employed by the defendant nor in "position to know anything about" accounting issue in alleged fraud), *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 398 (D. Del. 2010) (plaintiffs alleged scienter through documents drafted by company competitor but did not allege that these documents were provided to defendant)—Plaintiffs do not rely on one source to plead scienter, but on facts from nineteen FEs with corroborating accounts about FMC's information systems and reports, what data they contained, and who had access to them.

of scienter is the content and context of the statements made by [defendants], which were made in response to . . . analysts['] questions").

At every turn, Defendants spoke about demand and underlying channel inventories with specificity, often describing individual markets, in response to analyst questions. For example, when asked on February 9, 2022 about current channel inventories, Douglas noted "very, very strong" demand and described the channels in Brazil, North America, and Europe. ¶92. On May 3, 2022, he responded to an analyst question on "prebuying," stating that FMC was "not concerned about channel inventories," and explicitly discussed inventories in Latin America and India. ¶95. Defendants also gave detailed answers to analyst questions about FMC's Diamides IP portfolio. *See, e.g.*, ¶105 (Feb. 21, 2023, Sandifer: "we have patents on their composition of matter," "on the process to make several of those," and "on how [Diamide] product is finally formulated"); *cf.* MTD at 28 (claiming Defendants discussed "broad topics in general terms"). These particularized statements bolster the inference of Defendants' scienter. *See, e.g.*, *GSX*, 2024 WL 3163219, at *26 ("sharp, detailed, and recurring [analyst] questions that challenge the company's position on important matters can strongly bear on scienter"); *Energy Transfer*, 532 F. Supp. 3d at 228 (inferring scienter where defendants spoke "in detail" about project while holding themselves out as well informed on topic); *Avaya*, 564 F.3d at 270 ("focused [analyst] questions [] mark an important distinction between this case and those in which defendants win dismissal").[36]

Defendants' claim that they "disclosed negative information on those subjects" in their statements, thereby undermining a scienter inference, is wrong. MTD at 28. While Defendants

---

[36] Unlike here, *Utesch*, 316 F. Supp. 3d at 906 (MTD at 28), found the defendant's statements about "Lannett's 'core operation' in drug pricing" did not support an inference that he knew the prices "were the result of price-fixing" and attempts to conceal it. *Id*. Plaintiffs' claim is not so attenuated: Defendants' statements about channel inventories and generics give rise to an inference that they knew about **these subjects**. *See, e.g.*, *Avaya*, 564 F.3d at 270 ("Given the specificity and repetition of the analysts' questions, [defendant's] position as [CFO], and the alleged state of Avaya's business . . . there is a strong inference that [CFO's] behavior reached this threshold of recklessness.").

acknowledged isolated areas of high inventory in certain places, they told investors that these were attributable to weather conditions, and falsely assured the market that Company-wide, channel inventories were normal. *See, e.g.*, ¶102 (Douglas discussing "monsoons" and "rice acreage reductions" in India and drought in "parts of Brazil[]" and representing "we're happy where inventory levels are in the marketplace"); ¶104 (Douglas asserting "it was very dry in the fourth quarter" in Brazil and Argentina, but "it's pretty normal" and "it's pretty much what you would expect"). Thus, unlike in their cited authorities, Defendants concealed the true facts regarding the decline in demand across all markets resulting from backed-up channel inventories and generic diamide encroachment, and instead misleadingly represented that any demand and inventory issues were isolated, transitory, and not a concern.[37]

### 4. The Importance of the Diamides and the LATAM and APAC Markets Contributes to an Inference of Scienter

The inference of scienter is also strengthened by the fact that the Diamides were a primary revenue generator for FMC, and the LATAM and APAC markets contributed significantly to FMC's overall revenues. *See, e.g.*, *Energy Transfer*, 532 F. Supp. 3d at 232 (inference of scienter where "misstatements and omissions [are] made on core matters of central importance to the company and its high-level executives"). Defendants called the Diamides a "core part" of FMC's business and a "big driver of [FMC's] success" and at least 36% of FMC's annual revenues during the Class Period were attributable to these products. ¶¶441-43. LATAM and APAC, in turn, accounted for approximately 32% and 25% of FMC's total revenues leading into the Class Period. ¶87. The critical importance of these products and markets supports an inference that Defendants

---

[37]     *Cf. Alberci v. Recro Pharma, Inc.*, 2020 WL 806719, at *18 (E.D. Pa. Feb. 14, 2020) (MTD at 28) (defendant company disclosed in public filings clinical data that plaintiffs alleged provided basis for defendants' scienter); *Teamsters Loc. 456 Pension Fund v. Universal Health Servs.*, 396 F. Supp. 3d 413, 472 (E.D. Pa. 2019) (MTD at 28) (defendants disclosed "red flags" allegedly giving rise to scienter inference in public filings).

knew key factors impacting them. *See In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001) (defendants "presumed to have [] pertinent knowledge" of products constituting "bread and butter of [company's] business"); *In re Allergan Generic Drug Pricing Sec. Litig.*, 2019 WL 3562134, at *12 (D.N.J. Aug. 6, 2019) (applying core operations doctrine where product "comprised a substantial portion of its revenues and operations during the class period").[38]

### 5.    Additional Allegations Support an Inference of Scienter

The inference of scienter is further supported by the temporal proximity of Defendants' statements to the disclosure of the truth; Douglas's resignation; and FMC's efforts to increase sales and cash flow and its retaliation against employees who pushed back on its practices.

