# Exhibit 1

**Reply Exhibit 1: Summary Table of FE-Related Arguments from Defendants' Opening Brief**
*In re FMC Corporation Securities Litigation, Case No. 2:23-cv-04398-KNS*

| FE | Complete Complaint Paragraph Introducing FE | Motion to Dismiss Arguments Concerning Each FE [1] |
|---|---|---|
| FE-1 | ¶35: "FE-1 worked for FMC from 2019 through mid-2022. From early 2021 through the end of his tenure, FE-1 was a Manager in FMC's Structured Finance group for its LATAM business region, with more than six employees reporting directly to him. In this role, FE-1 was responsible for working with FMC LATAM clients to finance their FMC debt to enable further product sales to those clients, managing issues of client credit, and negotiating structured finance deals with third parties to sell client debt owed to FMC into the market. In 2021 to 2022, FE-1. reported to William Mills, FMC's CFO Americas, who reported, in turn, directly to FMC's CFO, Defendant Sandifer." | **Br. 13:** "Some FEs discuss customer returns in 2021 (pre-Class Period), seemingly attempting to allege that the returns indicated that customers had too much product—but offer no context for the volume of returns relative to prior periods or any basis for the apparent assumption that customers returned product only when they had too much.  AC ¶¶ 117[.]" (citing paragraph discussing FE-1 statements).<br><br>**Br. 13:** "Other FEs contradict each other in terms of when FMC's demand purportedly began to fall.  *Compare, e.g.*, *id.* ¶ 132 (FE-17 claiming 'worldwide demand' was down 'in 2021'), *with id.* ¶ 117 (FE-1 claiming 'excess[ive]' orders of 'huge volumes' into 2022)."<br><br>**Br. 14 n.4:** "Plaintiffs vaguely attempt to tie FMC's sales practices to alleged cash flow issues, *see, e.g.*, AC ¶ 288(c), they offer no support for this theory, relying solely on a LATAM-based FE who left FMC early in the Class Period, *id*. ¶ 35, and whose allegations focus on '2020 and 2021,' *id*. ¶¶ 176, 178–179."  (citing paragraphs discussing FE-1 statements).<br><br>**Br. 17:** "[T]hese alleged statements [that generic competitors in key FMC markets including China, India, and others were already directly competing with FMC for market share and causing FMC to lower prices] establish nothing more than what FMC had already disclosed.  *See* [AC] ¶¶ 158, 160, 163, 164 (FE statements regarding products 'coming off patents,' patents 'expiring,' and concerns regarding 'pending expirations') . . . ."  (citing paragraphs discussing FE-1 statements).<br><br>**Br. 17-18:** "To the extent the FEs attempt to go beyond merely confirming what was already disclosed regarding generic competition and patent protection, the allegations generally concern information the FE has no alleged or plausible basis to know.  *See, e.g.*, AC ¶¶ 35, 158 (failing to allege how FE-1, a manager in FMC's LATAM Structured Finance Group, would have any basis to know that FMC's distributors' marketing departments 'blamed reduced FMC product orders on . . . FMC's products coming off patents').  Such statements need not be credited under Third Circuit law.  *See, e.g.*, *Chubb*, 394 F.3d at 148 (declining to credit claims of confidential witness |

---

[1] Defendants also made arguments that apply to all the FEs, including that (i) "no FE alleges that FMC actually lowered prices during the Class Period or that generic competition compelled it to do so[,]" Br. 16, and (ii) "there is no reasonable 'probability' that any [FE] 'would possess the information alleged' about the Individual Defendants' scope of knowledge.  *Chubb*, 394 F.3d at 148.  *None* reported directly to an Individual Defendant. *See generally* AC ¶¶ 34–53.  Indeed, no FE alleges *any* direct interaction with any Individual Defendant during the Class Period[,]"  Br. 27.