*First*, many alleged misrepresentations were made mere months or weeks before the truth regarding FMC's floundering demand was revealed. For example, on February 8, 2023, Douglas characterized the channel inventories as "normal," attributing pockets of higher inventories to weather conditions. ¶¶104, 357. On February 21, 2023, Sandifer similarly dismissed concerns about inventory levels. ¶¶107-08, 363-64. Weeks later, FMC lowered its 2Q23 guidance, citing reduced demand in certain markets and some channel inventory issues, including destocking. ¶238. As FE-19 aptly stated: "***You don't discover in two months that your inventory is full***." ¶183.

Rather than disclose the full truth on May 1-2, 2023, however, Defendants assured investors that FMC's reduced outlook fully accounted for any inventory issues and asserted that "***all the signs are all good***" and that "***the volume perspective as we go through the year will improve***." ¶¶110-11, 384, 474. Then in July, FMC slashed its 2Q23 guidance again, citing "unprecedented volume declines" ¶242. The close proximity of Defendants' misrepresentations to

---

[38]    *See also Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) ("That no member of the company's senior management who was involved in authorizing or making public statements about the demand for the [company's "flagship" products] knew that they were false is very hard to credit."); *Mill Bridge V, Inc. v. Benton*, 2009 WL 4639641, at *31 (E.D. Pa. Dec. 3, 2009) ("where the information relates to the organization's core business, such facts are powerful circumstantial evidence of scienter").

the revelations regarding the true state of affairs at FMC supports a finding of scienter. *See Avaya,* 564 F.3d at 272 ("the proximity" of alleged misstatements to release of disappointing results "diminish[ed] the plausibility of innocent explanations" for defendant's "denials").

*Second*, Douglas's unexplained resignation as CEO on June 11, 2024, just months after the full extent of Defendants' fraud was revealed to the market on October 31, 2023, further strengthens the scienter inference. *See DFC*, 2015 WL 3755218, at *17 (resignation of key executive "responsible for implementing new regulations" bolstered scienter); *Novo Nordisk*, 2018 WL 3913912, at *8 (departures of officers "contribute to a finding of scienter").[39]

*Finally*, Defendants' efforts to push sales and stem cash flow issues in the face of saturated channels and sinking demand, and their retaliation against employees who challenged these measures also contributes to a strong inference of scienter.[40] *See, e.g.*, *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 244 (S.D.N.Y. 2022) (employee's termination after raising concerns supports inference of scienter).

### D.      Plaintiffs Sufficiently Allege Control Person Liability

Because Plaintiffs sufficiently plead a primary Section 10(b) violation, the Section 20(a) claim should be sustained. *See Olafsson*, 2024 WL 4263211, at *12.

### V.      CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied.

---

[39]      Unlike in Defendants' cases, Douglas held himself out as expert on FMC's demand and participated in setting sales goals around the globe. *See Intelligroup*, 527 F. Supp. 2d at 347 (executives resigned "months—or a year—before or after the airing of the Press Release" in a "fashion that cannot possibly suggest a 'joint resignation'").

[40]      *See, e.g.*, ¶177 (FE-17: participated in conversations with Sandifer regarding selling railcar assets as an alternative to factoring.); ¶179 (FE-1: LATAM CFO would email Sandifer for approval of client credit limit increases over a certain amount.); ¶181 (FE-19: European Market Manager Olivier Ryckeboer, was fired in mid-April 2023 after pushing back on the strategy being imposed in Europe and the U.S.).

Dated: November 4, 2024

s/ *Joshua E. D'Ancona*
Joshua E. D'Ancona (PA #206438)
**KESSLER TOPAZ MELTZER
& CHECK, LLP**
Johnston de. F. Whitman, Jr. (PA#207914)
David A. Bocian (PA #315542)
Margaret E. Mazzeo (PA #312075)
Vanessa M. Milan (PA #329312)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
jdancona@ktmc.com
jwhitman@ktmc.com
dbocian@ktmc.com
mmazzeo@ktmc.com
vmilan@ktmc.com

*Counsel for Ruth Asset Management and
Lead Counsel for the Class*


**BLEICHMAR FONTI & AULD LLP**

Javier Bleichmar Thayne Stoddard
300 Park Ave, Suite 1301
New York, New York 10022
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jbleichmar@bfalaw.com
tstoddard@bfalaw.com

-and-

Nancy A. Kulesa
George N. Bauer
75 Virginia Road
White Plains, New York 10603
Telephone: (914) 265-2991
Facsimile: (212) 205-3960
nkulesa@bfalaw.com
gbauer@bfalaw.com


*Counsel for Additional Plaintiff
Oklahoma Firefighters Pension and
Retirement System*

36

**CERTIFICATE OF SERVICE**

I, Joshua E. D'Ancona, hereby certify that on November 4, 2024, I caused a true and correct copy of the foregoing Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaint to be filed electronically with the Clerk of the Court using the ECF system, and it is available for viewing and downloading from the ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

 *s/ Joshua E. D'Ancona*
Joshua E. D'Ancona (PA #206438)
**KESSLER TOPAZ MELTZER**
 **& CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
jdancona@ktmc.com

*Counsel for Ruth Asset Management*
*and Lead Counsel for the Class*

37