| FE | Complete Complaint Paragraph Introducing FE | Motion to Dismiss Arguments Concerning Each FE [1] |
|---|---|---|
| | | where allegations did not support the probability that a person in the position occupied by the [FE] would possess the information alleged')." |
| FE-2 | ¶36: "FE-2 worked for FMC for over twenty-five years, through early 2022. For at least fifteen years up through the time of his departure, FE-2 was the head of FMC's business in several countries in Southwest Asia. One of FE-2's primary responsibilities was managing FMC's business in these countries to achieve monthly, quarterly and annual sales targets. The business headed by FE-2 routinely produced approximately $70 million in annual revenues for FMC in the final years of FE-2's tenure. FMC's Southwest Asia business was in FMC's Asia-Pacific or APAC business region, and FE-2 reported to FMC's APAC head." | **Br. 14 n.4:** "[T]hree of the FEs on whom Plaintiffs principally rely for this theory [that FMC encouraged salespeople to sell, and customers to accept, unwanted product]—FE-2, FE-7, and FE-17—did not even work at FMC during the alleged Class Period. [AC] ¶¶ 38, 41, 51."<br><br>**Br. 17:** "[T]hese alleged statements [that generic competitors in key FMC markets including China, India, and others were already directly competing with FMC for market share and causing FMC to lower prices] establish nothing more than what FMC had already disclosed. *See* [AC] ¶¶ . . . 165–168 (FE statements regarding increased 'generic competitors,' sales of 'competing generic products,' lower-priced generic products, and concerns with illegal competition)." (citing paragraphs discussing FE-2 statements).<br><br>**Br. 17 & n.7:** "To the extent the FEs attempt to go beyond merely confirming what was already disclosed regarding generic competition and patent protection, the allegations generally concern information the FE has no alleged or plausible basis to know." [Accompanying footnote:] "*See also, e.g.*, AC ¶¶ 36, 166 (statements from FE-2 about registrations and sales of competing generics in Q2 2022 and 2023 when FE-2 allegedly only worked at FMC through 'early 2022')[.]"<br><br>**Br. 28:** "Other FEs allege 'myriad meetings and calls' in which 'channel inventories, demand, sales forecasts, revenues and other information' were discussed, *see generally* AC ¶¶ 210–220, but similarly do not provide any specifics—or even claim to have attended the meetings themselves. *See Pharmanet*, 720 F. Supp. 2d at 543 (discounting 'second-hand' information about meetings witnesses did not attend); *see also Rahman*, 736 F.3d at 245 (discounting allegations of source with no alleged 'way of knowing what was discussed in [] closed-door meetings')." (citing paragraphs discussing FE-2 statements).<br><br>**Br. 29 n.29:** "[T]he FEs' basis for this knowledge [that certain FMC employees were fired in retaliation for raising issues regarding customer demand and inventory] is not alleged; they do not claim personal involvement in the terminations. *See* [AC] ¶¶ . . . 207. Allegations that amount to repetition of secondhand rumor and conjecture should be discounted. *See Intelligroup*, 527 F. Supp. 2d at 361 (rejecting statements of witness 'who was not providing firsthand information')." (citing paragraph discussing FE-2 statements). |
| FE-3 | ¶37: "FE-3 worked for FMC for over four years, through mid-2022, as a member of the Demand Planning team for FMC's Europe, Middle East and Africa or EMEA | **Br. 12:** "[T]he anonymous FE statements are vague as to the date or even general time period discussed, instead alleging broadly that overbuying . . . was 'always a problem for FMC in the 2020-2022 period,' id. ¶ 126 (FE-3)." |

| FE | Complete Complaint Paragraph Introducing FE | Motion to Dismiss Arguments Concerning Each FE [1] |
|---|---|---|
| | business. His team's primary responsibilities included analyzing supply chain, sales and demand trends, including inventory, with respect to FMC's products in the EMEA market. To accomplish this, FE-3's team worked closely with FMC counterparts in Marketing, Sales, Finance and corporate leadership. FE- 3's team reported to the heads of FMC's European business, Marc Hullebroeck and Sebastian Pons, who, in turn, reported to FMC's CEO, Defendant Douglas." | **Br. 13:** "Some FEs discuss customer returns in 2021 (pre-Class Period), seemingly attempting to allege that the returns indicated that customers had too much product—but offer no context for the volume of returns relative to prior periods or any basis for the apparent assumption that customers returned product only when they had too much.  AC ¶¶ []134." (citing paragraph discussing FE-3 statements).<br><br>**Br. 17:** "[T]hese alleged statements [that generic competitors in key FMC markets including China, India, and others were already directly competing with FMC for market share and causing FMC to lower prices] establish nothing more than what FMC had already disclosed.  *See* [AC] ¶¶ 158, 160, 163, 164 (FE statements regarding products 'coming off patents,' patents 'expiring,' and concerns regarding 'pending expirations') 159–163 [] (FE statements regarding increased 'generic competitors,' sales of 'competing generic products,' lower-priced generic products, and concerns with illegal competition)."  (citing paragraphs discussing FE-3 statements).<br><br>**Br. 28:** "Other FEs allege 'myriad meetings and calls' in which 'channel inventories, demand, sales forecasts, revenues and other information' were discussed, *see generally* AC ¶¶ 210–220, but similarly do not provide any specifics—or even claim to have attended the meetings themselves.  *See Pharmanet*, 720 F. Supp. 2d at 543 (discounting 'second-hand' information about meetings witnesses did not attend); *see also Rahman*, 736 F.3d at 245 (discounting allegations of source with no alleged 'way of knowing what was discussed in [] closed-door meetings')." (citing paragraphs discussing FE-3 statements). |
| FE-4 | ¶38: "FE-4 worked for FMC for over twenty years, through mid-2022. From late 2020 through the end of his tenure, FE-4 was involved in FMC's Product Engineering and Precision Agriculture Group, reporting to Group head Sarah Sterling. Sterling reported, in turn, to FMC Executive Vice President and Chief Marketing Officer, Brian Angeli. FE-4's primary responsibilities included expanding the use of mechanical application technologies used with FMC's products by farmers in the U.S. and FMC's other regional markets." | **Br. 12:** "[T]he anonymous FE statements are vague as to the date or even general time period discussed, instead alleging broadly that overbuying 'started in approximately 2020 and lasted until 2022,' AC ¶ 125 (FE-5), or was 'always a problem for FMC in the 2020-2022 period,' *id*. ¶ 126 (FE-3).  *See also id*. ¶¶ 118, 122, 124 (similar allegations from FE-6, FE-4, and FE-10)."<br><br>**Br. 12:** "Instead, nearly all generally allege that orders for 'FMC products' (or some variation thereof) from various broad categories of direct or indirect purchasers—'distributors,' 'retailers and farmers,' 'customers'—were 'high' or 'excessive.'  *See, e.g.*, AC ¶ 143[.]"<br><br>**Br. 13:** "Still others report walking into warehouses where 'pallets of inventory' were stacked 'higher than usual,' [AC] ¶¶ 143 [], but offer no detail from which to infer the timing, extent or import of any such occurrences." (citing paragraph discussing FE-4 statements)<br><br>**Br. 14:** "Similarly, the Complaint relies on FE-4 for the notion that COVID-era purchasing was excessive, see, e.g., AC ¶ 122, but FE-4 was an engineer, not in sales or sales forecasting, id. ¶ 38." |

| FE | Complete Complaint Paragraph Introducing FE | Motion to Dismiss Arguments Concerning Each FE [1] |
|---|---|---|
| | | **Br. 14:** "[N]umerous FE allegations relay subjective, hindsight opinions.  For example, . . .  FE-4 claims a drop in demand was 'imminent" in spring 2022, [AC]. ¶ 122 . . . .  Absent any particularized factual explanation for why these FEs held these views—and there is none—these personal speculative opinions "add nothing."  *See, e.g.*, Intelligroup, 527 F. Supp. 2d at 360." <br><br> **Br. 18:** "Other allegations merely relay the FEs' subjective opinions, but offer no particularized facts to support those personal viewpoints.  *See, e.g.*, AC ¶ 164 (statement from FE-4 that it was 'kind of a long shot' for FMC to be 'banking a lot on the protection of the process patents') . . . ." <br><br> **Br. 17:** "[T]hese alleged statements [that generic competitors in key FMC markets including China, India, and others were already directly competing with FMC for market share and causing FMC to lower prices] establish nothing more than what FMC had already disclosed.  *See* [AC] ¶¶ 158, 160, 163, 164 (FE statements regarding products 'coming off patents,' patents 'expiring,' and concerns regarding 'pending expirations') . . . ."  (citing paragraphs discussing FE-4 statements). <br><br> **Br. 18:** "Still others involve broad, vague statements not grounded in any facts, *see, e.g.*, [AC] ¶ 164 (mentioning 'concerns over process patents' without explaining what that means or how it conflicts with any public statement by FMC), rendering such allegations '[in]sufficiently precise' to be credited, *Am. Bus. Fin. Servs.*, 413 F. Supp. 2d at 390." <br><br> **Br. 27-28**: "Only FE-4 and FE-16 claim to have attended 'All Hands' or 'Town Hall' meetings also attended by the Individual Defendants, [AC] ¶¶ 211, 217, but they do not allege when those meetings took place, what specifically was said, and how (if at all) it supposedly conflicted with public statements.  This is insufficient.  *See Intelligroup*, 527 F. Supp. 2d at 358–59 (requiring FEs to provide 'dates on which the relevant information was acquired' and 'detailed descriptions of the alleged events')." <br><br> **Br. 28:** "Other FEs allege 'myriad meetings and calls' in which 'channel inventories, demand, sales forecasts, revenues and other information' were discussed, *see generally* AC ¶¶ 210–220, but similarly do not provide any specifics—or even claim to have attended the meetings themselves.  *See Pharmanet*, 720 F. Supp. 2d at 543 (discounting 'second-hand' information about meetings witnesses did not attend); *see also Rahman*, 736 F.3d at 245 (discounting allegations of source with no alleged 'way of knowing what was discussed in [] closed-door meetings')."  (citing paragraphs discussing FE-4 statements). <br><br> **Br. 28-29:** "[FEs'] conclusory statements that ['everyone knew' about the alleged problems, AC ¶ 122,] are 'undisputedly insufficient' to support scienter.  *See, e.g.*, *Chubb*, 394 F.3d at 155; |

4

| FE | Complete Complaint Paragraph Introducing FE | Motion to Dismiss Arguments Concerning Each FE [1] |
|---|---|---|
| | | *Universal Health Servs.*, 396 F. Supp. 3d at 471 (similar)." (citing paragraph discussing FE-4 statements). |
| FE-5 | ¶39: "FE-5 worked at FMC from late 2022 through early 2024 in FMC's corporate headquarters in Philadelphia, PA, as a member of the Integrated Accounts team for the North America region, including both the U.S. and Canada. His team's primary responsibilities included handling order management for FMC's North American distributor clients, and the processing and fulfilment of client orders. There were nine account specialists and a manager on FE-5's team. FE- 5's team reported to FMC's Director of Revenue Operations Matthew Hancock, who, in turn reported to FMC's North America President, Darren Dillenbeck." | **Br. 12:** "[T]he anonymous FE statements are vague as to the date or even general time period discussed, instead alleging broadly that overbuying 'started in approximately 2020 and lasted until 2022,' AC ¶ 125 (FE-5) . . . ." (citing paragraph discussing FE-5 statements).<br><br>**Br. 12:** "Instead, nearly all generally allege that orders for 'FMC products' (or some variation thereof) from various broad categories of direct or indirect purchasers—'distributors,' 'retailers and farmers,' 'customers'—were 'high' or 'excessive.' . . . *e.g.*, *id*. ¶ 125 (alleging that FMC's customers 'ordered too much product' and had 'stocked up on product')." (citing paragraph discussing FE-5 statements).<br><br>**Br. 28-29:** "[FEs'] conclusory statements that ['everyone knew' about the alleged problems, AC ¶ 125,] are 'undisputedly insufficient' to support scienter. *See, e.g.*, *Chubb*, 394 F.3d at 155; *Universal Health Servs.*, 396 F. Supp. 3d at 471 (similar)." (citing paragraph discussing FE-5 statements). |
| FE-6 | ¶40: "FE-6 worked for FMC for over twelve years, through mid-2022. For more than five years, and through the time of his departure in 2022, FE-6 was a Manager in FMC's Pakistan business operations. FE-6 had various responsibilities, including procurement, product warehousing, and supplying FMC product dealers in Pakistan. FE-6 reported to a Director, Dinesh Diaz, who reported to Sanjeev Kumar, Regional Supervisor and Supply Chain Director." | **Br. 10:** "At most, Plaintiffs rely on vague FE statements, *see, e.g.*, AC ¶ 136, that are entirely insufficient." (citing paragraph discussing FE-6 statements).<br><br>**Br. 12:** "[T]he anonymous FE statements are vague as to the date or even general time period discussed, instead alleging broadly that overbuying 'started in approximately 2020 and lasted until 2022,' AC ¶ 125 (FE-5), or was 'always a problem for FMC in the 2020-2022 period,' *id*. ¶ 126 (FE-3). *See also id*. ¶¶ 118, 122, 124 (similar allegations from FE-6, FE-4, and FE-10)."<br><br>**Br. 13:** "Yet other FEs claim sales were booked for later delivery or later payment, but again fail to allege the extent of any such incidents, whether that was inconsistent with prior periods or uncommon in the industry, or how it evidences customer oversupply. [AC] ¶ 119." (citing paragraph discussing FE-6 statements)<br><br>**Br. 13-14:** "[M]any centrally featured FEs offer views on subjects about which they have no alleged basis to know. For example, the Complaint cites statements from FE-6, a manager based in the relatively small market of Pakistan, claiming that it was 'apparent . . . during COVID that the downstream channels were becoming overstocked,' [AC] ¶ 119, that he 'kn[ew] that this issue . . . was occurring in various FMC regions, not just Pakistan,' *id*. ¶ 186, and that he told 'many people' that a drop-off was coming, *id*. ¶ 121. *See also id*. ¶ 118, 136. But the Complaint |

| FE | Complete Complaint Paragraph Introducing FE | Motion to Dismiss Arguments Concerning Each FE [1] |
|---|---|---|
| | | does not identify how FE-6 acquired this knowledge (and about what 'regions') or who was supposedly told.  Such statements should not be credited.  *See, e.g., In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 574–75 (E.D. Pa. 2009) (rejecting confidential witness statements where witness was unlikely to be aware of information at issue)."<br><br>**Br. 14:** "[N]umerous FE allegations relay subjective, hindsight opinions.  For example, . . . FE-6 asserts that, in 2020, 'he expected sales numbers to drop dramatically' in subsequent years, [AC] ¶ 121.  Absent any particularized factual explanation for why these FEs held these views—and there is none—these personal speculative opinions "add nothing."  *See, e.g.*, Intelligroup, 527 F. Supp. 2d at 360."<br><br>**Br. 28:** "Other FEs allege 'myriad meetings and calls' in which 'channel inventories, demand, sales forecasts, revenues and other information' were discussed, *see generally* AC ¶¶ 210–220, but similarly do not provide any specifics—or even claim to have attended the meetings themselves.  *See Pharmanet*, 720 F. Supp. 2d at 543 (discounting 'second-hand' information about meetings witnesses did not attend); *see also Rahman*, 736 F.3d at 245 (discounting allegations of source with no alleged 'way of knowing what was discussed in [] closed-door meetings')."  (citing paragraphs discussing FE-6 statements)<br><br>**Br. 28-29:** "[FEs'] conclusory statements that ['everyone knew' about the alleged problems, AC ¶ 121,] are 'undisputedly insufficient' to support scienter.  *See, e.g., Chubb*, 394 F.3d at 155; *Universal Health Servs.*, 396 F. Supp. 3d at 471 (similar)."  (citing paragraph discussing FE-6 statements) |
| FE-7 | **¶41**: "FE-7 worked at FMC in a manager-level position in the Finance and Supply Chain Group for the Southwest Asia business for over ten years, through early 2022. His primary responsibilities in this role were to monitor and manage the finance-related operations of FMC's business in Southwest Asia. FE-7 had over a dozen people reporting to him in this position, and his reporting managers included Sujit Mukherjee, FMC's Director of Asia Finance, in Singapore. Mukherjee, in turn, reported to FMC's CFO, Defendant Sandifer." | **Br. 14 n.4:** "[T]hree of the FEs on whom Plaintiffs principally rely for this theory [that FMC encouraged salespeople to sell, and customers to accept, unwanted product]—FE-2, FE-7, and FE-17—did not even work at FMC during the alleged Class Period.  [AC] ¶¶ 38, 41, 51."<br><br>**Br. 17:** "[T]hese alleged statements [that generic competitors in key FMC markets including China, India, and others were already directly competing with FMC for market share and causing FMC to lower prices] establish nothing more than what FMC had already disclosed.  *See* [AC] ¶¶ . . . 159–163 [] (FE statements regarding increased 'generic competitors,' sales of 'competing generic products,' lower-priced generic products, and concerns with illegal competition)."  (citing paragraphs discussing FE-7 statements).<br><br>**Br. 18 & n.8:** "Still others involve broad, vague statements not grounded in any facts . . . , rendering such allegations '[in]sufficiently precise' to be credited, *Am. Bus. Fin. Servs.*, 413 F. Supp. 2d at 390."  [Accompanying footnote:] "*See also, e.g.*, [AC] ¶ 159 (claiming 'FMC's China business had been reduced by as much as 50% by generics' but failing to explain the basis for |

| FE | Complete Complaint Paragraph Introducing FE | Motion to Dismiss Arguments Concerning Each FE [1] |
|---|---|---|
| | | the 50% figure or what it means for 'business' to have been 'reduced') . . . ." (citing paragraph discussing FE-7 statements). <br><br> **Br. 28:** "Other FEs allege 'myriad meetings and calls' in which 'channel inventories, demand, sales forecasts, revenues and other information' were discussed, *see generally* AC ¶¶ 210–220, but similarly do not provide any specifics—or even claim to have attended the meetings themselves. *See Pharmanet*, 720 F. Supp. 2d at 543 (discounting 'second-hand' information about meetings witnesses did not attend); *see also Rahman*, 736 F.3d at 245 (discounting allegations of source with no alleged 'way of knowing what was discussed in [] closed-door meetings')." (citing paragraphs discussing FE-7 statements). <br><br> **Br. 29 n.29:** "[T]he FEs' basis for this knowledge [that certain FMC employees were fired in retaliation for raising issues regarding customer demand and inventory] is not alleged; they do not claim personal involvement in the terminations. *See* [AC] ¶¶ 141 . . . . Allegations that amount to repetition of secondhand rumor and conjecture should be discounted. *See Intelligroup*, 527 F. Supp. 2d at 361 (rejecting statements of witness 'who was not providing firsthand information')." (citing paragraph discussing FE-7 statements). |
| FE-8 | **¶42:** "FE-8 worked at FMC for over three years through early 2022 as a member of FMC's Enterprise Governance and Continuous Improvement Group and in Business Process Management, at the corporate headquarters in Philadelphia, PA. His team's primary responsibilities involved implementing an SAP program—an 'end-to-end' business resource planning system that houses comprehensive data on all facets of FMC's overall business, from raw goods to invoicing customers—including product sales, pricing, inventory and forecasting, | **Br. 26-27**: "[A]llegations [about the Individual Defendants' supposed access to information] are too vague and conclusory to satisfy Plaintiffs' heightened pleading burden and/or cannot be credited because Plaintiffs plead no basis to infer that the FE had reason to know the information alleged or that any such information was known to either Individual Defendant."[2] |

---

[2] The referenced pages of the Motion argued that Plaintiffs' allegations that "the Individual Defendants' supposed 'access to information' reflecting demand and inventory levels" are insufficient to plead scienter. Although these pages do not cite specific paragraphs containing allegations from FE-8, FE-8's only statements related to the functioning of FMC's internal data systems. *See* AC ¶¶ 68-70.

| FE | Complete Complaint Paragraph Introducing FE | Motion to Dismiss Arguments Concerning Each FE [1] |
|---|---|---|
| | which was fully operational at FMC in all of its global regions in 2020." | |
| FE-9 | ¶43: FE-9 worked at FMC as a Regional Business Manager ('RBM') in the Midwest U.S. for over seven years, through mid-2024. His primary responsibilities involved working with FMC sales managers, and distributors, and retailers, to facilitate sales of FMC products from FMC to the distributors, and from the distributors to the retailers (who sold agricultural chemical products to end-users). FE-9 also had responsibilities for communicating to FMC managers about market, sales, and forecasting numbers. Pursuant to FMC's standard structure, along with around a half dozen other RBMs, FE-9 reported to FMC Regional Director Randy Young, who reported to FMC's Director of Sales for North America, who, in turn, reported to FMC's CEO, Defendant Douglas." | **Br. 14:** "[N]umerous FE allegations relay subjective, hindsight opinions. For example, FE-9 opines that ordering was 'unnatural' during the pandemic, [AC] ¶ 129 . . . . Absent any particularized factual explanation for why these FEs held these views—and there is none—these personal speculative opinions 'add nothing.' *See, e.g., Intelligroup*, 527 F. Supp. 2d at 360."<br><br>**Br. 18 & n.8:** "Still others involve broad, vague statements not grounded in any facts . . . , rendering such allegations '[in]sufficiently precise' to be credited, *Am. Bus. Fin. Servs.*, 413 F. Supp. 2d at 390." [Accompanying footnote:] "*See also, e.g.*, . . . [AC] ¶¶ 43, 165 (claiming "the market was obliterated" when the generic versions of "FMC's Hero product became available" but not explaining when the generic became available, what "obliterated" means, or which "market" is referenced)." (citing paragraphs discussing FE-9 statements).<br><br>**Br. 28:** "Other FEs allege 'myriad meetings and calls' in which 'channel inventories, demand, sales forecasts, revenues and other information' were discussed, *see generally* AC ¶¶ 210–220, but similarly do not provide any specifics—or even claim to have attended the meetings themselves. *See Pharmanet*, 720 F. Supp. 2d at 543 (discounting 'second-hand' information about meetings witnesses did not attend); *see also Rahman*, 736 F.3d at 245 (discounting allegations of source with no alleged 'way of knowing what was discussed in [] closed-door meetings')." (citing paragraphs discussing FE-9 statements). |
| FE-10 | ¶44: "FE-10 worked at FMC as a Retail Market Manager ('RMM') in the Midwest U.S. for over twenty years, through early 2024. His main responsibilities involved working with distributors to facilitate their purchases of FMC products, and also working with retailers and other FMC retail personnel to facilitate retailers' purchases of FMC products from distributors. FE-10 reported to RBM, Brian Laverentz. Laverentz reported to Randy Young, who had roughly six RBMs who reported to him. Young reported to FMC's | **Br. 12:** "the anonymous FE statements are vague as to the date or even general time period discussed, instead alleging broadly that overbuying 'started in approximately 2020 and lasted until 2022,' AC ¶ 125 (FE-5), or was 'always a problem for FMC in the 2020-2022 period,' *id*. ¶ 126 (FE-3). *See also id*. ¶¶ 118, 122, 124 (similar allegations from FE-6, FE-4, and FE-10)."<br><br>**Br. 17:** "[T]hese alleged statements [that generic competitors in key FMC markets including China, India, and others were already directly competing with FMC for market share and causing FMC to lower prices] establish nothing more than what FMC had already disclosed. *See* [AC] ¶¶ . . . 159–163 [] (FE statements regarding increased 'generic competitors,' sales of 'competing generic products,' lower-priced generic products, and concerns with illegal competition)." (citing paragraphs discussing FE-10 statements).<br><br>**Br. 21:** "[T]heory [that industry consolidation among retailers and distributors in North America was squeezing revenues] is based entirely on statements by FE-10, a Midwest-based retail |

| FE | Complete Complaint Paragraph Introducing FE | Motion to Dismiss Arguments Concerning Each FE [1] |
|---|---|---|
| | national sales and marketing Director, Julio Negreli." | manager, multiple reporting levels removed from management.  [AC] ¶¶ 44, 170–172.  His anecdotal statements offer no insight into the overall effects of consolidation." |
| FE-11 | ¶45: "FE-11 worked at FMC from early 2020 through the first quarter of 2023 as a Retail Sales Manager in the Midwest U.S. FE-11's primary responsibilities were facilitating sales of FMC's products to retail customers from FMC's distribution partners, and dealing with FMC client issues or complaints. When working with retailers, FE-11's objective was to make sure retailers had sufficient supplies of FMC products, including Diamides, for their current or upcoming season. FE-11 reported to two RBMs, both of whom reported to Manager for the Midwest U.S. region, Randy Young." | Br. 28: "Other FEs allege 'myriad meetings and calls' in which 'channel inventories, demand, sales forecasts, revenues and other information' were discussed, *see generally* AC ¶¶ 210–220, but similarly do not provide any specifics—or even claim to have attended the meetings themselves.  *See Pharmanet*, 720 F. Supp. 2d at 543 (discounting 'second-hand' information about meetings witnesses did not attend); *see also Rahman*, 736 F.3d at 245 (discounting allegations of source with no alleged 'way of knowing what was discussed in [] closed-door meetings')." (citing paragraphs discussing FE-11 statements). |
| FE-12 | ¶46: "FE-12 worked at FMC from 2019 through late 2022 as a Global Research and Development ('R&D') Scientist, first in FMC's R&D Group based in Delaware, and then, starting in 2022, as a member of FMC's Operations Group in Philadelphia, PA. FE-12's primary responsibilities included working on process engineering and related patents for FMC products, including some concerning Diamides products. While in FMC's Operations Group, FE-12 reported to Connie White, the Company's Capital and Disciplined Engineering Director." | Br. 17: "[T]hese alleged statements [that generic competitors in key FMC markets including China, India, and others were already directly competing with FMC for market share and causing FMC to lower prices] establish nothing more than what FMC had already disclosed.  *See* [AC] ¶¶ 158, 160, 163, 164 (FE statements regarding products 'coming off patents,' patents 'expiring,' and concerns regarding 'pending expirations'), *id.* ¶¶ 159–163 [] (FE statements regarding increased 'generic competitors,' sales of 'competing generic products,' lower-priced generic products, and concerns with illegal competition)." (citing paragraphs discussing FE-12 statements).<br><br>Br. 17 & n.7: "To the extent the FEs attempt to go beyond merely confirming what was already disclosed regarding generic competition and patent protection, the allegations generally concern information the FE has no alleged or plausible basis to know."  [Accompanying footnote:] "*See also, e.g.*, . . . [AC] ¶¶ 46, 162 (statements from FE-12 regarding 'pending expirations' in 'various foreign jurisdictions,' concerns about 'illegal' competition in 'foreign countries,' and how 'the strength of a process patent depends on the country' but failing to allege how FE-12, a U.S.-based scientist for FMC, is qualified to opine on patent law in a wide array of countries)." |

| FE | Complete Complaint Paragraph Introducing FE | Motion to Dismiss Arguments Concerning Each FE [1] |
|---|---|---|
| | | **Br. 18**: "Other allegations merely relay the FEs' subjective opinions, but offer no particularized facts to support those personal viewpoints. *See, e.g.*, AC . . . ¶ 163 (statement from FE-12 that 'any claim that FMC has a strong patent portfolio all over the world is 'overstated'')." |
| FE-13 | **¶47:** "FE-13 worked at FMC for over thirty years, through mid-2022. He worked in both the product Development and Regulatory groups of FMC's business in a Southwest Asian country, working the last several years of his tenure as a Manager in the Regulatory Department. FE-13's primary duties involved product registration and distribution. FE-13 reported to FMC's Country head, who, in turn, reported to the Director, or head, of FMC's APAC business." | **Br. 17:** "[T]hese alleged statements [that generic competitors in key FMC markets including China, India, and others were already directly competing with FMC for market share and causing FMC to lower prices] establish nothing more than what FMC had already disclosed. *See* [AC] ¶¶ . . . 165–168 (FE statements regarding increased 'generic competitors,' sales of 'competing generic products,' lower-priced generic products, and concerns with illegal competition)." (citing paragraphs discussing FE-13 statements). |
| FE-14 | **¶48:** "FE-14 worked at FMC as a National Sales Manager in FMC's Southwest Asia business, for over eight years, through early 2023. His responsibilities involved working with FMC's Country Manager and sales representatives as well as distributors, dealers and farmers, to facilitate sales of FMC products. FE-14 reported to Pramod Thota and the Country Head." | **Br. 17:** "[T]hese alleged statements [that generic competitors in key FMC markets including China, India, and others were already directly competing with FMC for market share and causing FMC to lower prices] establish nothing more than what FMC had already disclosed. *See* [AC] ¶¶ . . . 165–168 (FE statements regarding increased 'generic competitors,' sales of 'competing generic products,' lower-priced generic products, and concerns with illegal competition)." (citing paragraphs discussing FE-14 statements). |
| FE-15 | **¶49:** "FE-15 worked at FMC as a Market Professional in FMC's U.S. territory from early 2022 through the second quarter of 2023. His primary responsibilities involved moving FMC products to the consumption point through, among other things, interactions with distributors and retailers." | **Br. 13:** "Still others report walking into warehouses where 'pallets of inventory' were stacked 'higher than usual,' [AC] ¶¶ [] 145, but offer no detail from which to infer the timing, extent or import of any such occurrences." (citing paragraph discussing FE-15 statements). |
| FE-16 | **¶50:** "FE-16 worked at FMC as an Analyst in the Financial Planning and Analysis | **Br. 27-28:** "Only FE-4 and FE-16 claim to have attended 'All Hands' or 'Town Hall' meetings also attended by the Individual Defendants, [AC] ¶¶ 211, 217, but they do not allege when those |

| FE | Complete Complaint Paragraph Introducing FE | Motion to Dismiss Arguments Concerning Each FE [1] |
|---|---|---|
|  | ('FP&A') Group in the Philadelphia, PA corporate headquarters from the second quarter of 2023 through the first quarter of 2024. His primary responsibilities involved financing matters related to the operations of third-party manufacturers or 'tollers' used by FMC to make its products." | meetings took place, what specifically was said, and how (if at all) it supposedly conflicted with public statements.  This is insufficient.  *See Intelligroup*, 527 F. Supp. 2d at 358–59 (requiring FEs to provide 'dates on which the relevant information was acquired' and 'detailed descriptions of the alleged events')."<br><br>**Br. 28:** "Other FEs allege 'myriad meetings and calls' in which 'channel inventories, demand, sales forecasts, revenues and other information' were discussed, *see generally* AC ¶¶ 210–220, but similarly do not provide any specifics—or even claim to have attended the meetings themselves.  *See Pharmanet*, 720 F. Supp. 2d at 543 (discounting 'second-hand' information about meetings witnesses did not attend); *see also Rahman*, 736 F.3d at 245 (discounting allegations of source with no alleged 'way of knowing what was discussed in [] closed-door meetings')." (citing paragraphs discussing FE-16 statements). |
| FE-17 | **¶51:** "FE-17 worked at FMC in the area of FP&A within the Treasury Group at corporate headquarters in Philadelphia, PA, for over six years, through the fourth quarter of 2021. FE-17's primary responsibilities involved addressing issues of working capital and material requirements and planning. He reported to corporate VP Robert Blair, who reported to FMC CFO Defendant Sandifer." | **Br. 13:** "Other FEs contradict each other in terms of when FMC's demand purportedly began to fall.  *Compare, e.g., id.* ¶ 132 (FE-17 claiming 'worldwide demand' was down 'in 2021'), *with id.* ¶ 117 (FE-1 claiming 'excess[ive]' orders of 'huge volumes' into 2022)."<br><br>**Br. 14 n.4**: "[T]hree of the FEs on whom Plaintiffs principally rely for this theory [that FMC encouraged salespeople to sell, and customers to accept, unwanted product]—FE-2, FE-7, and FE-17—did not even work at FMC during the alleged Class Period.  [AC] ¶¶ 38, 41, 51."<br><br>**Br. 27 n.27:** "FE-17 alleges discussions with Mr. Sandifer and others 'in 2020 to 2021' regarding efforts to increase cash flow.  AC ¶ 177.  But these vaguely described conversations predate the putative Class Period, and Plaintiffs provide no explanation of how such efforts rendered any Class Period statement false or misleading." |
| FE-18 | **¶52:** "FE-18 worked at FMC as a senior scientist in the Company's R&D facility in Stein Haskell, Delaware for over four years, through mid-2023. FE-18's primary responsibilities involved scientific review of FMC's products in connection with regulatory review. He reported to James Styr." | **Br. 14:** "FE-18—a research scientist—faults FMC for 'resisting lowering prices' when 'inventory that was overbought during COVID was stockpiling over a lack of demand,' [AC] ¶ 128.  But Plaintiffs do not explain how a research scientist came to have insight into real-time inventory management and pricing, much less why he would be qualified to opine about it."<br><br>**Br. 28:** "Other FEs allege 'myriad meetings and calls' in which 'channel inventories, demand, sales forecasts, revenues and other information' were discussed, *see generally* AC ¶¶ 210–220, but similarly do not provide any specifics—or even claim to have attended the meetings themselves.  *See Pharmanet*, 720 F. Supp. 2d at 543 (discounting 'second-hand' information about meetings witnesses did not attend); *see also Rahman*, 736 F.3d at 245 (discounting allegations of source with no alleged 'way of knowing what was discussed in [] closed-door meetings')." (citing paragraphs discussing FE-4 statements) |

11

| FE | Complete Complaint Paragraph Introducing FE | Motion to Dismiss Arguments Concerning Each FE [1] |
|---|---|---|
| FE-19 | **¶53:** "FE-19 worked at FMC for over five years, through mid-2023, as a member of the Finance Team and Demand Team for the EMEA region. His Demand Team's primary responsibilities included managing financial matters in FMC's businesses in Southwest Europe (including France, Spain, Italy, Belgium, the Netherlands and other countries), and working with FMC's Product, Manufacturing, Marketing and sub-regional business leaders to track and fulfil demand for FMC products across the entire EMEA region. His Demand Team included seven subregional EMEA demand planners (e.g., in Africa and Europe)." | **Br. 29 n.29:** "[T]he FEs' basis for this knowledge [that certain FMC employees were fired in retaliation for raising issues regarding customer demand and inventory] is not alleged; they do not claim personal involvement in the terminations.  *See* [AC] ¶¶ . . . 181 . . . .  Allegations that amount to repetition of secondhand rumor and conjecture should be discounted.  *See Intelligroup*, 527 F. Supp. 2d at 361 (rejecting statements of witness 'who was not providing firsthand information')."  (citing paragraph discussing FE-19 statements) |

12